## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TOWER HEALTH, f/k/a READING HEALTH SYSTEM, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>CHS/COMMUNITY HEALTH SYSTEMS, INC., *et al.*,<br><br>　　　　Defendants. | :<br>:<br>:　No. 5:19-cv-02782-EGS<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE DEFENDANTS' PROPOSED EXPERT TESTIMONY AT TRIAL

### I.　INTRODUCTION

The requirements of admissible expert testimony under Rule 702 are well settled: (1) the expert must be sufficiently qualified, (2) the expert's opinion must be reliable, and (3) the expert's opinion must address the facts at issue in the case. Here, four of the experts designated by Defendants ("**CHS**") fall short of satisfying these requirements, and the Court should grant Plaintiffs' motion to exclude these four experts from presenting expert opinion testimony at trial.

As summarized below, the deficiencies in the four experts' opinions are not minor issues that can be addressed through cross examination. Instead, they are systemic flaws that wholly undercut any probative value in their opinions.

Hubert Worrell. CHS designated Hubert Worrell to respond to the remediation recommendations of Plaintiffs' ("**Tower Health**") expert Jensen Hughes concerning the sprayed fire resistive material ("**SFRM**") at Pottstown Hospital. Unfortunately for CHS, Mr. Worrell lacks the relevant experience necessary to present opinion as to the method of remediation required; in fact, he ***admitted*** during his deposition that his experience is limited to physically

applying SFRM based on the recommendations of others, ***not analyzing how to remediate the issue***.  In contrast to the engineers at Jensen Hughes, Mr. Worrell does not have a specialized degree in fire protection engineering, and instead did not complete his college history / philosophy degree.  Additionally, Mr. Worrell's opinions are not sufficiently reliable.  He presents purely speculative opinions and does not utilize a scientifically-recognized methodology.  Because he does not have the relevant qualifications and presents a wholly speculative theory of remediation lacking any foundation, his opinion is irrelevant.

Craig Hofmeister.  CHS designated Mr. Hofmeister as both an affirmative expert and a rebuttal expert to address Pottstown Hospital's compliance with NFPA 101, 2012 edition.  In rendering his opinions, however, Mr. Hofmeister makes broad conclusions while ignoring the actual facts developed in discovery in this case.  He also relies on a "temporary interim amendment" to the 2013 edition of NFPA 101A—that another CHS expert proposed to the NFPA ***three years after Tower Health purchased Pottstown Hospital on October 1, 2017***.  Moreover, and perhaps even more fatal to his conclusions, this proposed amendment ***has not been adopted by CMS, the Pennsylvania Department of Health (the "DOH"), or the Joint Commission*** and is, therefore, irrelevant to whether compliance can be achieved.  As a result, his "opinion" concerning compliance is nothing more than a hypothetical scenario and in no way helpful to the Court.

John Galassini.  CHS designated Mr. Galassini as a rebuttal expert witness to respond to the opinions of Tower Health's construction expert, Robert Miller.  Here again, Mr. Galassini's opinions fail both the reliability and fit requirements.  Among other things, Mr. Galassini failed to engage an architect to determine whether his conceptual design complied with code requirements and ignored the opinions of Tower Health's architect, notwithstanding his

2

deposition admission that if he were handling this assignment outside of litigation, he would follow an architect's recommendations.  Additionally, his cost estimate is entirely speculative because he relies on his own assumptions and subjective belief, without independently verifying that his opinions would even pass muster by the DOH or local code officials.

        Sean Kruskol.  CHS presented Sean Kruskol purportedly as a rebuttal expert to address the conclusions of Tower Health's financial accounting expert (Paul Pocalyko) that CHS breached its representations and warranties in Section 3.4 of the APA.  In Section 3.4, CHS promised Tower Health that certain historical financial statements of Pottstown Hospital (not the financial statements of any parent or holding company of CHS) were prepared in accordance with GAAP, presented fairly in all material respects the financial condition of the hospital, and that all material liabilities of any nature were disclosed on the schedules to the APA.  Rather than directly address the Pottstown Hospital financial statements or Mr. Pocalyko's opinions, however, Mr. Kruskol instead opined on the preparation of the financial statements of Community Health Systems, Inc. ("**CHSI**"), CHS/Community Health Systems, Inc.'s parent company.  His opinion has no relevance at all to any issues in the case.

        Therefore, as more fully discussed below, the Court should exercise its discretion and preclude these four witnesses from presenting expert testimony at trial.

## II.    FACTUAL BACKGROUND

        This lawsuit involves claims by Tower Health against CHS for its breaches of the parties' asset purchase agreement (the "**APA**") pursuant to which Tower Health bought five hospitals, including Pottstown Hospital.[1]

---

[1] Tower Health incorporates herein the Factual Overview from its motion for partial summary judgment.  [Doc. No. 106].

3

As the Court is aware, a primary issue in this case is that, as of October 1, 2017, Pottstown Hospital was not in compliance with its regulatory requirements, state licensing requirements, and the Medicare/Medicaid conditions of participation, as CHS represented and warranted to Tower Health.  Another key issue in this case involves CHS's breach of its representations and warranties in Section 3.4 of the APA, because Pottstown Hospital's historical financial statements were not prepared in accordance with GAAP and because CHS did not disclose the material contingent liability associated with the extensive remediation work necessary to bring Pottstown Hospital into compliance to Tower Health, as required.

As fully discussed in Tower Health's opposition to CHS's motion to exclude [Doc. No. 148], the parties each designated multiple experts.  Tower Heath produced affirmative expert reports from six experts to address the non-compliance of Pottstown Hospital with the NFPA 101, 2012 life safety requirements (William Koffel and David Major), the methods to remediate the non-compliant conditions (Arthur Parker of Jensen Hughes), and the extensive costs to do so (Robert Miller).  Additionally, Tower Health produced an expert report (Paul Pocalyko) to address CHS's breaches of Section 3.4 of the APA concerning Pottstown Hospital's financial statements and to calculate the damages to Tower Health resulting from CHS's non-disclosures.

Relevant to this motion, CHS presented a rebuttal expert report from Hubert Worrell to respond to the methodologies proposed by Mr. Parker to fix the non-compliant condition of Pottstown Hospital, specifically focusing on the SFRM.  It also presented an affirmative expert report and a rebuttal report from Craig Hofmeister that discussed the compliance of Pottstown Hospital with applicable life safety requirements, including Pottstown Hospital's ability to achieve compliance through an equivalency.  CHS served a rebuttal expert report of John

4

Galassini to respond to Mr. Miller's opinions on the costs of remediation.  And, CHS served a

rebuttal expert report of Sean Kruskol, ostensibly to respond to Mr. Pocalyko's opinions

concerning CHS's breach of Section 3.4 of the APA.

Each of these four experts should be precluded from presenting their opinions at trial

because they fail to satisfy one or more of Rule 702's requirements.

## III.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of this case.

Fed. R. Evid. 702.

The Court acts as a gatekeeper to ensure that expert testimony meets the exacting

requirements of Rule 702.  *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993);

*Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017).  This role is important

even in bench trials, like this one.  *UGI Sunbury LLC v. A Permanent Easement for 1.7575*

*Acres*, 949 F.3d 825, 832 (3d Cir. 2020).  The district court's gatekeeping function extends

beyond scientific testimony to "testimony based on technical and other specialized knowledge."

*ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002)

(quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999)).

5

Guided by *Daubert*, the Court must consider three substantive restrictions before admitting expert testimony: (1) the qualification of the expert; (2) the reliability of the expert's opinion or testimony; and (3) the fit of the expert's opinion or testimony to the facts at issue. *See Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). "Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'" *UGI Sunbury*, 949 F.3d at 832. These restrictions go hand-in-hand with the three duties of a trial judge as the gatekeeper:  the Court must:

> (1) confirm the witness is a qualified expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is "sufficiently tied to the facts of the case," so that it "fits" the dispute and will assist the trier of fact.

*Id.* (citing *Daubert*, 509 U.S. at 591).

Courts have "latitude" to decide "how" to apply these requirements. *See Kumho Tire*, 526 U.S. at 152. However, the Court cannot "'abandon the gatekeeping function' or 'perform the function inadequately. Rather, it is discretion to choose among *reasonable* means of excluding expertise[.]'" *UGI Sunbury*, 949 F.3d at 832. "[T]he failure to conduct any form of 'assessment' of an expert and the proposed testimony before admitting the testimony is an abuse of discretion." *Id.* (quoting *Daubert*, 509 U.S. at 592-93).

"The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." *Checkpoint Sys., Inc.*, 198 F. Supp. 2d at 602 (citing *Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)). Under *Daubert* and Rule 702, "[p]roponents of expert testimony do not have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are *correct*, they only have to

6

demonstrate by a preponderance of evidence that their opinions are reliable." *In re DVI, Inc. Sec. Litig.*, No. 03-5336, 2014 WL 4636301, at \*5 (E.D. Pa. Sept. 16, 2014) (emphasis original) (citing *Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). Thus, *Daubert* "focuses on principles and methodology, not on the conclusions generated by principles and methodology." *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999).

Nevertheless, "trial courts must guard against 'expertise that is *fausse* and science that is junky.'" *UGI Sunbury*, 949 F.3d at 829. The Third Circuit cautions that an expert opinion is properly excluded if "there is simply too great a gap between the data and the opinion proffered." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (quotations omitted). In short, proper expert testimony requires "more than a haphazard, intuitive inquiry" and well more than an expert's *ipse dixit*. *Id.* at 156, 158 (affirming exclusion of experts); *see also Furlan v. Schindler Elevator Corp.*, 864 F. Supp. 2d 291, 298-99 (E.D. Pa. 2012) (granting *Daubert* motion for expert's lack of reliability and failure to set forth a valid methodology); *Pappas v. Sony Electronics, Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000) (excluding expert because "the only evidence in this case to validate Brugger's method is Brugger's own claim that this method is reliable").

### A. Qualifications

First, the trial judge must "confirm the witness is a qualified expert." *UGI Sunbury*, 949 F.3d at 832. Expert qualification "refers to the requirement that the witness possess specialized expertise." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). The Third Circuit has "interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert." *Id.* However, it is not enough for the witness to be generally qualified in certain areas; rather, "Rule 702 requires the witness to have

7

'specialized knowledge' *regarding the area of testimony*."  *See Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 335 (3d Cir. 2002) (emphasis added).

### B.  Reliability

Second, the trial judge must "check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge . . . ."  *UGI Sunbury*, 949 F.3d at 832.  The Third Circuit has "made clear" that "the reliability analysis required by *Daubert* applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012).  "The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."
*Kumho*, 526 U.S. at 152.

To meet the reliability requirement, the "expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *Paoli*, 35 F.3d at 742 ("As long as an expert's scientific testimony rests upon good grounds, based upon what is known, it should be tested by the adversary process . . . .").  The *Daubert* test of reliability is "flexible" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys with respect to its ultimate reliability determination."  *Kumho*, 526 U.S. at 141-42.

Courts often use eight factors to assess an expert's reliability and ensure that the expert's methodology is generally accepted in his field:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of

8

> error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*United States v. Mitchell*, 365 F.3d 215, 235 (3d Cir. 2004). And, "[a]lthough *Daubert* does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than [a] haphazard, intuitive inquiry." *Oddi*, 234 F.3d at 156. Reliability under Rule 702 requires more than an expert's say-so. "[B]efore the gates to the courtroom will be opened in this Circuit, a proposed expert must do more than simply say 'let me in (because I say so).'" *Pappas*, 136 F. Supp. 2d at 422; *see also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 527 (W.D. Pa. 2003) (quoting *In re TMI Litig.*, 193 F.3d at 687) ("Something doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive.").

Additionally, an expert must be "as careful as he would be in his regular professional work outside his paid litigation consulting." *See* Fed. R. Evid. 702, Advisory Committee Notes to 2000 Amendment; *see also Kumho Tire*, 526 U.S. at 152 (the reliability factor "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). Thus, courts routinely grant *Daubert* motions and exclude proffered experts when they fail to establish the methodology followed in the litigation was generally accepted in the field. *See, e.g.*, *Dearson v. Bostrom Seating, Inc.*, 241 F. Supp. 2d 494, 499 (E.D. Pa. 2003) (granting *Daubert* motion; "There is in fact no evidence that Messrs. Davis and Suckey's methods have ever been used before by anyone, in either a judicial or non-judicial setting.").

SL1 1683085v3 006375.01188

## C. Fit

Third, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The trial judge must "ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury*, 949 F.3d at 832.

The requirement of "fit" means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Schneider*, 320 F.3d at 404. "[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for the purposes of the case*." *UGI Sunbury*, 949 F.3d at 832 (citing *Paoli*, 35 F.3d at 743). "This condition goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. Thus, "there is no fit . . . when an expert offers animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans." *Soldo*, 244 F. Supp. 2d at 527 (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

In *UGI Sunbury*, the Court held that proposed expert testimony would not assist the trier of fact and failed the "fit" requirement because the expert's report contained "leaps of logic, elements of subjectivity, and even speculation …" and was "'the beginning of a discussion and not the end.'" 949 F.3d at 835-36. When an expert's opinions are subjective and speculative, they do not assist the trier of fact in understand the evidence or determining the facts. *Id.*; Fed. R. Evid. 702.

10

## IV.    ARGUMENT

The Court should exclude the expert opinions and testimony of Hubert Worrell, Craig

Hofmeister, John Galassini, and Sean Kruskol because they fail to satisfy Rule 702's

requirements of reliable and relevant testimony.

### A.    Hubert Worrell Fails to Meet All Three *Daubert* Requirements.

Mr. Worrell was retained by CHS to analyze the expert opinions and remediation

recommendations of Jensen Hughes set forth in the expert report of Arthur Parker.  In his report,

Mr. Worrell rejects Mr. Parker's opinion that that the existing SFRM in place at Pottstown

Hospital is deficient, or to the extent that it is deficient, that it must be stripped out and wholly

replaced.  [Worrell Report, attached as **Exhibit A**, at 2-4].[2]  Instead, Mr. Worrell recommends

that appropriate remediation can occur through saturating existing SFRM with a bond seal

adhesive and applying additional layers of SFRM over the existing or deficient areas, or by

patching.  [*Id.* at 4-5].  Mr. Worrell provides a proposal containing his opinion regarding the cost

of remediating the fireproofing at Pottstown Hospital.  [*Id.* at 5, 30].

### 1.    Mr. Worrell Lacks the Relevant Qualifications.

Mr. Worrell is a Fireproofing Senior Consultant for Charlie Irwin Painting, LLC, and

purportedly has 30 years of experience completing fireproofing renovation projects.  [CHS

Expert Disclosure, attached as **Exhibit B**].  According to Mr. Worrell, he has over 30 years of

"hands-on fireproofing experience" and has been "involved in many projects that involve

fireproof remediation."  [Ex. A at 1].

However, Mr. Worrell's experience with fireproofing is limited to physically applying

SFRM *based on the specifications and recommendations of architects, engineers, and general*

---

[2] Mr. Worrell's expert report is not paginated.  All references to pagination in this brief are made in the order the pages appear in the report.

*contractors*.  By his own admission, Mr. Worrell does not personally determine the scope or method of the remediation—rather, he follows the recommendations of others because he lacks experience assessing the severity of SFRM deficiencies or developing plans to remediate SFRM deficiencies in accordance with applicable code requirements.

For instance, Mr. Worrell testified under oath that he has never performed testing in accordance with the standards set forth by the American Society for Testing and Materials ("**ASTM**"), the industry-wide guidelines for methodology used while testing SFRM, as Jensen Hughes did in this case in preparing its opinion.  [Worrell Dep. Tr., attached as **Exhibit C**, at 32:19 – 33:22].  Instead, Mr. Worrell's experience lies in physically performing the remediation work determined by experts like Mr. Parker.  Critically, Mr. Worrell *admits* he would need to "work with a general contractor," such as Jensen Hughes, to develop a plan for him to perform whatever remediation was ultimately necessary.  [Ex. A at 4].  Mr. Worrell also testified that he would need to rely extensively on an architect to determine proper testing parameters and the scope of necessary remediation.  [Ex. C at 85:8 – 87:10; *see also id.* at 41:6 – 43:1].

Mr. Worrell also lacks any educational experience related to fire protection engineering or scientific based testing requirements.  Mr. Worrell pursued a degree in History/Philosophy at Vanderbilt University from 1970 to 1974 but did not complete his degree.  [Ex. A at 27; Ex. C at 19:8-11].  Additionally, Mr. Worrell offered his opinions after spending only 40 total hours on this matter between July 2020 and his February 2, 2021 deposition.  [Ex. C at 10:19 – 11:13 ($8,000 at $200 per hour)].

In summary, Mr. Worrell's testimony illustrates that he has no specialized knowledge concerning how to review and analyze a building for fireproofing deficiencies or how to develop a plan to remediate such deficiencies.  Rather, he relies on others, such as Jensen Hughes and

architects, to determine the appropriate plan of remediation.  Here, that was done by an expert

with appropriate qualifications and experience—Jensen Hughes, not Mr. Worrell.  Therefore, as

the focus of his report is Jensen Hughes' own investigation and analysis of Pottstown Hospital,

an area in which Jensen Hughes is undoubtedly experienced and highly knowledgeable, the

Court cannot find Mr. Worrell qualified to render the opinions set forth in his report.  *See*

*Betterbox*, 300 F.3d at 335.  Thus, the Court can preclude Mr. Worrell from testifying at trial on

this basis alone.

### 2.  Mr. Worrell's Opinion Lacks Reliability.

In addition to Mr. Worrell's lack of qualifications to provide expert testimony concerning

the areas discussed in his report, his opinions are purely subjective and speculative.  Mr. Worrell

has provided no legitimate basis for his opinions and fails to substantiate his "methodology."

Mr. Worrell's opinions cannot be considered reliable because they are purely subjective and are

not based on the "methods and procedures of science."  *See Paoli*, 35 F.3d at 742.

First, Mr. Worrell admitted that his process in this matter did not meet the standards he

would utilize in making a recommendation of this type in his regular work outside of litigation.

Part of the Court's gatekeeping function is to "make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the courtroom the

practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152; *Soldo*, 244 F. Supp. 2d

at 527; *Dearson*, 241 F. Supp. 2d at 499 (excluding experts because their methods had never

been used before in a judicial or non-judicial setting); *see also In re TMI Litig.*, 193 F.3d at 703

n.144 ("[I]t is impossible to test a hypothesis generated by a subjective methodology because the

only person capable of testing or falsifying the hypothesis is the creator of the methodology.");

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) (important factor in

13

assessing reliability is "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

When describing the steps he would take in a similar matter outside of the context of being a litigation expert, Mr. Worrell explained that he would begin a project by visiting the site. [Ex. C at 21:13 – 22:13].  Yet Mr. Worrell never conducted a site-visit to Pottstown Hospital. [*Id.* at 43:3-5, 45:4-15 (testifying when he asked whether he could visit the facility, CHS said "at this time it wasn't important.")].  Mr. Worrell testified under oath that he had never issued a remediation proposal to a client without first visiting the facility.  [*Id.* at 44:25 – 45:3].  Neither Mr. Worrell nor CHS has established that a proper fireproofing remediation analysis can be performed without an on-site inspection of the facility.

Second, Mr. Worrell testified that he relied on testing conducted by Jensen Hughes in forming his opinions.  Mr. Worrell did so despite not being present for any of these tests and not conducting a single test at the facility.  [*Id.* at 43:3 – 44:24, 63:24 – 65:18 (testifying he did not know how Jensen Hughes selected the spots to test and that he had no reason to believe Jensen Hughes did not follow generally accepted testing parameters and procedures when Jensen Hughes performed its bond strength testing].  In *Dearson v. Bostrom Seating, Inc.*, another court in this District found that the proffered experts were not reliable when they were not present for part or all of the testing which their testimony relies.  241 F. Supp. 2d at 498-99.

Third, Mr. Worrell's techniques ignore the very methods utilized by Mr. Parker, which have been established to be reliable.  For instance, many of Mr. Worrell's criticisms of Mr. Parker's report and his own proposed remediation are based on directions provided by the supposed manufacturer of the existing SFRM, Isolatek.  [Ex. A at 2–4].  However, Mr. Worrell

14

fails to provide any reasoning why this method is preferred over the remediation recommendations in Mr. Parker's report.  In fact, Mr. Worrell testified under oath that he is not certain his plan to fix the SFRM would result in a UL Design-sanctioned fireproofing assembly, which is necessary to achieve the required hourly fire resistive rating.  [Ex. C at 48:9 – 55:22]. In selecting his own method, Mr. Worrell ignores the industry established standards applied by Mr. Parker.

Next, Mr. Worrell's opinions are wrought with subjectivity and speculation and lack any scientific basis.  Mr. Worrell testified that he did not know how well his remediation would work "until you sprayed the BOND-SEAL and then do the testing to see if it works . . . ."  [*Id.* at 47:6-11; *see also id.* at 48:1-8 (agreeing he "can't have any confidence in the degree of adhesion, without going to Pottstown, on the primed steel")].  In other words, Mr. Worrell's entire plan for remediating the deficient fireproofing at Pottstown Hospital is dependent upon the success of tests *that he has not yet performed*.  When asked how he knows this would work, Mr. Worrell testified that he just does because of his 30 years of experience.  [*Id.* at 44:22-24].

Mr. Worrell's opinions clearly fail to meet several of the Third Circuit's eight factors. Mr. Worrell has not established a testable hypothesis or that his methods have been subject to peer review and are generally accepted.  Further, not only is the rate of error unknown, it is impossible to know until the SFRM is sprayed.  Finally, he has not shown why his method is superior (or even comparable) to any other method, including that of Jensen Hughes.  *See Mitchell*, 365 F.3d at 235.  Instead, Mr. Worrell asks the Court to accept his opinion based solely on his "thirty years' experience" and his *ipse dixit*, a practice squarely rejected in the Third Circuit as satisfying the reliability prong.  *See Oddi*, 234 F.3d at 156, 158 (district court properly excluded expert as not sufficiently reliable); *Furlan*, 864 F. Supp. 2d at 298-99 (E.D. Pa. 2012)

15

(granting *Daubert* motion for expert's lack of reliability and failure to set forth a valid
methodology); *Pappas*, 136 F. Supp. 2d at 426 (W.D. Pa. 2000) (excluding expert; "If *Daubert*
and its progeny require anything, it is that [the party] must come forward with proof of a valid
methodology based on more than just the *ipse dixit* of the expert."); *see also Daubert*, 43 F.3d at
1319 ("Personal opinion, not science, is testifying here.").  Therefore, Mr. Worrell's expert
opinions are not sufficiently reliable and should be precluded at trial.

### 3.   Mr. Worrell's Opinion Is Not Relevant.

Based on Mr. Worrell's lack of qualifications concerning the subject of his opinion and
the unreliability of his analysis, his testimony is irrelevant to this case and would not aid the
Court in determining the appropriate process to remedy the severe SFRM deficiencies at
Pottstown Hospital.  Mr. Worrell's proffered testimony fails to meet the "fit" requirement and
the Court should preclude his testimony at trial.  *See Daubert*, 509 U.S. at 591.

### B.   Craig Hofmeister's Opinion Lacks Reliability and Is Not Relevant Because He Ignores Critical Evidence and Relies on Speculation.

In his affirmative expert report and his rebuttal report, Craig Hofmeister provides
opinions regarding Pottstown Hospital's compliance with NFPA 101, 2012 edition.  As
explained below, Mr. Hofmeister should be precluded from testifying at trial because his
proffered testimony fails to meet the reliability and fit requirements.

While Mr. Hofmeister appears to be qualified, he significantly misrepresents or
misunderstands the relevant code and/or facts underlying his opinions.  These flaws go beyond
those that can be resolved through the ordinary "adversary process" or the fact-finder's ability to
"weigh [their] inadequacies," but instead make Mr. Hofmeister's opinions entirely unhelpful and
irrelevant to the determination of issues of fact in this case.  *Paoli*, 35 F.3d at 742.

First, Mr. Hofmeister claims that "a facility is in compliance with the accreditation/licensure process until a re-licensure survey is conducted by either the [state agency] or authorized deemed compliance entity (such as TJC) and deficiencies are noted." [Hofmeister Report, attached as **Exhibit D**, at 9–10].  Further, Mr. Hofmeister states that to his knowledge, "the current CMS re-licensure process does not allow for self-reporting of deficiencies related to NFPA 101 Life Safety Code compliance."  [*Id.* at 9].

While Tower Health has no basis to basis to question Mr. Hofmeister's personal knowledge, it is patently false that the re-licensure process precludes healthcare facilities like Pottstown Hospital from self-reporting code deficiencies to Authorities Having Jurisdiction, or AHJs.  Mr. Hofmeister's opinion ignores important facts, such as CHS's self-reporting of deficiencies at other hospitals in Pennsylvania outside of the CMS re-licensure process.  For example, CHS-owned Sharon Hospital self-reported a construction type deficiency to DOH prior to any licensure or accreditation survey.  This voluntary reporting resulted in DOH preparing an FSES for Sharon Hospital using the 2013 Edition of NFPA 101A.  [Doc. No. 106-2, ¶¶ 47-52, 55].  Despite Mr. Hofmeister's speculative opinion, nothing prevented CHS from self-reporting deficiencies at Pottstown Hospital.

Second, Mr. Hofmeister believes DOH "approved the FSES equivalencies, both as part of the CMS accreditation/licensure process and as part of occupancy/renovation projects."  [Ex. D at 8].  This statement is misleading and relies on a distorted interpretation of DOH surveys. Mr. Hofmeister relies on DOH Occupancy Surveys for his opinion that DOH had determined Pottstown Hospital was in compliance prior to October 1, 2017.  In doing so, Mr. Hofmeister ignores the fact that DOH Occupancy Surveys are limited to assessing whether a recently

17

renovated portion of a hospital is suitable for occupancy.[3]  Mr. Hofmeister testified that he understood the limited scope of DOH Occupancy Surveys, yet his opinions ignore this key factual information.  [Hofmeister Dep. Tr., attached hereto as **Exhibit E**, at 68:2 – 69:15].

Third, Mr. Hofmeister contends that a Tentative Interim Amendment ("**TIA**") for the 2013 edition of NFPA 101A "effectively allows Pottstown Hospital to be able to utilize an FSES and establish equivalency with the requirements of the 2012 edition of the NFPA."  [Ex. D at 10-11, 13].  TIAs are "amendments to an NFPA standard processed in accordance with Section 5 of the Regulations Governing the Development of NFPA Standards…" that have not been subjected to all of the procedures of the standards development process.[4]  NFPA (the National Fire Protection Association) is a "codes and standards organization."[5]  The codes and standards published by NFPA do not have the force and effect of law until they are adopted by regulatory agencies such as CMS and DOH.  For example, CMS adopted NFPA 101, 2012 edition in 2016 rather than the most current edition at that time (NFPA 101, 2015 ed.).

In August 2020, NFPA adopted TIA 1501, which tentatively changed the mandatory values assigned to high rise hospitals on the 2013 FSES forms.  The TIA was submitted by CHS's paid litigation expert, Wayne Carson, well after the lawsuit was filed and CHS denied Tower Health's indemnification demand.[6]  [Doc. No. 144-3, at 12-13].  In Mr. Hofmeister's

---

[3] Pennsylvania Department of Health, Division of Safety Inspection, Definitions – OCCUPANCY SURVEY; available at https://sais.health.pa.gov/CommonPOC/content/publiccommonpoc/divText/DSIdefinitions.htm (last accessed on April 13, 2021).

[4] NFPA, Codes & Standards, Tentative Interim Amendments, Errata, and Formal Interpretations, https://www.nfpa.org/Codes-and-Standards/Standards-development-process/How-the-process-works/TIAs-Errata-and-FIs (last accessed on April 13, 2021).

[5] NFPA, NFPA Overview, https://www.nfpa.org/overview (last accessed on April 13, 2021).

[6] "Expert opinions generated as a result of litigation have less credibility than opinions generated as the result of academic research or other forms of 'pure' research."  *Soldo*, 244 F. Supp. 2d at 527 (noting the importance of the "expert's motivation" for his opinion).

opinion, the scoring changes in TIA 1501 means that Pottstown Hospital can obtain an FSES equivalency.

Mr. Hofmeister ignores that TIA 1501 was not adopted by NFPA until August 2020, *nearly three years after Tower Health purchased Pottstown Hospital*. Additionally, Mr. Hofmeister's opinion is based on the assumption that Pottstown Hospital would be able to use the FSES forms as amended by TIA 1501 to obtain an equivalency. [Ex. D at 11 (acknowledging that Pottstown Hospital can only obtain an FSES using the values in the TIA)]. However, TIA 1501 *has not been adopted by CMS, TJC, or DOH*. Furthermore, the official FSES form published by CMS—CMS-2786T—does not permit hospitals to utilize the provisionally amended mandatory values set forth in TIA 1501.[7]

These errors are fatal to Mr. Hofmeister's report and render his proffered testimony unreliable and diminish any value his opinions would provide to assist the Court in understanding whether Pottstown Hospital can obtain a valid FSES. Therefore, the Court should preclude his testimony at trial.

## C. John Galassini's Opinion Is Not Reliable and Irrelevant Because He Failed to Follow the Standard Methodology for Cost Estimates and Relies on Speculation.

CHS designated John Galassini as a rebuttal expert witness to respond to the opinions of Tower's construction expert, Robert Miller. Mr. Galassini should be precluded from testifying at trial because his proffered testimony fails both the reliability and fit requirements.

First, Mr. Galassini offers a proposed remediation plan for Pottstown Hospital and opines that it will result in Pottstown Hospital meeting code requirements. [Galassini Report, attached as **Exhibit F**, at 1]. To be compliant, Pottstown Hospital must meet the fire and life safety

---

[7] A copy of the CMS FSES form is available at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS2786T.pdf (last accessed on April 13, 2021).

requirements of the NFPA Life Safety Code. [Ex. D at 8]. Mr. Galassini admitted that he relies on other experts, such as architects and engineers, to determine whether a project he is working on complies with NFPA regulations. [Galassini Dep. Tr., attached as **Exhibit G**, at 112:16 – 113:7]. Yet Mr. Galassini offered this opinion without consulting a single architect or engineer to confirm that his plans would even result in a compliant hospital.

Second, Mr. Galassini bases his cost estimate on the assumption that Pottstown Hospital would not be required to bring the areas requiring SFRM remediation up to current codes. [Ex. F at 1]. Mr. Galassini testified that he does not have an opinion regarding whether this is feasible and that it would be up to an architect to determine whether parts of the hospital facility would need to be brought up to current code. [Ex. G at 69:8 – 70:22]. Mr. Galassini is not an architect, nor did he engage an architect to support his premise. Even worse, Mr. Galassini ignored the expert opinions of Brian Tracy—an experienced healthcare architect in Pennsylvania with decades of experience answering this very question. Thus, Mr. Galassini fails to follow what he admits is the standard methodology for developing construction cost estimates outside of litigation, thereby undercutting any reliability of his opinions. *Kumho Tire*, 526 U.S. at 152; *Dearson*, 241 F. Supp. 2d at 499; *see also In re TMI Litig.*, 193 F.3d at 703 n.144.

Third, Galassini's cost estimate also assumes that "the existing top track and studs will remain in place." [Ex. F at 25]. Mr. Galassini relies on this method as a means of reducing the amount of hard construction work necessary to obtain sufficient access to the building's structural members so the SFRM can be remediated. Mr. Galassini relies on this assumption despite not having determined that it is feasible. Mr. Galassini testified that he would need to review this method with the Department of Health and local code officials, [Ex. G at 79:18 – 80:10], yet he failed to do either prior to offering his opinions. Mr. Galassini also admitted he

has no experience employing this approach with DOH.  [*Id.* at 47:19 – 48:18].  Furthermore, Galassini's proposed method is inherently speculative because, according to his expert report, "a UL-tested assembly or engineering judgment will be needed to confirm this approach for implementation."  [Ex. F at 25; Ex. G at 80:11-20].  Mr. Galassini's opinions are unreliable because he failed to make these essential determinations.

Last, Mr. Galassini bases his opinion entirely on Mr. Worrell's conclusions that the SFRM can be patched at Pottstown Hospital, rather than the remediation determined by Jensen Hughes.  [Ex. G at 28:4 – 29:5, 40:7-19, 45:2-20].  To the extent the Court agrees that Mr. Worrell's opinions should be excluded at trial, then Mr. Galassini's cost estimates based on Mr. Worrell's scope of work should likewise be excluded.

Mr. Galassini's opinions and proffered testimony are unreliable because they are based on "subjective belief or unsupported speculation."  *Paoli*, 35 F.3d at 742.  Mr. Galassini likewise fails the "fit" requirement due to the "leaps of logic, elements of subjectivity, and even speculation" in his opinions.  *UGI Sunbury*, 949 F.3d at 835-36.  Mr. Galassini's opinions are a perfect example of "the beginning of a discussion and not the end," a characteristic of unreliability condemned by the Third Circuit in *UGI Sunbury*.  *Id.*  For these reasons, Mr. Galassini should be precluded from testifying at trial.

## D.    Sean Kruskol's Opinion Is Irrelevant Because He Addresses the Wrong Financial Statements.

In a typical straw-man argument, CHS served a rebuttal report from Sean Kruskol to ostensibly address the opinion of Mr. Pocalyko.  Mr. Kruskol spends a great deal of time analyzing the financial statements of defendant CHS/Community Health Systems, Inc.'s parent company, CHSI, and then concluding CHS's financial statements were prepared in accordance with GAAP.  [Kruskol Report, attached hereto as **Exhibit H**, ¶¶ 12–19, 67–119].  But

Mr. Kruskol's opinion has zero relevance to whether or not CHS breached Section 3.4 of the APA, which deals with the financial statements of <u>Pottstown Hospital</u>. Therefore, his opinion is not helpful to the Court and should be excluded.

As promised in Section 3.4 of the APA, CHS provided to Tower Health historical unaudited balance sheets and income statements (defined as the "**Financial Statements**") for each of the acquired hospitals, including Pottstown Hospital. [Doc. No. 19-1, § 3.4]. CHS represented that the Financial Statements of Pottstown Hospital, except as set forth in Schedule 3.4, "have been prepared in accordance with GAAP," and further represented that the "Balance Sheets present fairly in all material respects . . . the financial condition of [Pottstown Hospital] as of the dates indicated thereon, and such Income Statements present fairly in all material respects . . . the results of operations of [Pottstown Hospital] for the periods indicated thereon." [*Id*.]

CHS separately represented to Tower Health: "Except as disclosed on <u>Schedule 3.4</u>, no Seller Entity or Acquired Company has any material liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a type required to be disclosed or reflected in financial statements . . . in accordance with GAAP except for (i) liabilities reflected or reserved against in the Financial Statements, and (ii) liabilities incurred in the ordinary course of business since [March 31, 2017]." [*Id.*]

Thus, the APA is clear and unambiguous: CHS represented and warranted the financial statements of <u>each of the hospitals Tower Health purchased</u> were prepared in accordance with GAAP and fairly presented the hospitals' respective financial condition. Section 3.4 does not address the financial statements of CHSI in any way. And why would it? Tower Health wanted

22

to make sure the financial condition of the hospitals it was buying, including Pottstown Hospital, was as described and promised.

Tower Health's financial accounting expert, Paul Pocalyko, reviewed the Pottstown Hospital Financial Statements provided to Tower Health.  He opined within a reasonable degree of professional certainty that "the financial information provided to Plaintiffs pursuant to the APA violated disclosure and recognition requirements under Financial Accounting Standards Board ('FASB') accounting standards that follow GAAP and did not present fairly in all material respects the financial condition of the hospitals."  He identified two "primary deficiencies" present in those Financial Statements:  CHS's "failure to disclose contingent liabilities related to the lack of compliance with current Life Safety Code ('LSC') requirements, among other deficiencies" and the "failure to disclose increases to contractual allowances and allowances for bad debts (and the corresponding decrease in net patient revenue) based on established accounting pronouncements."  Mr. Pocalyko further noted that both deficiencies were not in accordance with GAAP, as required by Section 3.4.

In his report, Mr. Kruskol never addresses the Pottstown Hospital financial statements. Instead, he bases his opinion solely on reviewing the financial statements of **CHSI**.  The financial statements of CHSI are not at issue in this case.  Accordingly, Mr. Kruskol's opinions that the **CHSI** financial statements were prepared in accordance with GAAP and that **CHSI** maintained appropriate "processes, controls, and certifications/approvals" is irrelevant, misleading, and unhelpful to the trier of fact.  [Ex. H, ¶¶ 12–19, 67–119].

Because Mr. Kruskol's testimony does not relate to any issue in this case, *Daubert*, 509 U.S. at 591; *Paoli*, 35 F.3d at 742-43, and will not assist the Court in deciding if the **Pottstown**

23

**Hospital** financial statements breached CHS's representations and warranties in the APA, *Schneider*, 320 F.3d at 404, Mr. Kruskol should be precluded from testifying at trial.

## V.    CONCLUSION

CHS's experts Hubert Worrell, Craig Hofmeister, John Galassini, and Sean Kruskol should be precluded from presenting testimony and opinions at the trial in this case because their opinions do not conform to the qualifications, reliability, and fit requirements of Federal Rule of Evidence 702.

STEVENS & LEE

Date:  April 14, 2021

By:  *s/ Julie E. Ravis*
Daniel B. Huyett (Pa. ID No. 21385)
Julie E. Ravis (Pa. ID No. 203101)
Matthew J. Banta (Pa. ID No. 326413)
111 North Sixth Street
Reading, PA  19601
Phone:  (610) 478-2219
Email:  dbh@stevenslee.com,
jera@stevenslee.com, mb@stevenslee.com

Joseph E. Wolfson (Pa. ID No. 44431)
1500 Market Street, East Tower, 18th Floor
Philadelphia, PA 19102
Phone:  (215) 751-1249
Fax:  (610) 988-0808
Email:  jwo@stevenslee.com

*Attorneys for Plaintiffs*

SL1 1683085v3 006375.01188