**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| TOWER HEALTH, f/k/a READING HEALTH SYSTEM, *et al.*, | : : No. 5:19-cv-02782-EGS : |
| Plaintiffs, | : : |
| v. | : : |
| CHS/COMMUNITY HEALTH SYSTEMS, INC., *et al.*, | : : : |
| Defendants. | : : : |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

# TABLE OF CONTENTS

Page

I.  PARTIES AND OVERVIEW ............................................................................................1

    A.  Plaintiff Tower Health is a Reading-Based, non-profit healthcare
        system..............................................................................................................1

    B.  Defendant CHS/Community Health Systems, Inc. is a nationwide
        health company whose parent company is publicly traded...........................3

    C.  Tower Health filed a lawsuit against CHS to recover damages
        relating to CHS's breaches of the Asset Purchase Agreement ......................4

II.  KEY PROVISIONS IN THE ASSET PURCHASE AGREEMENT ........................................9

    A.  Tower Health purchased From CHS five operating businesses.....................9

    B.  CHS provided an unconditional guaranty to Tower Health, and the
        Seller Entities provided representations and warranties to Tower
        Health ...........................................................................................................13

    C.  Representations and warranties provided to Tower Health in
        Sections 3.6, 3.7, and 3.8, and the Seller Entities' and CHS's promise
        of compliance in all material respects..........................................................18

        1.  Defendants promised that Pottstown Hospital was in compliance
            in all material respects with its license................................................18

        2.  Defendants promised that Pottstown Hospital was in compliance
            in all material respects with the Medicare Conditions of
            Participation .......................................................................................20

        3.  CHS promised that Pottstown Hospital was in compliance in all
            material respects with its regulatory requirements............................21

        4.  "Compliance" as used in the APA is not defined, has no standard
            industry meaning, and must be given its "ordinary meaning" .........25

    D.  The Seller Entities, as guaranteed by CHS, promised to provide
        accurate financial statements that complied with GAAP in
        Section 3.4....................................................................................................26

    E.  The Seller Entities, as guaranteed by CHS, provided covenants to
        Tower Health................................................................................................29

    F.  The parties did not agree to a fair market value allocation of the
        hospitals in the purchase price ....................................................................30

    G.  Other APA provisions discussed at trial .....................................................32

III.  OVERVIEW OF THE REGULATORY FRAMEWORK FOR PENNSYLVANIA HOSPITALS LIKE
     POTTSTOWN HOSPITAL ...........................................................................................35

IV.  CMS AND PA. DOH ADOPTED THE 2012 EDITION OF THE LIFE SAFETY CODE IN
JULY 2016 ....................................................................................................................40

    A.  The Life Safety Code requires hospitals to meet minimum
requirements of both active and passive fire protection. ...............................40

    B.  The 2012 edition of NFPA 101 applied to Pottstown Hospital as of
July 5, 2016, and at the APA's execution (May 30, 2017) and the
APA's closing (October 1, 2017). ..................................................................43

    C.  CHS knew the NFPA 101, 2012 edition applied to Pottstown
Hospital. .........................................................................................................49

    D.  As of execution of the APA and closing on the APA, if a hospital
relied on an FSES for compliance with the Life Safety Code, it
needed to prepare the FSES using the 2013 edition of NFPA 101A. ...........51

    E.  Specific changes made to NFPA 101, 2012 edition and NFPA 101A,
2013 edition affected Pottstown Hospital as a high-rise hospital. ...............58

V.  POTTSTOWN HOSPITAL'S DEFICIENT BUILDING CONSTRUCTION TYPE DID NOT COMPLY
WITH THE LIFE SAFETY CODE SINCE AT LEAST 2003 AND CHS DID NOT REPAIR THE
DEFICIENT SFRM ........................................................................................................60

    A.  Pottstown Hospital is a community hospital in Pottstown,
Pennsylvania. ..................................................................................................60

    B.  CHS owned and controlled Pottstown Hospital from 2003-2017................61

    C.  Pottstown Hospital had a non-compliant Type II (000) Building
Construction Type.............................................................................................63

    D.  CHS elected to use an FSES, rather than remediate, the non-
compliant Type II (000) construction at Pottstown Hospital.........................68

    E.  Peters Rice prepared FSESs for Pottstown Hospital.......................................70

    F.  The 2009 FSES was invalid and should never have been submitted
by CHS to Pa. DOH. .......................................................................................74

        1.  The 2009 FSES is invalid because it was not prepared based on a
survey, it included hypothetical values and not actual conditions
of the hospital, and Mr. Peters told Pottstown Hospital it could
not be submitted to Pa. DOH ...............................................................76

        2.  The 2009 FSES represented to Pa. DOH that corridor walls would
be made one-hour fire rated, and it is unrebutted that CHS never
did that promised work.........................................................................79

        3.  The 2009 FSES is inaccurate because it does not reflect the
condition of Pottstown Hospital based on the 2009 Pa. DOH
survey ...................................................................................................81

    G.  CHS continued to rely on the 2009 FSES for compliance and never
prepared an FSES under the 2013 edition of NFPA 101A. ...........................83

H.   The 2015 TJC accreditation of Pottstown Hospital (conducted under NFPA 101, 2000 edition and using the invalid 2009 FSES) does not demonstrate compliance as required by the APA. .........................................................87

I.   CHS never provided a copy of the 2009 FSES to Tower Health. ................................91

VI.   OUTSIDE OF LITIGATION, BOTH CHS AND REGULATORS USE THE ORDINARY DICTIONARY MEANING OF COMPLIANCE ..................................................................94

A.   CHS established internal policies requiring compliance with the Life Safety Code as part of its compliance program. ..........................................................96

B.   CHS conducted annual and mock surveys to assess its facilities' compliance with the Life Safety Code and other regulations. ...................................103

C.   CMS, TJC, and Pa. DOH encouraged "continuous compliance" with the Life Safety Code by the hospitals ..........................................................107

D.   Other witnesses testified to the every day and ordinary meaning of "compliance" consistent with Tower Health's interpretation .....................................111

E.   All Life Safety Code consulting experts at trial testified to their routine use of "compliance" including in assessing a hospital's compliance with the Life Safety Code. ..........................................................113

VII.   CHS DID NOT PREPARE AN UPDATED 2013 FSES FOR POTTSTOWN HOSPITAL TO DETERMINE ITS COMPLIANCE WITH THE LIFE SAFETY CODE ................................116

A.   Pa. DOH removed the reference to FSES for Pottstown Hospital from its survey reports after adoption of the 2012 edition of the Life Safety Code. ..........................................................................................118

B.   Pa. DOH informs CHS that Pottstown Hospital needs an updated FSES..........................................................................................................120

C.   CHS was aware of changes in the 2013 FSES Form to high-rise hospitals ....................................................................................................127

D.   CHS prepared new FSESs under NFPA 101A, 2013 edition for its Pennsylvania hospitals proactively and without a citation except for Pottstown Hospital. ..........................................................................................128

VIII.   READING HOSPITAL UNDERTAKES A TRANSFORMATIONAL STRATEGY TO BECOME A HEALTH SYSTEM, AND POTTSTOWN HOSPITAL WAS AND IS INTEGRAL TO THAT STRATEGY..........................................................................................................132

A.   CHS solicited bids for Pottstown Hospital and the other four hospitals through a confidential request for proposals................................................135

B.   Tower Health decided to bid on the hospitals because of the importance of Pottstown Hospital to its strategic plans..............................................136

C.   The purchase price in the letter of intent was based on limited information..............................................................................................138

D.   The letter of intent was superseded by the definitive APA........................................140

E.  The drafting history of the APA cannot be relied on to interpret the
    APA because the relevant provisions in the APA are not ambiguous. .......................142

IX.  THE DUE DILIGENCE PERMITTED BY CHS WAS LIMITED AND HIGHLY CONFIDENTIAL........145

A.  Outside consultants assisted Tower Health in due diligence .....................................147

B.  CHS did not provide all documents requested by Tower Health,
    including the 2009 FSES, the BDA life safety plans with Pa. DOH's
    preliminary stamp, and the emails relating to Mr. Sanders'
    discussions with Pa. DOH.  Instead, CHS provided life safety plans
    it knew were "way out of compliance" without disclosing that fact to
    Tower Health..........................................................................................................149

C.  CHS severely limited Tower Health's ability to conduct physical due
    diligence prior to closing because of confidentiality concerns  ..................................157

D.  CHS limited Tower Health's access to local facilities................................................160

E.  Tower Health's explanation why it did not retain a life safety
    consultant is credible................................................................................................162

F.  Tower Health did not learn about the deficient life safety conditions
    at Pottstown Hospital prior to execution of the APA or closing of the
    APA.........................................................................................................................166

G.  Tower Health's Board voted in favor of the transaction, in part based
    on the value of Pottstown Hospital to Tower Health .................................................167

H.  The purchase price adjustments in the Second Amendment to the
    APA were not based on information learned by Tower Health during
    due diligence ...........................................................................................................170

X.  AFTER CLOSING, CMS AND PA. DOH NOTIFY TOWER HEALTH THAT POTTSTOWN
    HOSPITAL WAS NOT IN COMPLIANCE WITH ITS REGULATORY OBLIGATIONS.....................173

A.  The February 2018 TJC survey did not cite Pottstown Hospital for
    deficient Building Construction Type.........................................................................173

B.  TJC routinely misses deficiencies found on later CMS validation
    surveys ....................................................................................................................174

C.  Pa. DOH's March 2018 CMS validation survey identified issues
    with the Building Construction Type and the occupied stories of
    Pottstown Hospital ...................................................................................................176

D.  On June 25, 2018, CMS notified Pottstown Hospital that it was not
    in compliance with CMS COP, including the Life Safety Code, and
    removed Pottstown Hospital's deemed status through TJC.........................................181

E.  On August 23, 2018, Pa. DOH notified Pottstown Hospital that it
    was not in compliance with Pa. DOH licensing requirements.....................................190

iv

XI.   TOWER HEALTH RESPONDED TO THE CMS VALIDATION SURVEY AS A SIGNIFICANT
      PROBLEM ARISING IN THE ORDINARY COURSE OF BUSINESS...............................................192

      A.   Tower Health's immediate response in March and April 2018
           included retaining internationally-renowned fire protection
           engineers ......................................................................................................................192

           1.   Tower Health Evaluated if Pottstown Hospital Could Achieve
                equivalency with a 2013 FSES ......................................................................194

           2.   Jensen Hughes' April 2018 initial inspection and assessment of
                Pottstown Hospital's SFRM. ..........................................................................197

      B.   Tower Health's Development of a plan of correction following
           receipt of the CMS Validation Survey and the CMS Important
           Notice..............................................................................................................................201

      C.   Tower Health Carefully Considered Other Alternatives to Address
           the K-161 Tag Deficiency................................................................................................208

           1.   Tower Health considered alternative solutions and attempted
                discussions with Pa. DOH..............................................................................209

           2.   Tower Health considered building a new hospital but decided to
                remediate Pottstown Hospital as the lowest cost alternative. ........................218

           3.   Tower Health does not have the financial resources to pay for the
                remediation.....................................................................................................221

           4.   Tower Health attempted to confer with Pa. DOH..........................................222

XII.  TOWER HEALTH SENT A TIMELY INDEMNIFICATION DEMAND TO CHS, AND CHS
      REFUSED TO ASSIST TOWER HEALTH. ..................................................................................224

      A.   CHS's response to the Notice of Claim was designed to deceive
           Tower Health....................................................................................................................226

      B.   CHS did not offer to or provide assistance to Tower Health. .....................................231

XIII. EXPERT TESTIMONY ESTABLISHED DEFENDANTS' LIABILITY FOR BREACHES OF THE APA. 232

XIV.  IT IS UNDISPUTED THAT THE SAME BUILDING CONSTRUCTION TYPE DEFICIENCY
      EXISTED AT POTTSTOWN HOSPITAL ON OCTOBER 1, 2017 AS MARCH 15, 2018.................237

XV.   POTTSTOWN HOSPITAL WAS NOT IN COMPLIANCE AT THE TIME OF CLOSING BECAUSE
      THE 2009 FSES WAS INVALID AND POTTSTOWN HOSPITAL COULD NOT ACHIEVE
      EQUIVALENCY USING A 2013 FSES. ......................................................................................240

      A.   The 2009 FSES could not be used by Pottstown Hospital to
           demonstrate equivalency with the Life Safety Code as of October 1,
           2017..................................................................................................................................240

      B.   Pottstown Hospital should have prepared an updated 2013 FSES
           before October 1, 2017.....................................................................................................243

      C.   Pottstown Hospital could not achieve equivalency with the Life
           Safety Code using a 2013 FSES as of October 1, 2017 .............................................248

XVI. Pottstown Hospital Must be Converted to a Type II (222) Building Construction Type to be in Compliance with the Life Safety Code. ......................249

    A.  CHS's TIA does not solve Pottstown Hospital's compliance deficiencies because it has not been adopted by CMS, Pa. DOH, and TJC and just delays the remediation ...........................................................................251

    B.  A traditional equivalency is not an option to address compliance deficiencies at Pottstown Hospital ................................................................263

    C.  A hardship waiver is not an option to remediate the K-161 tag deficiency .......................................................................................................266

    D.  Removing Pottstown Hospital from its high-rise designation is not a viable alternative to remediation ................................................................269

XVII. Tower Health Is Entitled To the Costs of Remediating Pottstown Hospital as Damages.. ...................................................................................................275

    A.  Tower Health presented unrebutted testimony from Jensen Hughes to convert Pottstown Hospital's Deficient Type II (000) Building Construction Type to a Compliant Type II (222) Building Construction Type ..........................................................................................276

        1.  Daniel Martin's testing and methodology was accepted by CHS without objection or cross examination .........................................279

            a.  Mr. Martin's qualitative testing ....................................................282

            b.  Mr. Martin's quantitative testing ................................................285

        2.  Mr. Parker's analysis of Mr. Martin's data was also accepted by CHS...................................................................................................286

            a.  Thickness testing ..........................................................................286

            b.  Bond strength testing....................................................................288

        3.  Mr. Parker's opinions regarding the required remediation..............290

    B.  CHS completed gut renovations of parts of the third, fourth, and seventh floors of Pottstown Hospital and did not patch or overspray the fireproofing.............................................................................................302

    C.  CHS's expert Mr. Worrell is neither reliable nor credible..........................303

    D.  Tower Health's expert, Brian Tracy, presented credible and reliable expert testimony on the plans to implement Jensen Hughes' proposed remediation ...................................................................................311

    E.  Tower Health presented credible and reliable cost estimates from its building construction expert to complete Mr. Tracy's plans. .....................321

    F.  CHS's critiques of Mr. Miller construction costs .......................................326

    G.  The Court rejects the Galassini alternative approach to remediation.........................332

H.  The Court rejects Mr. Galassini's proposal to abandon the seventh
floor of Pottstown Hospital and relocate the behavioral health unit to
an off-site location as a viable remediation alternative.................................340

XVIII. TOWER HEALTH PRESENTED CREDIBLE EVIDENCE OF ALTERNATIVE CONTRACTUAL
DAMAGES ......................................................................................................342

A.  The Court accepts the damages presented by Tower Health's expert
Todd Zigrang..................................................................................................342

B.  Corrections to Mr. Zigrang's calculations based on Mr. Barbo's
criticisms reduce but do not eliminate Tower Health's damages ................345

XIX.  THE SELLER ENTITIES, AS GUARANTEED BY CHS, DID NOT COMPLY WITH THEIR
FINANCIAL STATEMENTS REPRESENTATIONS IN SECTION 3.4 OF THE APA, CAUSING
TOWER HEALTH TO SUFFER SUBSTANTIAL DAMAGES. .......................................348

A.  Defendants breached Section 3.4 of the APA...........................................348

1.  The Seller Entities, guaranteed by CHS, failed to disclose a
contingent liability associated with accounts receivable and
revenue recognition issues ...............................................................351

2.  The Seller Entities, as guaranteed by CHS, failed to disclose a
contingent liability related to Pottstown Hospital's lack of
compliance with the Life Safety Code .............................................356

B.  Plaintiffs are entitled to recover lost contribution damages because
of Defendants' failure to disclose contingent liabilities. ...........................358

1.  Lost contribution resulting from the required remediation
construction. ....................................................................................358

2.  Lost contribution resulting from the overstatement of accounts
receivable. ........................................................................................360

C.  The Court rejects Mr. Kruskol's criticisms of Mr. Pocalyko .....................361

XX.   SUMMARY OF DAMAGES SUFFERED BY TOWER HEALTH BECAUSE OF DEFENDANTS'
BREACH OF THE APA. .....................................................................................364

Pursuant to the Court's June 25, 2021 and August 18, 2021 Orders [D.E. 238, 243], Plaintiffs submit the following Proposed Findings of Fact.

## I.  Parties and Overview

### A.  Plaintiff Tower Health is a Reading-Based, Non-Profit Healthcare System.

1. On May 30, 2019, Plaintiffs filed this breach of contract action to recover substantial damages caused by Defendants' breaches of their contractual obligations in the parties' asset purchase agreement as related to the purchase of Pottstown Hospital.  Defendants removed the lawsuit to federal court, based on diversity of citizenship and the amount in controversy. [D.E. 1].  On July 29, 2019, Plaintiffs filed an Amended Complaint.  [D.E. 19].

2. Plaintiff Tower Health, formerly known as Reading Health System prior to the transaction at issue ("**Tower Health**"), is a Pennsylvania nonprofit healthcare system with its principal place of business in West Reading, Pennsylvania.  [D.E. 1, ¶ 4; DX111 (APA), at 1].

3. Tower Health was formerly known as Reading Health System prior to the transaction at issue and began as a single hospital, Reading Hospital, more than 150 years ago.  [May 3, Judge, at 68:25 – 69:10].

4. Tower Health is a non-profit entity and is tax exempt.  [May 3, Judge, at 68:24 – 69:4; DX111 (APA), at 1].

5. Immediately prior to the transaction at issue, Tower Health owned one hospital, Reading Hospital.  Today, Tower Health owns seven hospitals:  Reading Hospital, St. Christopher's in Philadelphia, and the five purchased from Defendants (Pottstown, Phoenixville, Brandywine, Chestnut Hill, and Jennersville Hospitals).  [May 3, Judge, at 68:24 – 69:7, 71:9-22].

6. As part of its mission statement, Tower Health is dedicated to serving the needs of its local and regional community, providing exceptional care to patients and their families, and

expanding the boundaries of medicine within the acute setting and beyond.  [PX97 (Jan. 2017 Integrated Strategic Financial Plan), at 24; May 24, Ahern, at 122:3-9].

     7.  Tower Health's primary market is Berks County and the contiguous counties of Chester, Montgomery, and Philadelphia.  [May 3, Judge, at 69:17-21].

     8.  Prior to the financial impact of COVID, Tower Health had $2 billion in annual revenue and remains in the top ten hospital systems in Pennsylvania in terms of revenue. Reading Hospital is the largest hospital between Philadelphia and Pittsburgh.  [May 3, Judge, at 69:22 – 70:4].

     9.  The other Plaintiffs in this action, PI One through Seven, are legal entities controlled by Tower Health created to purchase certain assets in connection with the asset purchase agreement that is the subject of this lawsuit and are all parties to that asset purchase agreement as "Buyer Entities."  [May 3, Judge, at 72:8-23; DX98 (May 2017 Board Presentation), at TOWER-CHS-PMMC-043980; DX111 (APA), at Recital B & Ex. B].  The other Plaintiffs are Pennsylvania limited liability companies whose members are not Delaware or Tennessee residents.  [DX111 (APA), at Ex. B; D.E. 1, ¶¶ 4-5].  Tower Health changed the names of Plaintiffs PI One through Seven after the deal was publicly announced.  [May 3, Judge, at 72:10-23; DX98 (May 1, 2017 Tower Health Board presentation), at 40].

     10.  Plaintiff PI Five, LLC, n/k/a Pottstown Hospital, LLC, owns Pottstown Hospital. [May 3, Judge, at 72:24 – 73:11].

     11.  As described by Tower Health's lead attorney in the transaction, Tower Health and Defendants used a code name, Project Independence, to protect the confidentiality of the transaction.  [June 8, Conti, at 192:4 – 193:4; May 3, Judge, at 72:18-20].

2

**B.    Defendant CHS/Community Health Systems, Inc. Is a Nationwide Hospital Company whose Parent Company is Publicly Traded.**

12.    Defendant CHS/Community Health Systems, Inc. ("**CHS**") is a Delaware corporation whose principal place of business is Tennessee.  [DX111 (APA), at 1; D.E. 1 ¶ 7].

13.    CHS is owned by, Community Health Systems, Inc., a for-profit, publicly-traded, and NYSE-listed company (symbol "CYH") headquartered in Franklin, Tennessee ("**CHSI**").  [PX308-1 (Dec. 2016 CHSI 10-K), at 3; D.E. 4 (corporate disclosure statement)].

14.    CHSI, the publicly traded parent company, is not a defendant in this lawsuit.  [*See* PX220 (Am. Compl.)].  CHSI is not a party to the APA.  [DX111 (APA)].

15.    CHSI describes itself as "one of the largest publicly-traded hospital companies in the United States."  [PX308-1 (Dec. 2016 CHSI 10-K), at 3].

16.    In November 2016, CHSI owned 160 hospitals in 22 states, including Pottstown Hospital.  [PX84 (Nov. 2016 CHS Facilities Management Orientation Presentation), at 16]. After completing a divestiture strategy of selling hospitals to pay down debt [June 8, Conti, at 190:15 – 191:11], as of December 2017, CHSI owned or leased 125 hospitals, with an aggregate of 20,850 licensed beds, and earned $15.35 billion in net operating revenue.  [PX308-2 (Dec. 2017 CHSI 10-K), at 1, 56].

17.    Before October 1, 2017, when the purchase transaction closed, one hospital owned by CHS, through its subsidiaries and affiliates, Defendants Pottstown Hospital Company, LLC and Pennsylvania Hospital Company, LLC, was Pottstown Memorial Medical Center, now known as Pottstown Hospital ("**Pottstown Hospital**").  [DX111 (APA), at Recital C & Ex. C].

18.    CHS owned or controlled, directly or indirectly, Pennsylvania Hospital Company, LLC and Pottstown Hospital Company, LLC.  [DX111 (APA), at Recital A].  Defendants Pennsylvania Hospital Company, LLC and Pottstown Hospital Company, LLC are Delaware

3

entities whose principal place of business is in Tennessee.  The members of both Pennsylvania

Hospital Company, LLC and Pottstown Hospital Company, LLC are Delaware entities whose

principal place of business is in Tennessee.  [D.E. 1 ¶¶ 6-14].

19.  CHS operated and controlled Pottstown Hospital from 2003, when it purchased the

hospital, through October 1, 2017, when the purchase transaction with Tower Health closed.

[PX6 (2003 purchase agreement); DX111 (APA), at Recitals A, D, § 1.1 & Ex. A; PX136 (First

Amendment to APA), § 2].

### C.   Tower Health Filed a Lawsuit Against CHS to Recover Damages Relating to CHS's Breaches of the Asset Purchase Agreement.

20.  Effective October 1, 2017, Tower Health purchased five hospitals from Defendants,

including the assets of Pottstown Hospital, pursuant to an Asset and Membership Interest

Purchase Agreement dated May 30, 2017 (the "**APA**").  [DX111 (APA)].

21.  In the APA, CHS and the other defendants affirmatively represented and warranted to

Tower Health that the five hospitals they were selling to Tower Health, including Pottstown

Hospital, were compliant in all material respects with their licensing requirements, regulatory

requirements, and the Medicare/Medicaid Conditions of Participation, among other things, as of

October 1, 2017, the date of the closing of the APA.  [DX111 (APA), §§ 3.6, 3.7, 3.8].

22.  In the APA, CHS and the other defendants also represented and warranted that the

financial statements they provided to Tower Health concerning Pottstown Hospital were

prepared in accordance with Generally Accepted Accounting Principles ("**GAAP**") and

presented fairly in all material respects the financial condition of Pottstown Hospital, as

promised in Section 3.4 of the APA.  [DX111 (APA), § 3.4].

23.  On March 14-15, 2018, the Pennsylvania Department of Health ("**Pa. DOH**"), on

behalf of the federal Centers for Medicare and Medicaid Systems ("**CMS**"), conducted an

unannounced validation life safety survey of Pottstown Hospital and determined the hospital was not in compliance with the Life Safety Code of the National Fire Protection Association ("**NFPA**"), NFPA 101, 2012 edition (the "**Life Safety Code**"), and CMS federal regulation at 42 C.F.R. § 482.41(b), Condition of Participation:  Physical Environment.  [PX157 (March 2018 survey results); PX173 (June 25, 2018 email from CMS with survey results and Important Notice)].

24.  By letter dated June 25, 2018 from CMS, called an "Important Notice," Tower Health received the results of the Pa. DOH survey along with a copy of the Pa. DOH March 15, 2018 Statement of Deficiencies.  [PX173 (June 25, 2018 email from CMS with survey and Important Notice)].  Among other things, CMS advised Tower Health that, as a result of Pa. DOH's survey, Pottstown Hospital was not in compliance with the Medicare Conditions of Participation ("**COP**").  [*Id.* at TOWER-CHS-PMMC-015516].

25.  In August 2018, Pa. DOH notified Pottstown Hospital that, based on the results of the March validation survey, Pottstown Hospital was also not in compliance with its Pennsylvania hospital licensing requirements.  [May 3, Judge, at 77:23 – 78:8; *see also* PX196 (Aug. 23, 2018 email with Pa. DOH re-licensure survey results), at 2].

26.  The most significant Life Safety Code violation cited by Pa. DOH and CMS is Pottstown Hospital's deficient Building Construction Type, a requirement of the NFPA Life Safety Code.  [PX173 (June 25, 2018 email from CMS with survey and Important Notice), at TOWER-CHS-PMMC-015440 – 015442].  As explained in more detail below, Pottstown Hospital has had a designated building construction type of Type II (000) for many years before the Tower Health purchase.  [*See generally* PX334 (Summary of Pa. DOH surveys)].  However, the Life Safety Code requires a Type II (222) Building Construction Type to operate as a hospital

5

above the second floor, or on floors three through seven of Pottstown Hospital, a Building

Construction Type Pottstown Hospital does not, and did not, have.  [PX41 (Life Safety Code), at

101-203, § 19.1.6.1 & Table 19.1.6.1].

27.  Instead, since the time Defendants purchased Pottstown Hospital, Pottstown Hospital

relied on the use of an equivalency (a fire safety evaluation system or "**FSES**") to compensate

for the Building Construction Type deficiency and to achieve compliance with the Life Safety

Code.

28.  In December 2016, CMS adopted a revised FSES form in which the mandatory

values for FSESs prepared under the 2013 edition of NFPA 101A (the "**2013 FSES Form**"), the

version of the FSES that all parties agree applied at the time of closing on the APA, changed

significantly for high-rise hospitals.  [PX94 (Dec. 16, 2016 CMS S&C Memo); PX45 (NFPA

101A, 2013 Edition Handbook), at 4.1.2, at 100; May 10, Koffel, at 125:15-21; May 26, Carson,

at 68:1-2 ("the FSES for the 2012 edition of the code, that would be NFPA 101A 2013 edition),

193:6 – 195:5 ("If they're going to use the FSES, a 2013 edition is the edition to use."), 199:1-4

(he would have used the 2013 edition of NFPA 101A if he prepared an FSES for Pottstown on

October 1, 2017); June 10, Hofmeister, at 29:8 – 30:7 ("if you're going to use an FSES, you

would then use the 2013 edition of NFPA 101A")].

29.  At all times material, Pottstown Hospital was, and is, classified as a high-rise hospital

under the NFPA Life Safety Code.  [PX221 (Defendants' Ans. to Am. Compl.), ¶¶ 39-40].

30.  The combination of its deficient construction type with the new mandatory values for

high-rise healthcare occupancies made it mathematically impossible for Pottstown Hospital to

achieve a passing score on the FSES as of October 1, 2017.  [May 10, Koffel, at 143:21 –

144:21; May 26, Carson, at 199:1-7; June 10, Hofmeister, at 35:5-13 (FSES can pass only if he applies the TIA change to mandatory value), 84:4-6].

31.  CHS knew about Pottstown Hospital's deficient Building Construction Type; its long-standing use of an FSES to achieve compliance with the Life Safety Code; the change in the mandatory values for the 2013 FSES Form; and its failure to update Pottstown Hospital's FSES to comply with the 2013 FSES Form; but CHS never disclosed this information to Tower Health, as the APA required.

32.  Following the adoption in December 2016 of the revised 2013 FSES Form, Pottstown Hospital was unable to address its long-standing Life Safety Code deficiency as a Type II (000) Building Construction Type using an FSES.

33.  Without a valid FSES, to address the deficient building construction type, Defendants were required to remediate the building's deficient fireproofing to make the hospital a Life Safety Code-compliant Type II (222) Building Construction Type, which is time consuming and expensive.

34.  Tower Health's position in this litigation is that because it is undisputed that the condition of Pottstown Hospital was the same as of October 1, 2017 as it was in March 2018, the time of the Pa. DOH survey, and the same Building Construction Type deficiency existed on October 1, 2017 without a valid FSES, Pottstown Hospital was not in compliance in all material respects with the Life Safety Code, the Medicare COP, and its Pennsylvania licensing requirements, in breach of Defendants' representations and warranties and covenants in Sections 3.6, 3.7, 3.8, 5.2, 5.3, and 5.4 of the APA.  [May 3, Judge, at 204:8-21; May 4, Judge, at 169:5 – 170:9 & PX288 (J. Judge errata sheet)].

7

35.  Tower Health's position is also that any liability for bringing Pottstown Hospital into compliance with the Life Safety Code is an "Excluded Liability" it did not assume under the APA, and therefore the Seller Entities breached Section 1.4 of the APA.

36.  Tower Health's position is that the Pottstown Hospital financial statements disclosed to Tower Health by Defendants before the October 1, 2017 closing did not comply with GAAP because they failed to disclose to Tower Health on the schedules to the APA certain contingent liabilities, in breach of Section 3.4 of the APA.

37.  Tower Health also contends that CHS breached its unconditional and absolute guaranty in Section 12.26 by failing to ensure the prompt performance and observance of the Seller Entities with Sections 1.4, 3.4, 3.6, 3.7, 3.8, 5.2, 5.3, 5.4, and 11.2 (indemnification) of the APA.

38.  On July 24, 2018, Tower Health sent a notice of indemnification claim to CHS pursuant to Section 11.5 of the APA, advising CHS that it had breached certain representations and warranties in the APA based on Pottstown Hospital's non-compliance with federal regulations and the requirements of the 2012 edition of the Life Safety Code.  [PX186 (July 24, 2018 Notice of Claim)].

39.  After CHS denied the indemnification demand, Tower Health filed its lawsuit in the Court of Common Pleas of Berks County, Pennsylvania on May 30, 2019, for breach of the APA.  [ECF No. 1-3].  CHS removed the lawsuit to this Court on June 25, 2019.  [ECF No. 1].

40.  Plaintiffs' Amended Complaint, filed on July 22, 2019, asserts claims for indemnification under the APA for Defendants' breaches of the APA, and breach of CHS/Community Health Systems, Inc.'s guaranty in Section 12.26.  All but the claim for breach of Section 3.10, which was dismissed after the close of Plaintiffs' case in chief, remain.

8

41.  A 19-day bench trial was held in this matter in May and June of 2021.  [D.E. 179 –
227].

## II.  Key Provisions in the Asset Purchase Agreement

42.  All of Tower Health's claims are for breach of the parties' contract (the APA) for
which Tower Health requests indemnification.  Accordingly, we must begin with a discussion of
the relevant provisions of that contract to place the rest of the evidence presented at trial in
context.

### A.   Tower Health Purchased from CHS Five Operating Businesses.

43.  On May 30, 2017, CHS and the other Defendants entered into the APA with Tower
Health and the other Plaintiffs.  [DX 111 (APA)].

44.  Tower Health was primarily represented in the negotiation of the transaction by
Joanne Judge of Stevens & Lee who was the point person for speaking with counsel for CHS.
Ms. Judge has practiced exclusively in the transactional and regulatory side of healthcare for the
last 25 years, and currently serves as the General Counsel for Tower Health.  [May 3, Judge, at
62:10 – 65:2, 68:8-21, 179:7-10].  Ms. Judge has extensive experience representing healthcare
buyers in transactions, including in drafting asset purchase agreements and conducting due
diligence.  [*Id.* at 66:1 – 67:15].

45.  Prior to attending law school, Ms. Judge was a certified public accountant working
for Deloitte in healthcare audit.  She then served as the controller, Chief Financial Officer, and
eventually president and Chief Executive Officer of Lancaster Community Hospital.  [May 3,
Judge, at 62:20 – 64:12].

46.  CHS was also represented by experienced healthcare deal counsel, Stephen Braun of
Bradley.  Mr. Braun has represented CHS in approximately 100 transactions since 1998.
[June 9, Braun, at 5:22, 7:18-21, 8:7-11].

47.  Defendants, Pennsylvania Hospital Company, LLC and Pottstown Hospital

Company, LLC, who own the assets of Pottstown Hospital, are included in the APA's definition

of "**Seller Entities**."  Defendant CHS is a party to the APA and guaranteed the obligations of the

Seller Entities, including Pennsylvania Hospital Company, LLC and Pottstown Hospital

Company, LLC.  [DX111 (APA), at Recitals A, G, § 12.26 & Ex. A].

48.  The "**Buyer Entities**" to the APA include Plaintiff, Pottstown Hospital, LLC, f/k/a PI

Five, LLC, which owns the assets of Pottstown Hospital.  [DX111 (APA), at Recital B].

Pottstown Hospital, LLC, a Pennsylvania limited liability company, is owned by Plaintiff, Tower

Health, with Tower Health as its sole member.  [DX111 (APA), at Recital B; May 3, Judge, at

72:17-23; DX98 (May 2017 Board presentation), at TOWER-CHS-PMMC-043980; D.E. 12

(corporate disclosure statement)].

49.  The Buyer Entities purchased from the Seller Entities the assets described in the

APA, which included five "**Hospitals"** (as defined in the APA).  [DX111 (APA), at Recitals C,

D, § 1.1].

50.  One of the five Hospitals was Pottstown Memorial Medical Center, now known as

Pottstown Hospital.  [DX111 (APA), at Recitals C, D, § 1.1].

51.  Tower Health purchased the five operating hospital businesses and fourteen physician

practices as a "going concern" and all "the operating assets of the hospital . . . includ[ing]

everything that it – everything that was required to operate the hospitals as they were

functioning."  [May 3, Judge, at 184:23 – 185:11; *id.* at 140:5-15].

52.  The assets of the Hospitals included both tangible assets, such as real estate,

equipment, and tangible personal property, but also intangible assets, such as intellectual

property and goodwill.  [DX111 (APA), § 1.1(a) – (p); *see also id.* at Recital D ("The Seller

10

Entities desire to sell to the Buyer Entities and the Buyer Entities desire to purchase substantially

all of the assets of the Seller Entities which are directly or indirectly related to, necessary for, or

used in connection with, the operation of the Hospitals . . . .")].

53.  Counsel for CHS who prepared the first draft of the APA, Stephen Braun, understood

that Tower Health was purchasing operating businesses and not just real estate property and

buildings.  He drafted the representations and warranties to address the viability of the ongoing

businesses:

> Q. . . . But first of all, sir, you'd agree with me, this was not a real estate
> deal, right?
>
> A.  Well, I mean there's real estate involved.  It's not a – just a straight
> real property purchase agreement.
>
> Q.  Right.  And the buyer wasn't just buying hard physical assets, right?
>
> A.  It was buying hard physical assets, and essentially the business
> operations and goodwill.
>
> Q.  You knew where I was going, sir.  What Tower was really buying was
> an operating business.  Isn't that fair?  The assets that make up an
> operating business.
>
> A.  Correct.
>
> Q.  And the entire asset purchase agreement that you were drafting, was to
> ensure the transfer of the operating business, as we just described, from
> CHS to Tower, right?
>
> A.  Correct.
>
> Q.  And what you understood as the drafter for CHS is what a buyer wants
> are representations and warranties relating to the operating business; isn't
> that fair?
>
> A.  Correct.
>
> Q.  So a buyer buying an operating business wants representations and
> warranties broader than just the physical condition of assets or real estate,
> right?
>
> A.  Correct.

> Q.  And that's why you included all of the reps and warranties that you had in your first draft, right?
>
> A.  Correct.
>
> Q.  So that the seller would know that the reps and warranties relate to the operating business, correct?
>
> A.  A portion of the reps and warranties relate to an operating business.

[June 9, Braun, at 76:11 – 77:16].

54.  Along with the assets, the Buyer Entities assumed three specific categories of limited liabilities under the APA, as set forth in Section 1.3.  [DX111 (APA), § 1.3; May 3, Judge, at 186:7-15, 187:3-12].

55.  The parties agreed:  "Except for the Assumed Liabilities, the Buyer Entities shall not assume and under no circumstances shall the Buyer Entities be obligated to pay or assume, and none of the assets of the Buyer Entities shall be or become liable for or subject to any liability, indebtedness, commitment, or obligation of the Seller Entities, whether known or unknown, fixed or contingent, recorded or unrecorded, **currently existing or hereafter arising** or otherwise (collectively, the 'Excluded Liabilities'), including, without limitation, the following Excluded Liabilities."  [DX111 (APA), § 1.4 (emphasis added); May 3, Judge, at 186:22 – 187:2; June 9, Braun, at 49:15-25 (this was an asset transaction with "specific, excluded liabilities and assumed liabilities")].

56.  Among the specified Excluded Liabilities were:

(a)  "Any debt, obligation, expense or liability that is not an Assumed Liability;" [DX111 (APA), § 1.4(a)];

(b)  "Liabilities and obligations of the Seller Entities in respect to periods prior to the Effective Time relating to the operation or ownership of Assets prior to the Effective Time . . . ;" [*id.* § 1.4(e)];

12

(c) "Any obligation or liability accruing, arising out of, or relating to any federal, state or local investigations of, or claims or actions against the Seller Entities or any of their Affiliates or any of their employees, medical staff, agents, vendors or representatives with respect to acts or omissions prior to the Effective Time;" [*id.* § 1.4(h)];

(d) "Any civil or criminal obligation or liability accruing, arising out of, or relating to any acts or omissions of the Seller Entities . . . ;" [*id.* § 1.4(i)]; and

(e) "Any act or omission of any Seller Entity or any of its Affiliates, or any of their respective employees, officers, agents or independent contractors that accrued, arose, occurred or came into existence at any time prior to the Effective Time." [*Id.* § 1.4(q)].

57. Mr. Braun agreed that, unlike a stock transaction, as an asset purchase transaction, Tower Health was not agreeing to assume the liabilities of the operating businesses. [June 9, Braun, at 81:4-22, 83:22 – 84:9].

58. The APA defined "**Effective Time**"—or closing on the APA—as 12:00:01 a.m., local time, on August 1, 2017, or at such other time as the parties may mutually designate in writing. [DX111 (APA), § 2.1].

59. The parties agreed to extend the closing of the APA to October 1, 2017 in the First Amendment to the APA. [PX136 (First Amendment to APA), § 2; May 3, Judge, at 228:23 – 229:5; June 9, Braun, at 62:6-8].

## B. CHS Provided an Unconditional Guaranty to Tower Health, and the Seller Entities Provided Representations and Warranties to Tower Health.

60. In Section 12.26 of the APA, Defendant CHS "unconditionally and absolutely guarantees the prompt performance and observance by the Seller Entities of each and every obligation, covenant and agreement of the Seller Entities arising out of, connected with, or

13

related to, this Agreement or any ancillary documents hereto and any extension, renewal and/or modification thereof."  [DX111 (APA), § 12.26].

61.  The APA provides that CHS's unconditional and absolute guaranty is "a continuing guaranty and shall remain in effect."  [DX111 (APA), § 12.26].

62.  The guaranty is not qualified in any way.  [DX111 (APA), § 12.26; May 4, Judge, at 175:16-22].

63.  Ms. Judge, the primary transaction counsel for Tower Health and current Tower Health General Counsel, testified as to why this guaranty by CHS was important:  "I think for two really fundamental reasons.  One was, as I just mentioned, each of the five hospitals was owned by a single-purpose entity by CHS.  And it was not without the realm of possibility that as soon as the sale was over, CHS would close those companies once the proceeds had been distributed.  So there would have been no financial wherewithal to stand behind . . . the reps and warranties.  The second one was, although reps and warranties are important in every agreement, they were of particular importance in this agreement because we did have limited due diligence and therefore were really relying entirely on CHS's representation to us about quite a number of issues, most importantly for this purpose regulatory."  [May 3, Judge, at 183:16 – 184:3; *see also* May 4, Judge, at 175:2-15].

64.  Ms. Judge testified that she would not have recommended that Tower Health close on the transaction without CHS's guaranty "because the representations and warranties were so important and the indemnification provision was extremely important and I would have advised Tower that without CHS standing behind them, there may have been no one standing behind them not long after the closing."  [May 3, Judge, at 184:4-16].

14

65.  Ms. Judge's testimony concerning Section 12.26 is unrebutted; Mr. Braun did not testify about Section 12.26 of the APA.

66.  The Seller Entities provided 25 different categories of express representations and warranties to the Buyer Entities and Tower Health in Section 3 of the APA.  [DX111 (APA), § 3].

67.  Ms. Judge testified that she viewed the 25 categories of representations and warranties provided by the Seller Entities, and guaranteed by CHS, as "distinct" and not duplicative.  [May 3, Judge, at 189:3-7; *see also* June 9, Braun, at 41:18 – 42:11].

68.  The Seller Entities, as guaranteed by CHS, made the representations and warranties to Tower Health effective "on two different dates.  The date that the agreement is executed and then again on the date that the agreement is closed."  The date of execution of the APA was May 30, 2017 and the date of closing was October 1, 2017.  [May 3, Judge, at 188:2-16; June 9, Braun, at 88:21 – 89:14; *see also* DX111 (APA), § 3 ("As of the date hereof, and, when read in light of any Schedules which have been updated in accordance with the provisions of <u>Section 12.1</u> hereof, as of the Closing Date, the Seller Entities represent and warrant to the Buyer Entities the following.")].

69.  The two different dates for the representations and warranties were important, because as of the APA's execution date, "it gives the buyer the comfort that they have been advised about everything that is important to know about the seller entities.  And because there are a number of months . . . that ensured between the date of execution and the date of closing, the buyer is advised on the date of closing then, that essentially nothing material has changed between the execution date and the closing date."  [May 3, Judge, at 188:17 – 189:2].

15

70. The parties included a "survival clause" that specified the representations and warranties survived the Closing Date for two years, except for a claim of fraud or intentional misrepresentation. [DX111 (APA), § 12.17].

71. Additionally, the same provision states: "All of the representations, warranties, covenants, and agreements made by the parties in this Agreement . . . may be fully and completely relied upon by the Seller Entities and the Buyer Entities, as the case may be, notwithstanding any investigation heretofore or hereafter made by any of them or on behalf of any of them . . . ." [DX111 (APA), § 12.17].

72. Ms. Judge testified about this provision, "I would note that it says that all of the reps and warranties essentially remain in place regardless of any investigation conducted by the buyer parties. Before or after the – the execution of the agreement. And I would note that this provision was drafted by CHS and I think that it was – it was intentionally essentially [sic] offered to Tower Health as a compromise for why Tower Health could not conduct full due diligence." [May 3, Judge, at 191:20 – 192:2; May 4, Judge, at 188:21 – 189:10 ("[I]t is basically saying that everything that the parties are making in terms of representations and warranties can be relied upon in their absolute, regardless of what the entities discovered during due diligence or any other way. And I will point out that this provision was drafted by CHS. And I believe when I read it originally, I understood that it was being offered by CHS, essentially, as a counterpoint to the fact that they understood we were not going to be able to engage in complete due diligence. Other agreements may say the representations and warranties may be relied upon except as the parties have identified a matter in due diligence. That's not what this one said.")].

16

73. Section 12.17 was important "[b]ecause it – it really reinforced the fact that the representations and warranties would stay in place for the entire survival period regardless of what Tower had learned or did not learn."  [May 3, Judge, at 192:3-10].

74. Ms. Judge would not have recommended that Tower Health close the transaction without the provision in Section 12.17:  "[T]he lack of complete and full due diligence created – would have created too much exposure for Tower in the absence of this provision."  [May 3, Judge, at 192:16-18].

75. Ms. Judge further explained:  "This was . . . a not evenly balanced acquisition from the buyer's standpoint in terms of its ability to fully investigate the risks it was assuming.  And so, the balance to that risk was very strong representations and warranties, in most cases, not knowledge qualified, including the regulatory ones that we talked about.  Tower identified that there was nothing disclosed to it of concern on the schedules that say where CHS was not in compliance.  And the fact that CHS was willing to say that they would stand behind their reps and warranties absolutely, regardless of what Tower identified during due diligence, made Tower comfortable that it could proceed.  And without that, I'm not sure that Tower could have been willing to take the risk and spend the amount of money that it spent to acquire these hospitals."  [May 4, Judge, at 189:17 – 190:6].

76. Mr. Braun testified consistently with respect to the meaning of 12.17.  "The expectation was that the buyer was to do – and buyer's [sic] expected to do a substantial amount of due diligence.  **And if you don't have a provision like that, to the extent they do due diligence and discover things, it cuts into the reps, so this basically says, my reps will stand on its [sic] own and they're not going to be kind of shortened or [excepted] by the stuff that you find it due diligence.**  So it permits the buyer to do its due diligence without negatively

17

impacting the reps that I provide – that the seller provides to the buyer."  [June 9, Braun, at 51:22 – 52:5 (emphasis added)].

### C.   Representations and Warranties Provided to Tower Health in Sections 3.6, 3.7, and 3.8, and the Seller Entities and CHS's Promise of Compliance in All Material Respects.

77.   Craig Conti, Vice President of Acquisitions and Development for CHS who signed the APA, [June 8, Conti, at 190:12-14, 244:8-16], testified that representations and warranties provide comfort to the buyer in a transaction (like Tower Health).  [*Id.* at 246:22 – 247:10].

#### 1.   Defendants Promised that Pottstown Hospital Was In Compliance In All Material Respects with its License.

78.   In Section 3.6 of the APA, the Seller Entities represented and warranted, "Each Hospital is duly licensed as a hospital pursuant to the applicable laws of the Commonwealth of Pennsylvania."  [DX111 (APA), § 3.6].

79.   Separately, the Seller Entities, as guaranteed by CHS, also represented and warranted: "The Seller Entities and the Acquired Companies are in compliance in all material respects with all Licenses . . . ."  [DX111 (APA), § 3.6].

80.   Section 3.6 defines "**Licenses**" as those listed on Schedule 3.6.  The first license for Pottstown Hospital listed is its "Hospital License."  [*Id.* & Schedule 3.6 (at CHS-TOWER00079559)].

81.   Ms. Judge testified that the Seller Entities represented in Section 3.6 "four distinct things all related to the Hospital's ability to operate," which included "material compliance with all of the licenses, and essentially that they haven't gotten any deficiencies or know of no deficiencies that relate to them."  [May 3, Judge, at 194:13 – 195:4].

82.  As Ms. Judge testified, Section 3.6 was important to Tower Health in this transaction because "this is really key to buying a business.  If – if Tower bought a business that wasn't qualified to operate, then it really wasn't buying a business."  [May 3, Judge, at 195:7-9].

83.  The compliance representations in Section 3.6 are not limited by the Seller Entities' "knowledge."

84.  Mr. Braun explained during his testimony that if a contractual representation has a "knowledge qualifier," it is breached only if the seller has knowledge of the breach.  A representation and warranty that includes a knowledge exception is more limited than a representation and warranty without a knowledge exception, like the representations and warranties at issue in Sections 3.6, 3.7, and 3.8.  [June 9, Braun, at 84:23 – 85:17, 86:24 – 87:14].  The "broader" representations and warranties that are not limited to a seller's knowledge means the seller is liable for a breach of the representations and warranties whether or not the seller knows about the specific violations of the particular representation and warranty.  [*Id.* at 87:11-14].

85.  Ms. Judge testified that the separate "compliance in all material respects" representation as of October 1, 2017 included in Section 3.6 was critical to Tower Health because of the passage of time between the issuance of the license and closing on the transaction:

> [L]icenses are only reviewed every three years and regulations change in the intervening period of time.  It was really important for the buyer to know that the seller was telling us that they were in compliance with what is required for a license, as of the date of execution and closing.  Or where they were not.
>
> . . . .
>
> A license is issued and then re-issued on a – a cycle of three years.  And a lot can happen in between that period of time.  So let me just give you a different example.  So if – if Pottstown Hospital got a new license today from the Department of Health, and one month from today the Department of Health issued a new regulation or CMS issued a new regulation that

19

said, you now have to begin reporting quality measures for diabetes starting November 1st.  Pottstown could not wait for three years, until its next licensure cycle to implement that regulation.  It had to do it on November 1st.  So what we were asking them to tell us was, we know you have the license, because you've given them to us, but are you in compliance with everything that's required for the license that's been issued since the day that you got the license or before.

[May 4, Judge, at 177:17 – 178:5, 179:21 – 180:13].

### 2. Defendants Promised that Pottstown Hospital Was in Compliance in All Material Respects with the Medicare Conditions of Participation.

86.  In Section 3.7 of the APA, the Seller Entities represented and warranted:  "Each Hospital is qualified for participation in the Medicare, Medicaid and CHAMPUS/TRICARE programs, has current and valid provider contracts with such programs, **is in compliance in all material respects with the conditions of participation in such programs**, and has received all approvals or qualifications necessary for capital reimbursement by the Hospital."  [DX111 (APA), § 3.7 (emphasis added)].

87.  The parties agree that complying with the Life Safety Code is a required condition of participation for the Medicare program.  [PX296 (42 C.F.R. § 482.41(b)(1)(i)) (The hospital must meet the applicable provisions and must proceed in accordance with the Life Safety Code (NFPA 101 . . . .); PX72 (May 6, 2016 CMS S&C Memo)].

88.  Section 3.7 also includes a separate representation and warranty that each Hospital, including Pottstown Hospital, "is duly accredited, with no contingencies (except as set forth on Schedule 3.7) by The Joint Commission."  [DX111 (APA), § 3.7].

89.  Like Section 3.6, the relevant representations and warranties in Section 3.7 are not limited based on the Seller Entities' knowledge or reasonable investigation.  [*Compare with* DX111 (APA), § 3.7 ("To the knowledge of the Seller Entities, all billing practices of the Seller

Entities . . . have been in compliance with all applicable laws, regulations and policies . . . ."); *see also* June 9, Braun, at 108:10-20].

90.   Section 3.7 in the APA is the only representation and warranty addressing Medicare conditions of participation.  [June 9, Braun, at 110:7-14].

91.   As discussed in more detail in **Section III**, the inclusion of Section 3.7 in the APA was important because the continued participation in the Medicare and Medicaid programs was an "extremely important fact for any acute care hospital, as it was for Pottstown Hospital."  [May 3, Judge, at 198:8-16].

92.   Mr. Braun also understood that the continued participation in the Medicare COP was crucial for an operating business like Pottstown Hospital and that Section 3.7 was an important representation and warranty to the buyer, Tower Health.  [June 9, Braun, at 107:15-23].

### 3.   CHS Promised that Pottstown Hospital Was in Compliance in All Material Respects with Its Regulatory Requirements.

93.   In Section 3.8, the Seller Entities represented and warranted:  "Except as set forth on Schedule 3.8 hereto, the Seller Entities and the Acquired Companies are in compliance in all material respects with all applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the Facilities and the operations of the Facilities." [DX111 (APA), § 3.8].

94.   "**Facilities**" is defined in the APA to include the "Hospitals."  [DX111 (APA), vii (Glossary), Recital D].

95.   Section 3.8 defines "**Government Entity**" as "any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state, or local."  [DX111 (APA), § 3.8].

96.  Like Sections 3.6, and 3.7, the Seller Entities' representations and warranties with respect to their compliance in all material respects with all applicable laws is not limited to the Seller Entities' knowledge or reasonable investigation, meaning that it is an "unconditional representation and warranty" and had "no limitations," regardless of whether the Seller Entities knew of a violation.  [DX111 (APA), § 3.8; May 3, Judge, at 206:10 – 207:3; June 9, Braun, at 115:18-22].

97.  Ms. Judge testified about why the first sentence of this paragraph concerning compliance in all material respects with all regulations was important:  "Because the regulations are fluid, and the hospital is required to comply, as soon as the effective date happens, we wanted to know whether the seller entities could tell us that they were in material compliance – compliance in all material respects, with everything that was applicable, as of the date of execution and again, as of the date of closing."  [May 4, Judge, at 181:19 – 182:8].

98.  Mr. Braun agreed that CMS is one of the government entities having jurisdiction over the facilities, and that it is important for Tower Health "to know when it's buying these operating businesses that these facilities are, in fact, in compliance on those dates with the CMS rules, regulations, and requirements" because otherwise Tower Health may not be able to continue collecting Medicare payments.  [June 9, Braun, at 114:14 – 115:2].

99.  The effective date of both CMS and Pa. DOH's adoption of the 2012 edition of the Life Safety Code is July 5, 2016.  [PX67 (Federal Register); PX68 (May 6, 2016 CMS S&C Memo); PX69 (Pa. Bulletin)].

100.  The version of the FSES that complies with the 2012 edition of the Life Safety Code, found in NFPA 101A, 2013 edition, was effective November 1, 2016.  [PX94 (Dec. 16, 2016 CMS S&C Memo)].

22

101.  Section 3.8 required the Seller Entities, as guaranteed by CHS, to disclose on Schedule 3.8 of the APA all instances in which the Seller Entities and the Acquired Companies are not in compliance in material respects with all applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the Facilities.  [DX111 (APA), § 3.8].

102.  The Seller Entities and CHS did not make any disclosures on Schedule 3.8, but instead cross-referenced Schedule 3.7 and Schedule 3.13 (litigation).  [DX111 (APA), at Schedule 8 (CHS-TOWER-00079598); *id.* at Schedule 3.7 (CHS-TOWER00079570 - 00079597; *id.* at Schedule 3.13 (CHS-TOWER-00079627 – 00079711)].

103.  The Seller Entities and CHS did not disclose anything on Schedule 3.7, 3.8, or 3.17 concerning (1) the Life Safety Code compliance at Pottstown Hospital; (2) the CHS statement that its 2015 life safety plans, which relied on a 2009 FSES, were "way out of compliance" [PX96 (Jan. 16, 2017 approved CER)]; (3) CHS's failure to conduct a compliance audit of Pottstown Hospital in 2017 (as required by CHS's compliance policies) [May 13, Keown, at 40:16-23; May 24, Ridall, at 54:4 – 55:4]; (4) the discussions in April 2017 between CHS and Pa. DOH [PX128 (May 2017 email string); **Section VII(B)**]; (5) Pottstown Hospital's invalid 2009 FSES [**Section V(F)**]; or (6) CHS's decision not to evaluate whether Pottstown Hospital achieved a passing score under the 2013 FSES Form.  [May 3, Judge, at 208:9 – 209:1, 210:18 – 211:10, 212:10 – 213:9; May 4, Judge, at 29:1-3 ("There was nothing reported on the schedules to us about compliance that was an exception, which I would consider an FSES to be an exception."); *id.* at 55:13-21 (the information should have been disclosed on Schedule 3.8)].

104.  Between execution and Closing of the APA, the Seller Entities did not update Schedules 3.4 or 3.8 to the APA to disclose life safety conditions at Pottstown Hospital or any

contingent liabilities associated with the deficient life safety condition at Pottstown Hospital. [May 3, Judge, at 233:4-18].

105.  As testified by Ms. Judge, these instances of non-compliance should have been disclosed to Tower Health:  "I don't think anyone sitting here would argue that it was an immaterial compliance issue.  And on the date of execution and on the date of closing, clearly Pottstown Hospital was not in compliance with the required Fire Protection Code that was in place at that time."  [May 3, Judge, at 211:3-7].  She continued:  "[I]t would have been extremely important for Tower Health to understand that there was this issue of noncompliance at Pottstown Hospital so that it could properly address what it would take to get into compliance and perhaps even to decide whether it was going to go forward with the transaction."  [*Id.* at 214:9-14].

106.  Wayne Carson, one of CHS's Life Safety Code experts, was asked whether he would have advised his client to disclose the improperly submitted and invalid FSES (discussed in **Section V(F)**) in connection with a transaction involving these contractual requirements. Mr. Carson testified:  "[B]ased on those assumptions, if – if that was the case, I would say, yes, that's one of the conditions that should have been revealed."  [May 26, Carson, at 205:23 – 207:23].

107.  Mr. Carson also testified that he would have advised his client to disclose the April 2017 communications from Pa. DOH (discussed in **Section VII(B)**) about obtaining a new FSES for Pottstown Hospital under the 2012 edition of the Life Safety Code, using the 2013 FSES Form, and Pa. DOH's rejection of Pottstown Hospital's submittal of new life safety plans. [May 26, Carson, at 210:20 – 211:5 ("I would have probably told them they should tell the client about these plans.")].

108.  The inclusion of the Seller Entities' representations and warranties, as guaranteed by CHS, that the Seller Entities and Acquired Companies are in compliance in all material respects with applicable laws were important "so that Tower Health would understand that it was buying a going concern with no material flaws.  Nothing that would prevent it from operating the hospital on a go forward basis."  [May 3, Judge, at 199:8-10].

### 4.  "Compliance" as Used in the APA Is Not Defined, Has No Standard Industry Meaning, and Must Be Given its "Ordinary Meaning."

109.  Sections 3.6, 3.7, and 3.8 in the APA, each of which address distinct subject matters, are qualified by the phrase "in compliance in all material respects."  [May 3, Judge, at 199:11-14; DX111 (APA), §§ 3.6, 3.7, 3.8].

110.  The word "compliance" is not a capitalized defined term in the APA and is not included as a defined term in the APA's glossary.  [May 3, Judge, at 199:15 – 200:6; DX111 (APA), at vii].

111.  Ms. Judge testified that she would not have expected "compliance" to be defined in the APA:  "To me compliance is a word like true.  You're either in – you're obeying the rules and regulations.  You're in compliance with them or they're – you're not.  So Mr. Braun drafted this agreement.  He understood what compliance meant.  He was an experienced healthcare lawyer.  I – I have never seen an Asset Purchase Agreement for a hospital, that defined the word compliance."  [May 3, Judge, at 200:8-14].

112.  Ms. Judge testified that she never discussed the meaning of compliance with Mr. Braun or any other counsel for CHS.  [May 3, Judge, at 200:15-19].  Mr. Braun did not dispute her testimony; Mr. Braun was never asked about the term "compliance" in the APA.

113.  Ms. Judge also testified that in her experience in the healthcare industry, it is not industry standard to define the term "compliance" referring to CMS regulations for purposes of

the APA.  [May 3, Judge, at 200:20 – 203:5 (noting that defining the term "compliance" in Section 3.8 would make no sense since "CMS has absolutely no jurisdiction over anything in a hospital that would come from the Department of Health, the State Board of Pharmacy, or the local municipality, for that matter.")].

114.  The testimony of Ms. Judge is unrebutted because counsel for CHS elected not to question Mr. Braun about his understanding of the word "compliance" in the APA and likewise presented no other witnesses from CHS to discuss the meaning of "compliance" in the APA.

115.  The Court finds that, in contrast to CHS's position that the word "compliance" in the APA has the meaning provided in the CMS regulations, the word "compliance" in the APA does not refer to any CMS regulation.  [DX111 (APA), §§ 3.6, 3.7, 3.8].  The parties knew how to define a term by referencing a federal regulation as evidenced by the parties' reference to federal regulations to define another term in Section 3.8.  [*Id.* § 3.8 ("physicians' immediate family members (as that term is defined at 42 C.F.R. § 411.351)"); May 3, Judge, at 205:18 – 206:5].

116.  As discussed below in **Section VI**, compliance as used in the industry—including by CHS outside of this litigation, by regulators, and by all the code compliance experts who testified at trial for both parties—reflects the ordinary, dictionary definition of "compliance."

### D.     The Seller Entities, as Guaranteed by CHS, Promised to Provide Accurate Financial Statements that Complied with GAAP in Section 3.4.

117.  Section 3.4's representation by the Seller Entities relates to their "Financial Statements," defined as the Unaudited Balance Sheet as of March 31, 2017; the Unaudited Income Statement for the three months ended on March 31, 2017; and the Unaudited Balance Sheets and Income Statements for the fiscal years ended on December 31, 2016 and 2015. [DX111 (APA), § 3.4].

26

118.  The Financial Statements in Section 3.4 are for the individual Hospitals, such as Pottstown Hospital, not for CHS or its publicly traded parent company, CHSI, which is not a defendant.  [*Id.* § 3.4 ("The Seller Entities have delivered to the Buyer Entities copies of the following financial statements of the **Seller Entities and the Acquired Companies** . . . ."); *id.* at Ex. A, D; June 7, Kruskol, at 127:12 – 128:4].

119.  The Financial Statements of the individual Hospitals are not audited, unlike the financial statements of CHSI.  [June 7, Johnson, at 102:19 – 103:5, 106:4 – 107:2].

120.  Section 3.4 contains at least three separate representations and warranties and requires certain disclosures on Schedule 3.4 to the APA.

121.  First, the Seller Entities represented and warranted, and CHS guaranteed, "Except as set forth in Schedule 3.4, such Financial Statements have been (and the monthly financial statements delivered pursuant to Section 5.6 will be) prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated."  [DX111 (APA), § 3.4].

122.  Second, the Seller Entities represented and warranted, and CHS guaranteed, "Such Balance Sheets present fairly in all material respects (and, in the case of financial statements delivered pursuant to Section 5.6, will present fairly in all material respects) the financial condition of each Seller Entity and Acquired Company as of the dates indicated thereon, and such Income Statements present fairly in all material respects (and, in the case of financial statements delivered pursuant to Section 5.6, will present fairly in all material respects) the results of operations of each Seller Entity and Acquired Company for the periods indicated thereon."  [DX111 (APA), § 3.4].

123.  Third, the Seller Entities represented and warranted, and CHS guaranteed, "Except as disclosed on Schedule 3.4, no Seller Entity or Acquired Company has any material liabilities of

27

any nature (whether accrued, absolute, contingent or otherwise) that are of a type required to be disclosed or reflected in financial statements of a Seller Entity or Acquired Company in accordance with GAAP except for (i) liabilities reflected or reserved against in the Financial Statements, and (ii) liabilities incurred in the ordinary course of business since [March 31, 2017]."  [DX111 (APA), § 3.4; May 3, Judge, at 215:3-11].

124.  As stated in Section 3.4 ("Seller Entities have delivered to the Buyer Entities"), CHS provided copies of the Financial Statements to Tower Health, including for Pottstown Hospital. [May 3, Judge, at 215:19 – 221:5; PX319 (Pottstown Hospital balance sheets); PX320 (Pottstown Hospital balance sheets); PX321 (Pottstown Hospital income statements); PX322 (Pottstown Hospital income statements); DX116].

125.  Although Schedule 3.4 includes a disclosure that the Financial Statements do not include footnotes, relating to the first sentence of Section 3.4, the Schedule did not disclose any contingent liabilities, relating to the last sentence of Section 3.4.  [DX111 (APA), at Schedule 3.4 (CHS-TOWER00079539)].

126.  Ms. Judge, as counsel for Tower Health, understood that CHS was required to disclose material liabilities on Schedule 3.4 to comply with the last sentence of Section 3.4. [May 4, Judge, at 183:21-24].

127.  Schedule 3.4 did not disclose the contingent liability associated with the cost of remediating Pottstown Hospital to comply with the Life Safety Code.  [DX111 (APA), at Schedule 3.4 (CHS-TOWER00079539); May 4, Judge, at 184:5-14].

128.  Schedule 3.4 did not disclose the contingent liability related to the allowances associated with bad debts and corresponding decrease in net patient revenues at Pottstown

28

Hospital.  [DX111 (APA), at Schedule 3.4 (CHS-TOWER00079539); May 12, Pocalyko, at
24:24 – 25:8].

### E.    The Seller Entities, as Guaranteed by CHS, Provided Covenants to Tower Health.

129.  In Section 5 of the APA, the Seller Entities, as guaranteed by CHS, provided a
number of covenants to Tower Health prior to closing.  [DX111 (APA), § 5].

130.  In Section 5.2, the Seller Entities, as guaranteed by CHS, promised to Tower Health
that they would "(b) use commercially reasonable efforts to maintain the Facilities and all parts
thereof in good operating condition, ordinary wear and tear excepted;" and "(e) use
commercially reasonable efforts to . . . maintain their relationships with . . . third party
payors . . ."  [DX111 (APA), §§ 5.1(b), (e)].

131.  Medicare, Medicaid, and insurance companies like Independence Blue Cross or
Capital Blue Cross are examples of third party payors.  [PX80 (CHS Confidential Information
Memorandum), at TOWER-CHS-PMMC-029614; May 3, Judge, at 100:7 – 101:16].

132.  Complying with the Medicare COP is a condition for hospitals to receive Medicare
reimbursement, as well as to receive payment from third party insurance companies.  [May 3,
Judge, at 74:11-20, 76:16 – 77:22; PX173 (June 25, 2018 CMS email with survey and Important
Notice), at TOWER-CHS-PMMC-015516; PX296, 42 C.F.R. § 482.41].

133.  In Section 5.3, the Seller Entities, as guaranteed by CHS, agreed not to "take any
action that would result in any breach of the representations made herein."  [DX111 (APA),
§ 5.3(f)].

134.  In Section 5.4, the Seller Entities, as guaranteed by CHS, promised to Tower Health
that they would "use reasonable efforts to obtain all governmental approvals (or exemptions

29

therefrom) necessary or required to allow the Seller Entities to perform its obligations under this Agreement."  [DX111 (APA), § 5.4(i)].

> **F.** **The Parties Did Not Agree to a Fair Market Value Allocation of the Hospitals in the Purchase Price.**

135.  The purchase price for the five Hospitals was $456,300,000 with certain specified adjustments and credits.  [DX 111 (APA), §§ 1.6, 5-6].

136.  The parties did not agree to a fair market value allocation of the purchase price among the five hospitals.  [May 4, Judge, at 91:14-17].  CHS presented no evidence that the parties ever agreed on a fair market value allocation for the assets purchased in the APA.

137.  Instead, Tower Health agreed to CHS's requested allocation of the purchase price for use by CHS for its own tax purposes.  [May 3, Judge, at 224:10-13].  As a non-profit company, Tower Health is tax-exempt.  [*Id.*at 69:3-4].

138.  Section 10.1 of the APA states, in pertinent part, "The Purchase Price shall be allocated among the various classes of Assets in accordance with and as provided by Section 1060 of the [Internal Revenue] Code.  The Buyer Entities and the Seller Entities shall agree on a proposed allocation among the various classes of Assets and by Hospital prior to Closing, and shall list the proposed allocation on Schedule 10.1 to this Agreement.  Within ninety (90) days of the Closing, the Seller Entities shall provide the Buyer Entities with a proposed final allocation of the Purchase Price for the Buyer Entities' review and approval . . . The parties agree that any tax returns or other tax information they may file or cause to be filed with any governmental agency shall be prepared and filed consistently with such agreed upon allocation."  [DX111 (APA), § 10.1].

139.  Schedule 10.1 attached to the APA is the preliminary proposed allocation for tax purposes.  [May 3, Judge, at 223:19 – 225:15].

140.   As Ms. Judge testified, "This was an issue that was much more important to CHS because CHS is the taxpayer and Tower Health is a tax exempt.  And this allocation of purchase price is really about the allocation for tax purposes, as you see in the last sentence, where it says, 'Each party will prepare and file Form 8594,' which is an IRS form."  [May 3, Judge, at 224:8-13].  The reference to "Code" in this paragraph relates to the Internal Revenue Code.  [May 4, Judge, at 186:21-23].

141.   Ms. Judge explained what she meant when she testified that Schedule 10.1 was an allocation for tax purposes:  "[I]t is not uncommon at all for a business to have things that it reports to the IRS using different methodologies than it reports on its books. . . . CHS is a tax paying entity.  Tower Health is a tax exempt entity.  So this provision can be very controversial between two tax paying entities, because each of them may benefit differently from the allocation of purchase price the way that it's reported to the Internal Revenue Service.  In Tower's particular case, because it was not a tax paying entity, it was very happy to support the allocation that CHS believed would be appropriate for CHS from a tax standpoint, because it had no bearing, essentially, on Tower Health."  [May 4, Judge, at 187:1-20].

142.   For its own purposes as recorded on its books and records, Tower Health used a fair market value methodology to allocate the purchase price.  [May 3, Judge, at 225:22 – 227:13; May 4, Judge, at 81:4-24, 84:8-12; DX198 (final allocated purchase price)].

143.   Tower Health engaged FTI Consulting to assist with the allocation, and assigned a fair market value allocation to Pottstown Hospital of "just under $149 million" for its enterprise value as a going concern business.  [May 3, Judge, at 226:1-7; *see also* PX118 (April 2017 FTI fair market value assessment), at TOWER-POCALYKO-0002348 – 23477].

144.  For reasons discussed in more detail below, the "value" of Pottstown Hospital to Tower Health was much more than either the tax allocation or Tower Health's calculated fair market value, given Pottstown Hospital's overall significance to the Tower Health healthcare system and the millions of dollars in patient referrals from Pottstown Hospital to Reading Hospital for higher level care.

### G.    Other APA Provisions Discussed at Trial.

145.  As one of its defenses to liability for breach of the representations and warranties in Sections 3.6, 3.7, and 3.8, CHS relies on Section 3.22 of the APA, "Condition of Assets."

146.  Section 3.22 states:  "Other than with respect to the representations and warranties herein provided, the Seller Entities shall transfer the Assets to the Buyer Entities and the Buyer Entities shall accept the Assets from the Seller Entities and as owned by the Acquired Companies at the Closing AS IS WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, WITH RESPECT TO THE LAND, BUILDINGS, AND IMPROVEMENTS, AND WITH NO WARRANTIES, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE EQUIPMENT, INVENTORY, AND SUPPLIES, AND ANY AND ALL OF WHICH WARRANTIES THE SELLER ENTITIES HEREBY DISCLAIM."  [DX111 (APA), § 3.22].

147.  Ms. Judge testified that because Section 3.22 begins with the qualifying phrase "other than with respect to the representations and warranties herein provided," Section 3.22 has no effect on the representations and warranties provided in Sections 3.6, 3.7, and 3.8 of the APA. [May 3, Judge, at 222:12 – 223:12 ("None.  It just reinforces it. . . . It just repeats that those representations and warranties stand)].

32

148.  This provision relates to implied warranties concerning certain assets of the Hospitals, such as a hospital's roof or an HVAC system, and does not negate the APA's affirmative regulatory representations.  "Tower understood going in that if Pottstown Hospital had a leak in its roof or, you know, a break in the sidewalk that had to be repaired or the x-ray machine had to have a new part, that it was going to be Tower's responsibility.  What it expected was that it was receiving a hospital that it could operate under the Pennsylvania licensure and CMS conditions of participation, and that is not, in fact, what happened."  [May 4, Judge, at 185:10 – 186:5].

149.  The representations in Sections 3.6, 3.7, and 3.8 each require Pottstown Hospital's compliance with the Life Safety Code, which addresses the "construction . . . features necessary to minimize danger to life from the effects of fire, including smoke, heat, and toxic gases created during a fire."  [PX41 (Life Safety Code), at 101-22, § 1.1.2].  Section 3.7 requires compliance with CMS's COP, including 42 C.F.R. § 482.41, called Physical Environment, which incorporates the Life Safety Code.  [PX296, 42 C.F.R. § 482.41(b)(1)(i), (e)(vi)].

150.  By its very contractual language, Section 3.22 does not negate the representations of Sections 3.6, 3.7, and 3.8 as they relate to compliance with the Life Safety Code.

151.  Section 3.22's prefatory clause "other than with respect to the representations and warranties herein provided" does not refer specifically, by paragraph reference, to any other provisions in the APA.

152.  The APA also provides a right of indemnification to the Buyer Entities under Section 11 in the event of a breach of the APA.  [DX111 (APA), § 11.2].

153.  The Seller Entities agreed to indemnify the Buyer Entities "from and against any and all losses, liabilities, damages, costs (including, without limitation court costs and costs of appeal) and expenses (including, without limitation, reasonable attorneys' fees and fees of expert

33

consultants and witnesses) that such Buyer Indemnified Party incurs as a result of, or with respect to (i) any misrepresentation or breach of warranty by the Seller Entities under this Agreement, . . . . [or] (iii) any of the Excluded Liabilities."  [DX111 (APA), § 11.2].

154.  The APA provides that a notice of the indemnification claim should be provided within 30 days "after becoming aware of such breach of claim, specifying in detail the circumstances and facts which give rise to a claim under this <u>Section 11</u>."  [DX111 (APA), § 11.5].

155.  The failure to provide notice within 30 days does not eliminate the obligation of the Indemnifying Party to indemnify the Indemnified Party; instead, the APA provides that the indemnity "shall be limited to the damages that would have nonetheless resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above . . . ." [DX111 (APA), § 11.5].

156.  The APA contains a Pennsylvania choice of law provision.  [DX111 (APA), § 12.6].

157.  The parties agreed to an integration provision in the APA, including that the APA superseded any prior negotiations or representations not expressly incorporated into the agreement.  [DX111 (APA), § 12.23; May 3, Judge, at 181:16 – 182:5].

158.  This integration provision provided that the APA superseded the parties' letter of intent.  [June 8, Conti, at 241:24 – 242:11, 245:9-15 (agreeing that Section 3.22 "is what governs the transaction between the parties" and that he "understood that when [he] signed the agreement"); June 9, Braun, at 70:4-23 (agreeing that after the APA is signed, "It's all reflected in the definitive asset purchase agreement" and the LOI has no effect)].

159.  The parties agreed the prevailing party in this litigation would be entitled to recover its reasonable attorneys' fees and costs.  [DX111 (APA), § 12.5].

III.  **Overview of the Regulatory Framework for Pennsylvania Hospitals like Pottstown Hospital.**

160.  Pennsylvania hospitals, like Pottstown Hospital, are subject to regulation by multiple entities [May 3, Judge, at 73:15 – 76:8], three of which have particular significance in this case.

161.  First, the federal Centers for Medicare and Medicaid Systems (CMS) regulates participation in the Medicare program for hospitals, allowing hospitals to receive Medicare and Medicaid payments.  [May 3, Judge, at 74:11-20].

162.  Approximately 50% of all healthcare is paid by Medicare and Medicaid.  [May 3, Judge, at 76:16 – 77:22].

163.  In the years prior to its sale by CHS, Pottstown Hospital received 65-70% of its revenue from Medicare and Medicaid.  [PX80 (CHS Confidential Information Memorandum), at 16; May 3, Judge, at 101:8-16 (managed care is added to the Medicare component)].

164.  To participate in the Medicare program, a hospital must be certified to be in compliance with CMS's Conditions of Participation (COP), set forth by federal regulations.  One of the conditions of participation is compliance with the Life Safety Code, codified in NFPA 101, 2012 edition.  [PX296, 42 C.F.R. § 482.41(b)(1)(i); May 3, Judge, at 77:10-14 ("They have adopted the same requirement that I just mentioned from the Pennsylvania Department of Health, Department of Life Safety, that you must be in compliance with the then current National Fire Protection Standards."); May 10, Koffel, at 37:22-24; June 8, Stefanov, at 265:19-25].

165.  Complying with the Medicare COP is critical to a hospital like Pottstown.  "If you're not in compliance, the ultimate penalty, I guess is the right word to use, would be that you couldn't operate anymore and accept Medicare patients.  And as I said earlier, because almost 50 percent of all inpatients in the United States are covered by Medicare, that's an extremely important participation for every hospital."  [May 3, Judge, at 77:15-22; May 10, Koffel, at 37:25

35

– 38:5 (participation in the program allows the hospital to receive reimbursement from CMS for services provided to Medicare and Medicaid eligible patients)].

166. Second, the Pennsylvania Department of Health, Pa. DOH, regulates Pennsylvania hospitals.  [May 3, Judge, at 73:22 – 74:1, 75:2 – 76:12].

167. Pa. DOH issues a hospital license, which is required for a hospital to remain operating in the Commonwealth of Pennsylvania.  [May 3, Judge, at 73:22 – 74:1].

168. There are two distinct divisions of Pa. DOH:  the Division of Acute and Ambulatory Care ("**DAAC**"), and the Division of Life Safety ("**DSI**").  [May 3, Judge, at 75:2-23; May 13, Keown, at 24:2-18].  DAAC focuses on patient care, infection control, and the clinical side of hospitals.  [May 3, Judge, at 75:2-23].  The DAAC's inspections and surveys are not relevant to Tower Health's breach of contract claims.

169. The DSI side of Pa. DOH reviews building code and fire protection issues.  [May 3, Judge, at 75:12-15].

170. DSI, like CMS, requires compliance with "whatever the current fire code is at the time" as a condition of the Pennsylvania licensing requirements, which currently is NFPA 101, 2012 edition, Life Safety Code.  [May 3, Judge, at 76:7-15; PX69 (46 Pa. Bulletin 2917) (announcing adoption of NFPA 101, 2012 edition)].

171. Pa. DOH conducts a number of different surveys of hospitals under its jurisdiction.  [May 10, Koffel, at 70:20 – 71:2].

172. One survey that Pa. DOH conducts is a **licensure survey**.  In this survey, Pa. DOH typically reviews the entire hospital to determine if the facility is in compliance with its Pennsylvania licensing requirements.  [May 10, Koffel, at 71:15-20; PX292 (Pa. DOH, DSI definitions), at 2].

36

173.  Another survey Pa. DOH conducts is a **certification survey**.  In this survey, Pa. DOH, on behalf of CMS, reviews the entire hospital to determine if the facility is in compliance with the Medicare conditions of participation.  "Certification" is the term CMS uses with respect to its conditions of participation.  [May 10, Koffel, at 72:15 – 73:2; PX292 (Pa. DOH, DSI definitions), at 1].

174.  A third type of survey Pa. DOH conducts is an **occupancy survey**.  In an occupancy survey, Pa. DOH reviews a specific area of a hospital undergoing construction or a rehabilitation project rather than the entire facility.  [May 10, Koffel, at 71:3-14; May 24, Ridall, at 66:15-23; May 26, Carson, at 245:14-20; PX292 (Pa. DOH, DSI definitions), at 2].

175.  An occupancy survey does not assess "compliance" of the entire facility; instead, as defined by Pa. DOH, an occupancy survey is "an announced survey conducted to ensure regulatory compliance in a new or renovated area of the building prior to granting approval for patient utilization of the area."  [PX292 (Pa. DOH, DSI definitions), at 2; May 10, Koffel, at 170:14 – 171:7; *compare with* PX292 (Pa. DOH, DSI definitions), at 2 (defining "licensure survey" as "a survey completed to verify that the facility is in compliance with state licensure regulations")].

176.  Third, although not a regulator and not a governmental entity, The Joint Commission ("**TJC**") provides a voluntary accreditation if requested by hospitals.  The accreditation is akin to a "Good Housekeeping seal of approval," and most hospitals choose to seek TJC accreditation.  [May 3, Judge, at 79:19 – 80:16].

177.  Additionally, a hospital can obtain "**deemed status**" by CMS for its COP by which the hospital can rely on a TJC survey to satisfy CMS's COP and by Pa. DOH to satisfy its

licensing requirements.  [May 3, Judge, at 81:21 – 82:15; May 13, Keown, at 86:13 – 87:2; May 10, Koffel, at 89:7 – 90:13].

178.  Instead of having three separate surveys, if a hospital has deemed status, a hospital must go through only the TJC survey process, which is then used to recommend certification by Medicare and by Pa. DOH for its Pennsylvania license.

179.  TJC typically surveys hospitals once every three years.  [May 3, Judge, at 80:24 – 81:5].

180.  However, CMS conducts what are known as "**validation surveys**" to test the work completed by the various accrediting agencies, such as TJC.  [*See* May 3, Judge, at 82:22-24 ("A validation survey is really that.  Just a test to see whether the Joint Commission is doing what it's supposed to be doing under the Deemed Status."); May 10, Koffel, at 49:12-22, 90:14-23; *see also* 42 C.F.R. § 488.9 (validation surveys)].  A validation survey happens frequently when there is a change in ownership.  [May 3, Judge, at 82:16-22].

181.  CMS reports the results of its validation surveys to Congress every year.  The discrepancy rate of things that TJC misses during its accreditation surveys is high.  [PX202 (2017 CMS annual report to Congress), at 44; PX290 (2019 CMS annual report to Congress), at 44].  One of CHS's Life Safety Code compliance experts, Wayne Carson, acknowledged that it is not unusual for TJC to miss things during its accreditation surveys.  [May 26, Carson, 176:5-8].

182.  Following TJC's accreditation survey of Pottstown Hospital in February 2018, when Tower Health owned Pottstown Hospital, Pa. DOH, on behalf of CMS, conducted its March 2018 survey of Pottstown Hospital as a CMS validation survey.

183.  In its March 2018 validation survey, CMS determined that TJC's February 2018 survey was deficient, removed Pottstown Hospital's TJC deemed status, and placed Pottstown

38

Hospital under state agency survey (Pa. DOH) jurisdiction rather than under TJC.  [May 3, Judge, at 83:12 – 84:4; PX 173 (June 25, 2018 email with survey results and CMS Important Notice); *see also* 42 C.F.R. § 488.9(b), (c)].

184.  Pottstown Hospital remains under state agency survey jurisdiction, does not have TJC deemed status today, and can no longer rely on TJC's accreditation surveys to satisfy CMS's COP and Pa. DOH licensing requirements.  [May 3, Judge, at 83:17 – 84:4, 244:15-17; May 13, Keown, at 72:6 – 73:20].

185.  As one of its defenses, CHS argued throughout trial that "compliance," as used in the APA, is a "status" determined by CMS, Pa. DOH, and TJC.  Tower Health does not dispute that CMS, Pa. DOH, and TJC make the final determination with respect to regulatory determinations as to whether a hospital can participate in Medicare COP, whether a hospital has its Pennsylvania hospital license, and whether a hospital has a TJC accreditation.

186.  The issue with respect to Sections 3.6, 3.7, and 3.8, however, is the parties' meaning of "compliance" as used in the APA.

187.  The Court specifically rejects CHS's interpretation of "compliance" as meaning "regulatory compliance;" that is, that only a regulator can determine compliance through surveys, as discussed in more detail in the Conclusions of Law.  The Court finds the plain language of the APA, combined with the testimony presented at trial about the meaning of compliance outside of this litigation, supports the contractual interpretation of compliance as having its ordinary meaning.

**IV.  CMS and Pa. DOH Adopted the 2012 Edition of the Life Safety Code in July 2016.**

**A.    The Life Safety Code Requires Hospitals to Meet Minimum Requirements of Both Active and Passive Fire Protection.**

188.  NFPA 101 (the **Life Safety Code** or **LSC**) is a code that addresses fire protection construction required of different occupancies, including healthcare occupancies (like hospitals), and provides "minimum requirements . . . for the design, operation, and maintenance of buildings and structures for safety to life from fire."  [PX41 (Life Safety Code), at 101-22, § 1.2; *see also id.* § 1.1.2 ("The Code addresses those construction . . . features necessary to minimize danger to life from the effects of fire, including smoke, heat, and toxic gases created during a fire.")].  The Life Safety Code "endeavors to avoid requirements that might involve unreasonable hardships . . . ."  [*Id.* at 101-339, A.1.2].

189.  Fire protection falls generally into two categories, active and passive.  Active fire protection addresses systems like sprinklers, fire alarms, fire detection, and evacuation.  Passive fire protection addresses the building's construction, such as fire resistance rated assemblies, fire doors, smoke barriers, and penetration fire stopping systems, and spray fireproofing protection on steel structural components.  [May 6, Martin, at 161:10-23; May 7, Parker, at 81:21 – 82:10; May 26, Carson, at 20:13-25].

190.  The Life Safety Code requires redundancies of systems and mandates requirements for both active and passive fire protection systems.  "The design of every building or structure intended for human occupancy shall be such that reliance for safety to life does not depend solely on any single safeguard.  An additional safeguard(s) shall be provided for life safety in case any single safeguard is ineffective due to inappropriate human actions or system failure."  [PX41 (Life Safety Code), at 101-37, Section 4.5.1].

191.  A hospital's active fire protection, such as sprinklers or smoke detectors, does not eliminate the separate requirement under the Life Safety Code (and as incorporated into the Medicare COP) that the hospital maintain passive fire protection features at the minimum levels prescribed in the Life Safety Code.  [May 7, Parker, at 119:13 – 120:17].

192.  CHS's expert Mr. Carson agreed that NFPA 101 provides "an overall package of protection" of both active and passive fire resistant elements.  "The Life Safety Code actually says that life safety should not depend on – on a single safety feature, that there should be, if you will, a belt and suspenders' approach to fire protection, so if one item[] fails, then we've got a backup."  [May 26, Carson, at 32:17 – 33:17].

193.  This case relates to the passive fire protection at Pottstown Hospital, and specifically the "**SFRM**" (spray applied fire-resistive material), or spray fireproofing, on all the steel structural membranes of the building, such as beams, floor and ceiling decks, and columns.

194.  Daniel Martin from the international engineering firm Jensen Hughes summarized the purpose of fireproofing on the building's structural members:  "Fireproofing is a material used to limit the temperature rise of structural steel in a fire event.  You want to make sure that you maintain the stiffness and strength of the steel so you don't have a building collapse.  So it allows the building to stay in place during a fire event, for people to evacuate, people to shelter in place, particularly with the hospital, patients to shelter in place since they're not as mobile as you and I or the other members in this room to make it out of the building, but it also allows the fire department time to get into the building and get water on the fire."  [May 6, Martin, at 174:2-12 (emphasis added)].

195.  As explained by Arthur Parker of Jensen Hughes, the fireproofing on the building's structural steel members is "intended to prevent excessive temperature rise of that steel during a

41

fire" and prevent the steel from losing its "stiffness and its strength and then potentially can lead to collapse."  [May 7, Parker, at 108:6-17, 114:23-25].

196.  Far from being the last line of protection, a building's structural steel is one of the first things a fire protection engineer considers.  "I need to have my horizontal fire resistance rated elements, so as my walls need to remain intact to do exactly what you're talking about, which is either [prevent] the vertical spread of fire from floor to floor or if it's on a floor, to contain it to a small area.  The structural steel is that internal skeleton that holds all those other components together.  So everything's working together as one system."  [May 7, Parker, at 109:2-13].

197.  Protecting a building's structural steel with fireproofing is important to maintain the structural skeleton of the building "so that the other features of that building, both the passive and the active, are intact and can provide the protection that we need for the building occupants. If the structural steel collapses, nobody's going to get out alive."  [May 7, Parker, at 115:1-8].

198.  Normal house fires or office fires are intense enough to "deform the steel and result in structural steel failure if it's not protected."  [May 7, Parker, at 109:16-19].

199.  The passive fire protection in a hospital, including protecting the structural steel, is "[v]ery important, because in a hospital, it's unique in that patients are not capable of self-preservation and not capable – they're not mobile, so they can't save themselves as we all can here in an office building."  Patients need to remain in place during a fire and cannot evacuate. [May 7, Parker, at 115:15 – 116:4; *see also* May 26, Carson, at 20:5-10 (passive fire protection is important in a hospital "because now people are considered to be incapable of getting up and walking out.  So we have to protect them in place and provide protection for them in the building.")].

42

200.  Missing or inadequate fireproofing on any one section of one of the structural beams results in a deficient fire resistance rating for the entire structural member.  As Mr. Parker testified, "The design listings that we utilized based on the fire testing assumes . . . all of the entire structure is protected.  So the entire length of beam or the entire length of column must be completely protected with the fireproofing material in order to limit the temperature rise of that steel member."  If there is a bare spot on the structural steel, this means that the entire structural member is deficient and may eventually lead to structural steel collapse in a fire.  [May 7, Parker, at 118:12 – 119:1].

## B.  The 2012 edition of NFPA 101 Applied to Pottstown Hospital as of July 5, 2016, and at the APA's Execution (May 30, 2017) and the APA's Closing (October 1, 2017).

201.  NFPA 101, the Life Safety Code, establishes "minimum" prescriptive requirements "intended to provide a reasonable or acceptable level of life safety to the occupants of a building."  [May 10, Koffel, at 25:5-12; PX41 (Life Safety Code), at 101-22, § 1.2].

202.  The Life Safety Code addresses a wide variety of measures, including building construction, compartmentation, sprinkler systems, alarm systems, and fire and smoke barriers.  Two chapters of the Life Safety Code apply to healthcare occupancies:  Chapter 18 applies to new construction, and Chapter 19 applies to conditions within an existing healthcare occupancy that take effect at the time of the adoption of the code.  Chapter 19 is applicable to Pottstown Hospital as an existing healthcare occupancy.  [May 10, Koffel, at 28:16 – 29:4; PX41 (Life Safety Code), at 101-201, § 19.1.1.1.1].

203.  Experts like Tower Health's William Koffel[1] and CHS's Mr. Carson refer to NFPA 101 as a "prescriptive document:  "It prescribes protection features that are required to provide a

---

[1] Mr. Koffel's qualifications are discussed in more detail in **Section XIII**.  Defendants do not challenge Mr. Koffel's qualifications or experience, including with respect to NFPA 101 and NFPA 101A.

minimum level of safety.  It's not a specification.  It doesn't tell me how to build a wall, but rather it will tell me certain performance characteristics of a wall, such as being noncombustible or combustible; having a one-hour fire resistance rating or a two-hour fire resistance rating.  So it prescribes the requirements necessary to provide a minimum or reasonable level of life safety in a building."  [May 10, Koffel, at 29:18 – 30:3].

204.  Before July 5, 2016, under federal regulation, to qualify as a Medicare and Medicaid participating health care provider, CMS required hospitals, including Pottstown Hospital, to comply with the fire safety requirements set forth in the 2000 edition of the NFPA 101 LSC. [PX67 (Federal Register), at 26873; May 10, Koffel, at 64:12-17; May 26, Carson, at 52:2-10].

205.  By federal regulation, dated May 4, 2016 and effective July 5, 2016, CMS required all participating health care providers, including Pottstown Hospital, to comply with the LSC requirements in the 2012 edition of the NFPA 101 to qualify as participating Medicare / Medicaid health care providers.  [PX67 (Federal Register), at 26872; May 10, Koffel, at 28:21 – 29:1, 64:18-20; PX296, 42 C.F.R. § 482.41(b)(i) ("The hospital must meet the applicable provisions and must proceed in accordance with the Life Safety Code (NFPA 101 and Tentative Interim Amendments TIA 12-1, TIA 12-2, TIA 12-3, and TIA 12-4.)")].

206.  The Federal Register commentary addressing CMS's adoption of the 2012 edition of the Life Safety Code, effective July 5, 2016, "eliminate[d] references in our regulations to all earlier editions of the Life Safety Code."  [PX67 (Federal Register), at 26872].

207.  Even though the NFPA updates the Life Safety Code every three years, CMS only adopted the 2012 edition to replace its earlier adoption of the 2000 edition of the Life Safety Code.  [PX67 (Federal Register), at 26873].

208.  As discussed in **Section V(C)**, the minimum construction type and height requirements provided in NFPA 101 for existing healthcare occupancies (such as Type II (000) and Type II (222)) did not change between the 2000 edition and the 2012 edition of the Life Safety Code.  [May 10, Koffel, at 82:19 – 83:11].

209.  As discussed in **Section IV(E)**, one of the significant changes in the 2012 edition of the Life Safety Code, and the corresponding 2013 FSES Form, applied to high-rise hospitals. Pottstown Hospital is classified as a high-rise hospital under the Life Safety Code.  [PX221 (Defendants' Answer to Am. Compl.), ¶¶ 39-40].

210.  On May 6, 2016, CMS issued its S&C:16-22-LSC memo addressing its final rule updating the fire safety requirements for health care providers and suppliers.  CMS stated:  "This regulation requires certain providers and suppliers to meet the requirements of the 2012 edition of the Life Safety Code (LSC), National Fire Protection Association (NFPA) 101 and the 2012 edition of the Health Care Facilities Code, NFPA 99."  [PX68 (May 6, 2016 CMS S&C Memo), at 1].

211.  CMS further advised, "The regulation does away with the use of the 2000 edition of the LSC and associated reference documents."  [PX68 (May 6, 2016 S&C Memo, at 1].

212.  On month later, on June 20, 2016, CMS issued S&C:16-29-LSC memo notifying of the implementation of the 2012 edition of the Life Safety Code, its effective date, and when CMS surveys would apply the newly adopted LSC.  [PX72 (June 20, 2016 CMS S&C Memo)].

213.  According to CMS, "On May 4, 2016, CMS adopted the 2012 LSC and the 2012 HCFC by final rule.  The final rule was published in the Federal Register (Vol. 81, No. 86), is entitled 'Medicare and Medicaid Programs; Fire Safety Requirements for Certain Health Care Facilities,' and **is effective July 5, 2016**.  The final rule also adopted 2012 LSC Tentative

45

Interim Amendments (TIA) 12-1, 12-2, 12-3, and 12-4 . . . ."  [PX72 (June 20, 2016 CMS S&C Memo), at 1 (emphasis added); May 10, Koffel, at 116:18 – 117:6].

214.  The memo further states:  "The final rule eliminates all references to the previously adopted 2000 edition of the LSC, and **requires providers** and suppliers **to comply with the 2012 LSC with certain modifications . . . by the effective date of July 5, 2016**."  [PX72 (June 20, 2016 CMS S&C Memo), at 2 (emphasis added); May 10, Koffel, at 117:17-25].

215.  CMS advised health care providers, including CHS, that "**CMS will begin surveying facilities for compliance with the 2012 edition of the LSC and HCFC on November 1, 2015**."  [PX72 (June 20, 2016 CMS S&C Memo), at 2 (emphasis in original); May 10, Koffel, at 117:7-10].

216.  On June 4, 2016, Pa. DOH adopted the 2012 edition of the Life Safety Code, effective July 5, 2016, applicable to any healthcare facility licensed by Pa. DOH.  [PX69 (46 Pa. Bulletin 2917); May 10, Koffel, at 28:21 – 29:1, 118:11-23].  The Pennsylvania Bulletin advised: "As of July 5, 2016, the Department [of Health] will apply these new requirements to all plans for new construction or renovation of licensed health care facilities and for State licensure inspections of these facilities."  [PX69 (46 Pa. Bulletin 2917)].

217.  The Bulletin stated that the use of the 2012 edition of NFPA 101 was mandatory after the effective date of July 5, 2016:  "The Department has received inquiries regarding the implementation of the 2012 LSC and when the LSC would be enforced.  The 2012 edition of the LSC can be utilized immediately; however, the **mandatory** usage of this edition will not take effect until July 5, 2016, consistent with the Federal final rule 'Medicare and Medicaid Programs; Fire Safety Requirements for Certain Health Care Facilities,' published at 81 FR 26872 (May 4, 2016)."  [PX69 (46 Pa. Bulletin 2917) (emphasis added)].

218.  TJC also provided notice to providers, like CHS, of the adoption of the 2012 edition of NFPA 101, Life Safety Code.  [PX70 (June 10, 2016 TJC Memo); May 10, Koffel, at 28:21 – 29:1, 119:5-17, 164:20 – 165:7; PX336 (Oct. 31, 2016 TJC revisions for Life Safety Code update) (comparing changes in TJC elements of performance to be consistent with the 2012 Life Safety Code)].

219.  According to TJC, the months between the effective date of the Life Safety Code (July 5, 2016) and when CMS would begin surveying using the new Life Safety Code (November 7, 2016) was to "**allow providers** and suppliers **a chance to assess their facilities for compliance with the 2012 LSC and HCFC**."  [PX70 (June 10, 2016 TJC Memo) (emphasis added); May 10, Koffel, at 119:21 – 120:17].  "Providers" in the TJC notice includes healthcare facilities like Pottstown Hospital.  TJC provided time for CHS to assess Pottstown Hospital for "compliance" and "evaluate their compliance before all of a sudden a surveyor shows up at the door enforcing a new set of requirements."  [May 10, Koffel, at 120:18 – 121:5; May 26, Carson, at 190:7-19].

220.  TJC required hospitals participating in its hospital accreditation program to comply with it standard, LS.01.01.01:  "The hospital designs and manages the physical environment to comply with the Life Safety Code."  [PX336 (TJC hospital accreditation program requirements), at 48; May 10, Koffel, at 166:3-16].

221.  The change to NFPA 101, 2012 edition was well-known in the industry, in part because the life safety code applicable to hospitals did not change very frequently.  [May 3, Judge at 84-87; May 10, Koffel, at 114:23-25; June 10, Hofmeister, at 25:18-22; *see also* May 6, Sanders, at 12:24 – 13:4].

47

222.  Tower Health assembled a team and identified what it needed to do to comply with the new Life Safety Code edition with respect to Reading Hospital; it did not wait for a survey or citation from Pa. DOH, CMS, or TJC before undertaking this evaluation.  [May 3, Judge, at 85:11 – 87:5].

223.  Other hospitals did the same.  As Ms. Judge testified, "[W]hen the 2012 edition came out, most hospitals that I work with started evaluating themselves, to see what, if anything, they might have to change, and were waiting, simply, for CMS to announce its effective date for CMS . . . hospitals were well aware of it, there were lots of seminars about it; lots of planning going [on] to prepare for it."  [May 3, Judge, at 85:2-10].

224.  Code consultant experts like Mr. Koffel were retained by hospitals to assist in preparing for the code change.  Among other things, they advised clients that an FSES prepared under the old edition of the code may not pass after the adoption of the new code.  Mr. Koffel also "offered seminars as early as 2013 to help healthcare organizations understand the impact of the 2012 edition of the code and how it would impact their compliance."  [May 11, Koffel, at 14:1-24].

225.  As of July 5, 2016, CMS, Pa. DOH, and TJC all required Pottstown Hospital to be in compliance with the requirements of NFPA 101, 2012 edition.  [May 10, Koffel, at 38:6-14, 121:6-15; May 11, Koffel, at 17:18 – 19:18; PX72 (June 20, 2016 CMS S&C Memo); PX67 (Federal Register); PX69 (46 Pa. Bulletin 4217); PX70 (June 10, 2016 TJC Memo)].

226.  CHS's code compliance experts agreed that as of May 30 (when the APA was executed) and October 1, 2017 (when the transaction closed), the applicable life safety code to hospitals, including Pottstown Hospital, was the NFPA 101, 2012 edition.  [May 26, Carson, at

29:18-25, 167:18 – 168:3, 174:9-22, 189:16 – 190:11, 192:21 – 193:1 (CMS and Pa. DOH

enforce the 2012 edition of LSC); June 10, Hofmeister, at 25:14 – 26:4].

227.  Instead of evaluating whether Pottstown Hospital complied with the 2012 edition of

the Life Safety Code or remediating Pottstown Hospital's non-compliant conditions, CHS put

Pottstown Hospital up for sale in November 2016.  [PX80 (CHS Confidential Information

Memorandum)].

### C.    CHS Knew the NFPA 101, 2012 Edition Applied to Pottstown Hospital.

228.  The Court finds that CHS was aware of CMS's adoption of the 2012 edition of the

Life Safety Code, that it would be implemented as of November 1, 2016, and that it was

applicable to Pottstown Hospital.

229.  David Sanders, the President and CEO of BDA Architects, previously known as

Burkavage Design Associates ("**BDA**"), and a long-time consultant for CHS, testified at trial.

[May 6, Sanders, at 10:10-21].

230.  BDA is a healthcare design architecture firm that spends 80-90% of its work in any

given year on healthcare oriented projects.  [May 6, Sanders, at 11:7-16].

231.  As part of his work at BDA, Mr. Sanders has an understanding of the applicable life

safety code regulations and the FGI Guidelines applicable to hospitals.  [May 6, Sanders, at

11:20 – 12:4].

232.  The percentage of BDA's work for CHS was as high as 30-35% annually.  BDA's

work for CHS is declining "largely" as a result of CHS's sale of the Southeastern Pennsylvania

hospitals to Tower Health, but remains 10-20% of BDA's work in the last five to seven years.

[May 6, Sanders, at 14:19 – 15:20].

233.  In November 2016, Mr. Sanders presented at a CHS conference for facilities directors

of CHS hospitals, using materials provided by Charles Schlegel of Pa. DOH, and discussed

49

CMS's adoption of NFPA 101, 2012 edition.  [May 6, Sanders, at 16:11-24; PX81 (Overview of Recent PA DOH Changes Affecting Health Care Facilities), at TOWER-CHS-BDA-00021-22].

234.  In Mr. Sanders' opinion, the "drop dead" date for when facilities needed to "flip[] everything to the new code" was November 1, 2016.  [May 6, Sanders, at 24:23 – 25:9].

235.  As of November 1, 2016, BDA "used the new code" for life safety plans and for other life safety code related documents for its clients.  [May 6, Sanders, at 25:10 – 26:2].

236.  Mr. Sanders testified that Dean Tiratto (the Regional Project Manager for CHS, based in Tennessee) and Jesse Ridall (a Regional Engineer for the Pennsylvania region employed by CHS) both attended the CHS conference.  [May 6, Sanders, at 18:12 – 19:11, 20:18 – 21:8].

237.  Ray Gostkowski, the Director of Facilities of Pottstown Hospital at the time, attended the conference.  [May 6, Sanders, at 47:17 – 48:23].

238.  Mr. Sanders testified that the information included in Mr. Schlegel's presentation did not include a discussion about high-rise hospitals.  [May 6, Sanders, at 90:10-18].  However, during the same Pennsylvania Society for Health Facility Engineers Conference, where Mr. Schlegel presented the materials Mr. Sanders used during his presentation to CHS, Mr. Koffel presented on the changes to NFPA 101, including the effect on high-rise healthcare occupancies like Pottstown Hospital.  [May 10, Koffel, at 14:1 – 16:11].

239.  As discussed in **Section VII(B)**, CHS was also aware that Pa. DOH applied the 2012 edition of the Life Safety Code to Pottstown Hospital when Pa. DOH informed Mr. Sanders of BDA that Pa. DOH was stamping Mr. Sanders' life safety drawings for Pottstown Hospital "preliminary until such time that the FSES for your facility is updated to use the most current FSES forms that dovetail into the 2012 NFPA 101 Life Safety Code."  [PX128 (May 1, 2017 email from Sanders to Gostkowski and Ridall), at TOWER-CHS-PMMC-005347].

50

240.  As discussed in **Section VI(A)**, following the adoption of the 2012 edition of the Life Safety Code, CHS updated its corporate compliance policies to require compliance with NFPA 101, 2012 edition.  The Court finds the revisions to update the compliance manuals to correspond to CMS and Pa. DOH's effective date of the Life Safety Code is an acknowledgement by CHS that the 2012 edition of the Life Safety Code applied to its hospitals as of July 5, 2016.

### D. As of Execution of the APA and Closing on the APA, if a Hospital Relied on an FSES for Compliance with the Life Safety Code, It Needed to Prepare the FSES Using the 2013 Edition of NFPA 101A.

241.  The Life Safety Code permits a healthcare facility like Pottstown Hospital to demonstrate an equivalent level of life safety for its patients and employees as mandated in the prescriptive life safety code by utilizing a "fire safety evaluation system (FSES) of NFPA 101A, Guide on Alternative Approaches to Life Safety . . . ."  [PX41 (Life Safety Code), at 101-416, A.19.1.1.1.1].

242.  The type of equivalency that Pottstown Hospital utilized since before CHS purchased the Pottstown Hospital in 2003 was an "FSES" or a Fire Safety Evaluation System.

243.  An FSES is an alternative means of demonstrating that a facility has a level of safety equivalent to that which would be provided by a building complying with the prescriptive requirements of the life safety code.  [May 10, Koffel, at 23:10-13; May 26, Carson, at 48:11-16; *see also* PX45 (NFPA 101A, 2013 edition handbook), Section 4.1.1, at 99 ("The user of NFPA 101 Chapter 18 or 19 might employ NFPA 101A where the facility is not compliant with the requirements of the applicable chapters of NFPA 101 and an equivalency submittal is to be prepared for submittal to the AHJ [Authority Having Jurisdiction].  NFPA 101A presents a formalized method for preparing an equivalency submittal, for health care occupancies, in accordance with the equivalency concept permitted by NFPA 101 Section 1.4.")].

244.  The requirements for an FSES are described in NFPA 101A, called Guide on

Alternative Approaches to Life Safety, 2013 edition.  [May 10, Koffel, at 121:21-25; May 26,

Carson, at 50:19-21; PX46 (NFPA 101A, 2013 edition)].

245.  William Koffel, a Tower Health testifying expert on code compliance, has been the

Chair of the NFPA Technical Correlating Committee on Safety to Life and a member of the

NFPA Technical Committee on Alternative Approaches to Life Safety, the two NFPA

committees responsible for the NFPA Guide on Alternative Approaches to Life Safety, 2013

edition.  [PX46, at 101A-2, 3; May 10, Koffel, at 23:23 – 26:25, 30:6 – 31:7; PX261 (Mr. Koffel

CV), at 3-6].

246.  Mr. Koffel was Chair of the Technical Committee on Alternative Approaches to Life

Safety in addressing the amendments in 2009 to the Life Safety Code and the 2010 edition of

NFPA 101A.  At the time, Mr. Carson, one of CHS's experts, was also on the Committee.

[May 10, Koffel, at 24:23 – 25:4, 34:3-15; May 26, Carson, at 74:1-5; PX22 (NFPA 2009 annual

meeting), at 101A-1, TOWER-KOFFEL-000150].

247.  NFPA 101A is a guide, as opposed to a code or a standard.  "[I]t does not provide

mandatory language.  What it provides is a series of methods that can be used to demonstrate

equivalency to the code.  In particular, chapter 4 of NFPA 101A, contains the FSES for

healthcare occupancies.  That would be used to determine if a facility has a level of safety

equivalent to a facility that complied with the prescriptive requirements contained in NFPA

101." [May 10, Koffel, at 29:5-17; *see also* May 26, Carson, at 28:22 – 29:6].

248.  In general, an FSES is a form or series of worksheets prepared by surveying the

health care facility and applying a point score system; if the facility has a passing score (i.e., zero

or greater), an FSES can be an acceptable way of meeting the requirements of the LSC.  The

existing conditions in the hospital, based on a survey, are compared to certain mandatory values established by NFPA 101A.  [May 10, Koffel, at 136:14 – 141:18; May 26, Carson, at 43:11 – 48:16; June 10, Hofmeister, at 33:1-12; PX178 (CMS 2013 FSES Form)].

249.  An example of the FSES forms and worksheets required to be filled out is found in the NFPA 101A, Guide on Alternative Approaches to Life Safety, 2013 edition.  [PX46 (NFPA 101A, 2013 edition), at 101A-13 – 16].

250.  Simplistically, the FSES "add[s] up the good points for good things like sprinklers," and "subtract[s] bad things with negative values like construction.  And [if] you come out with a zero or positive number, you're good."  [May 26, Carson, at 93:3-9].  A sprinklered building like Pottstown Hospital, for instance, receives positive 10 points on the FSES.  [May 26, Carson, at 92:20-24].

251.  As Mr. Koffel explained:  "[T]here are 13 safety parameters that I am to evaluate, and the way the FSES works at the thousand-foot level is I might be deficient in one of these areas, but because I exceed the code requirement in some other category, that might offset that deficiency.  So for each of these 13 parameters, you notice a building construction is one of those, I need to identify the type of construction for the building, and I need to assign a particular point value.  You'll notice that the point values vary for first, second, third, and fourth floor and above."  [May 10, Koffel, at 139:12-25].  After the person preparing the FSES adds the numbers in the columns, to demonstrate an equivalency, the totals must meet or exceed the mandatory value provided in NFPA 101A plus the general safety column.  [May 10, Koffel, at 140:22 – 141:18].

252.  At the end of the FSES worksheet, the FSES preparer selects a box for his "Conclusions" in Worksheet 4.7.11 as to whether the level of life safety is at least equivalent to

that prescribed by the life safety code.  [PX46 (NFPA 101A, 2013 edition), at 101A-16; PX178 (CMS 2013 FSES Form), at 7; May 10, Koffel, at 145:19 – 146:19].

253.  An FSES must be prepared for each zone in a hospital, with each zone separated by a smoke compartment.  [May 10, Koffel, at 138:21 – 139:4].

254.  CMS told hospitals, like Pottstown Hospital, that an "FSES can be completed by the facility [such as CHS for Pottstown Hospital], a trained consultant, or by the [State Agency] at their discretion."  [PX94 (Dec. 16, 2016 CMS S&C Memo), at 2; May 10, Koffel, at 124:9-15].

255.  A CHS corporate policy on Documentation of Inspections and Approvals, which CHS adopted from TJC, allowed an FSES to be prepared for approval by a registered architect, like Mr. Sanders of BDA.  [PX85 (CHS Policy LS.01.01.01.5); May 24, Ridall, at 26:19 – 29:23 (Ridall agreed that "CHS tells its facilities managers and people in its compliance program that registered architects like Mr. Sanders of BDA can certify an FSES for CHS to be submitted")].

256.  A new edition of NFPA 101A is released for each edition of the Life Safety Code.  [May 10, Koffel, at 23:13-16, 121:25 – 122:3].  It is revised on a three-year cycle to give the NFPA Life Safety Technical Committee on Alternative Approaches "an opportunity to calibrate to the newer edition of the code."  [May 10, Koffel, at 122:1-9; *see also* May 26, Carson, at 50:24 – 51:18; PX45 (NFPA 101A, 2013 edition Handbook), at 101A-1 ("NFPA 101A is revised every three years on a schedule that lags that of NFPA 101 by one year so as to accurately reflect the requirements of NFPA 101, against which the NFPA 101A Fire Safety Evaluation Systems (FSESs) measure equivalency.")].

257.  As part of that "recalibration" work, in the 2013 edition of NFPA 101A, "the mandatory values were revised to be consistent with the requirements of the [2012 edition] of the life safety code."  [May 10, Koffel, at 33:18 – 34:15].

54

258.  Prior to July 2016, a hospital would use the FSES found in the 2001 edition of NFPA 101A to achieve compliance with the applicable edition of the Life Safety Code, NFPA 101, 2000 edition.  [May 10, Koffel, at 122:12-16].

259.  After the adoption of the 2012 edition of NFPA 101, on December 16, 2016, CMS notified health care providers, including CHS, that they could comply with NFPA 101, 2012 edition by submitting an FSES that complied with the 2013 edition of NFPA 101A, Guide on Alternative Approaches to Life Safety.  [PX94 (Dec. 16, 2016 CMS S&C Memo); May 26, Carson, at 193:6-18].

260.  On December 16, 2016, CMS advised:  "If the FSES is being used to demonstrate compliance with the fire safety requirements, the version of the FSES for Health Care Occupancies . . . found in the 2013 edition of the Guide on Alternative Approaches to Life Safety, NFPA 101A must be used."  [PX94 (Dec. 16, 2016 CMS S&C Memo)].

261.  On December 16, 2016, CMS made clear that effective November 1, 2016, "The 2013 FSES will be used in place of the 2001 FSES which was previously approved for use . . . with the 2000 LSC.  The 2013 FSES has been updated by the NFPA and is calibrated to the requirements found in the recently adopted 2012 LSC."  [PX 94 (Dec. 16, 2016 CMS S&C Memo)].

262.  CMS advised that, after the adoption of the 2012 edition of NFPA 101, effective July 5, 2016, the 2001 edition of NFPA 101A was superseded and "you had to use a different FSES to determine or evaluate equivalency to that edition of the Life Safety Code," which was the 2013 edition.  [May 10, Koffel, at 122:12 – 123:3; PX94 (Dec. 16, 2016 CMS S&C Memo); *see also* PX46 (NFPA 101A, 2013 edition), at 101A-5, § 1.3.1 (referencing the 2012 edition of NFPA 101, Life Safety Code)].

263.  The 2001 edition of NFPA 101A cannot be used to address a facility that is noncompliant with the 2012 edition of the Life Safety Code.  [May 10, Koffel, at 126:2-5].

264.  As stated in the NFPA 101A, 2013 edition Handbook, "Once the AHJ [Authority Having Jurisdiction] approves an NFPA 101A equivalency submittal as providing a facility with life safety that, *in toto*, is equivalent to that provided by compliance with all applicable provisions of NFPA 101, such facility is deemed to comply with NFPA 101 as stated above in the text from NFPA 101 1.4.3.  However, such equivalency is relative to compliance with the provisions of a specific edition of NFPA 101.  **Where a jurisdiction adopts a newer version of NFPA 101, the equivalency submittal will need to be conducted anew, utilizing the applicable editions of NFPA 101 and NFPA 101A**."  [PX45 (NFPA 101A, 2013 edition Handbook), 4.1.2, at 99-100 (emphasis added)].  The Handbook explains:

> As an example of the case cited in the previous paragraph, at the time a health care occupancy equivalency submittal was prepared for an existing hospital per NFPA 101A-2001, the hospital was subject to the requirements of NFPA 101-2000 for an existing health care occupancy.  The NFPA 101A FSES mandatory values used for the hospital were those applicable to existing hospitals.  In 2013, the jurisdiction moves to enforcement of NFPA 101-2012 and another equivalency submittal is performed using NFPA 101A-2013. . . . The new equivalency submittal reflects that the NFPA 101 requirements applicable to existing hospitals might have changed between the 2000 and the 2012 editions.

[*Id.* at 100].

265.  Therefore, "[e]ffective July 5th of 2016, Pottstown Hospital would be required to use the 2013 edition."  [May 10, Koffel, at 128:1-5, 129:23 – 130:1].

266.  Tower Health did not have much experience with an FSES prior to this litigation. Although Reading Hospital has an FSES used for a small egress issue, Reading Hospital did not have any FSESs relating to building construction (like the one used by Pottstown Hospital). [May 3, Judge, at 89:14 – 90:9].

56

267. CHS presented the deposition testimony of Lori Dinney from the consulting firm TSIG at trial. Ms. Dinney has a Bachelor of Science degree in chemical engineering, a Master of Science degree in fire protection engineering, and is a licensed professional engineer in fire protection engineering. [TA-D-9, Dinney Dep., at 9:5-17, 15:18 – 16:11]. Ms. Dinney has worked in fire protection code consulting since 1999. [*Id.* at 11:4 – 12:9].

268. Ms. Dinney testified repeatedly that the existing 2009 FSES applicable to Pottstown Hospital was no longer valid because it had not been prepared using the 2013 edition of NFPA 101A. [TA-D-9, Dinney Dep., at 25:14-25 (in early 2018, in response to David Wolfskill's (from Tower Health) concern that the equivalency had been prepared under a prior edition, "I did tell him that it would not hold up present day since a more recent edition of the code had been adopted so that a more recent equivalency would have to be submitted for approval."); *id.* at 30:19 – 31:6, 84:25 – 85:15; TA-D-9, at Dinney-2 (telling Dave Wolfskill from Tower Health in February 2018, "[I]n case you weren't aware, the existing FSES no longer applies . . . ."); TA-D-9, at Dinney-6 (in January 2018, "The 2012 LSC references a more recent version of NFPA 101A than the 2000 edition, so an updated FSES would have to be submitted but only after the surveyor cites you during next survey. The older submittal is not retroactive.")].

269. Ms. Dinney agreed that after CMS adopted the 2012 edition of the Life Safety Code, hospitals like Pottstown Hospital needed to use the 2013 edition of NFPA 101A for an FSES. [TA-D-9, Dinney Dep., at 108:2-10].

270. CHS's experts agreed with Mr. Koffel, Tower Health's expert, that as of May 30 and October 1, 2017, if a hospital chose to use an FSES as a means to demonstrate compliance with the prescriptive requirements of the Life Safety Code, a hospital was required to use the forms provided in NFPA 101A, 2013 edition. [May 10, Koffel, at 125:15-21; May 26, Carson, at 68:1-

57

2 ("the FSES for the 2012 edition of the code, that would be NFPA 101A 2013 edition), 193:6 –

195:5 ("If they're going to use the FSES, a 2013 edition is the edition to use."), 199:1-4 (he

would have used the 2013 edition of NFPA 101A if he prepared an FSES for Pottstown on

October 1, 2017); June 10, Hofmeister, at 29:8 – 30:7 ("if you're going to use an FSES, you

would then use the 2013 edition of NFPA 101A")].

### E. Specific Changes made to NFPA 101, 2012 Edition and NFPA 101A, 2013 Edition Affected Pottstown Hospital as a High-Rise Hospital.

271. The most significant change to the 2012 edition of NFPA 101 as it relates to

Pottstown Hospital and this lawsuit is the mandatory requirement that high-rise buildings

containing a healthcare occupancy must be protected throughout with an automatic sprinkler

system. [May 10, Koffel, at 130:3-16, 132:9-14].

272. Section 19.4.2.1 now provides, "All high-rise buildings containing health care

occupancies shall be protected throughout by an approved, supervised automatic sprinkler

system . . . within 12 years of the adoption of this Code." [PX41 (Life Safety Code), at 101-214,

§ 19.4.2.1].

273. The requirement that health care occupancies become fully sprinklered was

introduced in the 2009 edition of the Life Safety Code. As stated earlier, both Mr. Koffel (Tower

Health's expert) and Mr. Carson (CHS's expert) were on the NFPA technical committees

addressing the 2009 amendments. [May 10, Koffel, at 24:23 – 25:4, 34:3-15; May 26, Carson, at

74:1-5; PX22 (NFPA 2009 annual meeting), at 101A-1, TOWER-KOFFEL-000150].

274. The most significant change to the 2013 FSES Form compared to the 2001 edition

was that the 2013 FSES Form provided mandatory values for high-rise hospitals that are

different than those provided in the 2001 edition of NFPA 101A. [May 10, Koffel, at 135:6-20;

PX22 (June 2009 NFPA annual meeting report), at 13 ("NFPA 101 is revised for the 2009

edition to require all existing high-rise buildings containing health care occupancies to be sprinklered. The mandatory safety requirements values in Worksheet 4.7.8A are being revised to accurately reflect the sprinkler requirement.")].

275. For changes to the 2013 edition of NFPA 101A, Mr. Koffel was the chair of the NFPA Technical Committee on Safety to Life and a member of the NFPA Technical Committee on Alternative Approaches to Life Safety. [PX46 (NFPA 101A, 2013 edition), at 101A-2, 3].

276. CMS publishes on its website its approved form to prepare an FSES using NFPA 101A to comply with the 2012 Life Safety Code. [May 10, Koffel, at 135:24 – 136:13; PX178 (CMS 2013 FSES Form)]. Mr. Koffel confirmed that the CMS form admitted as Plaintiffs' Exhibit 178 (the 2013 FSES Form) was the form available on the CMS website as of May 10, 2021. [May 10, Koffel, at 135:2-4].

277. Worksheet 4.7.8A in NFPA 101A, 2013 edition added a new line for high-rise hospitals that did not exist in NFPA 101A, 2001 edition. [May 10, Koffel, at 141:19 – 142:10; PX178 (CMS 2013 FSES Form), at 5].

278. The mandatory values applicable to an existing high-rise hospital like Pottstown Hospital increased between the 2001 NFPA 101A FSES and the 2013 NFPA 101A FSES:

| Zone Location | Containment (Existing) | Extinguishment (Existing) | People Movement (Existing) |
|---|---|---|---|
| 2001 NFPA 101A | 9 | 6 | 3 |
| 2013 NFPA 101A | 17 | 16 | 7 |

[PX178 (CMS 2013 FSES Form) at 5; May 10, Koffel, at 143:2-20; June 10, Hofmeister, at 30:8-22].

279. Therefore, as of May 30, 2017 and October 1, 2017, an existing hospital like Pottstown Hospital must apply the mandatory values for a high-rise hospital when preparing an

FSES to achieve an equivalent level of safety under the 2012 edition of NFPA 101, Life Safety Code.  [May 10, Koffel, at 142:11-20].

280.  If a hospital cannot achieve equivalency through an FSES, the hospital needs to instead satisfy compliance with the prescriptive requirements of the Life Safety Code.  [May 10, Koffel, at 148:24 – 149:5].

281.  Both Tower Health's expert (Mr. Koffel) and CHS's experts (Mr. Carson and Mr. Hofmeister) agree that as of October 1, 2017 (the date of closing), it was mathematically impossible for Pottstown Hospital to achieve a passing score using the 2013 FSES Form, and it remains mathematically impossible using the currently available, CMS-approved FSES available on CMS's website.  [May 10, Koffel, at 143:21 – 144:21; May 26, Carson, at 199:1-7; June 10, Hofmeister, at 35:5-13 (FSES can pass only if he applies the TIA change to mandatory value), 84:4-6].

## V.  Pottstown Hospital's Deficient Building Construction Type Did Not Comply with the Life Safety Code since at Least 2003 and CHS Did Not Repair the Deficient SFRM.

### A.  Pottstown Hospital is a Community Hospital in Pottstown, Pennsylvania.

282.  Pottstown Hospital is a medium-sized community hospital.  As described by its President, Richard Newell, Pottstown Hospital provides "bread and butter" healthcare services to the surrounding community.  "[I]t means that we're not a tertiary center or a quaternary center, in terms of offering the higher level of expertise or the ability to do higher level procedures." [May 13, Newell, at 115:18 – 116:2].

283.  Pottstown Hospital's primary service area is within a ten-mile radius of the hospital and includes the boroughs of Pottstown, Pottsgrove, Royersford, and the surrounding areas. There are no other hospitals within that service area.  [May 13, Newell, at 116:14-20].

284.  Pottstown Hospital employs approximately 1,000 employees and about 500 doctors and advance care practitioners on its active medical staff.  [May 13, Newell, at 116:14-20].

285.  In Mr. Newell's opinion, and not disputed by CHS, the impact of Pottstown Hospital closing to the community "would be devastating."  [May 13, Newell, at 116:21-23].

286.  Pottstown Hospital is composed of a seven-story tower block and a two-story section on the side built in the early 1970s.  [Martin, May 6, at 177:20 – 178:1].  The hospital also includes an outpatient building and an emergency department that were built separately and are not at issue in this lawsuit.  [Martin, May 6, at 178:6-16; *see* PX317 (photographs of hospital)].

287.  Pottstown Hospital has 232 beds.  [PX80 (CHS Confidential Information Memorandum), at TOWER-CHS-PMMC-029604].

### B.      CHS Owned and Controlled Pottstown Hospital from 2003-2017.

288.  CHS, through its subsidiaries Pennsylvania Hospital Company, LLC and Pottstown Hospital Company, LLC, owned Pottstown Hospital, formerly known as Pottstown Memorial Medical Center since 2003.  [PX6 (2003 asset purchase agreement)].

289.  When CHS owned Pottstown Hospital, the CEO of Pottstown Hospital, which was Richard Newell starting in July 2015, reported to the CHS Division Vice President and the CHS Division President, both located in Tennessee.  The Division President was Tom Miller and then John McClellan in 2016.  The Division Vice President was Joe Dorko.  [May 13, Newell, at 97:20 – 99:19].  Mr. McClellan and Mr. Dorko were Mr. Newell's bosses.  [*Id.* at 99:20 – 100:12].

290.  Each Division had a division chief financial officer, located at CHS in Tennessee, and different infrastructure support for other functions.  CHS also provided regional life safety support to its hospitals, including Pottstown Hospital, through Jesse Ridall and Dean Tiratto.  [May 13, Newell, at 98:17-22, 100:13-25].

61

291.  Mr. Ridall is a Regional Engineer employed by CHS whose responsibility included CHS-owned hospitals in Pennsylvania, Indiana, and West Virginia.  He had responsibility for Pennsylvania-area hospitals, including Pottstown Hospital, beginning in 2015.  [May 24, Ridall, at 5:8 – 6:23; *see also* PX84 (CHS Facilities Management Orientation Presentation), at 19].

292.  Gordon Carlisle is the head of the facilities department at CHS, and Mr. Ridall reports to him.  [May 24, Ridall, at 6:10-12].

293.  The facilities director of Pottstown Hospital was responsible for life safety, with support from the CHS corporate, including Jesse Ridall and Dean Tiratto.  [May 13, Newell, at 101:4-24].  As instructed by CHS, the Regional Engineer (Mr. Ridall) was the corporate contact for the facilities director and was considered his corporate supervisor.  [PX84 (CHS Facilities Management Orientation Presentation), at 21].

294.  Among other things, the Regional Engineer (Mr. Ridall) provided support to Pottstown Hospital with respect to "regulatory compliance."  [PX84 (CHS Facilities Management Orientation Presentation), at 22].

295.  CHS also provided corporate support to Pottstown Hospital for regulatory survey responses.

296.  When Pottstown Hospital was owned by CHS, Susan Keown, the Chief Quality Officer, was responsible for coordinating and uploading responses to the appropriate regulator with respect to any deficiencies noted in a TJC or Pa. DOH survey.  [May 13, Keown, at 23:13-18, 24:19 – 25:18, 26:5-8].

297.  Ms. Keown testified that the regulatory survey responses were reviewed at the corporate level and had to be approved by CHS prior to her submission.  On the clinical survey responses to both TJC and Pa. DOH surveys, the person from CHS who approved Pottstown

Hospital's responses was Lisa Stefanov.  With respect to life safety responses with respect to both TJC and Pa. DOH surveys, the individuals at CHS responsible for developing the plan of correction and approving the responses were Jesse Ridall and Dean Tiratto.  [May 13, Keown, at 24:19 – 27:15, 30:2-10; June 8, Stefanov, 249:8 – 252:5].

298.  During the time CHS owned Pottstown Hospital, Dean Gamler was the facilities director of Pottstown Hospital beginning at least in 2009.  [*See* PX28 (June 2009 email from D. Gamler to Pa. DOH)].  In early 2016, Mr. Gamler was fired—when CHS still owned Pottstown Hospital—and Ray Gostkowski became the facilities director.  [May 13, Keown, at 32:24 – 33:4; May 13, Newell, at 102:2-18].  CHS did not call Mr. Gamler to testify at trial.

299.  Mr. Gostkowski is deceased.  [May 13, Keown, at 83:25 – 84:7; May 13, Newell, at 102:19-20].

## C.    Pottstown Hospital Had a Non-Compliant Type II (000) Building Construction Type.

300.  One of the primary deficiencies of Pottstown Hospital cited by Pa. DOH, acting on behalf of CMS, in the March 2018 validation survey and by Pa. DOH in its March 2018 re-licensing survey, was the K-161, Building Construction Type.  [PX173 (June 25, 2018 CMS email with survey), at TOWER-CHS-PMMC-015440 - 015442; PX196 (Pa. DOH re-licensure survey), at 2-8].

301.  CMS and Pa. DOH found Pottstown Hospital, as a seven-story hospital, not in compliance with the Medicare COP and the Life Safety Code because it had a deficient Building Construction Type of Type II (000).  [May 10, Koffel, at 52:19 – 53:4; PX173, at TOWER-CHS-PMMC-015440 – 015516; PX196 (Pa. DOH re-licensure survey), at 2-8].

302.  The K-161 deficiency "is that since patients are located four or more stories above the level of exit discharge, in an existing healthcare occupancy, the building was required to be of

63

Type II (222) construction."  [May 11, Koffel, at 58:24 – 59:6; PX41 (Life Safety Code), at 101-203 (Table 19.1.6.1 providing construction type limitations)].

303.  Significantly, both CMS and Pa. DOH "determined the facility failed to maintain building construction requirements, such as minimum two-hour resistive rating of structural elements throughout the building . . . ," and as "a seven story, Type II (000) unprotected noncombustible structure.  This type of construction exceeds the minimum story height allowed."  [PX173 (June 25, 2018 CMS email with survey), at TOWER-CHS-PMMC-015440 - 42; PX196 (Pa. DOH re-licensure survey), at 2-8].

304.  The Life Safety Code provides minimum construction types for existing healthcare occupancies, like Pottstown Hospital, in Chapter 19 of NFPA 101, Section 19.1.6.  [May 10, Koffel, at 54:4-8; PX41 (Life Safety Code), at 101-203].

305.  Type II is a non-combustible building, meaning it cannot have combustible elements in the hospital.  [May 10, Koffel, at 56:4-12].

306.  The parenthetical values (xxx) identify fire-resistance ratings for three particular structural elements of the building.  [May 10, Koffel, at 56:4-17].

307.  The parenthetical (222) means that the walls, the structural steel, and floor construction are all two-hour fire rated, as explained by Mr. Parker, one of Tower Health's experts.[2]  [May 7, Parker, at 121:9-23].  In a Type II (222) construction, "we would expect during the course of a fire for at least two hours that . . . the steel temperatures would remain low, below threshold limits, and remain standing and intact, and capable of carrying whatever loads, building loads they are designed to carry."  [May 7, Parker, at 116:21 – 117:6; *see also* PX42 (NFPA 220, 2012 ed.), at 220-5, § 3.3.1].

---

[2] Mr. Parker's qualifications are discussed in **Section XVII**.  CHS did not challenge Mr. Parker's expertise or experience as a fire protection engineer, and the Court accepted him as an expert without objection.  [May 7, 90:14 – 91:22].

308.  For a Type II, the parenthetical (000) means that the structural elements do not provide any fire-resistance rating.  [PX42 (NFPA 220, 2012 ed.), at 220-6, Table 4.1.1].

309.  The Type II (000) deficiency is significant because it means the structure is not protected in the event of a fire.  If there is a fire in this type of facility, patients and hospital staff would be required to vacate the building.  On the other hand, if the facility is a Type II (222) construction, the components of the building have two-hour fire ratings which would allow the patients and staff to defend in place.  [May 5, Major, at 13:23 – 16:10].  As David Major, the former Vice President for Facilities and Construction for Tower Health, explained, evacuating patients from a hospital "becomes extremely difficult . . . because the patients are not self-reliant or potentially mobilized to be able to . . . walk themselves out of the hospital themselves." [May 5, Major, at 16:5-10].

310.  Section 19.1.6.1 of the Life Safety Code requires:  "Health care occupancies shall be limited to the building construction types specified in Table 19.1.6.1, unless otherwise permitted by 19.1.6.2 through 19.1.6.7."  Those exceptions are not applicable to Pottstown Hospital. [PX41 (Life Safety Code), at 101-203 – 101-204; May 10, Koffel, 62:2-15].

311.  Table 19.1.6.1 limits the total number of stories in a building based on the construction type and whether the building is sprinklered or not sprinklered.  With respect to Type II (222) and Type II (000), Table 19.1.6.1 provides:

| | | Total Number of Stories in Building | | | |
|---|---|---|---|---|---|
| **Construction Type** | **Sprinklered** | **1** | **2** | **3** | **4** |
| II (222) | Yes | X | X | X | X |
| | No | X | X | X | X |
| II (000) | Yes | X | X | NP | NP |
| | No | NP | NP | NP | NP |

[PX41 (Life Safety Code), at 101-203].  The "X" means permitted and the "NP" means "not permitted."  [May 10, Koffel, at 63:8-20].

312.  As specified in the Life Safety Code, a Type II (000) existing healthcare occupancy is limited to only two stories, if sprinklered.  [PX41 (Life Safety Code), at 101-203; May 4, Major, at 247:7-9].

313.  A Type II (222) existing healthcare occupancy can have over four stories in a building, whether or not it is fully sprinklered.  [PX41 (Life Safety Code), at 101-203; May 4, Major, at 247:7-9].

314.  When the Pa. DOH inspectors arrived at Pottstown Hospital on March 14, 2018 for the CMS validation survey, they told Richard Newell that the building was non-compliant and that "you need to take the top four floors of your hospital off because you can't use them to see patients."  [May 13, Newell, at 109:3-11].

315.  A hospital like Pottstown Hospital with seven stories requires a minimum construction type of Type II (222).  [May 10, Koffel, at 63:11-20, 65:5 – 66:15; May 4, Major, at 249:7-10].

316.  This requirement has been the same since the 2000 edition of the Life Safety Code.  "[B]ecause we prepared the comparison between the 2000 Edition and the 2012 Edition, that was used by CMS as part of their rule making process, I know that that is consistent with the type of construction that was required in the 2000 edition of the Life Safety Code."  [May 10, Koffel, at 64:1 – 65:4].  "[T]he basic requirement that the healthcare occupancy in a Type II (000) building existing healthcare protected by a sprinkler system should not be located above the second floor[,] that did not change."  [*Id.* at 83:8-11].

66

317.   A hospital can have multiple Building Construction Types within one building if the areas are separated by a fire barrier with a two-hour fire resistance rating.  Without that separation, the minimum type of construction applies throughout the building.  Pottstown Hospital has a barrier separating the main building from the adjacent buildings, but not within the main building itself.  As it exists today (and as it has existed since before CHS bought Pottstown Hospital), the main building of Pottstown Hospital cannot have two different building construction types and the entire main building is a Type II (000) building.  [May 10, Koffel, at 66:16 – 67:5].

318.   Since July 2003 when CHS acquired Pottstown Hospital, Pottstown Hospital has had the same Building Construction Type, Type II (000) and the same number of building stories (seven).  [*See generally* PX8 (2005 Pa. DOH survey); PX334 (summary of Pa. DOH surveys)].

319.   Mr. Major testified that, based on his review of the old blueprints at Pottstown Hospital and its structural elements, Pottstown Hospital was originally constructed as a Type II (222) building.  [May 4, Major, at 246:7 - 247:2, 248:22 – 3; May 4, Major, at 273:19 – 274:9; PX166 (April 2018 D. Major email), at TOWER-CHS-PMMC034382; PX167 (April 2018 Jensen Hughes report), at Photograph 11; PX169 (May 2018 D. Major presentation), at 5].

320.   CHS's counsel conceded that at some point, Pottstown Hospital had been a Type II (222) building but the classification changed to a Type II (000) construction.  [May 5, Dodson, at 122; *see also* May 6, Wolfe, at 194 ("[W]e've conceded . . . this is a Type II (000) building.")].

321.   Pottstown Hospital currently has, and has had, patients on floors two through seven.  [May 13, Keown, 64:10-15, 65:25 – 66:4].

322.   Pottstown Hospital meets the definition of a high-rise building under NFPA 101, 2012 edition.  [PX221 (Def. Answer to Am. Compl., ¶¶ 39-40; May 10, Koffel, at 132:22-24].

67

323.  Pottstown has an automatic sprinkler system.  [May 10, Koffel, at 132:25 – 133:3].

**D.     CHS Elected To Use an FSES, Rather than Remediate, the Non-Compliant Type II (000) Construction at Pottstown Hospital.**

324.  There is no dispute that Pottstown Hospital, with its seven floors and Type II (000) Building Type Construction, does not meet the prescriptive requirements of the Life Safety Code.  There is also no dispute that the deficient conditions at Pottstown Hospital existed for decades, and during the entire time it was owned by CHS.

325.  Michael Peters, the current president of the life safety consulting firm Peters Rice Associates, testified about visiting Pottstown Hospital for life safety compliance purposes as early as 2000 to consult with Pottstown Hospital.  [May 6, Peters, at 109:21 – 112:7].

326.  Mr. Peters has worked at Peters Rice for 24 years.  Peters Rice is a life safety consulting firm that, among other things, conducts annual assessments of its clients' facilities to assess whether the hospitals are in compliance by meeting the requirements of the life safety code.  Peters Rice conducts those assessments annually because TJC "asked for that to be an annual assessment, but it's a constant upkeep of the building."  [May 6, Peters, at 103:25 – 106:18].

327.  Mr. Peters' notes from April 2000 identify the building type of Pottstown Hospital as Type II (000).  [PX3 (Peters Rice handwritten notes), at Peters Rice 00034 ("This is still being considered (downgraded) as a Type II (000) building.")].

328.  Mr. Peters testified about his observations of the fireproofing on the structural steel members at Pottstown Hospital in April 2000:  "That's one of the things, and probably one of the things we were first brought in there for.  When we looked at the spray-on fireproofing, it was obvious from the start that the application of that assembly wasn't correct."  [May 6, Peters, at 113:9-17].  He remembered the fireproofing "literally just breaking off and falling down in

68

sheets" and not adhering to the structural steel, extensively throughout the hospital.  [*Id.* at 113:19 – 115:3].

329.  Mr. Peters believed that the building could have been a Type II (222) building if the fireproofing had been applied correctly, but it was downgraded to a Type II (000) because the fireproofing was not applied properly.  [May 6, Peters, at 117:12-19].

330.  Based on his observations, in 2000, Mr. Peters discussed with Dean Gamler, the director of facilities at Pottstown Hospital, the options:  "[H]ey, this is extensive, and you know, you can do this, or you can do that.  And those two things would be either fix it or we could possibly apply an FSES to see if it would cover the – the building."  [May 6, Peters, at 115:10-18].  The hospital needed to take one of those two actions, in his opinion, to bring the hospital into compliance with the LSC.  [*Id.* at 118:4-7].

331.  Pottstown Hospital elected not to fix the deficient fireproofing and instead utilized an FSES to address the deficient building construction type (Type II (000)).  "I believe they – they thought that it was going to be quite expensive in order to take off fireproofing throughout the entire hospital, or throughout the majority of the hospital, wherever it was needed, and – and reapply it.  That puts healthcare practices at a severe loss because of, you have patients – patients sleeping, you have patient treatment, and those things would be disrupted, as well as the expense."  [May 6, Peters, at 118:10-17].

332.  Mr. Major and Jensen Hughes described CHS's approach to Pottstown Hospital's building deficiencies following their site inspection in April 2018:  "Considering the building deficiencies noted above and the lack of apparent changes over the years, a decision appears to have been made to go the FSES route instead of correcting the identified deficiencies.  Most

likely due to costs."  [PX166 (April 24, 2018 D. Major email to Jensen Hughes), at TOWER-CHS-PMMC034382].

333.  Since July 2003 when CHS acquired Pottstown Hospital, Pottstown Hospital continued to use an FSES to overcome the deficient building construction type instead of remediating and replacing the deficient fireproofing.  [PX11 (2006 FSES); PX28 (2009 FSES submitted to Pa. DOH); PX334 (summary of Pa. DOH surveys)].

### E. Peters Rice Prepared FSESs for Pottstown Hospital.

334.  Peters Rice prepared an FSES for Pottstown Hospital in 2003 to address the deficient building construction type of Type II (000) following a survey of the hospital conditions.  [PX5 (Peters Rice survey notes)].

335.  In his 2003 survey, Mr. Peters observed that the corridors were smoke tight "except on floors above 3."  [PX5 (Peters Rice survey notes), at Peters Rice 00120; May 6, Peters, at 118:18-21].  Mr. Peters testified that, to achieve a passing score under the FSES, Pottstown Hospital needed to make floors four through seven one-hour fire rated.  Mr. Peters prepared the 2003 FSES taking advantage of the points for one-hour fire rated doors on floors four through seven.  Mr. Peters told Pa. DOH that Pottstown Hospital would need to fix the doors to make them one-hour fire rated.  [May 6, Peters, at 118:22 – 119:3].

336.  During a re-certification survey conducted by Pa. DOH in April 2005, Pottstown Hospital was cited by Pa. DOH for not meeting the minimum construction height provided in NFPA 101, 2000 edition.  [PX8 (April 29, 2005 Pa. DOH re-certification survey), at 3; May 10, Koffel, at 73:15-19 (the Building Construction Type deficiency "indicates that the Building Construction Type is not in accordance with the requirements of the Life Safety Code because we have unprotected Type II (000) building construction")].

70

337.  The Building Construction Type requirement in the life safety code was substantially the same in the 2000 edition as in the 2012 edition.  [May 10, Koffel, at 74:11-20].

338.  To address the Type II (000) deficiency, Pottstown Hospital (then owned by CHS) submitted an FSES revised in July 2004 by Peters Rice.  [PX8 (April 29, 2005 Pa. DOH re-certification survey), at 3; May 10, Koffel, at 69:8-17].  Pa. DOH reported "that condition was determined to be acceptable due to an equivalency using the 2001 edition of NFPA 101A, the FSES."  [May 10, Koffel, at 75:2-9].

339.  The K-12 tag deficiency nomenclature Pa. DOH used to label the deficient Building Construction Type in the 2005 re-certification survey is the same deficiency cited in the March 2018 CMS validation survey and identified as the K-161 tag.  [May 10, Koffel, at 68:15 – 69:7; May 4, Major, at 281:21 – 282:3; May 5, Major, at 33:9-16].

340.  The following year, on May 2, 2006, while CHS owned Pottstown Hospital, Pa. DOH completed another re-certification survey of Pottstown Hospital.  As with the survey the previous year, "It identifies the building as Type II 000 construction.  That is a seven-story building, protected throughout with a sprinkler system.  And again, it refers to the FSES dated 2004. . . . It then went on to cite the requirement, that the building had to meet the construction requirements of the NFPA 101."  Pa. DOH determined Pottstown Hospital did not meet the minimum type of construction because the hospital was Type II (000) construction.  "But again, because of the FSES, it was determined to offer an equivalent level of safety to . . . buildings that did not meet the prescriptive requirements."  [May 10, Koffel, at 76:2-22; PX334 (summary of Pa. DOH surveys), at 1].

341.  Following the 2006 recertification survey, Pottstown Hospital retained Mr. Peters to prepare an updated FSES for Pottstown Hospital—then owned by CHS—to address the Type II

71

(000) building construction type deficiency.  [PX11 (2006 FSES with cover letter); May 6, Peters, at 119:4 – 124:8].

342.  The 2006 FSES was submitted to both TJC and to Pa. DOH.  [May 6, Peters, at 131:14 – 133:19, 155:6 – 157:6; *see also* PX10 (2006 FSES) ("The FSES was completed in response to the DOH Licensure survey."); PX11 (2006 FSES with cover letter), at TOWER-CHS-PMMC-038477 (titled "DOH FSES" and instructing Mr. Gamler to submit a copy to Phil Long); May 6, Peters, at 119:25 – 120:4 (Phil Long is an official in the Pa. DOH field office); PX12 (copy of 2006 FSES produced by Pa. DOH); May 7, Dodson, at 18:7-8 ("[W]e'll stipulate that it was submitted to the Department of Health.")].

343.  The 2006 FSES was prepared using the 2001 NFPA 101A FSES form and under the 2000 edition of NFPA 101, Life Safety Code.  [*See* PX11 (2006 FSES with cover letter), at TOWER-CHS-PMMC-038480].

344.  Before he prepared the 2006 FSES, Mr. Peters conducted a two to three day survey of the hospital "to gain the information needed to be able to do the FSES, to make sure it was update[d] and current."  [May 6, Peters, at 124:12-21].

345.  Mr. Peters described the FSES as "a long engineering mathematical equation" into which you add information for the variables based on the condition of the hospital to come up with the end result.  [May 6, Peters, at 128:7-14].  Based on the comparison of the condition of the hospital to the mandatory values as provided in the Life Safety Code, "the FSES works if you get a – when you apply everything for those columns, that I get a zero or greater.  So it's either equivalent or better than the variables that they decided would work for the FSES."  [May 6, Peters, at 129:17 – 130:2].

72

346.  For the 2006 FSES, Mr. Peters identified negative values for multiple zones within the hospital.  [*See, e.g.*, PX11 (2006 FSES with cover letter), at TOWER-CHS-PMMC038482, 038487].  This means "[t]he deficient conditions that exist overwhelm what they considered to be safe for – safety conditions within your building.  In other words, containment, extinguishment, people movement, and then general safety, all those are overwhelmed by the negative – the deficient conditions within the building."  [May 6, Peters, at 130:3-9].

347.  The 2006 FSES did not achieve equivalency with its negative numbers.  [*See, e.g.*, PX11 (2006 FSES with cover letters), at TOWER-CHS-PMMC038482].  Instead, the hospital "would have to fix some of the deficient conditions" to achieve a passing score, "[o]bviously except for the fire proofing on the structural matters."  [May 6, Peters, at 134:12 – 135:1].

348.  To address the negative numbers, the 2006 FSES included "Alternate" numbers, which showed the deficient conditions as if they had been fixed within the facility, other than the fire proofing.  [May 6, Peters, at 135:2-11; *see, e.g.*, PX11 (2006 FSES with cover letters), at TOWER-CHS-PMMC038484].

349.  The "Alternate" numbers in the 2006 FSES did not reflect the actual condition of the hospital; those were the "As-Is" bracket.  Instead, the conditions identified in the "Alternate" were deficiencies Pottstown Hospital was "[g]oing to fix.  At this point, it would be going to fix, because you . . . couldn't fix them that fast – some of these.  It – it would take a little bit of time.  And – and it was acceptable to the Joint Commission, at that time."  [May 6, Peters, at 135:8-16, 135:22 – 136:10 (alternate numbers reflecting anticipated fixes identified in the plan of correction)].

350.  Mr. Peters discussed the conditions of Pottstown Hospital with Mr. Gamler, who remained the director of facilities at Pottstown Hospital when it was owned by CHS.  "[W]e

73

would have presented them with a list of deficient conditions and said you can either fix the fire proofing or we can do an FSES.  In order to do the FSES and have it come out in a positive manner, they would need to have fixed several of these deficient conditions as well as assured that the fourth floors and above for corridors and doors and parameter 4 and 5 would need to be one hour – of a one-hour fire rate[d] assembly."  [May 6, Peters, at 137:3-11].

351.    The 2006 FSES was submitted with a cover page promising that Pottstown Hospital would remediate the following:  "The corridor walls, above the ceiling, on the 4th through the 7th floors **will be made** one hour fire rated in accordance with the FSES."  [PX10 (2006 FSES), at TOWER-CHS-PMMC-038476 (emphasis added); PX12 (2006 FSES produced by Pa. DOH in response to Right to Know request)].

352.  CHS's corporate representative did not know if the work identified on the 2006 FSES Cover Page was ever completed and testified that no one told him the work was completed and he never asked anyone whether the work was completed.  [TA-P-4, Carlisle 30(b)(6) Dep., at 58:5-20].  However, any work identified in the letter "should have been done" at or around May 3, 2006.  [*Id.* at 58:21 – 59:17].

353.  A copy of the 2006 FSES was never provided to Tower Health during the due diligence in connection with the transaction.  [May 3, Judge, at 142:2 – 143:12].

### F.    The 2009 FSES was Invalid and Should Never Have Been Submitted by CHS to Pa. DOH.

354.  In June 2009, while CHS owned Pottstown Hospital, Pa. DOH conducted another re-certification survey of Pottstown Hospital.  [PX23 (June 3, 2009 re-certification survey); PX334 (summary of Pa. DOH licensure surveys)].

355.  Pa. DOH again found, "Based upon a Medicare/Medicaid recertification survey conducted on June 3, 2009, it was determined that Pottstown Memorial Medical Center **was not**

**in compliance** with the following requirements of the 2000 edition of the Life Safety Code for an existing healthcare occupancy.  Compliance with the National Fire Protection Association's Life Safety Code is required by 42 CFR 483.70(a)."  [PX23 (June 3, 2009 re-certification survey), at 2 (emphasis added)].

356.  The Pa. DOH survey described the building as a seven story Type II (000) construction with an FSES reviewed on June 3, 2009 for deficiencies K-12 and others.  [PX23 (June 3, 2009 re-certification survey), at 2].  Pa. DOH specifically noted that the FSES was prepared using the NFPA 101A, 2001 edition.  [*Id.* at 3].

357.  Again, Pa. DOH cited Pottstown Hospital for failing to meet the minimum building construction type and height required by NFPA 101, 2000 edition.  And again, Pa. DOH accepted an FSES, prepared in June 2009, as an equivalency to the prescriptive requirements of the life safety code.  [PX23 (June 3, 2009 re-certification survey), at 5; May 10, Koffel, at 77:5-21, 78:2-11, 79:5-15].

358.  Even though Pottstown Hospital had prepared an FSES in 2006, "CMS requires a new request for an equivalency after every certification survey," so Pottstown Hospital needed to submit another one.  [May 11, Koffel, at 123:11 – 124:4].

359.  The 2009 FSES referenced in the Pa. DOH 2009 recertification survey was prepared by Mr. Peters.  [May 6, Peters, at 140:5-8; May 10, Koffel, at 77:22 – 78:1].

360.  The 2009 FSES is dated June 11, 2009.  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard), at TOWER-CHS-PMMC-038563].

361.  Pa. DOH received the 2009 FSES and produced a copy to CHS in response to CHS's Right to Know request.  [PX26 (2009 FSES redacted by Pa. DOH); May 5, Major, at 123:2 – 124:4].

75

362.  The 2009 FSES purports to be prepared using the NFPA 101A, 2001 edition and references the 2000 edition of NFPA 101, Life Safety Code.  [PX28 (June 16, 2009 email from Gamler to Hilliard), at TOWER-CHS-PMMC-038563 ("For use with NFPA 101A-2001/NFPA 101-2000."); May 5, Major, at 115:13-14; *see also* PX166 (April 24, 2018 email from Major to Jensen Hughes), at TOWER-CHS-PMMC034381 ("The existing FSES was conducted under the Old NFPA 101 v.00 and NFPA 101A v.99 Life Safety Code.  This code has been changed to NFPA 101 v.12 and 101A v.13, respectively."); May 10, Koffel, at 131:5-13].

363.  The 2009 FSES form does not have the "high rise" mandatory values found in NFPA 101A, 2013 edition, discussed in **Section IV(E)**.  [May 10, Koffel, at 147:5-23].

364.  There are a number of reasons why CHS's 2009 FSES for Pottstown Hospital was invalid and cannot be relied upon—at any time—to demonstrate compliance with any edition of NFPA 101, Life Safety Code.

### 1.  The 2009 FSES Is Invalid Because It Was Not Prepared Based on a Survey, It Included Hypothetical Values and Not Actual Conditions of the Hospital, and Mr. Peters Told Pottstown Hospital It Could Not Be Submitted to Pa. DOH.

365.  The 2009 FSES represents that a survey was completed on June 28, 2004.  [PX28 (June 16, 2009 email from Gamler to Hilliard), at TOWER-CHS-PMMC-038563].  This is the same date as the survey date on the 2006 FSES.  [May 6, Peters, at 139:9-16; *compare with* PX11 (2006 FSES), at TOWER-CHS-PMMC-038480].

366.  Mr. Peters testified that he did not prepare the FSES so it could be submitted by Pottstown Hospital (then owned by CHS) to Pa. DOH in 2009.  [May 6, Peters, at 140:5-8].

367.  At the request from Mr. Gamler, the Facilities Director of Pottstown Hospital when it was owned by CHS, Mr. Peters prepared a "hypothetical" FSES.  "I remember talking to Dean and Dean . . . wanted something – this isn't based off a survey.  **So he wanted an FSES just**

76

**showing that if everything were fixed, how it would work**.  He wanted to go to administration or something like that and show them this is what it needs to be.  I don't know.  I — so I took an old survey and you can see where it's different from the one that I had before, because my signature's on it, because I printed it and not my father and then sent it over to him.  So this is a — this is just an old survey where we took out the numbers.  This is just a copy of the — of an old survey."  [May 6, Peters, at 140:9-22 (emphasis added)].

368.  Mr. Peters testified that he did not conduct a survey for the 2009 FSES or prepare the 2009 FSES in the same manner that he did with respect to the 2006 FSES.  [May 6, Peters, at 142:4-7 ("[T]his wasn't based off of a survey.  This is just blank.")].

369.  His intent in preparing the 2009 FSES document was "[j]ust to send it to Dean.  He wanted to show somebody what it would look like."  [May 6, Peters, at 141:24 – 142:3].

370.  Mr. Peters testified, "**I told Dean you can't submit this**.  This is just for – it's not based on a survey. . . . This isn't based off of anything."  [May 6, Peters, at 143:5-20 (emphasis added)].  Mr. Peters explained that he prepares an FSES to identify deficiencies identified by Pa. DOH or following a life safety assessment.  "So it has to be based on an actual survey of some sort and officially submitted.  This was – this is generic.  **This is just you have an issue with your fireproofing, but nothing else.  There's no other negative numbers taken on that, so it's not based on anything**."  [May 6, Peters, at 143:23 – 144:9 (emphasis added)].

371.  Unlike the 2006 FSES, which contained negative numbers compared with the mandatory values and required the correction of deficient conditions to achieve equivalency, the 2009 FSES document showed no deficient conditions other than fireproofing and no alternate numbers.  [May 6, Peters, at 147:4 – 149:16; PX28 (June 16, 2009 email from D. Gamler to G. Hilliard), at TOWER-CHS-PMMC-038565, 038569; *see also* June 10, Hofmeister, 132:3-11].

77

372.  The 2009 FSES contains what appears to be a stamped signature from Michael Peters of Peters Rice Associates.  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard), at TOWER-CHS-PMMC-038563].

373.  Mr. Peters testified that he did not sign the FSES and that his electronic signature was generated automatically when the form is printed.  [May 6, Peters, at 142:9 – 143:4].

374.  Contrary to Mr. Peters' explicit instructions that "you can't submit this," by email dated June 16, 2009, Pottstown Hospital, through Mr. Gamler, its Director of Plant Operations, submitted the Peters' 2009 FSES to Gwendolyn Hilliard, a supervisor for Pa. DOH in the Philadelphia area.  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard); May 5, Major, at 113:2 – 114:8].

375.  Pottstown Hospital, then owned by CHS, submitted the 2009 FSES to Pa. DOH "in response to the DOH Licensure survey."  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard), at TOWER-CHS-PMMC-038562; PX251, at 2].

376.  Mr. Peters did not know his 2009 FSES document had been submitted to TJC or to Pa. DOH before this litigation.  [May 6, Peters, at 149:17-20].

377.  Mr. Peters' testimony on the preparation and unauthorized submission of the 2009 FSES is unrebutted.  Even though CHS owned Pottstown Hospital at the time and relied on the 2009 FSES for compliance with the life safety code, CHS did not contest Mr. Peters' testimony with any witness, and never called its former employee Mr. Gamler to testify.

378.  Mr. Koffel presented an expert opinion—agreed to by CHS's expert witnesses—that the 2009 FSES should never have been submitted to Pa. DOH.  [May 10, Koffel, at 40:7-18].

379.  The 2009 FSES "should have been based upon a physical survey of the building, the conditions in the building," and it did not according to Mr. Peters.  [May 10, Koffel, at 149:19 – 150:3; May 11, Koffel, at 53:1-6, 54:12-17].

380.  Mr. Carson agreed that it was "inappropriate to submit that FSES" based on the circumstances testified to by Mr. Peters.  [May 26, Carson, at 200:9 – 201:3, 202:7-9].

381.  Craig Hofmeister, CHS's other code compliance expert, testified that an FSES requires "walking through a facility and making an assessment of what the protection features are and how it's installed" as well as engineering judgment.  [June 10, Hofmeister, at 43:18-23, 47:12-15].  He admitted that, if the 2009 FSES was prepared as Mr. Peters testified, "it probably should not have been submitted."  [*Id.* at 108:11-17].

### 2.  The 2009 FSES Represented to Pa. DOH that Corridor Walls Would Be Made One-Hour Fire Rated, and It is Unrebutted that CHS Never Did that Promised Work.

382.  Like the 2006 FSES, the 2009 FSES was submitted to Pa. DOH with a Cover Page. In the Cover Page, Pottstown Hospital represented to Pa. DOH, "The FSES will allow the building to remain as non-protected for Zones 1-15."  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard), at TOWER-CHS-PMMC-038562].

383.  Mr. Peters testified that Peters Rice Associates did not prepare the Cover Page attached to the 2009 FSES.  [May 6, Peters, at 138:22 – 139:5 ("[T]here's stuff that's stolen from us, but it's not in the – that's no[t] how it would be.")].

384.  The Cover Page submitted to Pa. DOH, as part of the 2009 FSES, promised Pa. DOH, "The corridor walls, above the ceiling, on the 4th through the 7th floors (Zones 1-8) **will be made one hour fire rated in accordance with the FSES**."  [PX28 (June 16, 2009 email from D. Gamler to G. Hilliard with 2009 FSES), at TOWER-CHS-PMMC-038562 (emphasis added)].

79

385.  David Major, a health care construction expert, was accepted without objection as an expert in the field.  [May 4 Major, at 205:4-12; *see also* May 4, 199-211; PX249 (D. Major resume)].

386.  Mr. Major testified that in 2018 to 2020 after carefully examining Pottstown Hospital's "corridor walls, above the ceiling, on the fourth through seventh floors" and after examining certain construction records, the corridor walls were not made "one hour rated in accordance with the FSES."  [May 5, Major, at 125:21 – 126:11, 127:21 – 128:3, 130:18 – 131:12; *see also* PX313 (photograph presentation from inspection)].

387.  Mr. Major described his review of the construction records in the facilities management department for the fourth floor and portions of the seventh floor.  In those areas, the renovated areas had been converted to a Type II (222) construction, and the walls were designated as smoke walls, not one-hour fire resistive walls.  [May 5, Major, at 128:11 – 130:6, 130:14-17].

388.  Mr. Major summarized the reasons for his conclusion that the corridor walls above the ceiling were not made one-hour fire rated:  "A combination of they appear to be either a combination of lath and plaster, or they're predominantly lath and plaster.  The areas that were renovated appear to be built per the construction documents and standards as smoke walls.  The areas on 5, 6, and 7 would all appear to be single wall units, which would not – above the ceiling, which would not indicate that they are fire walls.  The lack of intumescent paint, the lack of penetrations would all indicate that there is no fire wall between those partitions that would be required as a one-hour wall.  All those indications would indicate to me that they are not one-hour partitions."  [May 5, Major, at 151:5-15; *see also id.* at 151:16 – 152:3 (testifying that the

corridor walls above the ceiling on the seventh floor were also not one-hour fire rated); *id.* at 173:4-21].

389.  Mr. Major's testimony that Pottstown Hospital, while owned by CHS, did not convert the corridor walls above the ceiling on floors four through seven to one-hour fire rated, as promised in the 2009 FSES submitted to Pa. DOH, is unrebutted.

390.  CHS's corporate representative testified that if the 2009 FSES was submitted to Pa. DOH with the knowledge that the work identified on the Cover Page had not been completed, it would have been incorrect and improper.  [TA-P-4, Carlisle 30(b)(6), at 67:1-7].

### 3.  The 2009 FSES Is Inaccurate Because it Does Not Reflect the Condition of Pottstown Hospital Based on the 2009 Pa. DOH Survey.

391.  Mr. Koffel also testified that the 2009 FSES's worksheets were invalid and inaccurate, another opinion unrebutted by CHS's experts, because "there are safety parameter values that are not properly represented in this FSES."  Specifically, Mr. Koffel found the 2009 FSES included greater values than the conditions reported by Pa. DOH for certain doors, smoke compartments, hazardous areas, and sprinklers.  Mr. Koffel also testified that the penthouse floors in the hospital were not evaluated in either the 2006 or the 2009 FSES and the hospital should have taken a zero score instead of a plus 10.  [May 10, Koffel, at 40:7-18, 150:3-8, 150:23 – 153:14; PX28 (June 2009 email from D. Gamler to G. Hilliard); PX27 (2009 Pa. DOH survey)].  "[F]or those zones, where all of these conditions occur, they would not have passed the FSES.  And if one zone fails, the building does not demonstrate equivalency to the FSES."  [May 10, Koffel, at 153:13-16].

392.  As a result, Mr. Koffel concluded that even under the requirements of the 2000 edition of NFPA 101, the 2009 FSES would not demonstrate equivalency and the building is not

equivalent to a code-compliant building.  [May 10, Koffel, at 153:17 – 154:2; *see also* May 11, Koffel, at 53:7-16].

393.  Before this lawsuit was filed, Jensen Hughes raised questions about the validity of the 2009 FSES and the absence of a subsequent FSES submitted to TJC or Pa. DOH.

394.  Following the April 2018 inspection of Pottstown Hospital (after the CMS / Pa. DOH validation survey in March 2018), Mr. Major of Tower Health concluded, "[A] new FSES should have been developed, submitted and approved" whenever "a change or upgrades to the system [were] made."  [PX166 (April 24, 2018 email from D. Major to Jensen Hughes), at TOWER-CHS-PMMC034381].  Mr. Major and Jensen Hughes also concluded, "Based off what we observed, we are skeptical on how the equivalency elements [were] achieved thru analysis in the old code with some creative writing and loose interpretation of the guideline."  [*Id.* at TOWER-CHS-PMMC034382].

395.  Mr. Hofmeister, one of CHS's experts, testified that the 2009 FSES was "presumptively valid" merely because it was accepted by Pa. DOH.  Mr. Hofmeister, however, never compared the 2009 Pa. DOH survey against the 2009 FSES to see if the 2009 FSES accurately reflected the conditions in the hospital.  [June 10, Hofmeister, at 134:2-14].  He also admitted that he assumed—without any verification—that the alternative conditions the hospital promised in the 2006 FSES would be addressed were in fact remedied because the 2009 FSES was accepted by the authorities having jurisdiction.  [*Id.* at 131:16-22].

396.  Accordingly, Mr. Hofmeister's opinion that the 2009 FSES was "presumptively valid" is rejected because he had no basis to opine on the validity of either the 2006 or the 2009 FSES.  The Court rejects this opinion as unsupported and improper speculation.

82

**G.    CHS Continued To Rely on the 2009 FSES for Compliance and
Never Prepared an FSES under the 2013 Edition of NFPA 101A.**

397.  It is undisputed that the last FSES prepared for Pottstown Hospital was the 2009

FSES and that CHS continued to rely on the invalid 2009 FSES for TJC accreditation, CMS

certification, and Pa. DOH licensure.

398.  In May 2011, Pa. DOH conducted a re-licensure survey of Pottstown Hospital.

[PX38 (May 2011 Pa. DOH re-licensure survey); PX334 (summary of Pa. DOH surveys);

May 10, Koffel, at 79:16-23].

399.  As it had in 2005, 2006, and 2009, Pa. DOH "determined that Pottstown Memorial

Medical Center was not in compliance with the following requirements of the Life Safety Code

for an existing health care occupancy."  [PX38 (May 2011 Pa. DOH re-licensure survey), at 2].

Pa. DOH again determined Pottstown Hospital did not meet the requirement of minimum

building construction type and height required by NFPA 101, 2000 edition.  [*Id.* at 5].

400.  Pa. DOH noted that the building had a Type II (000) Building Construction Type with

an FSES reviewed on May 31, 2011 and identified deficiencies under the CMS "K-12 tag," and

others.  [PX38 (May 2011 Pa. DOH re-licensure survey), at 2].  Pa. DOH cited Pottstown

Hospital for having a "seven story building Type II (000) unprotected non combustible

construction" which "exceeds the maximum story height allowed by five stories."  [*Id.* at 6;

May 10, Koffel, at 81:1-4].

401.  In short, the "same conditions [Pa. DOH] identified in '09, '06, and '05 continued to

exist in 2011."  [May 10, Koffel, at 80:2-8].

402.  Pottstown Hospital was only able to demonstrate equivalency with the prescriptive

requirements of the life safety code through an FSES.  [PX38 (May 2011 Pa. DOH re-licensure

83

survey), at 5-6].  The FSES referenced in the 2011 re-licensure survey was the same invalid June 2009 FSES prepared by Mr. Peters.  [May 10, Koffel, at 80:8-11, 81:4-10].

403.  Two years later, in May 2013, Pa. DOH conducted another re-licensure survey of Pottstown Hospital.  [PX47 (May 2013 Pa. DOH re-licensure survey); PX334 (summary of Pa. DOH surveys)].

404.  Pa. DOH yet again found Pottstown Hospital "was not in compliance with the following requirements of the Life Safety Code for an existing healthcare occupancy," citing 28 Pa. Code § 101.42a Fire Safety Standards.  [PX47 (May 2013 Pa. DOH re-licensure survey), at 2-3].  Pa. DOH found the building "exceeds the maximum story height allowed" because it was a seven story, Type II (000) unprotected noncombustible construction and did not comply with the building construction type and height in the NFPA 101, 2000 edition.  [*Id.* at 3-4; May 10, Koffel, at 81:12-23].

405.  Yet again, Pa. DOH determined the deficiency was compensated by Pottstown Hospital's use of an FSES "conducted on June 11, 2009" under NFPA 101A, 2001 edition, referring to the invalid 2009 FSES.  [PX47 (May 2013 Pa. DOH re-licensure survey), at 2-4; May 10, Koffel, at 81:24 – 82].

406.  The last FSES prepared for Pottstown Hospital's deficient building construction type of Type II (000) was the 2009 FSES.  [TA-P-4, Carlisle 30(b)(6) Dep., at 72:17-24; May 5, Dodson, at 116 (conceding in response to the Court, "No further FSES" beyond the 2009 FSES); *see also* PX168 (May 2018 email string between D. Major and R. Gostkowski), at TOWER-CHS-PMMC033894 (Mr. Gostkowski, Pottstown Hospital's Director of Facilities, who succeeded Dean Gamler, wrote:  "CHS never updated after several attempts on my behalf after I arrived.")].

407. The 2009 FSES prepared by Mr. Peters, even if valid, was prepared using the 2001 edition of NFPA 101A, and cannot be used as an equivalency under the 2012 edition of the Life Safety Code. [May 10, Koffel, at 129:4-22].

408. None of Defendants prepared an FSES for Pottstown Hospital using the NFPA 101A, 2013 edition. [May 7, at 6:2-21 (response to request for admission 25); PX289, at response 25; *see also* May 4, Major, at 277:10-14 (no FSES prepared under the 2013 edition of NFPA 101A); PX169 (May 2018 D. Major PowerPoint), at 4 ("No record of 2013 NFPA 101A Alternative Method (FSES) appears to exist."); PX166 (May 2018 D. Major email to Jensen Hughes), at TOWER-CHS-PMMC034381 ("The existing FSES was conducted under the Old NFPA 101 v.00 and NFPA 101A v.99 Life Safety Code. This code has been changed to NFPA 101 v.12 and 101A v.13, respectively."); May 10, Koffel, at 86:11-13, 155:1-6].

409. Before Pottstown Hospital's sale to Tower Health, Mr. Ridall, the CHS Regional Engineer, never instructed anyone to prepare an FSES under the 2013 edition of NFPA 101A for Pottstown Hospital. [May 7, 7:4-8 (response to request for admission 46); PX289, at Resp. 46].

410. Significantly, in April 2017, shortly before the May 30th execution of the APA, Pa. DOH advised CHS that it refused to approve as final the proposed life safety plans for Pottstown Hospital prepared by Mr. Sanders and BDA, CHS's consultant, because the hospital's FSES had to be updated under the 2012 NFPA 101 Life Safety Code [PX128 (May 2017 emails between D. Sanders, R. Gostkowski, and J. Ridall)].

411. Mr. Sanders offered to update Pottstown Hospital's FSES, if Mr. Ridall, the CHS Regional Engineer, authorized him to do so. [PX128 (May 1, 2017 email from D. Sanders to R. Gostkowski and J. Ridall) at TOWER-CHS-PMMC-005347 ("I will not have enough fee remaining in my current fee proposal to reformat, revise and file your FSES with the state so if

85

that is something you want me to do, I will need to write another proposal to complete that scope of work.")].

412.  Mr. Ridall never authorized Mr. Sanders to update the Pottstown Hospital FSES before the CHS sale of Pottstown Hospital to Tower Health.  [May 6, Sanders, at 37:21-23, 72:25 – 73 ("**Q.  Sir, after you told your client that that Department of Health was strongly recommending that they prepare a new FSES, were you ever engaged to do that?  A.  No.**" (emphasis added)].

413.  Defendants presented no evidence at trial that anything prevented them from "preparing" an FSES under the NFPA 101A, 2013 edition, to evaluate whether Pottstown Hospital complied with the 2012 edition of the Life Safety Code.  Mr. Koffel testified that he has seen nothing from CMS or Pa. DOH that prevents a hospital from preparing an FSES using the 2013 edition of NFPA 101A even if the hospital had not been first cited or surveyed by an authority having jurisdiction, such as Pa. DOH.  [May 10, Koffel, at 155:7-18].

414.  Mr. Carson, one of CHS's Life Safety Code experts, testified that, if he became aware that a hospital improperly submitted an FSES—as was done with the 2009 FSES in this case—he would tell the hospital it is inappropriate and needs to be fixed, because in his opinion "that would be an out of compliance condition that could be discovered later on and cause the hospital to lose its licensure or accreditation."  [May 26, Carson, at 202:7-9, 202:25 – 203:8].

415.  On December 16, 2016, CMS issued a memo that instructed that, as of November 1, 2016, facilities that relied on an FSES for compliance must use the 2013 edition of the FSES, which had been "updated by the NFPA and is calibrated to the requirements found in the recently adopted 2012 LSC."  [PX94 (Dec. 16, 2016 CMS S&C Memo), at 1-2].  The CMS memo further

advised facilities, like Pottstown Hospital and CHS, that the "FSES can be completed by the facility, a trained consultant, or by the [State Agency] at their discretion."  [*Id.* at 2].

416.  Defendants presented no evidence that they ever undertook an effort to evaluate or prepare an FESS for Pottstown Hospital under NFPA 101A, 2013 edition to comply with the 2012 edition of NFPA 101, Life Safety Code.

417.  CHS relied on the invalid 2009 FSES for compliance and presented no evidence that it ever considered other alternatives to ensure Pottstown Hospital was in compliance with the 2012 edition of the Life Safety Code, such as repairing the deficient SFRM to convert the building to a Type II (222) Building Construction Type.  [*See* TA-P-4, Carlisle 30(b)(6), at 70:6 – 71:20, 73:1-10].

### H.    The 2015 TJC Accreditation of Pottstown Hospital (Conducted under NFPA 101, 2000 Edition and Using the Invalid 2009 FSES) Does Not Demonstrate Compliance as Required by the APA.

418.  After citing Pottstown Hospital for at least nine years for a deficient building construction type, Type II (000), Pa. DOH did not conduct another a re-licensure survey of Pottstown Hospital before closing on the APA because Pottstown Hospital opted to apply for and receive "deemed" status for Pa. DOH through the TJC process, along with the CMS certification. [May 10, Koffel, at 82:11-17, 179:19 – 180:3; May 13, Keown, at 86:23 – 87:2].  Between 2013 and 2018, Pa. DOH never conducted another re-licensure or recertification survey of Pottstown Hospital.  [May 10, Koffel, at 180:1-3; May 11, Koffel, at 117:23 – 118:4].

419.  Beginning in May 2015, TJC—instead of Pa. DOH—now conducted surveys "for the purposes of assessing compliance with the Medicare conditions of hospitals through The Joint Commission's deemed status survey process."  [PX59 (June 29, 2015 TJC letter)].

420.  The May 2015 survey conducted by TJC was conducted under NFPA 101, 2000 edition.  [PX53 (May 12, 2015 TJC survey report), at CHS-TOWER00022904 (partial

87

compliance with LS.02.01.10 and referring to NFPA 101-2000); *id.* at CHS-TOWER00022905 ("The hospital must meet the applicable provisions of the 2000 edition of the Life Safety Code of the National Fire Protection Association."); May 11, Koffel, at 20:17 – 21:5].

421.  The TJC 2015 survey did not cite Pottstown Hospital for the facility-wide deficiency of incorrect building construction type and inadequate fireproofing as Pa. DOH had, on behalf of CMS, in previous surveys and later did in its March 2018 CMS validation survey.  [*See generally* PX53 (May 2015 TJC survey report)].

422.  CHS's expert Mr. Carson testified that it is not unusual for TJC to miss things during a survey and it was consistent with his personal experience that TJC may conduct a survey and then a state regulator find things "starkly different."  [May 26, Carson, at 176:5-8, 179:7-9].

423.  In response to the few deficiencies TJC determined, Pottstown Hospital submitted proposed corrections and also completed a "successful on-site unannounced Medicare Deficiency Follow-up event."  [PX59 (June 29, 2015 TJC letter); *see also* DX15 (June 2015 ten-day clarification form)].  As a result of the removal of the areas of deficiency, TJC notified Pottstown Hospital by letter that it "is granting your organization an accreditation decision of Accredited with an effective date of May 16, 2015."  [PX59 (June 29, 2015 TJC letter)].

424.  The TJC letter also stated, "The Joint Commission is also recommending your organization for continued Medicare certification effective May 16, 2015.  Please note that the Centers for Medicare and Medicaid Services (CMS) Regional Office (RO) makes the final determination regarding your Medicare participation and the effective date of participation in accordance with the regulations at 42 CFR 489.13."  [PX59 (June 29, 2015 TJC letter)].

425.  Ms. Keown, the Chief Quality Officer of Pottstown Hospital while it was owned by CHS with responsibility for responding to TJC surveys, understood that TJC "accreditation" is a

voluntary recognition that Pottstown Hospital elects.  [May 13, Keown, at 41:1-5; *see also*
June 8, Stefanov, 254:21 – 255:12].

426.  Ms. Keown testified that the "accreditation" determination by TJC was separate and
distinct from the "certification" determined by CMS, and she viewed both as two different things
in the letter from TJC, particularly because CMS makes the determination of whether a hospital
is eligible for Medicare certification.  [May 13, Keown, at 41:23 – 43:9].

427.  According to the TJC letter, the "accreditation" provided by TJC had an
"Accreditation Expiration Date" of May 16, 2018.  [PX59 (June 29, 2015 TJC letter); May 13,
Keown, at 42:25 – 43:2].  CHS relies on this "expiration date" to argue that Pottstown Hospital
was in "compliance" as of October 1, 2017.

428.  The June 29, 2015 letter from TJC says nothing about the length of time of the
recommendation for Medicare certification.  [May 13, Keown, at 43:3-6].

429.  The June 29, 2015 letter from TJC found that as of May 16, 2015, the hospital was
compliant with the Medicare conditions of participation.  [May 13, Keown, at 43:10-15].

430.  However, the June 29, 2015 letter from TJC says nothing about the compliance of
Pottstown Hospital with the Medicare COP as of May 16, 2016; as of May 16, 2017; or as of
May 16, 2018.  [May 13, Keown, at 43:16 – 44:1].

431.  Although the TJC accreditation survey pointed out deficient fireproofing in various
spots, Pottstown Health had filed a plan of correction to the deficiencies identified by TJC in the
2015 survey, and Tower Health "presumed that they had actually implemented their corrections."
[May 4, Judge, at 59:17 – 60:3].

89

432.  Tower Health was not concerned about the fireproofing issues identified in the 2015 TJC survey "[b]ecause CHS told us there were no areas of noncompliance as of the date of execution or closing."  [May 4, Judge, at 61:20-24].

433.  Pottstown Hospital received its Pennsylvania hospital certificate of licensure from Pa. DOH effective August 31, 2015 and with an expiration date of August 31, 2018.  [DX20 (Aug. 2015 Pottstown Hospital license)].  That hospital license was based on the 2015 TJC survey because Pottstown Hospital had deemed status with Pa. DOH.  [May 13, Keown, at 86:23 – 87:2; June 8, Stefanov, at 257:6-9].

434.  Pottstown Hospital also received certification from CMS for participation in the Medicare program, again based on the 2015 TJC survey.  [May 13, Keown, at 87:16-21; June 8, Stefanov, at 257:6-9].

435.  The Pa. DOH license and the CMS certification were both based on the 2015 TJC survey, performed under the 2000 Life Safety Code, and likewise premised on the validity of the 2009 FSES, prepared under the 2001 edition of NFPA 101A.  [*See also* PX166 (April 2018 D. Major email to Jensen Hughes), at TOWER-CHS-PMMC034381 ("The existing FSES was conducted under the Old NFPA 101 v.00 and NFPA 101A v.99 Life Safety Code.  This code has been changed to NFPA 101 v.12 and 101A v.13, respectively.")].

436.  Mr. Koffel testified—unrebutted by CHS's code compliance expert witnesses—that the 2009 FSES was not valid and therefore Pottstown Hospital did not meet the TJC requirements at the time of the 2015 accreditation.  [May 10, Koffel, at 40:19 – 41:1; May 11, Koffel, at 55:12-24].

437.  As further support for his opinion, Mr. Koffel testified:  "The Joint Commission requires that any FSES submitted for an equivalency shall be based upon a survey that is no

90

more than one year old.  In 2015, when this facility was accredited, the FSES that was being used was based upon a survey that was 11 years old."  This was improper because the FSES should be "reflective of the conditions of the building on or around the time of the accreditation survey."  [May 11, Koffel, at 56:9-19].

438.  The TJC survey was conducted under the 2000 edition of the Life Safety, and therefore TJC did not verify compliance with the 2012 edition of NFPA 101.  "It does not address the fact that the requirements changed effective July 5th, 2016."  [May 11, Koffel, at 22:1-10].

439.  TJC did not conduct an accreditation survey of Pottstown Hospital between May 2015 and October 1, 2017.  [May 11, Koffel, at 22:11-17].

## I.    CHS Never Provided a Copy of the 2009 FSES to Tower Health.

440.  For an important document that allegedly compensated for the pervasive life safety code deficiencies at Pottstown Hospital, a copy of the 2009 FSES proved difficult to locate, much less provide to Tower Health.  Indeed, multiple witnesses were unaware it even existed.

441.  David Sanders, president and CEO of BDA and CHS's long-time consultant, testified that, even though he prepared new life safety plans for Pottstown Hospital in April 2017, he never saw the 2009 FSES applicable to Pottstown Hospital despite asking multiple times.  [May 6, Sanders, at 31:22 – 32:13, 61:2-17; PX128 (May 2017 email string between D. Sanders, R. Gostkowski, and J. Ridall), at TOWER-CHS-PMMC-005346 ("By the way have you made any progress in getting a copy of the old FSES?")].

442.  Mr. Ridall, the CHS Regional Engineer assigned to Pottstown Hospital who had responsibility for, among other things, reviewing the hospital's records in connection with LSC compliance, never saw the entire 2009 FSES applicable to Pottstown Hospital.  [May 7, 6:23 – 7:1 (response to request for admission 45); PX289, at Response 45; May 24, Ridall, at 50:11-14].

91

443.  Mr. Ridall instructed Mr. Gostkowski, the facilities director of Pottstown Hospital following Mr. Gamler's termination in 2016, to place the FSES into the function manual at Pottstown Hospital, but he apparently did not.  [PX65 (Jan. 2016 J. Ridall email with site visit report), at 10; May 24, Ridall, at 50:15 – 51:5, 89:19-25].  Mr. Gostkowski did not testify at trial because he is deceased.  [May 13, Keown, at 83:25 – 84:7; May 13, Newell, at 102:19-20].

444.  Mr. Gostkowski was present at the March 2018 CMS validation survey, but did not provide a copy of the 2009 FSES to the inspectors or anyone at Pottstown Hospital.  [May 13, Keown, at 66:11-16].

445.  Mr. Major testified that during his April 2018 inspection with Jensen Hughes after Tower Health purchased Pottstown Hospital, they could not find the FSES engineering scoring sheets for 2009.  [May 4, Major, at 244:20 – 246:3; *see also* PX166 (April 2018 D. Major email to Jensen Hughes), at TOWER-CHS-PMMC034381 ("There is extremely limited documentation on site regarding the FSES v 2000, updated in 2003 and then again updated in 2009."); *id.* at TOWER-CHS-PMMC034382 ("None of this documentation [] appears to be available.  Would CHS have this documentation?")].

446.  In May 2018, Mr. Major exchanged emails with Mr. Gostkowski about the FSES applicable to Pottstown Hospital as part of his attempt to obtain a copy of the FSES.  [PX168 (May 2018 email string between D. Major and R. Gostkowski); May 4, Major, at 275:18 – 276:21; *see also* May 4, Major, at 281:3-8 (the documentation at the hospital located did "not include the entire FSES")].

447.  Mr. Major asked Mr. Gostkowski whether the FSES was performed "once CMS mandated new 2013 FSES requirements in the Nov-Dec 2016 time frame?"  [PX168 (May 10, 2018 email from D. Major to R. Gostkowski), at TOWER-CHS-PMMC033895].

448.  Mr. Gostkowski responded, "I was not at the hospital at that time, when the FSES was originally performed by Peters and Rice.  CHS never updated after several attempts on my behalf after I arrived."  [PX168 (May 10, 2018 email from R. Gostkowski to D. Major), at TOWER-CHS-PMMC033894].

449.  Neither Susan Keown, the Chief Quality Officer for Pottstown Hospital since 2014, nor Richard Newell, the President of Pottstown Hospital, knew an FSES was applicable to Pottstown Hospital until the March 2018 CMS survey.  [May 13, Keown, at 56:8-16; May 13, Newell, at 109:18-24].

450.  Lisa Stefanov, CHS's Vice President of survey management and nursing informatics, was also unaware there was an FSES applicable to Pottstown Hospital, including one that Pottstown Hospital relied on for compliance with the Medicare COP.  [June 8, Stefanov, at 249:2-10, 268:3-16].

451.  Ms. Keown testified that she finally located a copy of the 2009 FSES buried in a file cabinet in a storage room, following a request from counsel in the fall of 2018.  [May 13, Keown, at 81:17 – 83:21].

452.  Counsel for Tower Health moved for the admission of Defendants' Response to Request for Admission 26 on June 17, 2021.  The Court requested an email explanation as to the admission of the response "and then I'll make a ruling by order or email and make it part of the record."  [June 17, at 66:12-16; *see also id.* at 67:11-21].  The parties provided their email positions to the Court on June 21 and 22, 2021.  The Court finds that Defendants' response to Request for Admission 26 is relevant and admissible.  The Court finds it is undisputed that a copy of the 2009 FSES was not provided to Tower Health during the due diligence process in

connection with the transaction.  [May 3, Judge, at 142:2 – 143:12; Def. Resp. to RFAs, at Response 26].

## VI.   Outside of Litigation, Both CHS and Regulators Use the Ordinary Dictionary Meaning of Compliance.

453.  CHS's primary defense to its contractual liability is that only a regulatory authority can determine compliance with the Life Safety Code because compliance is a "status."

454.  Plaintiffs do not dispute that only CMS can provide the official certification for participation in the Medicare program and only Pa. DOH can issue a Pennsylvania hospital license.

455.  Plaintiffs do not contend there was a breach of the representations in Sections 3.6, 3.7, and 3.8 that Pottstown Hospital had a valid license, was certified by CMS, and had a TJC accreditation at the time of the sale.

456.  Instead, Plaintiffs contend that CHS breached the separate representations in the APA concerning "in material compliance" with the conditions of the license, Medicare COP, and other laws and regulations.

457.  As a result, the testimony from CHS's witnesses that, in their opinions, an AHJ "determines compliance" is a red herring and beside the point.

458.  As the Court observed on May 24, there is a significant difference between "ultimate compliance," meaning "the regulatory authorities have approved you; you've got your license," and "in compliance with the rules and regulations."  [May 24, 86:1-16 ("But why do you do all these surveys?  Because you want to maintain compliance at all times because there's a reason for these regulations—life safety.  So you always want to keep your hospital in compliance.  You want to make sure its survey ready if there should be a surprise survey . . . .")].

459.  One of CHS's expert witnesses acknowledged that compliance has different meanings in different contexts, undercutting any standard industry definition.  [June 10, Hofmeister, at 24:6-7, 89:5-6 ("[T]he term compliance is well-used in the industry and **has different meanings under different context[s]**.") (emphasis added), 136:1-2 ("Now I'm using the term compliance in terms of meeting the code."); *see also* May 11, Koffel, at 133:10-21 ("There are many people within CHS, people – consultants like myself, licensing authorities, certification, entities like CMS, accreditation, that can determine whether a building is in compliance with the Life Safety Code. . . . You are correct that whether I determine or state the building is in compliance or not, does not result in a facility being accredited, certified, or licensed.  It may be taken into consideration, but . . . I have no authority to recommend [certification], licensure or accreditation."); May 26, Carson, at 143:12-14 ("I can evaluate a building and my opinion as to whether they're in compliance or not, but I have no authority to declare it in compliance.")].

460.  Mr. Ridall agreed that a compliance determination by Pa. DOH is different than the work he does to determine if the hospital is in compliance with the applicable codes and regulations.  [May 24, Ridall, at 90:14 – 91:6, 92:3-12].

461.  The Court rejects CHS's position that for determining whether CHS breached the APA's representations of "compliance" only a regulator can determine compliance, in every circumstance, given CHS's own policies and procedures to verify that its hospitals were in compliance with the Medicare conditions of participation as well as the testimony of CHS's witnesses.  The Court rejects the interpretation of the word "compliance" in the APA to have the meaning attributed by CHS given the plain language of the APA and CHS's use of the word "compliance" outside of this litigation.

95

**A.** **CHS Established Internal Policies Requiring Compliance with the Life Safety Code as Part of its Compliance Program.**

462.  CHS established internal policies for maintaining compliance in its hospitals that required compliance with the 2012 edition of the Life Safety Code, as determined by CHS "corporate surveys" and not exclusively by an AHJ following a regulatory survey.  These policies are persuasive evidence that CHS knew "compliance," as used in the APA, has its ordinary meaning, the dictionary meaning, and not a "status determined by a regulator."

463.  CHSI (the publicly-traded parent company of CHS) touted its corporate compliance policies to its shareholders.  [PX308-1 (Dec. 2016 CHSI 10-K); PX308-2 (Dec. 2017 CHSI 10-K), at 24 ("Our company-wide compliance program has been in place since 1997.")].

464.  While Pottstown Hospital was owned by CHS, Pottstown Hospital had an Environment of Care ("EC") committee, which reviewed on a monthly basis the different elements in the "Environment of Care" TJC manual.  The facilities director of Pottstown Hospital was a member of the EC committee and reviewed life safety and fire safety with the committee.  A subset of the EC committee toured the hospital on a monthly basis to make sure there were no life safety compliance issues.  [May 13, Keown, at 31:5 – 32:21].

465.  Pottstown Hospital, when it was owned by CHS, implemented life safety and environment of care policies.  The policies adopted by Pottstown Hospital were templates of the ones prepared and approved by CHS.  [May 13, Keown, at 33:5-22].

466.  CHS updated its corporate policies after the adoption by CMS of NFPA 101, 2012 edition.  Mr. Ridall was "part of the group that was making changes to CHS's policies as part of the compliance program to make sure the compliance program would be checking for things under the new Life Safety Code."  [May 24, Ridall, at 11:23 – 13:3; *see also* PX85 (Nov. 2016 J. Ridall email with revised CHS Policy LS.01.01.01.05); May 24, Ridall, at 25:15-25].

96

467.  Mr. Ridall testified that he expected the hospitals within his region, like Pottstown Hospital, to implement and follow the CHS compliance program policies, including becoming knowledgeable with the Life Safety Code.  [May 24, Ridall, at 13:4 – 14:23].

468.  The CHS corporate compliance policies were "certainly" important to CHS and were not intended simply for show.  [May 24, Ridall, at 14:7-12].

469.  In November 2016, Mr. Ridall presented materials as part of an orientation for new facilities directors at hospitals owned by CHS.  [PX84 (CHS Facilities Managers Orientation Presentation); May 24, Ridall, at 17:3-20, 18:25 – 19:2].

470.  Mr. Ridall told the new facilities directors, including Ray Gostkowski, that regional engineers like himself would be available as a resource to help Pottstown Hospital with its "**regulatory compliance**."  [PX84 (CHS Facilities Managers Orientation Presentation), at 23 (emphasis added); May 24, Ridall, at 19:3 – 20:3].

471.  Mr. Ridall also instructed the new facilities managers, including Mr. Gostkowski, that "The CHS Facilities Management **Compliance Program** is a comprehensive system for **managing regulatory compliance** & maintaining survey readiness," which included plans, policies, forms, and processes.  [PX84 (CHS Facilities Managers Orientation Presentation), at 23 (emphasis added); May 24, Ridall, at 20:18 – 21:7].  Mr. Ridall testified:

> Q. . . . [D]oes this first bullet refresh your recollection that CHS refers to this management program as a compliance program?
>
> A. Sure.
>
> Q. Okay.  And what's written in that first bullet is true, isn't it?
>
> A. Yes.
>
> Q. All right.  That compliance program is a comprehensive system for managing regulatory compliance, right?
>
> A. Yes, it is.

Q.  Because you want the facilities managers, like Mr. Gostkowski at Pottstown to know that they actually have to manage regulatory compliance, right?

A.  Yes.  It is their responsibility to manage that at the facility.

Q.  Because it's quite important for CHS to make sure that its facilities maintain their regulatory compliance, right?

A.  Yes.

Q.  So CHS wants its facilities managers to know what they should be doing to review the regulatory compliance, identify issues and manage those issues, right?

A.  Yes.

[*Id.* at 20:18 – 21:14].

472.  Mr. Ridall testified that facilities directors should not ignore any issues:  "We want to be the – sort of the problem solvers when we identify things, come up with a solution with the corrective action in play and pursue it to the end."  [May 24, Ridall, at 21:19 – 22:2].

473.  CHS described the Document Review Manuals—provided by CHS and maintained at each facility—as the facility's "road map to compliance."  The manuals are part of CHS's compliance program to have its hospitals maintain continuous compliance.  [PX84 (CHS Facilities Managers Orientation Presentation), at 26; May 24, Ridall, at 23:6 – 24:10].

474.  One such CHS corporate policy that was part of CHS's compliance program was called "Fire Safety Management Plan."  The policy was revised on November 16, 2016, shortly after the adoption of the 2012 edition of NFPA 101.  [PX87 (CHS Policy EC.01.01.01.06), at CHS-TOWER00170892].

475.  Under "Scope," the policy states, "The program is also designed to **assure compliance** with applicable codes and regulations."  [PX87 (CHS Policy EC.01.01.01.06), at II (emphasis added)].  Mr. Ridall agreed the policy is part of CHS's program of helping its

98

hospitals, including Pottstown Hospital, maintain continuous compliance with all applicable codes and regulations.  [May 24, Ridall, at 36:16 – 37:6].

476.  As stated in the policy, which was effective November 16, 2016, CHS's corporate policy required, "The hospital buildings **must be in compliance** with law, regulation, and accreditation, including **compliance** with 2012 *Life Safety Code*."  [PX87 (CHS Policy EC.01.01.01.06), at III.A. (emphasis added)].

477.  CHS also required, "Deficiencies with these codes must be corrected as quickly as practical."  [PX87 (CHS Policy EC.01.01.01.06), at III.B].  As one of the objectives, the policy stated, "Summaries of identified problems with fire detection and response systems, NFPA code compliance, fire response plans, drills and operations, in aggregate, are reported to the EC Committee quarterly."  [*Id.* at IV.C].

478.  Mr. Ridall agreed the policy was instituted because "CHS wants its hospitals to be in compliance, to take appropriate measures to identify issues that might put the [hospitals] out of compliance, to correct them, and have plans in place to protect the patients and people in the hospital."  [May 24, Ridall, at 38:11-16].

479.  CHS described the duties of the "Governing Body" responsible for the Fire Safety Program at each hospital, including Pottstown Hospital:  "The Governing Body . . . review[s] reports and, as appropriate, communicate[s] concerns about identified issues and **regulatory compliance**.  They also authorize capital budget expenses to correct *Life Safety Code* deficiencies."  [PX87 (CHS Policy EC.01.01.01.06), at V.A].  The policy further states, "The Safety Officer / Director of Plant Operations . . . identify *Life Safety Code* deficiencies, develop Plans for Improvement, manage the maintenance of fire systems, the fire plan, fire drills, and fire responses."  [*Id.* at V.C].

99

480.  CHS's policy as part of its program of continuous compliance requires the "design of buildings and spaces to assure compliance with current local, state and national building and fire codes."  [PX87 (CHS Policy EC.01.01.01.06), at VI., Protecting Patients Staff and Others]. According to Mr. Ridall, the facilities are required to comply with NFPA 101 as well as any local or state building codes or Pa. DOH fire codes applicable to the hospital.  [May 24, Ridall, at 40:4 – 42:3].

481.  The Fire Safety Management Plan policy requires the application of the 2012 edition of NFPA 101, Life Safety Code.  "Policies have been developed to support the requirements of the Life Safety Code as applicable to health care, business and ambulatory health care occupancies.  It is the policy of <<Facility>> to design new construction and to maintain means of egress to comply with the 2012 edition Life Safety Code (NFPA 101) as well as all other applicable codes.  For the Elements of Performance stated in this management plan, construction and system design includes compliance with NFPA 101-2012 and all other applicable codes." [PX87 (CHS Policy EC.01.01.01.06), at VI, Life Safety Code, at 9-10].

482.  Moreover, CHS required:  "Routine building inspections and Environmental Tours are conducted **to ensure compliance is ongoing**.  **Corporate**, regulatory and accreditation **surveys verify compliance** and plans of correction are implemented to correct deficiencies." [PX87 (CHS Policy EC.01.01.01.06), at VI, Life Safety Code, at 10 (emphasis added)].

483.  Again, Mr. Ridall confirmed that the purpose of this corporate policy, which includes "corporate" surveys to verify a hospital's compliance with the Life Safety Code, was to "maintain compliance on a continuous basis."  [May 24, Ridall, at 43:4-6; June 11, Carlisle, at 113:14 – 115:13 (testifying that "when CHS uses that word, they're not using it the same way that CMS uses it")].

100

484.  The same paragraph requiring compliance with the 2012 edition of NFPA 101, conducting routine inspections to ensure compliance, and conducting "**corporate**, regulatory and accreditation surveys" to verify compliance is repeated throughout the CHS policy.  [PX87 (CHS Policy EC.01.01.01.06), at VI, at 10, 11-15 (emphasis added)].

485.  Pottstown Hospital implemented the Fire Safety Management Plan drafted by CHS. [PX147 (Pottstown Hospital adoption of CHS Policy EC.01.01.01.06); May 13, Keown, at 33:5 – 34:22].

486.  Ms. Keown testified that, as used in the CHS policy and as implemented by Pottstown Hospital, "regulatory" means the standards "we have to comply by from the Department of Health, CMS;" "accreditation" is TJC; and "corporate" refers to "the mock surveys that [CHS corporate] did, both on the facility side or the life safety side as well as the clinical side." [May 13, Keown, 36:1-8; *see* PX147 (Pottstown Hospital adoption of CHS Policy EC.01.01.01.06), at 9 ("Life Safety Code")].

487.  Mr. Ridall confirmed that the "corporate" surveys referenced in CHS's compliance policies are annual inspections of the facilities for which he was responsible, including Pottstown Hospital.  [May 24, Ridall, at 43:13-17].

488.  Another CHS policy that is part of CHS's compliance program for its facilities is "Policy LS.02.01.10 – Building Features are Maintained to Minimize the Effects of Fire, Smoke and Heat Policy."  [PX88 (CHS Policy LS.02.01.10); May 24, Ridall, at 30:5-12].

489.  Like the Fire Safety Management Plan policy, CHS expected the facilities it owned, including Pottstown Hospital, to implement and follow the Policy LS.02.01.10 – Building Features are Maintained to Minimize the Effects of Fire, Smoke and Heat Policy.  [May 24, Ridall, at 31:3 – 32:10].

101

490.  As of November 17, 2016, it was CHS's policy "to design new construction and to **maintain** building and fire protection features to minimize the effects of fire, smoke and heat to comply with the 2012 edition of Life Safety Code (NFPA 101) . . . ."  [PX88 (CHS Policy LS.02.01.10) (emphasis added); May 24, Ridall, at 32:15 – 33:22].  CHS's policy was designed to protect patients and employees from fire, smoke, and heat because in a hospital the patients have to shelter in place in the event of a fire.  [May 24, Ridall, at 33:8-22].

491.  CHS's policy specifically required its facilities to "meet requirements for height and construction type in accordance with NFPA 101-2012:  18/19.1.6.2."  [PX88 (CHS Policy LS.02.01.10), at CHS-TOWER0171589 ("Compliance with the Elements of Performance.")].

492.  Section 19.1.6 states:  "Health care occupancies shall be limited to the building construction types permitted in Table 19.1.6.1."  [PX41 (Life Safety Code), at 101-203, § 19.1.6].  For a seven-story hospital like Pottstown Hospital, the minimum construction type mandated by Chapter 19 of the Life Safety Code is Type II (222).  [*Id.*; May 10, Koffel, at 63:11-20, 65:5 – 66:15; May 4, Major, at 249:7-10].

493.  As of November 17, 2016, it was CHS's policy that:  "For the Elements of Performance stated in this policy, construction and system design includes **compliance with NFPA 101-2012 and all other applicable codes**.  Routine building inspections and Environmental Tours are conducted to ensure that **compliance is ongoing**.  **Corporate**, regulatory and accreditation **surveys verify compliance** and plans of correction are implemented to correct deficiencies."  [PX88 (CHS Policy LS.02.01.10), at 1 (emphasis added)].

494.  The CHS corporate policies, and those implemented by Pottstown Hospital, require the self-identification of items that may be deficiencies under the Life Safety Code and

correction of those issues, without waiting for a regulatory body or TJC to first cite the hospital for those issues.

495. In short, CHS's own policies use the term "compliance" by its plain English dictionary definition and not as a "status" that can only be determined by a regulator. The Court finds that the CHS corporate compliance policies demonstrate that CHS interpreted the term "compliance" the same as Plaintiffs do in this case in regard to "compliance" in the APA's representations and warranties. [*See also* May 11, Koffel, at 4:17 – 13:15].

### B. CHS Conducted Annual and Mock Surveys to Assess its Facilities' Compliance with the Life Safety Code and Other Regulations.

496. Consistent with the CHS corporate compliance policies, CHS conducted annual and mock surveys of its hospitals to maintain continuous compliance with the applicable law and regulations, including the Life Safety Code.

497. Contrary to CHS's position that only a regulator can make a compliance determination, CHS's expert Mr. Carson agreed that hospital owners, including CHS, can, and do, identify issues that are out of compliance with the Life Safety Code. [May 26, Carson, at 172:3-9]. Mr. Carson understood that CHS's compliance program included annual surveys of the hospitals conducted by its regional engineers in an effort to seek continuous compliance with the life safety code. [*Id.* at 173:7-19, 175:20 – 176:4]. The surveys performed by CHS are designed to ensure "compliance with the code." [*Id.* at 175:8-19].

498. Ms. Keown testified that Mr. Ridall from CHS conducted life safety surveys of Pottstown Hospital at least annually, and had done so since at least 2008. [May 13, Keown, at 22:8 – 23:2, 36:9 – 37:19].

499. The purpose of the corporate-conducted annual life safety surveys was for "survey readiness," meaning "**being in continuous compliance with the standards**." [May 13, Keown,

at 37:20-24 (emphasis added); *see also* May 24, Ridall, at 22:3-14]. "Continuous compliance" to Ms. Keown meant "all of the standards are in compliance and are in place at the individual hospitals." [May 13, Keown, at 37:25 – 38:3].

500. CHS considers the annual site visits conducted by Mr. Ridall part of CHS's compliance program. [May 24, Ridall, at 7:10 – 8:1; *see also* PX84 (CHS Facilities Management Orientation presentation), at 23 ("The CHS Facilities Management Compliance Program is a comprehensive system for managing regulatory compliance & maintaining survey readiness.")].

501. As part of Mr. Ridall's responsibilities to conduct the annual site visits as part of CHS's compliance program, Mr. Ridall "make[s] observations based on my experience and make recommendations to the facility so that they would be in compliance with their program." [May 24, Ridall, at 8:11-23; May 26, Carson, at 172:19 – 173:6 (Mr. Ridall was identifying deficiencies with the life safety code, which are issues out of compliance with the prescriptive requirements with the code)].

502. Among other things, Mr. Ridall reviewed the hospitals to see if they are in compliance with the Life Safety Code. One of his goals was to ensure the hospitals within his responsibility, including Pottstown Hospital, satisfied the standards of NFPA 101, LSC because, if not, a regulator could find the hospital was not in compliance. [May 24, Ridall, at 8:24 – 9:14, 10:18-22, 11:3-6].

503. Mr. Ridall conducted both unannounced mock surveys, during which he would "try to act like the regulatory body," as well as announced annual surveys. [May 24, Ridall, at 10:7-17].

504. The specific purpose of conducting the mock surveys prior to the TJC survey is to identify those conditions that would be out of compliance so they can be corrected by the facility

before the TJC survey.  [May 24, Ridall, at 11:10-19; *see also id.* at 76:4-8 ("We go there, we make observations.  If we, based on our experience, observe something that we think would be a deficiency, then we make a recommendation to the hospital so that they can address that item, whatever it may be.")].

505.  Following his multi-day annual survey, Mr. Ridall routinely sends an email with his findings to Pottstown Hospital, including Ms. Keown.  Mr. Ridall included a list of what he thoughts were deficiencies and asked Pottstown Hospital to put together a plan of correction. [May 13, Keown, at 38:4 – 38:20].  Mr. Ridall "expected us to correct the deficiencies, do a plan of correction so that they were corrected, and submit that to him within a certain time period." [*Id.* at 39:2-12; *see also* May 24, Ridall, at 52:3-25].

506.  Mr. Sanders testified that the CHS mock surveys conducted by Mr. Ridall were conducted for compliance purposes:  "A mock survey, to my understanding of a mock survey is that the facility self-diagnoses themselves for when the authorities having jurisdiction would come.  They act as if they're the authority having jurisdiction, so they do a mock survey and look for things."  [May 6, Sanders, at 21:9 – 22:4].  After he conducted the mock surveys, Mr. Ridall would contact Mr. Sanders for assistance approximately six to twelve times a year.  [*Id.* at 22:5-12].

507.  In March 2015, after Mr. Ridall conducted an annual life safety assessment of Pottstown Hospital, he circulated his email with the survey results and request for a plan of correction to Pottstown Hospital and multiple other recipients at CHS.  [PX52 (March 2015 J. Ridall email with annual site visit report)].

508.  In January 2016, Mr. Ridall conducted an annual life safety assessment of Pottstown Hospital.  [PX65 (Jan. 2016 J. Ridall email with annual site visit report)].  Mr. Ridall sent the

105

results of his assessment to both individuals at Pottstown Hospital (like Mr. Newell, Ms. Keown, and Mr. Gamler) and to his supervisors at CHS (including Dean Tiratto, John Wooten, and Joseph Dorko, Vice President of the Division).

509.  Mr. Ridall wrote, "During the site visit, priority was given to reviewing your facility's **compliance** with the Joint Commission's high risk and most cited standards within the Physical Environment chapters (EC, EM, and LS).  The table below shows the high risk and/or most cited standards that your facility is at risk of being cited for during a Joint Commission survey based on my observations during the site visit."  [PX65 (Jan. 2016 J. Ridall email with annual site visit report), at CHS-Tower00207044 (emphasis added)].

510.  Mr. Ridall identified multiple deficiencies within the hospital and requested that the hospital respond to him with corrective actions plans.  [PX65 (Jan. 2016 J. Ridall email with annual site visit report), at CHS-Tower00207045-46].

511.  Mr. Ridall also provided an "executive summary" that included "[a]n assessment of the facility's **compliance** with the high risk and most cited standards from the Joint Commission as well as a concise summary of other priorities that require immediate attention."  [PX65 (Jan. 2016 J. Ridall email with annual site visit report), at CHS-Tower00207045 (emphasis added)].

512.  Mr. Ridall determined that Pottstown Hospital did not meet standard LS.01.01.01, requiring that "the hospital maintains documentation of any approvals/variances granted by state or local authorities."  Mr. Ridall wrote in the observation comments, "Place a copy of the approved FSES under this tab in the function manual."  [PX65 (Jan. 2016 J. Ridall email with annual site visit report), at 10].  Mr. Ridall instructed Mr. Gostkowski to place the FSES into the

function manual at Pottstown Hospital, but he apparently did not.  [PX65 (Jan. 2016 J. Ridall email with annual site visit report), at 10; May 24, Ridall, at 50:15 – 51:5, 89:19-25].

513.  Significantly, even though (1) CMS adopted the 2012 edition of the Life Safety Code, effective July 5, 2016; (2) CMS adopted the 2013 edition of NFPA 101A for facilities using an FSES to demonstrate compliance, effective November 1, 2016; and (3) CHS put Pottstown Hospital up for sale in November 2016 [PX80 (CHS Confidential Information Memorandum)], Mr. Ridall did not conduct an annual life safety survey of Pottstown Hospital in 2017, the year CHS executed the APA and sold Pottstown Hospital to Tower Health.  [May 13, Keown, at 40:16-23; May 24, Ridall, at 54:4 – 55:4].

514.  The Court finds that CHS established its corporate policies to assess its facilities' compliance with the Life Safety Code on an annual basis and did not leave the determination of whether a hospital met the requirements of the Life Safety Code solely to an AHJ conducting a regulatory survey once every three years.

### C.    CMS, TJC, and Pa. DOH Encouraged "Continuous Compliance" with the Life Safety Code by the Hospitals.

515.  The Court's finding that the definition of "compliance" in the APA does not mean a "status" as determined by a regulator is also supported by the regulators themselves.  The unrebutted evidence at trial demonstrated that CMS, TJC, and Pa. DOH all encouraged hospitals to maintain continuous compliance with the Life Safety Code and not wait for a regulatory survey once every three years to uncover a problem, and that CHS attempts to follow those directives through its corporate compliance policies.

516.  CMS requires hospitals to maintain continuous compliance.  [May 24, Ridall, at 22:7-9].

107

517.  Mr. Ridall testified that CHS wants the hospitals it owns to maintain continuous compliance in accordance with the CMS requirements.  [May 24, Ridall, at 22:3-14].  CHS's compliance program was designed, in part, to ensure the facilities maintained continuous compliance.  [*Id.* at 22:15 – 23:5, 23:6 – 24:10, 26:4-8].

518.  Mr. Carson, CHS's expert, agreed that the preferred practice is not for hospitals to ignore compliance issues and wait until the hospital is cited by the regulator.  The better practice is to follow a program of continuous compliance, which is recommended by CMS.  [May 26, Carson, at 166:1 – 167:17].  The program of continuous compliance includes monitoring conditions in the hospital and surveying the hospital on a regular basis.  [*Id.* at 167:3-17].

519.  The parties' experts also agree that TJC encourages continuous compliance of hospitals with the applicable regulations, including the Life Safety Code.  [May 10, Koffel, at 166:19 – 168:7 (TJC is looking for "continuous compliance," meaning "[t]hree hundred and sixty five days a year the facility should strive to be in compliance with the code."); May 26, Carson, at 168:10-13 (TJC suggests continuous compliance); June 10, Hofmeister, at 89:7-16 (TJC "certainly state[s] that as a – as a goal to maintain continuous compliance"), 91:2-23].

520.  "Continuous," or "continual" as used by TJC, means "the facility needs to have programs and policies similar to what we just saw that would result in the facility trying to and verifying their compliance with the requirements during the entire accreditation period, starting immediately after this survey and continuing until the next survey.  They are to verify compliance with the elements of performance."  [May 11, Koffel, at 21:17-24].

521.  "The Joint Commission, throughout their literature, will refer to continual compliance, and in fact, that . . . was the reason for the change in the survey process that I

referenced yesterday to have facilities to ensure a continual compliance with the elements of performance."  [May 11, Koffel, at 21:6-12].

522.  TJC's elements of performance include compliance with the 2012 edition of the Life Safety Code in the life safety chapter of the hospital accreditation program.  [May 11, Koffel, at 21:13-16; PX336 (TJC Hospital Accreditation Program Requirements), at 54 ("Buildings meet requirements for construction type in accordance with NFPA 101-2012.")].

523.  Following its May 2015 survey, TJC corresponded with Pottstown Hospital about the status of TJC accreditation.  The Chief Operating Officer of TJC wrote, "This [accreditation] process is designed to help your organization **continuously** provide safe, high-quality care, treatment, and services by identifying opportunities for improvement in your processes and helping you follow through on and implement those improvements.  **We encourage you to use the accreditation process as a continuous standards compliance and operational improvement tool**."  [PX59 (June 2015 TJC letter) (emphasis added)].

524.  The Court rejects CHS's reliance on the three-year accreditation by TJC, expiring May 16, 2018 [PX59 (June 29, 2015 TJC letter)], to demonstrate compliance as of closing on the transaction in October 2017 because TJC itself requires a facility to maintain "continuous compliance" and not compliance only every three years.

525.  TJC offers a service called "intracycle monitoring survey" ("**ICM**") in which a hospital can voluntarily elect to have TJC come to the hospital in the off-cycle years to review various issues identified by a hospital.  The purpose of the intracycle monitoring survey is for "continued compliance."  [May 13, Keown, at 51:9 – 52:9].

526.  TJC describes the intracycle monitoring process as helping organizations with "continuous standards compliance."  [PX226 (TJC Intracycle Monitoring Process Fact Sheet)].

109

"To support accredited organizations with their **continuous compliance efforts**, The Joint Commission offers the ICM application during the interim years of the accreditation cycle." [*Id.* (emphasis added)].

527.  Pottstown Hospital, when it was owned by CHS, participated in the ICM process and selected Option 3, in which the hospital would self-identify areas of concern for the TJC surveyor.  [May 13, Keown, at 52:21 – 54:2].  The surveyor then provided "standards compliance information . . . to the organization through an oral exit briefing; there is no documented record of any event findings."  [PX226 (TJC Intracycle Monitoring Process Fact Sheet)].

528.  In September 2017, the last ICM survey was conducted by TJC prior to the sale of Pottstown Hospital to Tower Health.  Ms. Keown, the person who personally identified the topics for TJC's review during that ICM survey, remembered asking TJC to focus on ligature concerns following Pa. DOH's psych survey earlier that year.  She did not identify the building construction type as an issue for the TJC surveyors during the ICM survey, and the surveyors did not ask to review the FSES during the ICM survey.  [May 13, Keown, at 54:6 – 55:15].

529.  As of September 2017, when TJC conducted the ICM survey, Ms. Keown had not heard the term "FSES" before.  [May 13, Keown, at 55:4-7].

530.  The Court rejects CHS's position that the TJC ICM survey in September 2017 determined Pottstown Hospital was in compliance with, for example, Pottstown Hospital's deficient building construction type.  CHS presented no witnesses to contradict Ms. Keown's description of the limited scope of the ICM survey and the issues reviewed by TJC during the ICM survey.

531.  Pa. DOH, like CMS and TJC, also suggest continuous compliance, meaning continuous compliance with the life safety code.  [May 26, Carson, at 170:19-25].

### D.   Other Witnesses Testified to the Every Day Use and Ordinary Meaning of "Compliance" Consistent with Tower Health's Interpretation.

532.  Other fact witnesses testified at trial to using "compliance" in accordance with its everyday dictionary definition and not as a regulatory "status."

533.  Mr. Major testified that, in his position as Vice President of Facilities and Construction at Tower Health, he served as a consultant with respect to, among other things, life safety issues including the LSC.  [May 4, Major, at 222:15 – 223:1].

534.  He testified that his "experience with the NFPA 101 Life Safety Coded is actively administering facilities in healthcare, using that code, along with other codes for compliance, for continual compliance."  [May 4, Major, at 223:2-6].

535.  He explained, "It's a – it's a continual, both education and experience with regards to how the code is both administered and how the – how the compliance issues take place and take hold."  [May 4, Major, at 223:7-13].

536.  Mr. Newell testified that, as President of Pottstown Hospital, he viewed "accreditation" and "compliance" as two different things and not interchangeable.  [May 13, Newell, at 134:11 – 135:13 ("I'm saying that to me, accreditation and certification are awards that are given for the survey, but compliance . . . could change on a daily basis.  So if they said I was in compliance on March 18th and something happened on March 19th, that doesn't mean I'm still in compliance.")].

537.  While Mr. Newell was testifying about his distinction between "accreditation" and "compliance," obviously displeased with Mr. Newell's testimony, CHS's counsel Mr. Dodson accused Mr. Newell of looking at counsel for Tower Health for signals.  The Court stated on the

record, "There's certainly no signaling of any sort going on," and Mr. Newell testified that he did

not look at Plaintiffs' counsel for his answers.  [May 13, at 137:15 – 139:2].  To avoid any doubt,

the Court finds that Plaintiffs' counsel did not signal or provide non-verbal responses to

Mr. Newell, or any other witness for that matter, and finds that Mr. Newell testified credibly and

truthfully.

538.  Ms. Stefanov, the Vice President of Survey Management and Nursing Information for

CHS [June 8, Stefanov, at 249:6-10], testified that she did not have concerns about Pottstown

Hospital's compliance because the hospital was "still fully accredited, fully licensed and fully

certified by CMS."  [*Id.* at 260:10-16].  However, Ms. Stefanov also testified that she is not an

expert in life safety issues; she is not an architect or an engineer and had no responsibility for

building construction or facilities issues; had never been to Pottstown Hospital personally; and

had no idea there was an FSES applicable to Pottstown Hospital.  [*Id.* at 256:7-10, 265:14-21,

266:3-7, 266:20 – 267:6, 268:3-16].  Therefore, the Court gives little weight to Ms. Stefanov's

testimony about whether or not Pottstown Hospital was in compliance at the time of the sale to

Tower Health.[3]

539.  Moreover, even Ms. Stefanov acknowledged the difference between the use of

"compliance" as presented by CHS's attorneys at trial versus the everyday use at CHS:

> Q.  . . . In your role do you monitor the status of a hospital for both their
> compliance with the state and their compliance with CMS?
>
> A.  **Do I monitor their compliance in terms of how they're doing with
> things or that they are fully certified and fully licensed?**

[June 8, Stefanov, at 263:24 – 264:4 (emphasis added)].

---

[3] Ms. Stefanov was not identified as a witness regarding the compliance of Pottstown Hospital by CHS.  [June 8, at
259:11-16; *see also* D.E. 71-3 (Def. Responses to Interrogatories)].

**E.     All Life Safety Code Consulting Experts at Trial Testified to Their Routine Use of "Compliance" Including in Assessing a Hospital's <u>Compliance with the Life Safety Code.</u>**

540.  The Court heard consistent testimony from multiple code consulting experts and life safety professionals who, as part of their everyday job responsibilities, assess the compliance of hospitals with the life safety code.

541.  Mr. Koffel testified that his responsibilities at his former firm (Gage Babcock and Associates) included evaluating buildings and surveying buildings for "compliance with the applicable codes.  We would work [with] architects in the design of buildings, to ensure that their designs were compliant with the applicable codes."  [May 10, Koffel, at 12:1-10].

542.  Koffel Associates similarly performs code consulting services, including with architects in the design of new buildings or the rehabilitation of existing buildings "to determine if they are in compliance with applicable codes, such as the Life Safety Code." [May 10, Koffel, at 16:12-22].

543.  Mr. Koffel testified that for his healthcare clients, Koffel Associates performs annual surveys that coincide with their TJC accreditation cycle.  "[T]he Joint Commission requirement is that the healthcare organization maintain the facility in compliance, and that the healthcare organization maintain accurate, meaning current, Life Safety drawings.  So throughout that three-year period, we would survey different parts of the facility" and then help the facility prepare its statement of conditions.  [May 10, Koffel, at 17:6 – 18:4].  Those surveys were done to determine compliance with the Life Safety Code.  [*Id.* at 19:8-10].

544.  As part of his compliance consulting work for clients, Mr. Koffel prepares FSESs for hospitals to demonstrate equivalent compliance with the Life Safety Code.  [May 11, Koffel, at 13:25 – 14:24].

113

545.  Similarly, Wayne Carson, one of CHS's experts, is a fire protection engineer who started his own code consulting business in 1973, Carson Associates.  [May 26, Carson, at 7:1-17, 9:15-18].  Mr. Carson described his work as a consultant:  "I worked for a variety of clients – could be architects, could be building owners, could be engineers – in providing consulting services in codes, application of codes.  I review drawings for new construction, for renovation work.  Do surveys of buildings **for compliance to see if they meet the code**.  **Give my opinion, as to whether they meet the code or not**. . . . ."  [*Id.* at 9:19 – 10:9 (emphasis added)].

546.  Mr. Carson's clients do not wait until after they are cited to request his compliance assistance; instead, Mr. Carson is consulted prior to a regulator's survey to assess the facility and determine in what respects the facility may or may not be in compliance.  [May 26, Carson, at 157:14 – 158:1].

547.  When Mr. Carson performs mock surveys for clients, he reviews the building to determine what issues the client may have that could affect the client's license with the state health authority or if there are life safety code issues that could affect the hospital being in compliance with the Medicare conditions of participation.  [May 26, Carson, at 159:20 – 160:12, 161:1-11].  "Typically, what I do is go into a building and look at for – look at the **compliance with the life safety code**."  [*Id.* at 160:24-25 (emphasis added)].

548.  If Mr. Carson identifies significant material issues during his survey that could affect the client's certification or accreditation status, he tells his client and works with the client to develop solutions to those issues.  He agreed "that's because [he knows] the clients need to be prepared for issues that could come up down the road" including during "a Joint Commission survey or CMS survey."  [May 26, Carson, at 161:7 – 162:12, 163:7-10].

114

549.  Mr. Carson wrote articles on fire protection for NFPA magazine in the column called "In Compliance."  [May 26, Carson, at 13:19-25].

550.  Significantly, Mr. Carson agreed that a code deficiency "does not meet the prescriptive requirements of the code" and is "not in compliance with the prescriptive requirements of the code."  [May 26, Carson, at 162:13-24].

551.  Mr. Carson also agreed that just because a hospital has a TJC accreditation does not mean the hospital is in compliance with the prescriptive aspects of the life safety code that are part of the Medicare conditions of participation.  [May 26, Carson, at 164:11 – 165:21].

552.  CHS's other code compliance expert, Craig Hofmeister, provides fire protection engineering consulting services for his clients, including "consulting on whether a – whether a facility meets code requirements or not."  [June 10, Hofmeister, at 8:20 – 9:16].  Among other things, Mr. Hofmeister—like Mr. Koffel and Mr. Carson—performs surveys for healthcare facilities to identify any deficiencies or issues with the life safety code.  [*Id.* at 13:20 – 14:4, 84:16 – 86:19 (Mr. Hofmeister is hired by his clients to help clients "review their facility as to whether they have specific code deficiencies for NFPA 101")].  Mr. Hofmeister agreed that, if the deficiencies were not corrected, it could lead to "severe action taken against you" by a regulator.  [*Id.* at 88:6-18].

553.  Mr. Hofmeister testified that the assessments he performs for clients stem from TJC's recommendation to hospitals to perform periodic life safety assessments, and when he finds deficiencies, he identifies for the client the items he believes are more significant.  [June 10, Hofmeister, at 91:2 – 92:23].

554.  During his deposition, part of which is included in the trial record, Mr. Sanders of BDA testified that as part of his role as an architectural professional, he has evaluated facilities

for compliance with applicable healthcare life safety codes.  [TA-P-1, Sanders Dep., at 34:21 – 35:1].

555.  Mr. Peters also described the annual assessments performed by Peters Rice as a life safety consultant.  He testified that Peters Rice performs these assessments for clients "to get them to be able to follow . . . the code and the standards that are set in place as law, you know, per CMS, the federal government, and the state of Pennsylvania."  During his assessments, he will "take a look at the facility and then I'll give them a list of deficient conditions based on, you know, right now, the 2012 version of the life safety code."  [May 6, Peters, at 107:2-23].

556.  Following his assessment, Mr. Peters tells his clients if there are any findings that could be violations of the law, "something that's going to cost them time and money."  The reason he informs his client of the findings as they compare with the LSC is "[s]o that [the client] can fix them. . . . [Y]ou adhere to the life safety code.  Ultimately it comes down to whether you get your reimbursement" from CMS, which requires compliance with the life safety code.  [May 6, Peters, at 107:24 – 108:22].

557.  Mr. Peters agreed that clients ask him to perform a review for compliance for the purposes of reimbursement from CMS.  [May 6, Peters, at 109:16-20].

558.  The Court finds that the ordinary meaning of the term "compliance" as used by the parties in the APA is a determination of compliance with the applicable code and regulation, whether or not determined by a regulatory authority.

## VII.   CHS Did Not Prepare an Updated 2013 FSES for Pottstown Hospital to Determine its Compliance with the Life Safety Code.

559.  To counter the position that after CMS adopted the 2013 edition of NFPA 101A, effective November 1, 2016, CHS should have prepared an updated FSES to determine whether Pottstown Hospital was in compliance with the 2012 edition of the Life Safety Code, CHS

argues it was unable to "submit" a new FSES until after it was cited by an authority having jurisdiction.  Whether or not that position is accurate, the Court finds that CHS could have, and should have, prepared or updated a new FSES for Pottstown to determine and evaluate whether it could satisfy the 2013 FSES forms.

560.  The Court also rejects CHS's position that it could continue to use the 2009 FSES to demonstrate equivalency with the Life Safety Code after the adoption of the 2012 edition of the Life Safety Code, effective July 5, 2016.  [*See generally* June 10, Hofmeister, at 98:2-20].

561.  Lori Dinney from TSIG testified that the existing 2009 FSES was not retroactive and was not good for the life of the building.  "In the past when equivalencies were approved by The Joint Commission, they were good as long as nothing was done to alter that area of the building, so they didn't have to be resubmitted.  But in the past few years, The Joint Commission has taken on the requirements of CMS, which now means that it's not good for the life of the building any longer.  They have to be resubmitted after each survey."  [TA-D-9, Dinney Dep., at 85:16 – 86:6; *see also id.* at 32:19 – 33:6 ("CMS, Center for Medicare and Medicaid Services, requires that after an equivalency is approved, it is resubmitted after each survey, whether that be a year later, two years later, or three years later.  So this had not been resubmitted, plus it was based on an earlier edition of the code which no longer applied."); TA-D-9, at Dinney-6 ("The older submittal is not retroactive.")].

562.  In June 2016, TJC circulated a memo about CMS's adoption of the 2012 edition of NFPA 101, notifying hospitals that although the new Code was effective July 5, 2016, CMS would defer surveying facilities for compliance with the 2012 edition of the Life Safety Code to "allow providers . . . a chance to assess their facilities for compliance with the 2012 LSC . . . ." [PX70 (June 2016 TJC memo)].

117

563.  On December 16, 2016, CMS advised hospitals, like CHS, that the 2013 FSES would be used in place of the 2001 FSES (the forms on which the 2009 FSES was prepared).  CMS stated:  "If the FSES is being used to demonstrate compliance with the fire safety requirements, the version of the FSES for Health Care Occupancies . . . found in the 2013 edition of the Guide on Alternative Approaches to Life Safety, NFPA 101A **must be used**."  [PX94 (Dec. 2016 CMS S&C Memo), at 1 (emphasis added)].

564.  All Life Safety Code compliance experts agreed that the version of the FSES that could be used to demonstrate compliance with the 2012 edition of the Life Safety Code was the 2013 edition of NFPA 101A.  [May 10, Koffel, at 125:15-21; May 26, Carson, at 68:1-2, 193:6 – 195:5, 199:1-4; June 10, Hofmeister, at 29:8 – 30:7; *see also* PX94 (Dec. 16, 2016 CMS S&C Memo); PX45 (NFPA 101A, 2013 Edition Handbook), at 4.1.2, at 100].

565.  Instead of determining whether Pottstown Hospital could qualify for a 2013 FSES, CHS put Pottstown Hospital up for sale in November 2016.  [PX80 (CHS Confidential Information Memorandum)].

### A.   Pa. DOH Removed the Reference to FSES for Pottstown Hospital from Its Survey Reports After Adoption of the 2012 Edition of Life Safety Code.

566.  The Pa. DOH survey reports assessing compliance with Pottstown Hospital under the 2000 edition of the Life Safety Code, prior to November 2016, contained a reference to an FSES used to address the deficient building construction type of Type II (000).  [PX334 (summary of Pa. DOH surveys)].

567.  After November 1, 2016, the date CMS announced it would begin surveying facilities for compliance, the Pa. DOH Occupancy Survey reports—which reviewed particular renovated areas of Pottstown Hospital and not the entire facility—removed all references to an FSES attached to Pottstown Hospital.  [PX335 (summary of Pa. DOH occupancy surveys); May 10,

Koffel, at 171:21 – 177:13 ("[N]one of the occupancy surveys after November 1st reference the

FSES."); *see also* PX169 (May 2018 Pottstown Hospital Review PowerPoint), at 3; May 4,

Major, at 283:1 – 284:16].

568.  Mr. Koffel concluded:  "This . . . would indicate to me that DOH did not have a valid

FSES on file to demonstrate an equivalency to the 2012 edition of the life safety code."

[May 10, Koffel, at 177:14-20].

569.  Mr. Major likewise testified about the significance of the removal of the reference to

FSES after the code change:  "To me, it would indicate that the Department of Health no longer

viewed this facility as having a valid FSES."  [May 4, Major, at 284:12-16; *see also id.* at 283:8-

9 ("The FSES . . . is not current and is not applicable.")].

570.  Mr. Sanders testified that as to Moses Taylor Hospital, also owned by CHS,

Mr. Ridall expressed concern to him when "as soon as the new code is adopted, it was curious

that all of the Department of Health records for inspection since the code was adopted dropped

the term FSES off their inspection reports. . . . And essentially that language was removed from

all of the reports when the new code was written."  [May 6, Sanders, at 76:17 – 77:13].

571.  Mr. Ridall decided Moses Taylor should get a new FSES, and "they asked that

[Mr. Sanders] prepare the calculations to see if it would still pass.  It's never been submitted[,]"

but it is available to the hospital.  [May 6, Sanders, at 78:11-19].

572.  After the FSES reference was dropped from the Pa. DOH survey records for

Pottstown Hospital, after November 1, 2017, when CHS put Pottstown Hospital up for sale, CHS

never arranged for anyone to prepare a 2013 FSES "calculations to see if it would still pass."

573.  Whether this was a Pa. DOH policy to delete references to FSESs prepared under the

2000 edition of the Life Safety Code after November 1, 2016 is not significant.  Its significance

is that it was a red flag and warning to CHS that after November 1, 2016 it should have evaluated whether Pottstown Hospital qualified for a 2013 FSES.

### B.   Pa. DOH Notifies CHS that Pottstown Hospital Needs an Updated FSES.

574.   The Court's finding that CHS was aware it needed a new 2013 FSES after November 1, 2016 and was aware its 2009 FSES did not achieve compliance under the 2012 Life Safety Code is supported by the uncontested fact that Pa. DOH itself told CHS so.  Prior to the sale to Tower Health, in April 2017, shortly before the May 30, 2017 APA execution, Pa. DOH notified CHS that it needed an updated FSES for Pottstown Hospital.

575.   On November 3, 2016, Mr. Gostkowski asked Mr. Sanders of BDA for a proposal to complete new life safety drawings for Pottstown Hospital.  Mr. Ridall, CHS's Regional Engineer, agreed with the request.  [PX82 (November 2016 J. Ridall email string relating to Pottstown Hospital life safety plans); May 6, Sanders, at 48:24 – 49:7 (Mr. Sanders added Mr. Ridall to the email thread because "I wanted to make sure he knew what was going on.")].

576.   Life safety plans are floor plans that identify certain features in the hospital, including exits, fire barriers, smoke barriers, the construction type of the building, and where the hazardous areas are.  Essentially, they are "plans of each floor of the hospital showing the conditions on that floor."  [May 10, Koffel, at 158:2-14].

577.   At November 3, 2016, the existing life safety plans that Mr. Gostkowski wanted replaced with new life safety plans were dated February 2015 and had been prepared by Noelker and Hull Associates, Inc. ("**NHA**").  [May 6, Sanders, at 50:22 – 51:4; DX10 (2015 NHA life safety plans)].

578.   On November 9, 2016, Mr. Ridall provided the February 2015 life safety plans prepared by NHA to Mr. Sanders.  [PX86 (Nov. 2016 J. Ridall email to D. Sanders)].

120

579. The NHA life safety drawings were prepared in accordance with NFPA 101, 2000 edition. [May 6, Sanders, at 53:12-14 ("[N]one of the references were relevant, because they were against the old code."); June 11, Carlisle, at 126:11 – 127:6]. They relied on, and specifically noted, the June 11, 2009 FSES. [DX10 (2015 NHA life safety plans), at CHS-TOWER00011557, "Facility Notes"].

580. Mr. Sanders provided a proposal to transpose the NHA plans into the BDA format that CHS adopted and to conform the plans to the 2012 edition of NFPA 101. [May 6, Sanders, at 37:3-17, 51:11-17].

581. On November 21, 2016, Pottstown Hospital submitted a Capital Expenditure Request ("**CER**") to CHS corporate to obtain authorization to have new life safety plans prepared, along with the proposal prepared by BDA. [PX89 (Nov. 2016 email with CER); PX96 (Jan. 2017 email with CHS approved CER)]. Mr. Newell needed to request approval from CHS corporate headquarters in Tennessee for authority to spend $15,000.00. [May 13, Newell, at 103:3-16].

582. The "CER Justification" included in the CER was: "Proposal to update Life Safety plan preparation. Current Life Safety drawings are required and ours are way out of compliance." [PX89 (Nov. 2016 email with CER), at TOWER-CHS-PMMC-011545]. The current life safety drawings referenced in the CER Justification were the plans prepared by NHA in February 2015. [May 24, Ridall, at 50:6-10]. The CER also noted, "Joint Commission Recommendation." [PX89 (Nov. 2016 email with CER), at TOWER-CHS-PMMC-011543].

583. November 1, 2016 is the date CMS notified hospitals that it would begin to survey under the 2012 edition of the Life Safety Code. [PX72 (June 2016 CMS S&C Memo)]. November 2016 is also the time when CHS advertised that Pottstown Hospital was for sale. [PX80 (CHS Confidential Information Memorandum)].

121

584.  In January 2017, the CER was approved by the required individuals at CHS,

including John McClellan (Division President), Joe Dorko (Division Vice President) and Gordon

Carlisle (Vice President for Facilities Management responsible for design and construction,

engineering support, real estate, and corporate facilities).  Mr. Carlisle signed the CER,

evidencing his specific approval.  [PX96 (Jan. 2017 CHS approved CER); May 13, Newell, at

103:21 – 104:10; June 11, Carlisle, at 104:17 – 106:6].

585.  BDA agreed to prepare "final" life safety plans for the owner (Pottstown Hospital)

and "make a 'for record only' plan review submission to PA DOH."  [PX99 (BDA fee proposal),

at TOWER-CHS-PMMC-028153, II.A.6-7].

586.  Pottstown Hospital's articulated purpose to Pa. DOH for Pa. DOH's "for record only"

plan review was for Pa. DOH to "check for conformance," review the plans, and provide

comments as to whether Pa. DOH views the plans as compliant.  [May 6, Sanders, at 56:12 –

57:7].

587.  BDA drafted new life safety plans and submitted those plans to Pa. DOH as a "for

record" submission.  [PX120 (April 2017 plan review application and cover letter); *see also*

PX128 (May 2017 email string between D. Sanders, R. Gostkowski, and J. Ridall), at TOWER-

CHS-PMMC-005351].

588.  Mr. Sanders included the Building Construction Type information for Pottstown

Hospital that was on file with Pa. DOH.  [May 6, Sanders, at 64:10-20].  For the main hospital

building, the BDA life safety plans state:  "Seven story building with basement and penthouse.

Type II (000) unprotected noncombustible construction, which is fully sprinklered, with a fire

safety evaluation system (FSES) for deficiencies K012, K0202, and K024."  [PX120 (April 2017

plan review application and cover letter), at TOWER-KOFFEL-000587].

589.  BDA's plans included the reference to NFPA 101, 2012 edition because Mr. Sanders prepared the plans to be reviewed by Pa. DOH under that edition of the Life Safety Code. [PX120 (April 2017 plan review application and cover letter), at TOWER-KOFFEL-000587; May 6, Sanders, at 84:16-18].

590.  The BDA life safety plans were submitted to Pa. DOH with a memorandum dated April 26, 2017 signed by Ray Gostkowski, Director of Facilities.  It stated:  "The updated Life Safety Plans are necessary to provide a more accurate set of documents illustrating building construction types, fire rated walls/barriers, exits, hazardous areas, smoke compartments, sprinklered areas, and life safety code suites.  During the update process, enough revisions were made to the previous Life Safety Plans that it was felt that these plans should be reviewed by PA DOH DSI for 'record purposes' and to also establish the new benchmark going forward for both PMMC's use and **also in future jurisdictional agency reviews of PMMC facilities**."  [PX128 (May 2017 email string between D. Sanders, R. Gostkowski, and J. Ridall), at TOWER-CHS-PMMC-005352 (emphasis added); PX120 (April 2017 plan review application and cover letter), at TOWER-KOFFEL-000586 (emphasis added); May 6, Sanders, at 71:23-25].

591.  Later in April 2017, after Pa. DOH reviewed the plans, Pa. DOH advised BDA that it could not approve the submitted plans because Pottstown Hospital needed a new FSES under the 2012 NFPA 101 Life Safety Code.  [PX121 (April 27, 2017 email from D. Sanders to Pa. DOH), at TOWER-BDA-000526 ("I also have a question on the requirement of having the FSES updated and it being tied to plan approvals so I can properly advise our client what needs to be done.")].

123

592. Mr. Sanders reported Pa. DOH's requirement for an updated FSES to both Mr. Gostkowski and Mr. Ridall. [PX128 (May 2017 email string between D. Sanders, R. Gostkowski, and D. Sanders)].

593. On May 1, 2017, Mr. Sanders wrote to Mr. Gostkowski and Mr. Ridall: "As we discussed, the plan reviewer Bill Gutches said that he is only stamping the plans as 'Preliminary' **until such time that the FSES for your facility is updated to use the most current FSES forms that dovetail into the 2012 NFPA 101 Life Safety Code**." [PX128 (May 1, 2017 email between D. Sanders, R. Gostkowski, and D. Sanders), at TOWER-CHS-PMMC-005347 (emphasis added)].

594. Mr. Sanders also informed Mr. Gostkowski and Mr. Ridall, "I will not have enough fee remaining in my current fee proposal to reformat, revise and file your FSES with the state so if that is something you want me to do, I will need to write another proposal to complete that scope of work." [PX128 (May 1, 2017 email between D. Sanders, R. Gostkowski, and D. Sanders), at TOWER-CHS-PMMC-005347].

595. On May 4, 2017, Mr. Sanders provided the "returned upload from PA DOH of the stamped reviewed Life Safety plans" to Mr. Gostkowski and Mr. Ridall. [PX128 (May 4, 2017 email between D. Sanders, R. Gostkowski, and D. Sanders), at TOWER-CHS-PMMC-005346].

596. Mr. Sanders wrote to Mr. Gostkowski and Mr. Ridall, "[T]he plans are still stamped 'PRELIMINARY' until a new FSES is filed with PA DOH. The results of the FSES really don't affect what is [in] the drawings so I would still use the drawings I sent you last week for ongoing use." [PX128 (May 4, 2017 email between D. Sanders, R. Gostkowski, and D. Sanders), at TOWER-CHS-PMMC-005346; May 24, Ridall, at 73:11 – 74:17 (conceding the life safety plans were never brought to final with Pa. DOH)].

124

597.  The Preliminary Stamp on the BDA life safety plans placed by the Pa. DOH DSI plan reviewer stated, "**An FSES per the 2012 Life Safety Code has not been completed we do not know that this meets an FSES any longer**."  [PX128 (May 4, 2017 email between D. Sanders, R. Gostkowski, and D. Sanders with Pa. DOH stamped plans), at TOWER-CHS-PMMC-005353 (emphasis added); May 6, Sanders, at 62:8-12; *compare with* PX120 (April 2017 BDA plan review application and cover letter), at TOWER-KOFFEL-000587 (BDA plan submission does not include Preliminary Stamp)].  Mr. Ridall was aware of the "Preliminary" stamp and comment placed by Pa. DOH.  [May 24, Ridall, at 63:7-9].

598.  Mr. Sanders discussed the Preliminary Stamp placed by Pa. DOH with Pa. DOH.  In those discussions, Pa. DOH strongly recommended that Pottstown Hospital prepare an FSES. [May 6, Sanders, at 65:9-19; *id.* at 58:19 – 59:3 ("**He strongly suggested that an FSES be prepared**.") (emphasis added)].  Mr. Sanders understood the issue with Pa. DOH was "[t]hat [Pottstown Hospital] needed an updated FSES."  [May 6, Sanders, at 69:1-2].

599.  Mr. Sanders believes he notified both Mr. Gostkowski and Mr. Ridall, CHS's Regional Engineer, about the conversations with Pa. DOH "because something like that would need to go to the district engineer."  [May 6, Sanders, at 65:24 – 67:4].

600.  Mr. Ridall testified that Mr. Sanders recommended preparing a new FSES.  [May 24, Ridall, at 64:7-13, 64:24 – 65:1].  Mr. Ridall relies on Mr. Sanders for his expertise and that he takes Mr. Sanders' recommendations seriously and respects Mr. Sanders' judgment.  [May 24, Ridall, at 65:6-20].

601.  Mr. Ridall admitted that he received Mr. Sanders' email recommending a new FSES and "explaining that he did not have enough money left in his budget after completing the

125

updated life safety drawings to continue and also perform the FSES without that becoming a separate project."  [May 24, Ridall, at 61:5-24].

602.  After Mr. Sanders advised Mr. Ridall and Mr. Gostkowski that Pa. DOH strongly recommended that Pottstown Hospital prepare an updated FSES, BDA was not retained by CHS or Pottstown Hospital to prepare one.  [May 6, Sanders, at 72:25 – 73:3].

603.  Neither CHS nor Pottstown Hospital, when it was owned by CHS, asked Mr. Sanders to write an updated FSES to determine whether it would pass under the 2012 edition of NFPA 101, Life Safety Code.  [May 6, Sanders, at 37:21-23].

604.  Mr. Sanders testified at his deposition (which is part of the trial record) that after he learned about the pending sale of Pottstown Hospital by CHS, "[a]ll projects in Pottstown were put on hold.  The IR project never went any further, and this never went any further."  [TA-P-1, Sanders Dep., at 138:2-13].

605.  Mr. Carson, one of CHS's experts, testified that, if he had been advising CHS when it had the communications with Pa. DOH discussed above, he would have instructed his client to look into getting a new FSES because Pa. DOH at least thinks the hospital may not be in compliance with the life safety code without a new FSES.  [May 26, Carson, at 210:8-19].

606.  Before the sale to Tower Health, CHS did not disclose to Tower Health in any schedule to the APA (1) its April and May 2017 communications with Pa. DOH; (2) the CER's acknowledgment that the NHA life safety plans, which relied on the 2009 FSES, were "way out of compliance;" (3) that in April 2017, Pa. DOH notified CHS that Pottstown Hospital needed to update its FSES to conform to the 2012 Life Safety Code; (4) the contents of the BDA life safety plans' Preliminary Stamp from Pa. DOH; and (5) that CHS never prepared an updated FSES to conform to the requirements of the 2012 edition of the Life Safety Code.

126

**C.     CHS Was Aware of Changes in 2013 FSES to High-Rise Hospitals.**

607.  As of at least February 2017, CHS was aware that, for high-rise hospitals, like

Pottstown Hospital, the FSES forms and calculations significantly changed in the 2013 edition of

NFPA 101A.

608.  It is undisputed that Pottstown Hospital is and always has been a high-rise hospital, as

defined by NFPA 101, Life Safety Code.  [PX41 (Life Safety Code), at 101-28, § 3.3.36.7;

PX221 (Defendants' Answer to Amended Complaint), ¶¶ 39-40].

609.  By email dated January 24, 2017, Mr. Ridall, the CHS Regional Engineer responsible

for Pottstown Hospital, asked Mr. Sanders from BDA if he knew "what DOH is up to regarding

revisiting previously approved FSES?"  [PX100 (Jan. 2017 email string between J. Ridall and

D. Sanders), at CHS-TOWER00224363; May 24, Ridall, at 47:1-10].

610.  In response to Mr. Ridall, on February 7, 2017, Mr. Sanders identified the significant

differences between the old FSES form (under the 2001 edition of NFPA 101A) and the new

2013 FSES Form (under the 2013 edition of NFPA 101A):  "[O]n page 3 they significantly

changed the Existing 'Extinguishment' value from 6 to 16 to be used on new or **existing hospital**

**buildings considered high rises** . . . . **That is a 10 swing in the calculations that is causing the**

**current issues**."  [PX100 (Jan. 2017 email string between J. Ridall and D. Sanders), at CHS-

TOWER00224362 (emphasis added)].  The changes to the FSES forms under the 2013 edition of

NFPA 101A significantly impacted high-rise hospitals, like Pottstown Hospital.  [May 6,

Sanders, at 29:10-21].

611.  Mr. Sanders attached to his February 7, 2017 email annotated and highlighted FSES

forms to identify for Mr. Ridall the changes he believed were important.  [May 6, Sanders, at

27:21 – 28:2].  Mr. Sanders noted the mandatory values in Worksheet 4.7.8 for use in hospitals

or nursing homes "has been changed significantly in 2013 form."  [PX100 (Jan. 2017 email

127

string between J. Ridall and D. Sanders), at CHS-TOWER00224367; *see also id.* at CHS-
TOWER00224371 (showing the addition to the 2013 FSES form of a "High rise" requirement
with associated values); May 6, Sanders, at 33:7-14, 34:16 – 35:4 (noting big change to existing
high-rise hospitals)].

612.   Mr. Sanders testified that he highlighted "2013 edition" on the bottom of the forms
attached to his email "[b]ecause that's the new FSES form that we were going to have to follow,"
and he agreed he wanted to "highlight for [his] client that this is the new version they were going
to have to understand."  [May 6, Sanders, at 34:2-15; PX100 (Jan. 2017 email string between
J. Ridall and D. Sanders), at CHS-TOWER00224371 (highlighting the high-rise addition)

613.   According to Mr. Sanders, the ten-point negative calculation under the 2001 NFPA
101A for building construction type could be overcome by having sprinklers throughout the
building.  But after the adoption of the 2012 Life Safety Code and the 2013 edition of NFPA
101A, "I can imagine that [the mandatory high-rise values] would negatively affect a calculation
in an[] FSES" even though he never evaluated a high-rise hospital.  [May 6, Sanders, at 30:11-
21].

614.   In 2017, Mr. Ridall never conducted his required annual or mock survey of Pottstown
Hospital before its sale to Tower Health.  [May 13, Keown, at 40:16-23; May24, Ridall, at 54:4 –
55:4].

## D.   CHS Prepared New FSESs Under NFPA 101A, 2013 Edition for Its Pennsylvania Hospitals Proactively and Without a Citation Except for Pottstown Hospital.

615.   CHS did not engage BDA to prepare a new FSES for Pottstown Hospital to determine
if it would pass under the 2013 edition of NFPA 101A, but argues that it could not prepare or
submit an FSES until after it was surveyed and cited by an AHJ, like Pa. DOH.  The Court
rejects this position for another reason:  the undisputed evidence proved CHS prepared or

128

facilitated the preparation of updated FSESs under the 2013 forms for two other Pennsylvania hospitals it owned, Sharon Hospital and Moses Taylor Hospital, without either Sharon or Moses Taylor first being surveyed or cited by Pa. DOH.

616.  CHS arranged for updated FSESs using the 2013 FSES Form for Sharon and Moses Taylor hospitals before it sold Pottstown Hospital to Tower Health.  [DX294 (August 5, 2016 FSES for Sharon Hospital)].

617.  Following the adoption of the 2012 edition of NFPA 101, Mr. Sanders testified that he (1) "facilitated getting a new FSES at Sharon Hospital" and (2) "wrote an FSES that was never filed with the state just to do a comparison to see if it would pass" for Moses Taylor Hospital.  Both Sharon Hospital and Moses Taylor Hospital were Pennsylvania hospitals owned by CHS.  [May 6, Sanders, at 35:9-25, 36:9-13, 36:19 – 37:2].

618.  For both Sharon Hospital and Moses Taylor Hospital, unlike for Pottstown Hospital, Mr. Sanders was retained to work on updated FSESs following his preparation of life safety plans under NFPA 101, 2012 edition.  [May 6, Sanders, at 36:15 – 37:2, 37:11-20; May 24, Ridall, 59:6-25 (Mr. Sanders worked with Sharon to have an FSES prepared)].

619.  As to Sharon Hospital, in August 2016, Charles Schlegel from Pa. DOH prepared the FSES using the 2013 edition of NFPA 101A.  [May 6, Sanders, at 36:3-8; *see also* PX100 (Jan. 2017 email string between J. Ridall and D. Sanders), at CHS-TOWER00224363 ("If you remember we had to wait for Charlie to write the Sharon FSES until the new FSES forms that dovetailed with the 2012 NFPA 101 were available."); DX294 (August 5, 2016 FSES for Sharon Hospital on 2013 FSES edition forms)].

620.  In 2016, Mr. Ridall contacted Mr. Sanders during his mock survey of Sharon Hospital.  As Mr. Sanders testified, "He just said that he wasn't sure what he was looking at

129

when he was above the ceiling and he wanted me to put a proposal together to A, develop some life safety plans; B, basically look – look into what the issues might be by doing field investigation and see for myself.  And what he had described to me was when he saw unprotected steel above the ceiling, he basically couldn't figure out how the building was protected.  Because there was no FSES on that building ever on the records."  [May 6, Sanders, at 38:11-19].

621.  CHS then retained BDA to "develop life safety plans, do the field investigation, to verify what the field conditions were, and then if necessary, facilitate contact with the state to see what should be done about it" with respect to Sharon Hospital.  [May 6, Sanders, at 38:20-25].

622.  Mr. Sanders testified that Sharon Hospital had a nonconforming building construction type.  "Over the years, that ceiling had been degraded and not maintained and people hadn't been paying attention or noticing it, **not even the state inspectors**, to the point where now the ceiling was not offering any protection to the steel or the deck, and it was in a pretty large area of the hospital in the older sections."  [May 6, Sanders, at 39:9-17 (emphasis added)].

623.  Sharon Hospital "**had never been cited** and there was no FSES for that facility," with the condition missed for more than 15 years by the regulators.  [May 6, Sanders, at 39:18-25 (emphasis added); *id.* at 76:4-10].

624.  Based on his 34 years' experience as a healthcare architect, Mr. Sanders testified that inspectors miss significant deficiencies "more than you would think."  [May 6, Sanders, at 40:13-19].  Mr. Sanders testified that "a lot of times [the surveyors] don't even go above the ceilings . . . [A] lot of times, they're – they can be lazy.  They're looking at – they can be lazy.  They're looking at the barriers more – the wall barriers than they are construction type."  [*Id.* at 40:1-12].

130

625. Mr. Sanders told Mr. Ridall "that without an FSES, [Sharon H]ospital would not be compliant." [May 6, Sanders, at 44:7-9; *see also* May 6, Sanders, at 44:5-6 ("I just said there's no way it's going to pass without getting an FSES.")].

626. As to Moses Taylor Hospital, after the new code was adopted, "it was curious that all of the Department of Health records for inspection since the code was adopted dropped the term FSES off their inspection reports." [May 6, Sanders, at 76:16 – 77:2, 77:12-13 ("And essentially that language was removed from all of the reports when the new code was written."), 77:22-25].

627. Mr. Ridall expressed concerns to Mr. Sanders about Pa. DOH's removal of the reference to FSES in the Pa. DOH reports concerning Moses Taylor Hospital. [May 6, Sanders, at 77:22 – 78:3].

628. Following that discussion, Mr. Ridall "asked that I prepare the calculations to see if it would pass." Mr. Sanders wrote the FSES using the 2013 FSES Form for Moses Taylor to have on file in the event the hospital is cited. [May 6, Sanders, at 78:16-22, 79:10 – 81:4].

629. Although Moses Taylor, like Pottstown Hospital, had previously been cited under the old LSC, Moses Taylor had not yet been surveyed by an AHJ since 2016. Thus, when BDA prepared the calculations for the updated FSES using the 2013 FSES Form, Moses Taylor had "not been cited for the non-conforming construction deficiency since the new code's been adopted." [May 6, Sanders, at 82:14-17].

630. For Moses Taylor, however, unlike Pottstown Hospital, "[T]he building that we were working with literally was not a high-rise, so the numbers transposed exactly the same and achieved the same score. . . . So Moses Taylor was easy." [May 6, Sanders, at 81:5-15].

631. When asked at his deposition (admitted as part of the trial court record) why a new FSES was prepared for Sharon Hospital and not Pottstown Hospital, Mr. Ridall responded, "I

was under the impression that a new FSES had been in the works for Pottstown." [TA-P-7, Ridall Depo., at 120:7-19].

632.  No FSES using the 2013 edition of NFPA 101A was prepared or submitted for Pottstown Hospital.  [May 24, Ridall, at 75:2-12].

633.  From 2009 through its sale to Tower Health in 2017, Pottstown Hospital continued to rely on the 2009 FSES "as part of their establishment of compliance" to the authorities having jurisdiction.  [June 10, Hofmeister, at 106:8-18; TA-P-4, Carlisle 30(b)(6) Dep. at 62:19 – 63:15, 67:8-13, 71:10-20, 72:17 – 73:10].

### VIII.   Reading Hospital Undertakes a Transformational Strategy to Become a Health System, and Pottstown Hospital Was and Is Integral to that Strategy.

634.  Daniel Ahern, Tower Health's Executive Vice President for Business Development and Strategy [May 24, Ahern, at 103:14-25], testified about Tower Health's strategic vision in moving from a single hospital to a health care system and explained how Pottstown Hospital was a key component to that strategy.  The strategic vision included expanding geographically to the east along the Route 422 corridor to take advantage of favorable demographics, defend against competitive pressures from other health systems, and obtain referrals for higher-level procedures to Reading Hospital, a recognized tertiary care provider.

635.  As described by Mr. Ahern, Tower Heath first became interested in growing its footprint beyond a single hospital in 2015, and Tower Health developed an internal strategic plan that identified areas of market opportunity.  [May 24, Ahern, at 106:9-12].  Mr. Ahern's team created statistical models to find the areas with greatest growth opportunity.  [*Id.* at 106:19 – 107:5].

636.  The area Tower Health identified with greatest market opportunity was the Route 422 corridor between Reading and King of Prussia, a market that is southeast of Reading and includes Pottstown.  [May 24, Ahern, at 106:12 – 107:24].

637.  Tower Health's analysis "said that we needed to be in that marketplace, and we were doing that to diversify some of the risk of Reading Hospital being a large single hospital system of 731 beds with projected demographics that were going to change.  So in the 422 market there were positive demographics, positive grow[th] trends, positive [payor mix] . . . ."  [May 24, Ahern, at 107:14-24, 108:2-24].

638.  Based on the internal analysis, Tower Health considered building a hospital of between 80-100 beds in Gilbertsville, Pennsylvania.  Mr. Ahern's internal team estimated the cost of that modular hospital—with less than half the beds of Pottstown Hospital—would be approximately $85 million to $100 million.  [May 24, Ahern, at 108:25 – 109:13, 111:9-14, 170:2-8].

639.  The benefit to building a brand new hospital is that "new hospitals have shown in our research to move market share.  It takes a little while, it takes about four or five years, but market share moves with new hospitals . . . We've seen competitors building hospitals and we recognize that new hospitals had, like, an appeal to the public, and we, again, we liked the demographics and . . . we felt like entering with a new hospital would be a competitive advantage."  [May 24, Ahern, at 110:15 – 111:3].

640.  The downside to building a new hospital is "zero percent market share.  So you enter a market with no real presence, no physician model to speak of, no ambulatory support network . . . ."  [May 24, Ahern, at 111:4-8].

641.  In the summer of 2016, Mr. Ahern, Gary Connor (the then-Tower Health CFO), and Clint Matthews (then-Tower Health President and CEO) all separately contacted individuals at CHS "because the literature was full of divestitures at CHS hospitals, and we knew that there were two hospitals in the marketplace that we had identified as opportunity, so we reached out to try and have some discussions around those hospitals."  [May 24, Ahern, at 111:15 – 112:18]. At the time, CHS was not interested in those discussions.  [*Id.* at 112:14-18].

642.  In the fall of 2016, Tower Health hired McKinsey & Company, a nationally recognized consulting firm with expertise in healthcare consulting in the mid-Atlantic region, to review strategic options for Tower Health.  [May 24, Ahern, at 112:23 – 113:8; PX97 (Jan. 2017 Integrated Strategic Plan Presentation), at 6].  McKinsey concluded that Reading Hospital as a stand-alone, was at risk over the long term for the reasons identified by Tower Health's internal team and because of competitive pressures from other health systems.  [May 24, Ahern, at 113:9-15, 118:4-8; PX97 (Jan. 2017 Integrated Strategic Plan Presentation), at 6, 10-11, 19].

643.  Significantly, McKinsey recognized as an opportunity for Tower Health a "significant amount of out-migration.  What we call out-migration is people who live in the market but go somewhere else for their care, like they'll live in the community and go to Philadelphia, to go to Penn or Jefferson, and we felt like it was just as easy to go to Reading Hospital, just turn the direction around."  [May 24, Ahern, at 113:16-21].

644.  Tower Health explained to its Board of Directors that if market conditions and competitive pressures occurred as predicted, "the baseline model would erode about $100 million or so" as to operating income, with operating EBITDA projecting to decline 35% over five years, "which was really one of the drivers for why we wanted to look at expanding markets."  [May 24, Ahern, at 117:21 – 119:2; PX97 (Jan. 2017 Integrated Strategic Financial

Plan Presentation), at 11, 13]. The baseline model assumed the status quo and excluded any strategic initiatives. [May 24, Ahern, at 119:3-9].

645. Pottstown Hospital and Phoenixville Hospital are located in the southeast market along the Route 422 corridor, and in 2015 they had a 47% market share in the southeast market. [PX97 (Jan. 2017 Integrated Strategic Financial Plan presentation), at 19; May 24, Ahern, at 119:13 – 121:4].

646. Ms. Judge testified consistently: Following the preparation of its strategic plan, Tower Health wanted to enter into this transaction because it needed to expand its provider offerings, and it needed to acquire or build other hospitals in its continuous service areas to do so. Tower Health believed it could enter the market faster if it purchased an existing hospital—and its market share—rather than build a new hospital. [May 3, Judge, at 91:11 – 92:5].

### A. CHS Solicited Bids for Pottstown Hospital and the Other Four Hospitals Through a Confidential Request for Proposals.

647. In November 2016, CHS began soliciting bids from potential buyers for five Pennsylvania hospitals, including Pottstown Hospital, through a Request for Proposal or Confidential Information Memorandum ("**CIM**"). [PX80 (CIM)]. CHS provided a copy of the CIM to qualified buyers after the buyers signed a non-disclosure agreement. [June 8, Conti, at 195:16 – 197:7].

648. The CIM describes each of the hospitals being sold from a fairly high level with basic and limited financial information. The CIM did not discuss the building construction type for Pottstown Hospital, nor would Tower Health have expected it to. "[T]his is really a broad overview of each of the hospitals, and what you're describing is a level of specificity that I would expect to be identified during due diligence; not in CIM." [May 3, Judge, at 99:8-19].

135

649.  The CIM does not provide a fair market value of the assets being sold.  Instead, it provides the book value for accounting purposes relating to the five hospitals being sold as recorded on the books and records of CHS.  [PX80 (CIM), at 17-18; June 8, Conti, at 235:12 – 236:4; May 3, Judge at 99:20-22].  Indeed, Conti testified that he had never seen a CIM with fair market values as opposed to book values in 25 years.  [June 8, Conti, at 236:5-11].  The reason for this is simple:  the CIM is soliciting proposals for offers from buyers, and the seller does not want to set the value for the businesses.  [*See generally* PX80 (CIM), at 4].

650.  The CIM emphasizes the confidential nature of the sale and the fact that the local management of the hospitals were not aware CHS was selling them:  "**PLEASE DO NOT ATTEMPT TO CONTACT ANY HOSPITALS OR HOSPITAL PERSONNEL, IN ANY WAY, WITHOUT THE EXPRESS WRITTEN AUTHORIZATION FROM ONE OF THE BELOW LISTED REPRESENTATIVES.  THE HOSPITAL MANAGEMENT AND STAFF ARE NOT AWARE OF THIS DISCUSSION AND IT WOULD BE PREMATURE TO INVOLVE ANYONE FROM THE HOSPITALS AT THIS POINT.  YOU ARE EXPECTED TO RESPECT THIS AND ALL OTHER ASPECTS OF THE CONFIDENTIALITY AGREEMENT.  THE INFORMATION PERTAINING TO THIS HOSPITAL AND THIS MEMORANDUM ARE SUBJECT TO THE TERMS AND CONDITIONS OF THE CHS CONFIDENTIALITY AGREEMENT**."  [PX80 (CIM), at 5 (emphasis in original)].

### B.     Tower Health Decided to Bid on the Hospitals Because of the Importance of Pottstown Hospital to its Strategic Plans.

651.  In mid-December, 2016, Michael Hammond of Hammond, Hanlon & Camp ("**H2C**"), a Tower Health consultant, told Tower Health that CHS was selling five hospitals in

the greater Philadelphia market.  [May 3, Judge, at 90-102; TA-D-8, Hammond Dep., at 15:10 –
16:9; May 24, Ahern, at 122:14-18].

652.  Tower Health "wanted to be a potential bidder for Pottstown Hospital.  We felt like
there were two parts to that, that it was important to us to be in that market, and Pottstown was
one of the important hospitals.  We did not want other competitors to enter that market,
especially after we targeted the market.  And Pottstown was important to us because we
identified the market and we were considering doing business plans about entering with zero
market share, but Pottstown had 45 percent market share so it – it was better to enter a market
where there was share versus building it from zero."  [May 24, Ahern, at 122:19 – 123:5].

653.  Tower Health decided to be a "candidate for acquisition" of Pottstown Hospital and
Phoenixville Hospital, and "abandoned" its plan to build a hospital in Gilbertsville.  Tower
Health decided it was better strategically to purchase the market share and to restrict competitive
access in the market it had been targeting.  [May 24, Ahern, at 123:6-19].

654.  Pottstown Hospital fit "ideally" into Tower Health's strategic plans both because it
was in the area targeted by both Tower Health and McKinsey for growth, but it was also close
enough to Reading Hospital that Tower Health "felt like we could change the direction of
referrals for specialty and sub-specialty care."  [May 24, Ahern, at 123:24 – 124:7].  Tower
Health felt that it could reverse the "out-migration" of patients seeking higher level and specialty
care to Reading instead of Philadelphia.  Reading "was closer.  You didn't have to deal with
traffic on the Schuylkill Expressway.  You didn't pay to park.  You didn't have congestion in the
city, and you had experts that were at the top of their field."  [May 24, Ahern, at 124:9-20].  The
referral of specialty services to Reading was a key part to Tower Health's diversification
strategy.  [*Id.* at 124:21 – 125:3].

137

655.  As explained to the Board of Directors, "The Potential Acquisition will help transform RHS into a major regional system with Reading Hospital serving as the tertiary referral hub for a service area with a population of 2.5 million."  [DX70 (March 2017 Project Independence Overview), at 3; DX98 (May 2017 Project Independence Board of Directors Report), at 3].  Tower Health viewed the market recapture of patients traveling to Philadelphia for higher-level care as "one of the primary drivers" for the transaction.  [May 24, Ahern, at 138:14 – 139:11; DX97 (FTI Consulting Project Independence Business Plan Report), at TOWER-CHS-PMMC-053303 - 053304; *see also* TA-D-8, Hammond Dep., 31:25 – 32:6 ("Reading . . . competes with the larger Philadelphia hospitals for the more complicated procedures, and I think Reading wanted to avoid the out migration from its market into Philadelphia and thought having greater size and scale in the market would help them in that way.")].

656.  In short, Tower Health wanted to become a regional health care system, and Pottstown Hospital was a key fit to its long-term strategy of acquiring market share and diversifying the risks attendant with one hospital.

657.  Tower Health had no plans to tear down Pottstown Hospital and build a new one; it intended to operate Pottstown Hospital.  [May 24, Ahern, at 123:20-23, 125:4-9].

### C.    The Purchase Price in the Letter of Intent was Based on Limited Information.

658.  Tower Health developed the initial purchase price for the five hospitals being sold by CHS based on the limited information provided by CHS, without access to the local facilities or full financial information.

659.  The President and Chief Executive Officer of Tower Health at the time,

Mr. Matthews, signed a non-disclosure agreement prior to receiving a copy of the CIM.  [PX93

(NDA); May 3, Judge, at 103:7-10; June 8, Conti, at 201:2-8].

660.  The non-disclosure agreement, like the CIM, restricted Tower Health from contacting

employees at any of the facilities without CHS's prior written approval.  [PX93 (NDA), at 3, ¶ 9;

May 3, Judge, at 104:23 – 105:1 ("Essentially, Tower was advised that it could not speak with

anyone at any of the five hospitals from the CEO on down because none of them were aware of

the potential for the transaction.")].

661.  After signing the NDA, Tower Health had access to the limited information in the

CIM and certain information in the data room, as well as publicly available information, to

determine if it wanted to submit a bid for some or all of the operating hospitals for sale.  [May 3,

Judge, at 98:11-24].

662.  The purchase price was based on H2C's analysis advice after reviewing "the relative

size of the hospitals, the payor mix, the information that was in the CIM, as well as what

hospitals were being purchased and sold for generally in the market."  [May 3, Judge, at 107:10-

14; *see also* TA-D-8, Hammond Dep., at 39:8 – 41:1, 41:17 – 42:8, 45:14-24].  Tower Health

submitted a purchase price proposal that it knew was on the higher end so that it could proceed to

the second round.  [May 24, Ahern, at 126:2-11].

663.  Tower Health did not have full access to the in-depth financial information

concerning the five hospitals when it prepared the letter of interest, which is not unusual in a

transaction like this.  [May 3, Judge, at 107:15 – 108:1].

664.  Tower Health had an interest in the "important" hospitals in the identified markets

(Pottstown, Phoenixville, and Brandywine Hospitals) and submitted a letter of interest with a

139

proposal to (i) buy all five hospitals, and (ii) buy the three hospitals Tower Health desired.

[May 3, Judge, at 106:2 – 107:2; May 24, Ahern, at 125:10 – 126:1, 126:12-20; *see also* TA-D-8,

Hammond Ex. 2, at TOWER-CHS-PMMC-039918 ("There are three hospitals in which Reading

has interest, but there are an additional two hospitals in which Community may require Reading

to acquire as part of the package.")].  As to purchasing all five hospitals, "[e]ven though that

wasn't our preferred option, we – those other three were so important to us we didn't want

anyone else in."  [May 24, Ahern, at 126:18-20].

665.  H2C prepared a preliminary enterprise valuation ranges for the five hospitals.  H2C

calculated the implied enterprise value of Pottstown Hospital to be between $266,815,000 and

$298,205,000.  [TA-D-8, Hammond Ex. 2, at TOWER-CHS-PMMC-039940].

666.  In response to the letter of interest, CHS advised that it was willing to sell all five

hospitals or none.  [May 3, Judge, at 108:1-8; May 24, Ahern, at 126:21-22; *see also* June 8,

Conti, at 195:13-15 (CHS would not have sold individual hospitals)].

667.  Because of the importance of the southeast market, and specifically Pottstown

Hospital and Phoenixville Hospital, to Tower Health's long-term strategic goals, Tower Health

decided to move forward with purchasing all five operating businesses from CHS.  [May 24,

Ahern, at 126:23 – 127:3].

### D.    The Letter of Intent Was Superseded by the Definitive APA.

668.  CHS questioned multiple witnesses about the letter of intent ("**LOI**") executed by the

parties, and specifically relating to the LOI's "as is" provision.  The Court finds the LOI has no

relevance to the interpretation of the APA because (1) the parties agreed they would enter into a

definitive asset purchase agreement, with the letter of intent serving as a framework for that

contract, (2) the APA contains an integration clause which Mr. Braun, the primary drafter

representing CHS, agreed superseded the LOI, and (3) Mr. Braun and Mr. Conti, the CHS Vice

140

President who signed the APA, agreed that Section 3.22 in the APA controlled rather than language in the LOI.

669. The parties executed the LOI on February 2, 2017. [DX52 (LOI); DX53 (Feb. 2, 2017 email with LOI)].

670. The LOI was drafted by counsel for CHS, Mr. Braun. [May 3, Judge, at 108:20-22; June 8, Conti, at 202:12-18; June 9, Braun, at 8:16-18]. The purpose of the LOI "is generally to lay out what I would call the framework for a potential agreement between the parties." [May 3, Judge, at 109:23-25; *see also* June 9, Braun, at 8:19 – 9:6].

671. The purchase price included in the LOI was in the range of $600 million to $625 million, as defined in the LOI, to purchase certain defined assets. [DX52 (LOI), ¶ 2 & Ex. B-1; TA-D-8, Hammond Dep., 47:5-14]. The purchase price in the LOI was developed using the same information as the indication of interest. [May 24, Ahern, at 127:7-12].

672. The parties agreed that, other than with respect to certain provisions such as confidentiality and exclusivity (i.e., the "no shop" provision), the LOI was non-binding. [DX52 (LOI), at Introduction & ¶ 10 ("[T]his letter of intent is not intended to be a binding agreement and shall not give rise to any obligations between the parties."); May 3, Judge, at 109:4-25, 110:16 – 111:12; June 9, Braun, at 20:10-20 ("I tend to include that language in letters of intent for CHS as well as other clients because it's my intention to make clear that this – that the letter of intent is not a binding agreement that obligates the seller to sell or the buyer to buy.")]. The parties made clear that the transaction would be subject to a definitive asset purchase agreement, prepared by counsel for CHS. [DX52 (LOI), ¶¶ 1, 10].

673. In the LOI, the parties agreed that the definitive agreement would contain "the representations, warranties, and other terms and conditions customary in this type of transaction"

141

as well as a provision from the Seller that the "Seller shall give no warranty as to the physical condition of the Assets, it being expressly understood and agreed that the Assets will be conveyed 'AS IS.'"  [DX 52 (LOI), ¶ 10].

674.  The LOI "as is" provision is different from the "as is" provision in Section 3.22 included in the APA, which was also drafted by counsel for CHS.  [*Compare with* DX 111 (APA), § 3.22; June 8, Conti, at 242:16 – 243:12].

675.  Mr. Conti testified about the provision in the LOI [*see generally* June 8, Conti, at 226:11-13], but not about Section 3.22 in the APA.  As discussed in the Conclusions of Law, the Court finds that the language in the APA is not ambiguous, and therefore Mr. Conti's testimony about the LOI—which is not the definitive agreement—is not relevant.

676.  Mr. Braun, the principal drafter of the APA on behalf of CHS, and Mr. Conti, the lead CHS business person involved in the transaction, agreed the "as is" provision in the APA controls because of the integration clause in the APA.  [June 8, Conti, at 241:24 – 242:11, 245:9-15 (agreeing that Section 3.22 "is what governs the transaction between the parties" and that he "understood that when [he] signed the agreement"); June 9, Braun, at 70:4-23 (agreeing that after the APA is signed, "It's all reflected in the definitive asset purchase agreement" and the LOI has no effect)].

### E.    The Drafting History of the APA Cannot Be Relied on To Interpret the APA Because the Relevant Provisions in the APA Are Not Ambiguous.

677.  Both Tower Health and CHS presented testimony from their respective deal counsel concerning the negotiation of the APA.  The Court finds that the parties' negotiations and drafting history is not admissible to interpret the APA because, as set forth in the Conclusions of Law, the Court finds the relevant provisions in the APA unambiguous.

678.  Mr. Braun prepared the first draft of the APA.  [May 3, Judge, at 177:21 – 178:1; June 9, Braun, at 21:21-25; PX104 (Feb. 20, 2017 S. Braun email)].

679.  Mr. Braun testified that he used as a template recent transactions done by CHS and referenced Pennsylvania transactions.  Although he reviewed the 2003 APA (by which CHS purchased Pottstown Hospital), Mr. Braun did not use that document as a template for the transaction.  [June 9, Braun, at 22:1-21, 30:25 – 31:19].

680.  Therefore, consistent with the Court's statements on the record on June 17 (41:21 – 42:10), the Court finds the 2003 APA not relevant to interpreting the APA—even if it was ambiguous—because the 2003 contract not involving Tower Health was not the basis or template used in drafting the APA at issue.

681.  Mr. Braun sent the first draft of the APA to Ms. Judge on February 20, 2017.  [PX104 (Feb. 20, 2017 S. Braun email)].

682.  Mr. Braun characterized the negotiation of the APA as "light," with the substantive negotiations completed after three drafts and that the negotiation was "accomplished through the exchange of drafts" and not telephone discussions.  [June 9, Braun, at 42:13 – 43:5, 64:25 – 65:9, 78:22 – 79:10].  Ms. Judge and Mr. Braun agreed the negotiations were accomplished through redline drafts, and not through oral discussions about the meaning or intent of the provisions. With few exceptions, Mr. Braun accepted Ms. Judge's proposed revisions to the APA.

683.  Ms. Judge did not provide any edits to Mr. Braun's drafted Section 3.22.  [PX106 (March 15, 2017 J. Judge redlines)].  Mr. Braun chose to use different language in Section 3.22 of the APA than what he drafted in the LOI.  [*Compare* DX52 (LOI), ¶ 10, *with* DX111 (APA), § 3.22].

684.  Although Mr. Braun testified about his present-day, subjective understanding of Section 3.22, he admitted that he never discussed his belief that this paragraph incorporated other, unidentified provisions in the APA or that some of the representations and warranties were limited to the operations of the businesses.  [June 9, Braun, at 71:24 – 72:1 (testifying "correct" that he "never told Ms. Judge the specific provisions you thought were being carved out"), 130:20-23].  Because Mr. Braun admits this provision was not negotiated, the Court finds his testimony about Section 3.22 is not relevant and inadmissible parol evidence that cannot be used to interpret the unambiguous APA.

685.  Mr. Braun did not try to explain how his interpretation of Section 3.22 in any way squared with the specific representations made in Sections 3.6, 3.7, and 3.8 of the APA.  [*See generally* June 9, Braun, at 41:18 – 42:11 (testifying that he tried to make each representation and warranty "self-contained" and related to specific and separate subject matter); *see also id.* at 49:21-24 ("[I]n an assets transaction, I expect the reps and warranties to stand on their own and they're limited to the reps and warranties we provided.  And you don't incorporate other things . . . .")].

686.  The Court notes that, although CHS has pointed to Section 3.22 as a defense throughout this case, Mr. Braun's testimony at trial was the first time CHS argued that Paragraph 3.22 somehow incorporated other, unidentified paragraphs.  For this reason, the Court finds Mr. Braun's testimony on this point not credible and, regardless, not relevant to the interpretation of the APA.

687.  The Schedules to the APA were prepared by CHS.  Tower Health received the first draft of the schedules to the APA on May 9, 2017 and the final schedules on the date of

144

execution of the APA, May 30, 2017.  [May 3, Judge, at 176:14 – 177:17; June 9, Braun, at 136:21 – 137:7; DX104 (May 9, 2017 M. Shaw email with schedules)].

688.  Neither the drafts of the schedules or the final versions of the schedules disclose any deficient life safety conditions at Pottstown Hospital, including the existence or non-existence of an FSES and the deficient Building Construction Type.

## IX.  The Due Diligence Permitted by CHS Was Limited and Highly Confidential.[4]

689.  CHS wanted to close the sale of the five operating businesses as quickly as possible. [May 3, Judge, at 108:10-14 ("CHS was very interested in closing this transaction as quickly as possible, partly because it was looking to use the proceeds to pay down some of its debt, and partly because it knew that it had a shareholders meeting coming up in the late spring.")].

690.  After the LOI was signed, the parties moved into conducting what is known as due diligence, which is an opportunity for the purchaser of the business to obtain more detailed information about the assets so it can decide if it wants to move forward with a definitive transaction.  [May 3, Judge, at 67:17 – 68:7; *see also* June 8, Shaw, at 105:19 – 106:4].

691.  Due diligence with respect to Project Independence lasted from the signing of the LOI through the May 30, 2017 execution of the APA.  [May 3, Judge, at 121:4-12; May 24, Ahern, at 128:17-23; June 8, Conti, at 238:25 – 239:22; TA-P-2, Shaw Dep., at 22:10 – 24:23; TA-P-6, Hendon Dep., at 19:17 – 20:4].  Mr. Conti and Mr. Braun testified that CHS required due diligence to be completed by the date of execution of the APA because CHS did not want a due diligence "out" after the deal was signed.  [June 8, Conti, at 238:25 – 239:22; June 9, Braun, at 51:22 – 52:5, 118:1-13, 119:2-7; TA-P-6, Hendon Dep., at 54:8 – 55:11 ("[W]e did not want a

---

[4] As noted in the Proposed Conclusions of Law, the due diligence process is not relevant to Tower Health's claims or CHS's defenses.  We include a description for completeness and in the event the Court deems the information helpful or relevant.

due diligence out in any of our APA's that would allow a buyer to sign an APA and walk away because, you know, of diligence.")].

692.  As Ms. Judge testified, "CHS was very clear that due diligence had to end on the date of execution of the agreement because they wanted to have an absolutely binding agreement when it was announced to the general public.  So we were advised that we could get information that we wanted from the hospitals for purpose of preparing for the transition, but there was no more due diligence after execution of the agreement."  [May 3, Judge, at 149:15-22].

693.  On May 5, 2017, Craig Conti sent an email to Clint Matthews and Michael Hammond, which was admitted without objection as a party admission.  [May 3, at 150:6-13; DX102 (May 5, 2017 C. Conti email)].

694.  On May 5, 2017, Mr. Conti wrote:  "As I mentioned to Michael, our negotiations [the] past couple days and intent to move forward are predicated on Reading confirming they're done with the material portions of diligence that in any way effect [sic] value.  I cannot go to CHS with any more price reductions, as I know same is true on your side for price increases. . . . Our discussions today on agreeing to schedule going forward, granting exclusivity extension, are predicated on your affirmation to me that your [sic] satisfied with your diligence as far as the renegotiated purchase price we just agreed to."  [DX102 (May 5, 2017 C. Conti email)].

695.  Counsel for CHS did not ask Mr. Conti, the drafter of the email, to explain his email at trial.

696.  The principal drafter of the APA, Mr. Braun, agreed that due diligence ended as of the date of signing of the APA, and he rejected Ms. Judge's proposed revisions to the APA making the completion of due diligence a condition precedent to close.  [PX106 (March 15, 2017 J. Judge email with redlines), at CHS-Tower00266108, § 7.13 ("Buyers' due diligence review of

146

the Assets shall be completed to Buyers' satisfaction."); PX110 (March 23, 2017 S. Braun email with redlines), at CHS-TOWER-00086767; June 9, Braun, at 50:19-24].

697.  Mr. Braun, on behalf of CHS, rejected this addition to the APA:  "It basically would have given the buyer the right to walk away from the deal, to not close the transaction for any reason, you know, prior to closing.  It would have essentially made what was a binding asset purchase agreement an option agreement where they could determine whether they want to close or not.  So it was rejected."  [June 9, Braun, at 50:19-24; *see also* PX110 (March 23, 2017 S. Braun email with redlines), at CHS-TOWER00086658 ("We would expect the Buyer to have completed its due diligence prior to signing the APA.")].

698.  Although information was disclosed after execution of the APA, the purpose of the exchange of that information was to assist in the transition of the businesses from CHS ownership to Tower Health ownership, as confirmed by Mr. Conti, CHS's lead business person involved in Project Independence.  [May 3, Judge, at 121:13 – 122:1; *see also* June 8, Shaw, at 147:13-16 (after execution of the APA, the focus shifts to "focusing on things that are more necessary to transition the – the hospitals in an orderly fashion"); June 8, Conti, at 231:11-13, 232:13-16 (after the signing of the APA, the buyer has access to the facilities "[l]argely for transitional issues"), 239:23 – 240:4 ("[W]e tell buyers if they have access to our management teams locally that we request that their activities be related to transitional maters to get them to day one."); TA-P-6, Hendon Dep, at 19:17 – 20:4].

### A.  Outside Consultants Assisted Tower Health in Due Diligence.

699.  Tower Health retained the services of outside consultants to assist with due diligence.

700.  On the financial side, Tower Health retained H2C as its investment banker to provide general advisory services and evaluate the transaction.  [TA-D-8, Hammond Dep., at 50:2-21, 51:6 – 53:153:23 – 59:18, 60:9 – 63:25].

147

701.  Tower Health also retained FTI Consulting.  FTI Consulting prepared an analysis of the acquired companies' quality of earnings, a review of the operating / business plan, and a fair market value analysis of the enterprise value of the operating companies.  [DX97 (FTI Operating Business Plan Report); PX98 (May 2017 Board Presentation), at 43948 – 58; PX115 (FTI Quality of Earnings Report); PX118 (April 2017 FTI fair market value assessment)].

702.  As Ms. Judge confirmed in response to the Court's question about FTI Consulting's role, FTI Consulting performed a fair market value analysis "as a hospital" and not just as a building.  "[W]hat Tower was buying were really going [] concern businesses and although the real estate is necessary to be there, the inherent value of the business is not the real estate." [May 3, Judge, at 133:5-17].  FTI was preparing an enterprise valuation as an ongoing business. [TA-D-8, Hammond Dep., at 57:8 – 58:4].

703.  Tower Health, as a tax exempt entity, could not pay more than fair market value for the assets.  [May 3, Judge, at 132:2-16].  "[F]air market value is not measured by book.  It's measured by its value in the market, which was determined by FTI in look[ing] at enterprise value."  [May 4, Judge, at 74:25 – 75:14].

704.  Third, Tower Health retained KPMG to prepare financial projections for the health system on a go-forward basis.  [May 3, Judge, at 134:9-18].

705.  Neither FTI nor KPMG was retained to audit the Pottstown Hospital financial statements, including the accounts receivable.  [May 3, Judge, at 131-134].

706.  Tower Health also engaged the Stevens & Lee law firm to assist with the legal aspects of the transaction and due diligence.  [May 4, Judge, at 15:16 – 16:4].

707.  Ms. Judge, on behalf of Tower Health, retained Smith Seckman & Reid ("**SSR**") to conduct an inspection of the buildings and equipment at the five hospitals so that Tower would

know whether it had any real exposure relative to the fact that we were going to acquire these buildings and equipment 'as is.'" [May 3, Judge, at 135:8-10].

708. SSR was not retained to conduct a life safety inspection and was not qualified to do so. [May 3, Judge, at 135:23-25; May 4, Judge, at 41:10-12].

**B. CHS Did Not Provide All Documents Requested by Tower Health, Including the 2009 FSES, the BDA Life Safety Plans with Pa. DOH's Preliminary Stamp, and the Emails Relating to Mr. Sanders' Discussions with Pa. DOH. Instead, CHS Provided Life Safety Plans It Knew Were "Way Out of Compliance" Without Disclosing that Fact to Tower Health.**

709. Tower Health and CHS participated in weekly telephone calls to discuss the outstanding information requested in due diligence, with a priority on the financial information. The calls were conducted from the first week in February through the last week of May. [May 3, Judge, at 130].

710. Tower Health submitted a list of document requests, drafted by both Tower Health and its consultants on the financial side, of information it wanted from CHS, which was updated over time. [May 3, Judge, at 127:21 – 128:1, 139:2-7; *see, e.g.*, DX78.1 (due diligence list)].

711. Michael Shaw of CHS was the "facilitator" of the due diligence process and was responsible for contacting the appropriate people within CHS to obtain the data requested by Tower Health. He organized the data in the data room in file folders that were arranged by item request. [June 8, Shaw, at 106:9-23, 112:4 – 113:19; *see also* DX78 (March 28, 2017 C. Gao email), at 3-19 (index of data room)].

712. The documents that populated the data room were provided predominantly by CHS's corporate office in Nashville. [June 8, Shaw, at 117:1-7, 140:19 -141:10; June 8, Conti, at 216:15-17; *see also* May 3, Dodson, at 125:2-15].

713. CHS populated the information in the data room slowly. "[A] limited amount of the information was provided quickly but part of the reason we were having these weekly calls is

because it was very difficult to get a lot of the information.  And as you asked earlier, this was a relatively compressed time frame from February through the end of May in order to get all of the due diligence done.  So as of the first week of May, we were still missing a lot of due diligence so . . . it was not provided with great speed."  [May 3, Judge, at 138:6-15].

714.  Mr. Shaw agreed at his deposition (admitted as part of the trial record), and confirmed at trial, that there was a "bottleneck" at CHS corporate that prevented Tower Health from receiving critical information.  [June 8, Shaw, at 161:7 – 163:4, TA-P-10, Shaw Dep., at 93:8 – 94:2; *see also* DX78 (March 28, 2017 C. Gao email), at 2 ("We are in a bottleneck at CHS corporate where we are having difficulty accessing the right data and the right responses to questions.  Furthermore, the responses are currently not being responded to in enough time to complete our work on schedule.")].

715.  Mr. Shaw testified at his deposition, admitted as part of the trial record, that there were instances when CHS was not providing information to Tower Health on a timely basis.  "That would – that would not be, again, unique to this particular transaction.  We were in a period of time where we had a lot of things going on and, yeah, resources stretched thin.  So I probably at that phase was not providing anyone with what they needed as quickly as they needed it."  [TA-P-2, Shaw Dep., at 94:13-23; *see also id.* at 95:24 – 96:5 ("I'm not sure if I've ever been caught up with everything that I have to do professionally.")].

716.  Part of the reason for the "bottleneck" was because Mr. Shaw, who facilitated the due diligence process from the CHS side, was simultaneously working on four or five other divestitures.  [June 8, Shaw, at 149:4-9; May 3, Judge, at 138:19-22 ("[O]ur impression was and from talking with Mr. Shaw, that CHS was involved in a number of transactions simultaneously.  And so, they were struggling to provide it.")].

150

717.  Mr. Shaw testified that this divestiture of five hospitals and the associated physician practices was on the large side of the transactions he has worked on for CHS.  [June 8, Shaw, at 104:5-22].

718.  The data requested by Tower Health included 12 broad categories of information, including "all of the regulatory issues that CHS had including starting with all of its licenses and accreditations and then any issues that CHS may have been aware of."  [May 3, Judge, at 139:22-25); DX78.1 (due diligence list), at Categories A-K].  Additionally, Tower Health's financial consultants requested separate detailed financial information about the five operating businesses.  [DX78.1 (due diligence list), at Categories L-O)].

719.  Under "Operations," Tower Health asked CHS to provide "copies of all permits, licenses, certifications, registrations, accreditations, etc. of Hospital and each of the Affiliates and practitioners from any governmental or regulatory body or agency . . . ."  [DX78.1 (due diligence list), at Category E(7)].

720.  Separately, under "Regulatory Compliance," Tower Health asked CHS to provide a "list of any **governmental approvals**, permits, certificates, registrations, concessions, **exemptions**, licenses, etc., required in order for Hospital and the Affiliates to conduct business." [DX78.1 (due diligence list), at Category F(1)(c) (emphasis added)].

721.  Although Tower Health did not specifically request copies of FSESs during due diligence, Ms. Judge, the drafter of the request and the person that led the due diligence on behalf of Tower Health, testified that an FSES should have been provided in due diligence, including as an "exemption" in Category F(1)(c).  [May 3, Judge, at 141:24 – 142:8; *see also* May 4, Judge, at 30:18-24 (testifying that the difference between exception and exemption in this request is "semantics")].

722.  CHS's corporate policy, adopted by TJC, called "Documentation of Fire Control Agency Inspections and Approvals Policy," specifically discusses FSESs and describes them as a variance or an approval by the AHJ maintained at the facility.  [PX85 (CHS Policy LS.01.01.01.05) (discussing FSESs in the "approvals" section; "Written documentation of all **approvals** shall be filed in the EC Function Manual along with any supporting documentation . . . .") (emphasis added)].

723.  Tower Health does not know what it does not know and sent broad requests for CHS to fulfill, which it assumed CHS satisfied.  [May 3, Judge, at 139:8 – 140:22, 141:22 – 142:8; *see also* June 8, Shaw, at 186:19 – 187:9 (agreeing if a buyer does not know what exists they cannot ask follow up questions)].

724.  CHS presented no witness to challenge Ms. Judge's interpretation of the information requested during due diligence.  No witness on behalf of CHS claimed that CHS was not required to provide copies of the 2009 FSES to Tower Health.

725.  The Court finds the 2009 FSES was specifically requested by Tower Health as either an exemption, a government approval, or a necessary document needed to operate the hospital. Moreover, the Court finds that CHS should have provided the 2009 FSES to Tower Health along with its TJC certification, Pa. DOH license, and CMS accreditation because CHS relied on the 2009 FSES to achieve compliance with the Life Safety Code for all three.

726.  CHS did not provide a copy of either the 2006 FSES or the 2009 FSES to Tower Health during due diligence.  [May 3, Judge, at 142:9-11, 142:18 – 143:12].

727.  Tower Health received from CHS a copy of the most recent TJC accreditation and TJC survey report prior to closing on the transaction, both of which were from 2015.  [May 3,

Judge, at 196:2-25; PX53 (2015 TJC accreditation report); PX59 (2015 TJC accreditation letter)].

728. Ms. Keown testified that she provided information concerning Pottstown Hospital's accreditation and survey reports to CHS during due diligence. [May 13, Keown, at 55:19 – 56:4; *id.* at 91:14-15 ("[A]ll [CHS] asked me for were my reports, and that's what I submitted.")].

729. CHS did not ask Ms. Keown to provide a copy of an FSES. And, as of October 1, 2017, Ms. Keown (1) did not know what an FSES was, (2) did not know Pottstown Hospital had an FSES, and (3) had not seen a copy of an FSES applicable to Pottstown Hospital. [May 13, Keown, at 56:5-16].

730. Mr. Shaw relied on the quality officer at CHS corporate, Lisa Stefanov, to provide information concerning Pottstown Hospital's survey documents. [June 8, Stefanov, at 262:18 – 263:22].

731. Ms. Stefanov testified that she provided Mr. Shaw the information requested by CHS concerning Pottstown Hospital, although she did not recall the language of the request. [June 8, Stefanov, at 263:19-22, 267:7 – 268:2; DX67 (March 3, 2017 email from L. Stefanov)].

732. Ms. Stefanov did not provide Mr. Shaw with an FSES applicable to Pottstown Hospital and did not even know that Pottstown Hospital had an FSES. [June 8, Stefanov at 268:3-16; DX67 (March 3, 2017 email from L. Stefanov)]. Mr. Shaw, the person responsible for uploading information to the data room, had no idea if the FSES was provided to Tower Health. [June 8, Shaw, at 151:9-11].

733. CHS presented no evidence that anyone ever from CHS ever provided a copy of the 2009 FSES to Tower Health, at any time.

734.  The Court finds that Tower Health did not learn there was an FSES applicable to Pottstown Hospital until after the March 2018 validation survey.

735.  In June 2018, Ms. Judge first learned there was an FSES applicable to Pottstown Hospital when she received the letter from CMS accompanying the survey results from the March 2018 CMS validation survey.  [May 3, Judge, at 142:12-17].

736.  CHS provided a copy of the NHA life safety plans to Tower Health in the data room. The NHA life safety plans, prepared in 2015, were placed in the "Environmental" section of the due diligence data room and not in a section relating to life safety, business operations, government approvals, or any other similar folder.  [May 3, Judge, at 211:11-25; May 4, Judge, at 20:22 – 22:18; PX112 (March 30, 2017 J. Ridall email with NHA plans)].

737.  Ms. Judge accessed the plans, but testified that she did so to verify that they were what they purported to be and did not read any of the information on the plans.  [May 4, Judge, at 23:7-13, 171:14 – 172:9].

738.  Ms. Judge also testified:  "I have no idea, even if I had studied it, because I'm not an expert, to know what the FSES compliance was or was not and whether it was current or not, and there was no way that we could follow up on it, so there was nothing I could do with that information."  [May 4, Judge, at 31:7-11].

739.  In November 2016, Pottstown Hospital notified CHS that the NHA life safety plans were "way out of compliance" and needed to be updated via a "Capital Expenditure Request." [PX89 (Nov. 2016 email with CER)].  The request was approved by CHS in January 2017 and BDA was retained to prepare new life safety plans.  [PX96 (Jan. 2017 email with CHS approval of CER); May 6, Sanders, at 37:3-10].

740.  CHS did not disclose to Tower Health that the NHA life safety plans included in the data room were "way out of compliance" or that Pottstown Hospital was getting new life safety plans prepared by BDA in the first quarter of 2017.  [May 3, Judge, at 212:1-22].

741.  When asked for life safety drawings by Mr. Canaan of CHS, which were eventually provided to Tower Health in connection with the purchase, Mr. Ridall provided the non-compliant 2015 NHA life safety plans and not the 2017 BDA life safety plans.  [PX112 (March 30, 2017 email from J. Ridall to J. Canaan and D. Tiratto)].  Mr. Ridall did not provide a copy of the 2017 BDA life safety plans to Mr. Shaw, Mr. Hendon, or Mr. Conti; Mr. Ridall testified that their names "sound[] familiar" but he did not know them personally.  [May 24, Ridall, at 69:18 – 70:20].

742.  CHS did not provide a copy of the 2017 BDA life safety plans to Tower Health during the due diligence period or at any time prior to execution of the APA.  [May 3, Judge, at 212:1-5, 213:2-16].

743.  CHS did not provide to Tower Health at any time the BDA life safety plans with the "Preliminary Stamp" placed by Pa. DOH stating:  "An FSES per the 2012 Life Safety Code has not been completed we do not know that this meets a FSES any longer."  [PX128 (May 2017 email from D. Sanders to R. Gostkowski and J. Ridall), at 8; May 3, Judge, at 213:14 – 214:14].

744.  CHS did not provide a copy of the May 4, 2017 correspondence between Mr. Sanders, Mr. Ridall, and Mr. Gostkowski concerning BDA's discussions with Pa. DOH about the life safety plans and the need for a new FSES.  [May 3, Judge, at 213:20-23; PX128 (May 2017 email from D. Sanders to R. Gostkowski and J. Ridall)].

745.  Tower Health received voluminous data concerning the five hospitals and physician practices.  [May 3, Judge, at 140:5-15 (noting it "would be a lot of information" if Tower Health

155

was acquiring only one hospital, but here the data was multiplied by five hospitals and 14 different physician companies)].

746.  Tower Health did not receive all of the information it requested from CHS.  [*See* May 3, Judge, at 128:5-7 ("I don't know if refused is the right word, Your Honor, but there were definitely things that we did not get by the time of the execution of the agreement."); May 4, Judge, at 68:11-19 ("I can't say that we were satisfied, but we accepted that that's all we were going to get."); *id.* at 70:24-25 & DX96 (May 1, 2017 Missing Due Diligence List); DX267 (May 17, 2017 M. Shaw email to J. Judge); May 24, Ahern, at 177:22-24 ("[T]here were items that were incomplete" on the due diligence list that Tower Health requested from CHS)].

747.  Mr. Shaw agreed that he did not provide every item requested by Tower Health.  "I think we've completed over 30 transactions over the last four years.  I think we've sold around 70 hospitals, and I honestly – there's not a single one of those transactions in which we have provided every single item on a diligence request list.  It's just not feasible or practical, you know."  [June 8, Shaw, at 155:10-19].  With respect to the regulatory compliance items, Mr. Shaw had no recollection of gathering those materials and could not say either way whether he provided the requested information to Tower Health.  [*Id.* at 156:3-18, 167:6-25, 170:22 – 171:3, 171:17 – 172:8, 185:17 – 186:13].

748.  CHS did not present any witnesses to rebut the testimony of Ms. Judge that the 2009 FSES, the discussions with Pa. DOH about the need for an updated FSES and its rejection of the 2017 life safety plans, and the BDA life safety plans with the "Preliminary" stamp, were not disclosed to Tower Health prior to execution or Closing of the APA.  Likewise, CHS did not present any witnesses to rebut the testimony of Ms. Judge that this information should have been disclosed to Tower Health, on the schedules to the APA or otherwise.

### C. CHS Severely Limited Tower Health's Ability to Conduct Physical Due Diligence Prior to Closing Because of Confidentiality Concerns.

749. Ms. Judge retained SSR to review the physical condition of the buildings from a capital expenditure perspective. [May 3, Judge, at 135:8-10].

750. SSR was not retained to assess life safety considerations because "they're not qualified to do that." [May 3, Judge, at 135:23-25; May 4, Judge, at 41:10-12 ("SSR is not a life safety firm and they were engaged to look at the engineering aspects of the building and equipment.")].

751. In March 2017, CHS placed restrictions on SSR's requests to review the five hospitals, specifically (1) limiting the number of individuals from SSR permitted on site at the facilities, and (2) limiting the amount of time at each hospital to three to four hours. [May 3, Judge, at 146:3-17; May 4, Judge, at 40:6-23 (discussing restrictions with Mr. Canaan and an attorney for CHS)]. The SSR representatives were also given a cover story that they were inspecting the facility for an insurance review so as not to alert the hospital employees that their hospital was for sale. [June 8, Shaw, at 153:5 – 154:4; June 8, Conti, at 217:20 – 219:6 (cover story developed for the walk through to preserve confidentiality); *see also* TA-P-3, Conti 30(b)(6) Dep., at 24:24 – 27:10 (30(b)(6) witness unable to identify the limitations during the SSR walkthroughs)].

752. These restrictions were identified in an email exchanged between representatives of SSR and representatives of CHS, admitted without objection as a party admission. [May 3, at 146:18-23; PX108 (March 22, 2017 email string between CHS and SSR)].

753. In response to SSR identifying a list of attendees on the site visits, John Canaan, the director of project manager for CHS, responded: "As we discussed the team should be no more than 3 people, prefer only 2. This is a walk through to review the general condition of the

facility and to review representative areas.  Your team will be able to gather more information after the announcement, but until that time, no one at the facility's [sic] know about the potential divestiture.  Going to be tough enough with 3-4 people on a site visit to keep the questions down."  [PX108 (March 21, 2017 email from J. Canaan to SSR and others), at CHS-TOWER00189381].

754.  Dean Tiratto of CHS, who was coordinating the site visit, wrote:  "Structural I think can be done via the drawings, this has to be preliminary to a certain degree, in that there will be another round of more detailed due diligence if the deal gets that far.  We have to limit the attendance as the individual hospital employees will be spending their time involved in the effort but not fully aware of it either."  [PX108 (Mar. 22, 2017 email from D. Tiratto to SSR and others), at CHS-TOWER00189380].

755.  In response, SSR agreed to bring only two individuals and "to gather what additional information they can regarding Technology systems and visual observation of structure." [PX108 (Mar. 22, 2017 email from SSR to D. Tiratto and others), at CHS-TOWER00189380].

756.  The structural steel drawings that CHS directed SSR to review do not contain any reference to an FSES or the Type II (000) building construction type.  [PX1 (1971 structural steel drawings)].

757.  Ms. Judge testified that there was no second round of due diligence.  [May 3, Judge, at 148:11-14; *see also id.* at 148:15-20].

758.  Although Mr. Ridall and Mr. Shaw testified at trial, counsel for CHS elected not to question any of these witnesses about the SSR restrictions in this email.

759.  Albeit without specific reference to this transaction, Mr. Shaw was aware that CHS "would typically" limit the number of consultants allowed in the facility being sold because

"we're trying to maintain some level of confidentiality and you know, not cause major disruption to the operations.  And so . . . again, that's why I say it's likely.  That's standard practice." [June 8, Shaw, at 122:18 – 123:2].

760.  Ms. Judge testified that the "walk through" permitted by CHS was not a life safety inspection, which would have required looking above the ceilings, and behind the walls.  [May 4, Judge, at 41:16 – 42:22].  And although Mr. Shaw testified in generalities, he testified consistently that a buyer "typically" engages an engineer to "perform a walk-through . . . of those facilities" as part of "general due diligence . . . on the physical plant."  [June 8, Shaw, at 119:1-11].

761.  Ms. Judge also testified, "I understood going in, that we were going to have limited access to the buildings.  I was surprised that it was that restrained.  But as I've said, many times now, we understood that CHS was A, going to tell us if there were any issues and B, were going to – and were going to stand behind the fact that it was telling us it was in compliance."  [May 4, Judge, at 41:4-12].

762.  Ms. Judge testified, "Believe me, our preference would have been to do everything to look at these buildings, but we weren't permitted to do it.  So asking 10 times and getting the same answer is no different than asking two times and getting the same answer."  [May 4, Judge, at 111:6-10].

763.  The report prepared by SSR is an analysis of the future capital expenditure needs for the hospitals.  [PX 340 (SSR report); May 3, Judge, at 135:8-10; May 4, Judge, at 43:5-7; May 4, Major, at 225:11-14, 226:3-5].

764.  The SSR report does not address life safety, NFPA 101, or the fireproofing at Pottstown Hospital.  [PX340 (SSR Report); May 3, Judge, at 174:5 – 175:3; May 4, Major, at 226:6-8].

765.  The Court finds—with no testimony to the contrary—that Tower Health was not permitted to conduct a full life safety inspection prior to closing.

766.  Further, based on the collective testimony of the witnesses who inspected Pottstown Hospital after closing, and considering the February 2018 TJC survey which did not identify any significant life safety deficiencies, the Court concludes that the deficient fireproofing could not be fully determined based on a few hours of visual observations without above-ceiling review or invasive testing.

### D.  CHS Limited Tower Health's Access to Local Facilities.

767.  The Court finds that confidentiality remained an issue for CHS throughout the due diligence process and limited Tower Health's ability to conduct all of the due diligence it wanted.

768.  Mr. Conti reminded Tower Health about confidentiality after he returned the executed LOI.  [DX53 (Feb. 2, 2017 C. Conti email) ("We'll talk about the process on the kickoff call, but please remind consultants etc. you're using that this is very confidential and our hospitals and C Suites are not privy to the transaction.")].

769.  CHS told Tower Health that the local management at the hospitals were not aware the hospitals were for sale and that Tower Health "having discussions with the management team would be disruptive and distracting to, you know, the ongoing operating and performance of the hospitals."  [May 24, Ahern, at 129:18 – 130:5].  Mr. Conti similarly testified:  "[W]e make it clear that our local management team at the hospitals do not know of this transaction.  And they're not to contact local management.  It's confidential.  We believe we can get you the

overwhelming majority of information you need through corporate books and records.  So we make that clear up front."  [June 8, Conti, at 216:12-17].

770.  Mr. Hammond described a "high level of sensitivity" about confidentiality and that "Craig restricted significantly access to local people."  [TA-D-8, Hammond Dep., at 74:21 – 76:12].

771.  As Ms. Judge testified, the fact that the "hospitals and C-suites" were not privy to the transaction "significantly hamper[ed]" Tower Health's ability to conduct due diligence "because the people who are most knowledgeable about everything about the hospitals did not know the transaction was happening and therefore, Tower could not speak with them."  [May 3, Judge, at 123:18-24; *see also* May 4, Judge, at 31:13-15 (Tower Health was "prohibited from going to the hospitals or talking with anybody at the hospitals to find out the current status of compliance with the code"); May 24, Ahern, at 130:6-14].

772.  Tower Health asked for access to Pottstown Hospital individuals at various times "[b]ut CHS was adamant that that not happen because they wanted to make sure that the potential sale of these hospitals did not become public."  [May 3, Judge, at 123:25 – 124:5; May 24, Ahern, at 130:15-19].

773.  Although Tower Health asked for permission to speak to the facilities manager, the chief quality control officer, and the accounting staff at Pottstown Hospital, "CHS repeated its position that no one at the hospitals knew this transaction was pending and that every piece of information we got had to come from corporate headquarters."  [May 3, Judge, at 125:6-19].

774.  In March 2017, Tower Health executives met with CHS corporate executives in Franklin, Tennessee to have a high-level discussion and to discuss transition of the hospitals. This meeting did not include any representatives from the local hospitals.  [May 24, Ahern, at

130:20 – 131:5; June 8, Shaw, at 125:4 – 128:13 (testifying that one day was a discussion among CHS management "to interact with somewhat their counterparts at the CHS level" and the other day was to discuss "transition services related" issues); DX75 (March 22, 2017 email), at CHS-TOWER0094731-32 (list of attendees)].

775.   Mr. Shaw generally described these meetings (and not this specific meeting) as a high-level management discussion, "not in abundant detail."  [June 8, Shaw, at 129:9-23].

776.   Tower Health was eventually able to interview the CEOs of the various hospitals, the week before the agreement was signed.  [May 4, Judge, at 131:20 – 132:17; May 24, Ahern, at 131:6-11].  Mr. Newell was instructed by CHS Division Vice President Joe Dorko to "treat this as your job interview."  [May 13, Newell, at 104:14 – 105:25].

777.   Mr. Newell and the Pottstown Hospital CFO met with Mr. Matthews (Tower Health CEO) and Mr. Connor (Tower Health CFO) at a hotel off the Pennsylvania Turnpike.  Mr. Newell described the meeting as a "meet-and-greet" where Tower Health discussed its strategic plans of growing from a single hospital to a health system, and asked about Mr. Newell's professional experience and strategic plans.  "[I]t was a very casual, informal meeting" that lasted about 90 minutes.  [May 13, Newell, at 106:13 – 107:2].

778.   As stated by Ms. Judge, "[A] meeting with the Tower Health CEO and the CEOs of the hospitals is not due diligence access."  [May 4, Judge, at 132:24-25].

### E.   Tower Health's Explanation Why It Did Not Retain a Life Safety Consultant is Credible.

779.   CHS has criticized Tower Health for not retaining a life safety consultant prior to closing on the transaction.  The Court rejects CHS's attempt to deflect the attention from CHS's own failure to affirmatively disclose the condition of Pottstown Hospital, as required under the

162

APA.  Additionally, the Court finds Tower Health's reasons why it did not retain a life safety consultant credible and persuasive.

780.  Tower Health did not retain a life safety consultant to assist with due diligence for two reasons.  First, what CHS permitted SSR to do was so severely limited "that we couldn't possibly have had a life safety consultant do an adequate job."  Second, the "tradeoff . . . for Tower's willingness to basically sign the asset purchase agreement without full and complete due diligence was the fact that CHS offered very strong reps and warranties in the agreement that it drafted.  And so, Tower felt comfortable that if there were any things that were not identified through inadequate due diligence, CHS had offered to stand behind them, essentially."  [May 3, Judge, at 136:1-15].

781.  When questioned on cross as to why Tower Health did not focus on life safety at the hospitals during due diligence, Ms. Judge testified credibly and consistently that Tower Health did not receive any documents or disclosures from CHS that would have alerted Tower Health of the need to retain a separate life safety consultant.  She also testified that Tower Health knew it had the representations and warranties of the Seller Entities, guaranteed by CHS, to rely on if there was a problem:

> First of all, CHS didn't provide any documents about the issues, when we asked CHS to provide all documents related to them.  And, coupled with that, we were not permitted to send anyone to the buildings to review them. . . .
>
> [W]e asked CHS to supply everything related to their regulatory issues, both compliance and exceptions to compliance.  And we asked for a schedule of those and the schedules to the asset purchase agreement.  Coupled with that, we were advised by CHS that we could not visit the buildings.  But, in exchange, CHS told us that they were going to give us very strong reps and warranties on which we could rely about the building compliance.  And so we knew that we were going in having to rely on CHS's representations.

[May 4, Judge, at 19:11 – 20:7; *see also id.* at 25:21-23 ("My testimony is we couldn't worry about it because we didn't have the ability to review it, and CHS told us that it was in compliance."); *id.* at 27:14-17 ("[W]e were relying on the fact that CHS told us they would tell us if there – if there were any areas of noncompliance, and they would stand behind them. We had an absolute guarantee.").

782. Ms. Judge further testified:

> [W]e were relying on CHS honestly telling us if there were any areas of noncompliance.
>
> . . .
>
> First of all, I would have expected CHS to tell us if there were any areas of noncompliance, which could have caused us to engage someone to look into more detail about what it was that was noncompliant and what had to be done to remedy it. But we were also confident that CHS was a reputable company, and if there were any areas of noncompliance, they would tell us about them, and then we could make a choice about how it impacted Tower's decision to move forward or not.

[May 4, Judge, at 31:21 – 32:10; *id.* at 39:15-17 ("[W]e trusted CHS that they were being honest in terms of telling us that there were no areas of non-compliance.")].

783. CHS did not present any testimony that it was unusual for an acquirer like Tower Health not to engage a separate life safety consultant, including from its seasoned and experienced divestiture counsel and in-house divestiture professionals. There was no testimony presented from any witness that it was inappropriate or out of the ordinary for Tower Health to not engage a separate life safety consultant.

784. CHS also criticized Tower Health for not conducting a life safety review between signing and closing. The Court rejects this argument because, in addition to the reasons stated earlier in this section, the evidence established that CHS and its counsel required due diligence to end as of the execution of the APA or May 30, 2017.

785.  Mr. Major testified that he visited the facilities once along with Mark McNash, the Vice President of Support Services at Tower Health and his boss, in July or August 2017 as a "general look at the hospital and a greeting with the CEO of the hospital and the facility directors at their respective locations."  [May 4, Major, at 225:21-23, 231:4-6].  This review did not have anything to do with finding out if Pottstown Hospital had deficiencies in the LSC, and it was not part of due diligence.  [*Id.* at 225:15 – 226:2].

786.  CHS's primary deal representative testified that such post-execution reviews were the exception and not the rule, citing three transactions out of almost 70 in his experience where buyers "asked for additional walkthroughs."  [June 8, Conti, at 221:11-15].

787.  CHS has pointed out that Tower Health had the opportunity to conduct an environmental study after execution of the APA but prior to Closing.  The requirement to conduct the environmental study after execution of the APA was included in Mr. Braun's original draft.  [PX104 (Feb. 20, 2017 S. Braun email with draft APA), at § 7.11 (TOWER-CHS-PMMC-028942)].  The original draft of the APA did not contain a similar right for Tower Health to conduct a life safety survey after execution of the APA but prior to Closing as part of Tower Health's due diligence.

788.  Ms. Judge testified—unrefuted by either Mr. Braun or anyone else from CHS—that Tower Health requested to complete the environmental study during due diligence, "and they said no, because they were afraid that if anybody came on the grounds and drilled a hole, that it would raise some concerns.  So they, CHS, asked Tower to postpone that until after the execution."  [May 4, Judge, at 113:21-25].

789.  Further, the Court finds persuasive the testimony of Mr. Braun relating to the effect of Section 12.17:  Mr. Braun expected the representations and warranties to stand on their own "and

165

they're not going to be kind of shortened or [excepted] by the stuff that you find in due diligence. So it permits the buyer to do its due diligence without negative impacting the reps that I provide – that the seller provides to the buyer." [June 9, Braun, 51:22 – 52:5].

### F.   Tower Health Did Not Learn About the Deficient Life Safety Conditions at Pottstown Hospital Prior to Execution of the APA or Closing of the APA.

790. Tower Health conducted a robust and appropriate amount of due diligence.

791. Following execution of the APA, Tower Health was "scrambling to bring on board 5 hospitals and 14 physician companies within a short period of time, originally was scheduled for July. So there wasn't time to do more due diligence as you're characterizing it. At that point, everything was oriented to transitioning the hospitals from CHS's ownership to Tower's ownership. And due diligence was over." [May 4, Judge, at 36:6-14].

792. The Court finds that Tower Health did not learn about the deficient life safety conditions that CMS cited Pottstown for prior to execution or closing of the APA. CHS presented no evidence that it did. [May 3, Judge, at 175:6-16].

793. The evidence was unrebutted that CHS did not disclose to Tower Health, on the schedules to the APA or in documents produced during diligence, that there was an FSES applicable to Pottstown Hospital concerning a deficient building construction type, that CHS had been advised by Pa. DOH that the old 2009 FSES would no longer pass and that Pottstown needed a new FSES under the 2013 forms, and the newly prepared BDA life safety plans.

794. The parties renegotiated the purchase price between the LOI and the APA based on the information learned by Tower Health during the financial due diligence. [TA-D-8, Hammond Dep., at 62:18 – 63:4 (following the quality of earnings analysis and business projections, "we realized that the run rate of the hospitals was significant – had deteriorated significantly, and there wasn't $70 million of run rate EBITDA, as represented originally. And

166

so we formulated a revised proposal – financial proposal and terms."), 121:20 – 122:12; May 24, Ahern, at 127:13 – 128:2; June 8, Conti, at 205:14 – 206:5].

795.  The renegotiated purchase price reflected the material adjustment in the EBITDA run rate, but was not based on any concern about the future of Medicare and Medicaid revenue streams or a contingent liability in excess of $25 million.  [TA-D-8, Hammond Dep., at 122:15 – 123:2].  Mr. Hammond testified that, had he known either of those facts, "it could have led to a variety of different outcomes," including cratering the deal "at least for that hospital or any hospital subject to those contingencies."  [*Id.* at 124:3-13].

796.  Neither the physical condition of the hospitals nor life safety conditions at Pottstown Hospital had anything to do with the change of price between the LOI and the APA.  [May 24, Ahern, at 128:3-12].

### G.   Tower Health's Board Voted in Favor for the Transaction, In Part Based on the Value of Pottstown Hospital to Tower Health.

797.  Tower Health's Board of Directors elected to move forward with the transaction. [May 3, Judge, at 154:17 – 155:20; DX98 (May 2017 Tower Health Board Presentation)].

798.  The Board considered the strategic importance of Pottstown Hospital specifically to Tower Health's survival as testified about by Mr. Ahern:  "I presented the information we're discussing now, why the marketplace was important, why Reading Hospital was at risk, what the opportunities were to leverage the high quality of Reading Hospital to new markets, and why the acquisition of these hospitals were important from a business standpoint, versus entering the market with zero market share."  [May 24, Ahern, at 140:20 – 141:19; *see also* DX98 (May 2017 Tower Health Board Presentation), at TOWER-CHS-PMMC-043944 – 043947, 043983 – 043996].

799.  Pottstown Hospital had the highest value to Tower Health of the hospitals it was acquiring from CHS because of "[a]djacency, market desirability, demographics, [payor mix] opportunities, growth market, and referrals."  [May 24, Ahern, at 144:12-21].

800.  As to referrals, one of the primary considerations for Tower Health's interest and eventual purchase of Pottstown Hospital was the ability to recapture out-migration of patients traveling to Philadelphia for specialty services.

801.  FTI and Tower Health's business projections for the acquisition estimated 457 recaptured admissions per year.  [DX97 (Jan. 2017 Integrated Strategic Financial Plan Presentation), at TOWER-CHS-PMMC-053303 – 053304].  Actual recaptured admissions for the specialty services "[w]ildly exceeded our expectations."  [May 24, Ahern, at 139:17 – 140:1 (the first year had 750 cases compared with the targeted 450 cases, the second year had over 1,000 cases, and the current annualized run-rate is 1,750 cases)].

802.  From a financial contribution perspective, this adds an additional $30 million in contribution margin to Tower Health on an annualized basis.  [May 24, Ahern, at 140:2-5].

803.  The Board also considered the financial analysis prepared by FTI Consulting and H2C concerning the quality of earnings and enterprise value.  [DX98 (May 2017 Tower Health Board Presentation), at TOWER-CHS-PMMC-043948 – 043959; TA-D-8, at Hammond Ex. 10].

804.  FTI Consulting's fair market value analysis valued the five hospitals on an "enterprise value" basis.  [DX98 (May 2017 Tower Health Board Presentation), at TOWER-CHS-PMMC-043957].  "Essentially, it's looking at the value of the business.  So, you know, I think if you think about it in one respect, you can operate a business in the total absence of owning the real estate, leasing the real estate, so it's really not a real estate transaction.  It's the acquisition of a

business.  What makes it an asset transaction is that Tower was not acquiring the membership or stock interest of the companies."  [May 3, Judge, at 156:24 – 157:5].

805.  FTI concluded that Pottstown Hospital's enterprise value was between $137,844,000 and $163,184,000, with a concluded enterprise value of $150,515,000.  [PX98 (May 2017 Tower Health Board Presentation), at TOWER-CHS-PMMC-043957].

806.  H2C also prepared a revised valuation analysis of the implied enterprise value of the hospitals in May 2017.  H2C used EBITDA multiples to value the "three strong performing hospitals," including Pottstown Hospital.  H2C calculated the implied enterprise value of Pottstown Hospital between $199,938,000 and $222,154,000.  [TA-D-8, Hammond Ex. 10, at HHC00013].

807.  Among other things, H2C relied on the unaudited financial statements and statements of operations to fairly and accurately reflect the operations of the hospitals in preparing its valuations.  [TA-D-8, Hammond Dep., at 110:20 – 111:6, 112:22 – 113:24].

808.  Mr. Hammond testified that a contingent liability in excess of $25 million "would be something material to consider" in preparing his valuation analysis because "a liability of that magnitude would affect the economic value of the assets being acquired."  [TA-D-8, Hammond Dep. at 117:5 – 118:6].

809.  Mr. Hammond also testified that the ability of one of the hospitals to continue to participate in Medicare and Medicaid programs is material to his valuation analysis "[b]ecuase of the . . . total amount of revenue that is generated from providing services at the hospital.  **And continuing qualification under those programs is material to the success of the hospital**." [TA-D-8, Hammond Dep., at 119:1-25 (emphasis added)].

810.  In preparing the valuation analysis, Mr. Hammond assumed the hospitals would continue to qualify for Medicare and Medicaid reimbursement.  "Failure . . . for any one of the hospitals to be able to continue to be qualified under the Medicare or Medicaid programs would have been a material consideration that would have had to have been addressed directly, either with some financial accommodation in the purchase price or some escrow or some other types of – or it may have been – it may have just cratered the whole idea of buying a hospital with that kind of concern hanging over it."  [TA-D-8, Hammond Dep., at 120:1 – 121:9].

811.  The Court finds the actual value of Pottstown Hospital to Tower Health was far greater than the calculated enterprise value by H2C, considering its importance in creating a larger health care system, protecting Reading Hospital from competitive threats, capturing market share to diversify the demographics and payor mix of Reading Hospital, and diverting millions of dollars in referral revenue from patients in the western Philadelphia suburbs to Reading Hospital.

812.  The Board also considered the strong representations and warranties as a basis to move forward with the transaction.  Mr. Ahern understood "that the representations and warranties were going to be strong and pretty robust.  And when we had our team meetings, we talked about ensuring that the reps and warranties were pretty profound for us so that we were protected against things that we didn't know."  [May 24, Ahern, at 132:20 – 133:5; *see also id.* at 160:4-6 ("My understanding is that we, Tower Health, wanted very strong reps and warranties because of less than full due diligence.")].

## H.   The Purchase Price Adjustments in the Second Amendment to the APA Were Not Based on Information Learned by Tower Health During Due Diligence.

813.  CHS argued that Tower Health discovered various issues that led to purchase price adjustments, inviting the Court to speculate that a similar result would have occurred in

connection with the discovery of Pottstown Hospital's Life Safety Code deficiencies. The Court declines CHS's invitation to engage in such speculation. Regardless, the Court finds that the issues in the Second Amendment to the APA that led to the purchase price adjustments were not discovered by Tower Health during due diligence.

814. Between execution of the APA on May 30, 2017 and closing on October 1, 2017, the parties agreed to certain revisions to the APA, including two price adjustments, reflected in the Second Amendment to the APA. [PX143 (Second Amendment to APA)].

815. First, Section 4 provided that the equity of Chestnut Knoll Home Health Care, L.P. would be an Excluded Asset in the transaction. [PX143 (Second Amendment to APA), § 4].

816. CHS identified the issue for Tower Health and disclosed that Chestnut Knoll was no longer an operating home health company. [May 3, Judge, at 230:5-16].

817. Second, in Section 5, the Seller Entities agreed to provide a $650,000 credit concerning "anti-ligature and related renovations at the Pottstown Memorial Medical Center Behavioral Health Unit." [PX143 (Second Amendment to APA), § 5].

818. The ligature issue was also identified by CHS and not by Tower Health. As explained by Ms. Judge: "CHS had been advised in its prior survey that it had to make what are referred to as 'anti-ligature renovations' at Pottstown in the behavioral health unit. It's basically a more recent regulation and Pottstown was not in compliance. CHS came to Tower Health pretty close to the closing and said that they had expected to have made those anti-ligature renovations by the date of closing, but they now understood they were not going to be able to accomplish that. And so they were advising Tower Health . . . that the issue existed. And then requesting that Tower Health take on the responsibility of making the renovations and providing a credit of $650,000 to the purchase price so that Tower Health could do that." [May 3, Judge, at

230:24 – 231:11; *see also* June 9, Braun, at 67:19 – 68:9 (agreeing the ligature issue was disclosed to Tower Health)].

819.  Third, Paragraph 6 in the Second Amendment to the APA provides an $8,000,000 credit to the purchase price based on the expiration of a lease agreement for the Blue Bell Surgery Center.  [PX143 (Second Amendment to APA), § 6].

820.  The surgery center was affiliated with Phoenixville Hospital.  In connection with transitioning the leases from CHS to Tower Health after due diligence ended, Tower Health learned the lease was no longer an asset of CHS, notwithstanding the list of assets in the APA.

821.  As Ms. Judge explained, "[W]hen Tower went to seek the assignment of the lease from the landlord, Tower was advised that Phoenixville had failed to renew the lease and the lease was terminated, which meant there was not going to be any more surgery center.  And so Tower Health brought this issue to CHS and CHS acknowledged that they had failed to renew the lease agreement."  [May 3, Judge, at 232:2-11; June 9, Braun, at 64:17-24].

822.  As stated by Mr. Hammond at his deposition, "I think we felt like, honestly, that CHS had not been forthright . . . that they weren't transparent with what was going on with respect to some of these leases . . . ."  [TA-D-8, Hammond Dep., at 80:15-21; *see also* TA-D-8, at Hammond Ex. 7 ("Let's be clear that despite all of the leases in the data room, we expected that CHS would continue to run the businesses that generated the EBITDA we were buying.  Someone at CHS screwed up and Reading is not going to pay for it.  Not only do we lose the EBITDA, you have allowed a major orthopedic competitor in the market.")].

823.  The Second Amendment to the APA does not otherwise affect the provisions in the APA, including the representations and warranties provided by the Seller Entities and guaranteed by CHS.  [PX143 (Second Amendment to the APA), § 8; May 3, Judge, at 232:12 – 233:3].

172

X.      **After Closing, CMS and Pa. DOH Notify Tower Health that Pottstown Hospital
        Was Not in Compliance with its Regulatory Obligations.**

824.  Tower Health purchased Pottstown Hospital when the parties closed on the APA

effective October 1, 2017.

825.  From October 1, 2017 through until March 15, 2018, Tower Health did not engage in

any significant construction projects or renovations to Pottstown Hospital after October 1, 2017.

[May 4, Major, at 238:14 – 239:9].

A.      **The February 2018 TJC Survey Did Not Cite Pottstown Hospital for
        Deficient Building Construction Type.**

826.  On February 12-16, 2018, TJC completed its three-year accreditation survey of

Pottstown Hospital.  [PX153 (Feb. 2018 TJC accreditation report); May 13, Keown, at 46:3-19].

827.  Although the TJC report indicated areas for improvement, Tower Health ultimately

received an accreditation from TJC.  [PX170 (May 2018 TJC letter to Pottstown Hospital)].  By

letter dated May 15, 2018—before Tower Health received the results of the CMS validation

survey discussed below—TJC advised Pottstown Hospital that "TJC is granting your

organization an accreditation decision of Accredited with an effective date of February 17,

2018."  [*Id.* at 1].

828.  In the same May 15, 2018 letter, TJC told Pottstown Hospital:  "The Joint

Commission is also recommending your organization for continued Medicare certification

effective February 17, 2018.  **Please note that the Centers for Medicare and Medicaid**

**Services (CMS) Regional Office (RO) makes the final determination regarding your**

**Medicare participation and the effective date of participation in accordance with the**

**regulations at 42 CFR 489.13.**"  [PX170 (May 2018 TJC letter to Pottstown Hospital), at 1

(emphasis added)].

**B.**     **TJC Routinely Misses Deficiencies Found on Later CMS Validation Surveys.**

829.  One month after the TJC survey, Pa. DOH, on behalf of CMS, conducted an

unannounced Medicare Sample Validation Survey of Pottstown Hospital to determine the

validity of the TJC February 2018 survey.  [May 3, Judge, at 238:7-14; May 10, Koffel, at 49:13-

22, 49:23 – 50:4 ("CMS will contract with the state surveying agency to do a survey shortly after

The Joint Commission does a survey and then there is a comparison done between the results of

the validation survey with the result to the accrediting organization survey."); 42 C.F.R. § 488.9

(validation surveys)].

830.  As stated by CMS in its June 25, 2018 Important Notice to Pottstown Hospital,

"Section 1864 of the above Act, as amended by Public Law 92-603, authorizes the Secretary of

Health and Human Services to conduct, on a selective sampling basis, surveys of [T]JC

accredited hospitals participating in Medicare as a means of validating the [T]JC survey

process."  [PX173 (June 25, 2018 CMS email with survey and Important Notice), at Tower-

CHS-PMMC-015516].

831.  Mr. Carson, one of CHS's experts, testified that it is not unusual for TJC to miss

things during a survey, and it was consistent with his personal experience that TJC may conduct

a survey and then a state regulator find things "starkly different."  [May 26, Carson, at 176:5-8,

179:7-9].

832.  CMS reports to Congress annually about the results of its validation surveys, done to

check the validity of the surveys performed by the ten CMS-approved Medicare accreditation

organizations, including TJC.  [May 26, Carson at 176:5 – 179:17; May 10, Koffel, at 49:13-22].

833.  In CMS's fiscal year 2017 report to Congress regarding its oversight of the Medicare

accrediting organizations, including TJC, CMS identified the disparities or errors found in the

174

validation surveys.  [May 26, Carson, at 177:6-25; PX202 (2017 CMS annual report to Congress)].

834.  CMS reported to Congress that TJC had an overall disparity rate (failure to cite condition-level deficiencies) of 42% in fiscal year 2014; 36% in fiscal year 2015; and 44% in fiscal year 2016.  CMS also reported that TJC had a 37% disparity rate involving physical environment in fiscal year 2014; a 25% disparity rate involving physical environment in fiscal year 2015; and a 25% disparity rate involving physical environment in fiscal year 2016.  [PX202 (2017 CMS annual report to Congress), at 44; *see also* May 26, Carson, at 178:1-18].

835.  CMS also reported the disparities or errors in the validation surveys, including surveys performed by TJC, to Congress for fiscal year 2019.  [PX290 (2019 CMS annual report to Congress)].

836.  CMS's report reports a 42% overall disparity rate of TJC surveys in fiscal year 2017 and a 46% overall disparity rate in fiscal year 2018.  As for physical environment, CMS reported to Congress that TJC had a 31% disparity rate involving physical environment in fiscal year 2017 and a 26% disparity rate involving physical environment in fiscal year 2018.  [PX290 (2019 CMS annual report to Congress), at 44].

837.  Mr. Sanders testified at trial that another hospital owned by CHS, Sharon Hospital, had a deficient construction type that had not been cited by a regulator in at least 15 years.  [May 6, Sanders, at 39:3-25].  He explained that surveyors missing significant life safety code deficiencies "happens more than you would think" because the surveyors "can be lazy" and may not ever look above the ceiling.  [*Id.* at 40:1-15].

175

C.    **Pa. DOH's March 2018 CMS Validation Survey Identified Issues with the
      Building Construction Type and the Occupied Stories of Pottstown Hospital.**

838.  On March 14-15, 2018, Pa. DOH, on behalf of CMS, conducted an unannounced

validation survey in which Pa. DOH was "validating compliance with the life safety code and

whether the joint commission did their job" in the TJC February 2018 survey.  [May 5, Major, at

31:1-15; May 13, Keown, 60:20 – 61:3 (the validation survey "is basically a check on the Joint

Commission that they're doing what they're supposed to do").

839.  The March 2018 Pa. DOH validation survey was conducted by the life safety division

(DSI) of Pa. DOH on behalf of CMS.

840.  The DAAC side of Pa. DOH (Division of Acute and Ambulatory Care) conducted a

separate unannounced CMS validation survey with respect to clinical issues of Pottstown

Hospital in April 2018 and a follow up clinical inspection in August 2018.  [May 13, Keown,

49:3-7, 56:23 – 59:23; May 13, Newell, at 140:19 – 143:7, 150:20 – 153:18; PX190 (Aug. 2018

R. Newell email) (commenting on the DAAC follow up validation survey)].

841.  The Pa. DOH clinical survey results or DAAC survey process are not relevant to

Tower Health's claims against CHS.

842.  When the Pa. DOH surveyors arrived unannounced at Pottstown Hospital,

Ms. Keown immediately returned to the hospital from an off-site conference because a CMS

validation survey is "not something that you have every year."  [May 13, Keown, at 61:4-18].

843.  The two Pa. DOH inspectors conducting the validation survey on behalf of CMS were

from the Harrisburg office, not from the Pa. DOH field office in Norristown, which normally

conducted surveys of Pottstown Hospital.  [May 13, Keown, at 61:19 – 62:6].

844.  Ms. Keown accompanied one of the life safety Pa. DOH surveyors around Pottstown

Hospital during the first day of the inspection.  [May 13, Keown, at 61:20 – 62:9].

176

845. According to Ms. Keown, "[M]y impression is that they knew that we didn't have this FSES and they came in knowing that, ready to cite us for it." [May 13, Keown, at 62:10-13].

846. At the end of the first day of the inspection on March 14, 2018, the two surveyors and Ms. Keown met in the facilities department. "[T]he surveyor said you don't have an FSES. You can't operate above the fourth floor of the hospital." [May 13, Keown, at 63:17 – 64:15]. Ms. Keown stopped the discussion: "I need to go get my CEO because I didn't know if we were going to have to transfer patients to other hospitals. I didn't know what this meant. So I went and got Rich Newell." [*Id.* at 64:12-15].

847. The surveyors, Ms. Keown, Mr. Newell, and Mr. Gostkowski continued the discussion in the executive conference room. The Pa. DOH surveyor again repeated that "you don't have an FSES. You can't operate above the fourth floor of the hospital." [May 13, Keown, at 64:18 – 65:8, 66:5-10].

848. As Mr. Newell testified:

> . . . I looked at the gentleman, I said, I understand we have an issue? And he -- he looked at me and said, well you need to take the top four floors of your hospital off because you can't use them to see patients. And I – I looked at him because I found that off-putting because I – that's something that I was shocked to hear. And I said, I'm sorry. What are you saying? And he said our building is not in compliance with the building code and that we need to remove the top four floors of our building to continue to see patients. . . .
>
> [I]t was mentioned during that discussion that we did not have an FSES and that our building is no longer in compliance to the code – building code. And that we had to address that.

[May 13, Newell, at 109:3-17]. Mr. Newell clarified that he meant Life Safety Code in his testimony. [*Id.* at 131:3-7].

849. Ms. Keown was "horrified" after hearing from the inspectors: "I didn't know what an FSES was. I didn't know if we were going to have to transfer patients to another hospital. We

177

have seven floors to the hospital.  A lot of our clinical units are on those floors, so how are we going to care for our patients in our community?"  [May 13, Keown, at 65:23 – 66:4].

850.  At the time of the survey, Ms. Keown did not know what an FSES was and had never seen a copy of an FSES applicable to Pottstown Hospital.  [May 13, Keown, at 66:19-25].

851.  Mr. Newell likewise did not know what an FSES was before it was mentioned by the Pa. DOH surveyors.  He had never heard that Pottstown Hospital had a building construction type deficiency before the March 2018 survey.  [May 13, Newell, at 109:18-24].

852.  Mr. Gostkowski, the Pottstown Hospital Facilities Director who was initially employed by CHS in 2016, did not provide a copy of an FSES to the inspectors during the survey, and he did not mention an FSES during the survey.  [May 13, Keown, at 66:11-16].

853.  Mr. Newell reached out to his boss, Mr. Matthews, the then-CEO of Tower Health, "to notify him of what was going on because this was a pretty significant finding and something that is like nothing I had ever experienced."  [May 13, Newell, at 110:13-17].

854.  Mr. Newell emailed Mr. Matthews, Therese Sucher (the COO of Tower Health), and Mark McNash (SVP for Facilities) following the first day of the survey.  [PX156 (March 14, 2018 R. Newell email)].  Mr. Newell wrote:  "The lead surveyor is having issues with the way our building is classified and the code to which we are following for life safety. . . . I will give you more of an update on our call tomorrow, I just want to keep you in the loop because I don't see a quick easy 'fix' for what the surveyor is proposing."  [*Id.*]

855.  On the second day of the survey, one surveyor traveled with Ms. Keown to an off-site building and the other surveyor reviewed documents at Pottstown Hospital.  The surveyor did not indicate that he located a copy of the FSES during that document review.  [May 13, Newell, at 111:17 – 112:3].

178

856.  Both Mr. Newell and Ms. Keown testified that the Pa. DOH surveyors, acting on behalf of CMS, referenced the lack of FSES again at the exit conference on the second day, March 15, 2018.

857.  Ms. Keown recalled, "[A]gain, he said you don't have an FSES.  You can't operate above the fourth floor of the hospital.  And I'm going to have to get back to Harrisburg, and talk with his superiors in Harrisburg, about how this would get cited, and what we would have to do." [May 13, Keown, at 67:15-19].

858.  During the exit conference on the second day, Mr. Newell testified:  "[R]eally the main concern I continued to have was having to take the top four floors of my building off.  He wasn't as direct or imposing as he was on the first day.  And he said – I'm paraphrasing, but something along the lines of you're fully sprinkled, you do need to get your FSES updated current to your current building. . . . You're – you're out of code.  This is a code issue." [May 13, Newell, at 112:8-15].

859.  After the second day, Mr. Newell again updated Mr. Matthews and Ms. Sucher about the exit conference.  Mr. Newell wrote:  "The exit conference was as clear as mud.  There was a general change in attitude today and the survey continued with minor findings. . . . I think we need to wait on the final report to figure out next steps.  The report is supposed to be posted within 10 days.  In the meantime we are going to reach out to Gwen Hillard, the Supervisor at the Norristown field office to ask for some guidance as she is intimately aware of the situation. The big issues are the construction type of the building and whether or not we need an FSES; fire doors not meeting 2012 code and the occupancy type of our Boyertown outpatient facility." [PX158 (March 15, 2018 R. Newell email)].

179

860.  Mr. Newell explained what he meant by "clear as mud" at trial:  "I think it goes back to the whole reference of the top four floors of the building, because on the first day this inspector was adamant that I had to take them off.  And the second day, it was more of the line – the lines of you just need to get your building in compliance."  [May 13, Newell, at 113:19-23].

861.  Mr. Newell suggested that Tower Health wait to see the survey results because he did not know what the fix would be for the problem and he did not know what an FSES was.  "He threw out building code numbers that, since I am familiar with, but at the time, they were just numbers, where he'd said that we are a Type II (000) building is what we're reported as, but we should be a Type II (222) building.  That meant nothing to me at the time."  [May 13, Newell, at 114:2-10].

862.  After the survey, Ms. Keown and Ms. Gostkowski called Gwen Hilliard, the life safety supervisor in the Norristown office.  Ms. Keown was "concerned" that the Pa. DOH surveyors said they needed to "go back to Harrisburg and discuss with their superiors, the fact that we didn't have this FSES, and I didn't even know like what we might have to do to be able to fix the deficiency, so I was reaching out for her guidance."  [May 13, Keown, at 68:10 – 69:21].

863.  Ms. Keown followed up her telephone call with an email to Ms. Hilliard on March 19, 2018, using an email address that she had used in the past to contact her.  [May 13, Keown, at 70:5 – 71:3; PX160 (March 19, 2018 S. Keown email)].

864.  Ms. Hilliard did not respond to Ms. Keown's March 19th email.  Between March 19, 2018 and when Pottstown Hospital received the survey results at the end of June, Ms. Keown did not hear back from Pa. DOH.  [May 13, Keown, at 71:4-10].

180

**D.    On June 25, 2018, CMS Notified Pottstown Hospital that It Was Not in Compliance with CMS COP, Including the Life Safety Code, and Removed Pottstown Hospital's Deemed Status Through TJC.**

865.  On June 25, 2018, Monica Goodwin, Principal State Representative, Certification and Enforcement, CMS Region 3, emailed Mr. Newell, CEO of Pottstown Hospital, with the written results of the CMS Validation Survey on March 14-15, 2018.  [May 3, Judge, at 240:22 – 241:22; PX173 (June 25, 2018 CMS email to R. Newell)].

866.  To her email, Ms. Goodwin attached the survey results for Pottstown Hospital in connection with both the life safety inspection (conducted by Pa. DOH DSI on March 15, 2018) and the clinical or health survey (conducted by Pa. DOH DAAC on April 13, 2018).  [PX173 (June 25, 2018 CMS email to R. Newell); May 13, Keown, at 72:6-15].  In the subject line of her email, Ms. Goodwin wrote:  "CMS Notice – CMS 2567s and Removal of deemed status – Pottstown Hospital 390123."  [PX173 (June 25, 2018 CMS email to R. Newell); May 3, Judge, at 241:5-13 (explaining that CMS 2567s are the survey results to report CMS's findings of deficiencies)].

867.  To her email, Ms. Goodwin also attached a letter she wrote to Pottstown Hospital from CMS, Northeast Division of Survey & Certification.  This letter—beginning "**IMPORTANT NOTICE – PLEASE READ CAREFULLY**"—notified Pottstown Hospital of several important things.  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516].

868.  CMS advised Pottstown Hospital of its authority to validate the surveys conducted by TJC (in this case, the TJC February 2018 survey) and of the validation survey findings.  "If, in the course of such a survey, a hospital is found not to meet one or more of the Medicare Conditions of Participation, we are required to place the hospital under State survey agency jurisdiction until it is in compliance with all Medicare Conditions of Participation."  [*Id.*]

181

869. CMS "found that Pottstown Hospital **is not in compliance with the following Federal regulations**," including 42 C.F.R. § 482.41 Physical environment. [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516 (emphasis added); *see also* May 5, Major, at 20:22 – 21:16 (Pottstown Hospital "was out of compliance with the code of federal regulations for those specific guidelines."); May 10, Koffel, at 50:20 – 51:4 ("the results of the validation survey were such that the Pennsylvania Department of Health determined that . . . Pottstown Hospital was not in compliance with the requirements for the life safety code, for an existing acute care healthcare occupancy," specifically Chapter 19 of the life safety code), 91:2-12].

870. "Condition of participation: Physical environment, 42 C.F.R. § 482.41(b)(1), (e)(1)(vii)," requires compliance with the LSC requirements of NFPA 101, 2012 edition. [PX296 (42 C.F.R. § 482.41); *see also* May 5, Major, at 21:12-16; May 10, Koffel, at 51:8-15].

871. Because 42 C.F.R. § 482.41 Physical Environment is a CMS Condition of Participation, the Important Notice from CMS informed Pottstown Hospital that it was not in compliance with the Medicare Conditions of Participation, specifically the 2012 edition of NFPA 101, Life Safety Code. [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516; PX296 (42 C.F.R. § 482.41); May 10, Koffel, at 97:4-6].

872. CMS also found, "Although the immediate jeopardy situation was abated, the health and fire safety deficiencies are serious and require immediate attention. Based on this survey, we are removing the deemed status of Pottstown Hospital and placing the hospital under State survey agency jurisdiction." [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516]. By removing the hospital's deemed status, CMS notified Pottstown

Hospital that it would no longer be allowed to rely on TJC accreditation to recommend certification by CMS or licensure by Pa. DOH.

873.  In its Important Notice, CMS notified Pottstown Hospital that "the Joint Commission accreditation does not satisfy the requirements of CMS for conditions of participation," which will be "evaluated by the Pennsylvania Department of Health."  [May 10, Koffel, at 92:4-13; May 5, Major, at 22:4 – 23:8; May 13, Keown, at 73:10-17].

874.  CMS also notified Pottstown Hospital, "The finding that the Pottstown Hospital is not in compliance with the above Conditions of Participation does not affect your hospital's [T]JC accreditation, its Medicare payments, or its current status as a participating provider of hospital services in the Medicare program."  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516].

875.  CMS warned Pottstown Hospital:  "However, you are required to submit an acceptable plan of correction regarding these deficiencies.  **After the approved plan of correction has been implemented, and we have found that all of the Medicare Conditions of Participation for hospitals are met, we will discontinue the State's survey jurisdiction**."  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516 – 17 (emphasis added)].

876.  In its Important Notice, CMS distinguished TJC "accreditation" from CMS "certification" when CMS informed Pottstown Hospital, it "can clearly continue to seek accreditation through the Joint Commission.  But that simply satisfies the requirements for accreditation.  That until these deficiencies are corrected, the facility will also be surveyed by Pennsylvania Department of Health for purposes of certification by CMS."  [May 10, Koffel, at 91:20 – 92:3].

183

877.  Ms. Judge testified that Pottstown Hospital is not in compliance with the Medicare COP today even though it submitted the plan of correction.  "It actually has to fulfill the plan of correction," which has not yet occurred.  [May 3, Judge, at 250:18 – 251:2; May 10, Koffel, at 97:17 – 98:19].

878.  The Court finds Ms. Judge's position is supported by the language in the Important Notice from CMS as well as the federal regulations on validation surveys.  [*See* 42 C.F.R. § 488.9(c) ("If a CMS validation survey results in a finding that the provider . . . is out of compliance with one or more Medicare conditions or requirements, the provider . . . will no longer be deemed to meet the Medicare conditions or requirements and will be subject to ongoing review by the SA in accordance with § 488.10(a) until the provider . . . demonstrates compliance."); *id.* § 488.9(d)(3) (deemed status reinstated if CMS finds the provider "meets all applicable Medicare CoP . . . .")].  Pottstown Hospital today remains under state agency jurisdiction and does not have deemed status.  [May 3, Judge, at 83:17 – 84:4, 244:15-17; May 13, Keown, at 72:6 – 73:20.

879.  Mr. Carson, CHS's expert, argued that, notwithstanding CMS's Important Notice that notified Pottstown Hospital that it was out of compliance with the 2012 edition of the Life Safety Code and would remain under state agency jurisdiction until the plan of correction was implemented, Pottstown Hospital was never out of compliance.  [May 26, Carson, at 101:23 – 103:4 (Pottstown Hospital is not out of compliance until it fails to meet its plan of correction)].  The Court rejects this opinion as incredible and unsupported by CMS's Important Notice, the March 15, 2018 Validation Survey, and the fact that the condition of Pottstown Hospital did not change in any material way from the time of closing, October 1, 2017, and the March 15, 2018 Validation Survey.

880.  CMS required Pottstown Hospital to submit its proposed plan of correction within 10 days to Pa. DOH, DSI.  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015517].

881.  CMS warned Pottstown Hospital, "You are advised that failure to achieve compliance with the Conditions of Participation, in accordance with the time frames set forth in an acceptable plan of correction, will result in the initiation of action to terminate your facility from the Medicare program."  [*Id.*; *see also* 42 C.F.R. § 488.9(c)(3) ("If CMS determines that a provider . . . is not in compliance with applicable Medicare conditions or requirements, the provider . . . may be subject to termination of the provider . . . agreement under § 489.53 of this chapter. . . .")].

882.  Mr. Koffel characterized the CMS Important Notice as a threat:

> THE COURT:  You would interpret this as a threat, what we've got on the screen right now?
>
> THE WITNESS:  Yes.  It indicates that they will initiate an action to terminate their participation in the program.

[May 10, Koffel, at 100:13-17].

883.  Mr. Koffel identified other occasions in the Mid-Atlantic region when CMS had in fact terminated or threatened to terminate a hospital's participation in the Medicare program based on Life Safety Code deficiencies.  [May 10, Koffel, at 98:23 – 100:10].

884.  Neither Mr. Carson nor Mr. Hofmeister, CHS's expert witnesses on code compliance, contradicted Mr. Koffel's testimony that CMS can, and will, terminate a hospital's participation in the Medicare program for Life Safety Code violations.

885.  Ms. Keown was "horrified" when she read the Important Notice from CMS "because they were pulling our deemed status, which is the first time I knew that, based on this letter, and

you know, it had all of the deficiencies that were listed there."  [May 13, Keown, at 72:23 – 73:3].

886.  The March 2018 Pa. DOH CMS validation survey identified a number of deficiencies, which CMS identifies as "K-tags."  [*See* PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015440 – 015454; *see also* May 3, Judge, at 242:5 – 243:3 (testifying that "tags" are "how they refer to the citation of the particular regulation that you are found to be not in – where you are found to be not in compliance" with K-tag being an "important," "material," and "severe" tag); May 10, Koffel, at 47:7-10 (K-tag comes from the CMS form "that takes life safety code requirements and assigns a K-tag to those requirements")].

887.  Among the compliance deficiencies the DOH identified was the failure to comply with K Tags 161, 211, 0225, 0311, 0325, 0353, 0355, 0363, 0371, 0754, and 0920.  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015440 – 015454; *see also* May 10, Koffel, at 47:20 – 48:5 (surveyor starts with "the regulatory requirement or the life safety requirement as the basis for their finding" and then identifies "the conditions they observed that were deficient, and not in compliance with that requirement")].  Most of these K-tags were easily correctible, but the K-161 tag, Building Construction Type, was "the most concerning" to Mr. Major.  [May 5, Major, at 36:3-21].

888.  Neither the May 2015 TJC survey nor the February 2018 TJC survey cited Pottstown Hospital's Building Construction Type, Type II (000), as a deficiency.  [PX53 (2015 TJC survey); PX153 (2018 TJC survey)].  As the Court noted during Mr. Carson's testimony, "Well, when you say in compliance, when the Department of Health came in for the validation survey, they said the Joint Commission basically did a bad job right?"  Mr. Carson responded, "That's correct."  [May 26, Carson, at 102:12-15].

889.  In the INITIAL COMMENT to its March 2018 validation survey, Pa. DOH stated, "Based on an unannounced Medicare Sample Validation Survey completed on March 14-15, 2018, it was determined that Pottstown Hospital **was not in compliance with the requirements of the Life Safety Code for an existing acute care health care occupancy**.  Compliance with the National Fire Protection Association's Life Safety Code is required by 42 CFR 482.41(b)." [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015440 (emphasis added)].

890.  Also in the INITIAL COMMENT section, Pa. DOH said about Pottstown Hospital, "This is a seven-story, Type II (000), unprotected noncombustible structure, with a basement and a penthouse, which is fully sprinklered."  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015440].  Unlike all its previous recertification and re-licensure surveys before the adoption of the 2012 edition of the Life Safety code, effective July 5, 2016, Pa. DOH did not explicitly refer to a "Fire Safety Evaluation System (FSES)."  [*See id.*; PX334 (summary of Pa. DOH licensure surveys); May 5, Major, at 32:13-17; May 10, Koffel, at 53:4-9 ("I then notice that there's a difference between this paragraph in this survey as compared to similar paragraphs in other surveys performed by the Pennsylvania Department of Health, in that there is no reference to a fire safety evaluation system."), 84:20 – 85:24].

891.  The Court finds that Pa. DOH's failure to reference an FSES, based on its past history of citing FSESs in its surveys before the adoption of the 2012 edition of the Life Safety Code, signifies that Pa. DOH did not recognize a valid FSES for Pottstown Hospital.

892.  With respect to the K-161 tag deficiency for Building Construction Type and Height, Pa. DOH embedded a table in the March 2018 validation survey, identified as "NFPA 101 Building Construction, Type and Height" [PX173 (June 25, 2018 CMS email to R. Newell), at

187

TOWER-CHS-PMMC-015440 – 015441] taken from the 2012 edition of the Life Safety Code, in Table 19.1.6.1.  [May 10, Koffel, at 54:1-21; *see also* PX41 (Life Safety Code), at 101-203]. The requirements of the Table labeled "NFPA 101 Building Construction, Type and Height" remained the same from the 2000 edition of NFPA 101 to the 2012 edition of NFPA 101.  [May 10, Koffel, at 85:25 – 86:5].

893.  Referring to "NFPA 101 Building Construction, Type and Height," Pa. DOH, on behalf of CMS, found:  "This STANDARD is not met as evidenced by . . . the facility **failed to maintain building construction requirements**, **such as a minimum two-hour fire resistive rating** of structural components throughout the building, affecting the entire component." [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015441 (emphasis added)].  It also found, "Interview, observations and document review on March 14, 2018, between 8:00 AM and 11:00 AM, revealed the building is a seven story, Type II (000) unprotected noncombustible structure. **This type of construction exceeds maximum story height allowed.**"  [*Id.* (emphasis added)].

894.  "[B]ased upon the information the surveyor had before them, the surveyor determined that the facility failed to maintain the building construction type that was required by the code which was a minimum Type II (222) building."  [May 10, Koffel, at 57:4-25].  Pa. DOH found "the structural elements throughout the building failed to provide the required two-hour fire resistance rating.  In fact, not only did it fail to provide the two-hour fire resistance rating, it failed to provide a one-hour fire resistance rating.  Because there is another type of construction in the code. The surveyor could have classified this as a Type II (111).  They identified that the deficiency was significant.  And, therefore, no fire resistance rating should be assigned to the structural elements of the building."  [May 10, Koffel, at 58:17 – 59:2].

188

895. Pa. DOH found that Pottstown Hospital exceeded the maximum story height allowed because, as set forth in Table 19.1.6.1 in NFPA 101, 2012 edition, an existing healthcare occupancy with a Building Construction  Type of II (000) cannot have patients "located above the second floor."  [May 10, Koffel, at 59:3-21; PX41 (Life Safety Code), at 101-203].  As the Pa. DOH surveyor told Mr. Newell on March 14 and 15, 2018, Pottstown Hospital cannot occupy floors three through seven.  [May 13, Newell, at 109:3-17, 131:3-7; May 13, Keown, at 65:23 – 66:4].

896. Mr. Koffel testified that the K-311 tag identified as a deficiency in the March 2018 Validation Survey, relating to the vertical openings in the building was also significant. Pottstown Hospital was cited for failing to maintain vertical openings at the two-hour fire resistance rating.  [May 10, Koffel, at 60:2 – 61:1; PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015444].

897. Ms. Judge testified that her personal reaction to the survey results was, "It – it certainly caused a lot of alarm" because she knew CMS did not "revoke deemed status lightly." [May 3, Judge, at 246:7-15].

898. Pottstown Hospital today remains under state agency survey jurisdiction.  [May 3, Judge, at 244:15-17, 73:10-20].

899. Pottstown Hospital today is "accredited" by TJC, but it still does not have TJC deemed status.  [May 13, Keown, at 48:7-17, 73:4-9, 74:1-3].  That is, since June 25, 2018, TJC has not been permitted to act on behalf of CMS as an "accrediting organization" for certification into the Medicare program.

900. The Court finds that based on the undisputed testimony that Pottstown Hospital's condition was not materially different on March 15, 2018 than it was at the time of closing on

189

October 1, 2017 (i.e., the Building Construction Type deficiency existed as of October 1, 2017),

and based on the uncontested Life Safety Code deficiencies in the March 2018 Pa. DOH

Validation Survey, Pottstown Hospital, as of the time of closing, had a non-compliant Building

Construction Type, had no valid FSES, and was non-compliant with the CMS Conditions of

Participation.

### E. On August 23, 2018, Pa. DOH Notified Pottstown Hospital that It Was Not in Compliance with Pa. DOH Licensing Requirements.

901.  Because Pottstown Hospital lost its deemed status to have TJC accredit Pottstown

Hospital for Pa. DOH licensing purposes, Pa. DOH itself was required to conduct a "Life Safety

Survey Relicensure" in that the Pa. DOH hospital license was going to expire at the end of

August.  [May 10, Koffel, at 92:14 – 93:10].

902.  The August 2018 survey by Pa. DOH was the first re-licensure survey of Pottstown

Hospital since 2013, and the first after the 2012 edition of the Life Safety Code was adopted,

effective July 5, 2016.  [May 10, Koffel, at 179:19 – 180:9].

903.  The Pa. DOH life safety division chose not to conduct another inspection in August

2018.  "What they chose to do was take their March report from their CMS validation survey and

make it their licensure survey on the life safety side."  [May 13, Keown, at 59:10-15].

904.  Although the Pa. DOH Relicensure Survey itself is dated March 15, 2018, the Pa.

DOH email that delivered it to Pottstown Hospital is dated August 23, 2018 with the subject line:

"Notification of Life Safety Survey Relicensure for Pottstown Hospital."  [PX196 (Aug. 23,

2018 Pa. DOH email to R. Newell), at TOWER-CHS-PMMC-026816].

905.  On August 23, 2018, Pa. DOH notified Pottstown Hospital that, as a result of its

March 2018 survey, Pottstown Hospital was also non-compliant with the Pennsylvania hospital

license requirements.  [PX196 (Aug. 23, 2018 Pa. DOH email to R. Newell), at TOWER-CHS-PMMC-026816; May 13, Keown, at 59:19 – 60:14; May 10, Koffel, at 111:23 – 112:3].

906.  The survey included the same K-tag deficiencies as the March 2018 CMS validation survey, including the K-161 tag, and notified Pottstown Hospital:  "Based on a relicensure survey completed on March 14-15, 2018, it was determined that Pottstown Hospital was not in compliance with the following requirements of the Life Safety Code for an existing health care occupancy."  [PX196 (Aug. 23, 2018 Pa. DOH email to R. Newell), at TOWER-CHS-PMMC-026817; May 10, Koffel, at 112:8-21, 113:2-7].

907.  Like the March 2018 CMS validation survey, the August 2018 Relicensure Survey does not reference an FSES.  [PX196 (Aug. 23, 2018 Pa. DOH email to R. Newell), at 1 (INITIAL COMMENT); PX334 (Summary of Pa. DOH surveys); May 10, Koffel, at 112:19-21].

908.  The Court finds that Pa. DOH's failure to reference an FSES, based on its past history of citing FSESs in its surveys before the adoption of the 2012 edition of the Life Safety Code, signifies that Pa. DOH did not recognize a valid FSES for Pottstown Hospital.

909.  Pottstown Hospital submitted the same plan of correction in response to the Pa. DOH Relicensure Survey as it did in response to the CMS validation survey.  [May 10, Koffel, at 113:8 – 114:3].

910.  "[N]ormal practice would be that if [Pottstown Hospital] fail[s] to meet the plan of correction, the Department of Health could initiate action to terminate their license."  [May 10, Koffel, at 114:4-10; *see also* May 3, Judge, at 79:5-12].

911.  The Court finds that based on the undisputed testimony that Pottstown Hospital's condition was not materially different on March 15, 2018 than it was at the time of closing on October 1, 2017 (i.e., the Building Construction Type deficiency existed as of October 1, 2017),

and based on the uncontested Life Safety Code deficiencies in the March 2018 Pa. DOH

Validation Survey, Pottstown Hospital, as of the time of closing, had a non-compliant Building

Construction Type, had no valid FSES, and was non-compliant with the Pennsylvania licensing

requirements.

## XI.      Tower Health Responded to the CMS Validation Survey As a Significant Problem Arising In the Ordinary Course of Business.

### A.      Tower Health's Immediate Response in March and April 2018 Included Retaining Internationally-Renowned Fire Protection Engineers.

912.  Immediately following the CMS validation survey, in March 2018 Tower Health

began assessing the scope of the problems verbally described by the Pa. DOH surveyors to

Mr. Newell and Ms. Keown.  [May 4, Major, at 239:11-18].

913.  One of the first tasks undertaken by Tower Health was to determine if Pottstown

Hospital could achieve equivalency through an FSES under the 2013 edition of NFPA 101A.

914.  In April 2018, Tower Health retained the international engineering firm Jensen

Hughes "to come in and do a preliminary study which included a preliminary FSES of the

facility."  [May 4, Major, at 241:5-11; *see also* May 13, Newell, at 146:21 – 147:5

(recommending that Tower Health proceed with trying to prepare an FSES "based on what the

Department of Health surveyor had shared with me that we need to update our FSES. . . . Again,

I wasn't sure what an FSES was.  So that's where we started down the road of let's get our FSES

if that's what we need.")].

915.  Tower Health retained Jensen Hughes because it "needed someone with the expertise,

along with the knowledge to make sure that how we were going to proceed in the future was

right and correct."  [May 4, Major, at 241:16-19].

916.  Jensen Hughes is an international engineering and safety consulting firm with offices

around the globe.  Jensen Hughes employs approximately 1,250 scientists, engineers, and

192

consultants specializing in, among other things, fire protection engineering.  [May 6, Martin, at 160:11-21].

917.  Tower Health also retained TSIG, a life safety consulting firm, to conduct a life safety assessment and prepare new life safety plans for all of the CHS-acquired hospitals.  [TA-D-9, at Dinney-3 (TSIG proposal)].  TSIG was not retained to look at the fireproofing or the structural steel of Pottstown Hospital.  [May 5, Major, at 195:23 – 196:15 (TSIG was instructed, "unless it was something glaring, to not do or touch in essence the fireproofing because it was being done by a different group for analyzation."); *id.* at 198:5-12, 199:10-16; TA-D-9, Dinney Dep., at 91:2-20, 111:10 – 115:16, 116:3-25 (TSIG not retained to review fireproofing or building construction type); TA-D-9, at Dinney-5 (life safety plans)].

918.  Although Tower Health did not have the CMS March 2018 Validation Survey yet, Tower Health began this investigation based on the concerns raised by the Pa. DOH surveyors about the lack of FSES.  [May 4, Major, at 253:22 – 254:3].

919.  The preliminary assessment undertaken by Tower Health, including the possibility of an FSES, was not conducted in anticipation of litigation but instead to try to address a pressing problem for Pottstown Hospital.  Ms. Judge testified that she, as primary outside counsel for Tower Health, was not contacted for advice about the survey in March 2018, and she did not undertake an evaluation of whether Tower Health had a contractual claim against CHS until after Tower Health received the CMS validation survey in June 2018.  [May 3, Judge, at 240:17-21].

920.  In response to questions from the Court, Mr. Major testified that the investigation was undertaken "both" to "make the hospital safe" and to "make sure [Pottstown Hospital] is in compliance with the regulations."  [May 4, Major, at 254:4-7].

### 1. Tower Health Evaluated if Pottstown Hospital Could Achieve Compliance Equivalency with a 2013 FSES.

921. First, Tower Health considered whether Pottstown Hospital could obtain an FSES under the 2013 NFPA 101A forms.  [May 4, Major, at 235:9-21; PX159 (March 2019 D. Major email to R. Gostkowski), at TOWER-CHS-PMMC-032659].

922. Pottstown Hospital, because it was an existing healthcare occupancy, was required to be a Type II (222) Building Construction Type.  [PX41 (Life Safety Code), at 101-203, § 19.1.6.1 & Table 19.1.6.1; May 4, Major, at 234:11 – 235:2].

923. As a Type II (000) building, without an FSES to address the Building Construction Type in the seven-story facility, Pottstown Hospital did not comply with the Life Safety Code. [PX41 (Life Safety Code), at 101-203, § 19.1.6.1 & Table 19.1.6.1; PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015440 – 015442].

924. Tower Health evaluated the FSES option first because, as stated in Mr. Major's March 19, 2018 email to Ray Gostkowski and Mr. McNash, it would be expensive and require significant construction to remediate the building construction type to the required Type II (222).  "I will be brutally honest – I don't know if we can get to a 222 Standard.  Our best and quickest bet – I believe – is to get you to an FSES standard and approval while we determine what it is going to take to get you to 222."  [PX159 (March 19, 2018 D. Major email), at TOWER-CHS-PMMC032659].

925. Mr. Major stated at the time:  "My worst case scenario is that we will have to figure out how to make the floors, columns, and ceilings 2 hour – 4 hour protected.  I don't know how we can do that without major construction across the entire tower."  [PX159 (March 19, 2018 D. Major email), at TOWER-CHS-PMMC032659].

194

926.  In April 2018, Tower Health retained Jensen Hughes to "do an initial documentation survey and a survey of the facility to see if an FSES was possible or start to make a better determination of what actually the physical condition was."  [May 4, Major, at 244:2-5; *see also* PX188 (Aug. 1, 2018 D. Major email), at 40 (cost of FSES concept study was $7,500.00)].

927.  In April 2018, Eric Babcock from Jensen Hughes inspected the hospital, including looking above the ceilings, and used the current NFPA 101A, 2013 edition FSES form to prepare the scoring for the hospital "[t]o see if we could get a FSES, if it was – if it was within a realm that we could get an FSES to pass with the existing conditions."  [May 4, Major, at 252:5-9].

928.  Mr. Major explained Tower Health's approach in April 2018: "We were developing the process to go through on – on what we could do and what we couldn't do from a compliant perspective, and knowing whether we could or could not get an FSES was critical to that initial decision process."  [May 4, Major, at 252:21 – 253:1].  If it had been physically possible to obtain an FSES for Pottstown Hospital, "[W]e probably would have proceeded with an FSES, along with direction or how we could get to a more compliant facility."  [May 4, Major, at 253:8-10].

929.  Jensen Hughes' conclusion was that the hospital could not achieve an equivalency using the 2013 FSES Form.  [May 4, Major, at 252:1-2 ("The initial scoring would indicate that it would not pass the equivalency."); PX166 (April 24, 2018 D. Major email), at TOWER-CHS-PMMC034381 ("Our consultant ran a very rudimentary FSES against the current code matrix. At face value, we would not be able to meet or overcome the current ranking/rating systems of a Type II (0,0,0) constructed healthcare high-rise structure.  In actuality, the code is written to make it extremely difficult (if not impossible) to attain an equivalency on a high-rise healthcare structure.")].

930.  Jensen Hughes also questioned how the 2009 FSES was accepted in the first instance. [PX166 (April 24, 2018 D. Major email), at TOWER-CHS-PMMC034381 ("Based on the information and existing condition, our consultant was very skeptical on how we obtained the original FSES clarification.  Which may validate the DOH inspector concerns regarding this designation.")].

931.  Mr. Major immediately advised Tower Health senior management:  "Consultant performed initial 2013 NFPA 101A FSES Survey.  The facility WILL NOT or be able to overcome current ranking/rating system.  The facility DOES NOT meet a current compliant [2012] NFPA 101 nor equivalent 2013 NFPA 101A Fire Safety requirement."  [PX169 (May 2018 D. Major presentation), at 5; May 4, Major, at 288:8-9 (the reference to 2010 and not 2012 in the document was a "[t]ypo on my part")].

932.  In March 2018, Tower Health's life safety consultant, TSIG, also did not believe that Pottstown Hospital could achieve an FSES under the 2013 NFPA 101A.  [TA-D-9, Dinney Dep., at 97:4-8, 105:18 – 106:15, 107:5-22; TA-D-9, at Dinney-8, TSIG0095 ("Right now, there is no possible way an FSES will pass.")].

933.  Ms. Judge testified, "Tower Health was advised by the architects and engineers and life safety consultants that it spoke with that it would not qualify under the 2013 [N]FPA for FSES qualifications."  [May 4, Judge, at 98:18-22].

934.  Mr. Koffel testified that Pottstown Hospital could not qualify for an FSES using the 2013 FSES Form.  [May 10, Koffel, at 143:21 – 144:21 ("[I]t is mathematically impossible to achieve a value of 16 in that extinguishment column, which is why without even doing a detailed analysis, I was able to assess the situation and say Pottstown Hospital cannot achieve a passing score using the 2013 edition of NFPA 101A.")].

196

935.  Jensen Hughes' and Mr. Koffel's conclusions about the inability of Pottstown Hospital to achieve compliance with a 2013 FSES are supported by Pa. DOH.  Specifically, (1) Pa. DOH previously informed CHS that its 2009 FSES, prepared to address deficiencies under the 2000 edition of the Life Safety Code, was no longer valid and "we do not know that this meets an FSES any longer" [PX128 (May 2017 D. Sanders email), at TOWER-CHS-PMMC-005353]; and (2) because Pa. DOH was aware of the 2009 FSES, its survey citations for the deficient building construction in its March 2018 survey is an implicit rejection of the use of an FSES at the high-rise hospital.

936.  At trial, Mr. Carson and Mr. Hofmeister, CHS's experts, conceded that Pottstown Hospital could not qualify for an FSES using the 2013 NFPA 101A.  Otherwise, Mr. Carson would not have realized the "error" in the scoring and submitted his TIA.  [May 26, Carson, at 93:19 – 94:12 (applying the "wrong" high-rise line values in the 2013 NFPA 101A FSES without the TIA "under this provision, the added benefit of sprinklers do not offset the negative of the construction"), 107:11-13 (agreeing "[t]he FSES form, at the time of this survey, didn't look like it does now"); *see also* June 10, Hofmeister, at 35:5-13 (Pottstown Hospital could achieve equivalency through an FSES only "[a]ssuming that the TIA is appropriate and applicable")].

937.  The Court rejects Defendants' arguments that Tower Health immediately proceeded with the most expensive option to address the Pottstown Hospital Life Safety Code deficiencies.

## 2.  Jensen Hughes' April 2018 Initial Inspection and Assessment of Pottstown Hospital's SFRM.

938.  Along with evaluating whether an FSES was feasible, Tower Health retained Jensen Hughes to review the hospital from a life safety standpoint.

939.  The inspection involved looking above ceiling tiles and conducting a more in depth inspection than simply a walk through.  [May 4, Major, at 250:16-20, 267:14-22].

940.  Jensen Hughes identified a number of deficiencies in addition to the building construction deficiency, outlined in Mr. Major's April 2018 summary email (PX166) "in regards to smoke and fire doors, quarter doors, penetrations throughout the facility."  [May 4, Major, at 255:10-13].

941.  During their April 2018 inspection, Mr. Major and Mr. Babcock from Jensen Hughes observed missing fireproofing on the beams, deck, and columns at the hospital.  Along with missing fireproofing, and fireproofing laying on ceiling tiles, they observed fireproofing that easily came off from the beams from "hand pressure and hand touch" throughout the hospital.  [May 4, Major, 263:7-9, *see generally* May 5, Major, at 261:23 – 275:1; *see also* PX167 (April 2018 Jensen Hughes report) at photographs)].

942.  The fireproofing is "supposed to stick to the beam.  That adhesion is critical for the maintenance of that material to do what it's meant to do." [May 4, Major, 263:11-13].

943.  Mr. Major and Mr. Babcock observed fireproofing that had "delaminated," meaning "[i]t has come loose and has fallen."  [May 4, Major, at 268:25 – 269:1].

944.  Mr. Major and Mr. Babcock also saw unsealed penetrations that did not appear to have the required fire rating.  [May 4, Major, at 269:17 – 270:24, 271:13-17; PX167 (April 25, 2018 Jensen Hughes report), at Photographs 7, 8].

945.  Mr. Major and Mr. Babcock observed deficient and missing spray fireproofing that was applied during the original construction of the building in the 1970s.  [May 4, Major, at 265:1-12].

198

946.  The walls in the un-renovated portions of Pottstown Hospital were observed to be constructed with lath and plaster, which is a predecessor to gypsum wallboard.  [May 4, Major, at 272:9 – 273:16; PX167 (April 25, 2018 Jensen Hughes report), at Photograph 10].

947.  Tower Health started preparing a plan to remedy these issues ahead of the receipt of the CMS validation survey "because we have a limited time once we get that report to actually be able to make those corrections within the time limits afforded to us."  [May 4, Major, at 255:13-17].

948.  Tower Health instituted "interim life safety measures," or ILSM, to address the life safety deficiencies while it was developing and implementing its plan of correction which are identified in the LSC.  [May 4, Major, at 255:18 – 257:5; PX166 (April 24, 2018 D. Major email), at TOWER-CHS-PMMC034383].

949.  In May 2018, Mr. Major reported to Tower Health senior management the findings from Jensen Hughes' initial review, Mr. Major recommended to senior management that Tower Health should (1) retain Jensen Hughes to complete further studies of Pottstown Hospital, (2) obtain a copy of the 2009 FSES, and (3) "proceed with getting a better understanding of what the physical condition of the fireproofing was at the facility."  [May 4, Major, at 275:2-17, 277:18:23; PX169 (May 14, 2018 D. Major Presentation)].

950.  Among other things, Mr. Major reported:  "Although we found deficiencies (validating the failure to meet 2013 NFPA 101A, FSES equivalency standard), the original building drawings and physical building/structure observed has the majority of elements which would indicate that the building was originally built to meet the fire safety requirements of a Type II (2,2,2) constructed facility."  [PX169 (May 14, 2018 D. Major Presentation), at 5].

199

951.  This was important as to determining "[i]s it repairable?  Or is this something beyond repair that needs to take place to be able to get the building in compliance" with the 2012 edition of NFPA 101 life safety standard.  [May 4, Major, at 288:20 – 289:1].  Because Pottstown Hospital was originally built as a Type II (222) building, Pottstown Hospital "had the potential capability of being renovated and repaired to get it to that standard."  [May 5, Major, at 6:23 – 7:2].

952.  Based on the information known at that time, including the conclusions reached by Jensen Hughes' first inspection in April 2018, Mr. Major reported to Tower Health senior management about the renovation alternatives of different floors, which included the "potential loss of 1/4 - 1/3 patient beds due to single bed conversion requirement" and "major infrastructure (electrical, emergency power, HVAC, plumbing, med gas) upgrade requirement."  [PX169 (May 14, 2018 D. Major Presentation), at 6].

953.  The conversion and "upgrade" requirement involved renovating the hospital compliant with "current FGI guidelines."  [May 5, Major, at 7:11-18].

954.  FGI guidelines are "the guideline[s] used in healthcare, with regards to construction and what you needed to bring from a standard perspective.  It prescribes the number of patients allowed per room; what the utilities needed to be in that room; what the bathrooms need to be self-contained within that room.  It goes from, not just patient rooms, but into ORs, radiology, across the full gamut of the hospital."  [May 5, Major, at 7:19 – 8:1].

955.  To remediate the fireproofing deficiencies and bring Pottstown Hospital into the required Type II (222) standard under the life safety code, Pottstown Hospital would also be required to bring the renovated areas into compliance with the current FGI guidelines applicable to healthcare occupancies.

956. Following Mr. Major's report to senior management on the preliminary Jensen Hughes findings, Tower Health continued the process by having TSIG, a life safety consultant, prepare updated life safety drawings and a statement of conditions, as well as retained Jensen Hughes to conduct a more thorough investigation of the entire structure of the hospital.  [TA-D-9, at Dinney-3; TA-D-9, at Dinney-4 (statement of conditions based on July 23, 2018 survey); PX169 (May 14, 2018 D. Major Presentation), at 7-8; May 5, Major, at 9:9-14, 71:15-19].

957. As of May 14, 2018, Tower Health had not made a decision about the solution to the life safety deficiencies identified at Pottstown Hospital.  [May 5, Major, at 17:19-21].

958. The Court finds that following the March 2018 validation survey, Tower Health followed a reasoned approach, using well-qualified consultants, when considering the various options to address the Building Construction Type deficiency at Pottstown Hospital and did not, as Defendants argue, immediately select the most expensive option to address Pottstown Hospital's life safety deficiencies.

## B. Tower Health's Development of a Plan of Correction Following Receipt of the CMS Validation Survey and the CMS Important Notice.

959. As noted, on June 25 2018, Tower Health received the March 2018 CMS validation survey.  [May 4, Major, at 257:13-17; May 13, Keown, at 50:6-10; PX173 (June 25, 2018 CMS email to R. Newell)].

960. Ms. Judge testified that after receiving the June 25, 2018 CMS Important Notice, "Tower Health understood that the revocation of the deemed status was something serious.  It also took a look at the four areas of citation in addition to fire safety and health safety and brought together a group of people who were subject matter experts in the hospital.  At this moment in time on June 25th, I did not know – and I don't believe anybody else at Tower Health

201

knew – exactly what the full scope of the remedial action that would be required might be."
[May 3, Judge, at 245:12 – 246:5].

961.  The June 25, 2018 CMS Important Notice required Pottstown Hospital to submit "an
acceptable" plan of correction for all the deficiencies cited in the survey, with time schedules, to
Pa. DOH Division of Safety Inspection within 10 days.  [PX173 (June 25, 2018 CMS email to R.
Newell), at TOWER-CHS-PMMC-015517].

962.  The plan of correction, according to the CMS Important Notice, must include
completion dates for the correction of each deficiency, "generally no longer than 60 days from
the date of the notice."  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-
PMMC-015517].

963.  At this time, Mr. Major "reached out directly to the Department of Health, knowing
that the issue in regards to the K161 tag was going to take a joint effort to come to a resolution."
[May 5, Major, at 37:2-5].

964.  On June 27, 2018, two days after receiving the CMS validation survey and the CMS
Important Notice, Mr. Major wrote an email to Charles Schlegel, the Director of the DSI at Pa.
DOH, "to begin an open dialogue with the Department of Safety and Inspection to come to a
resolution or how we can come to resolution with the facility deficiency."  [May 5, Major, at
37:22 – 38:1; PX174 (June 27, 2018 D. Major email to C. Schlegel)].

965.  Mr. Major wrote to Mr. Schlegel:  "Tower Health is in the process of responding to
the most recent CMS findings to Pottstown Hospital and I would like to discuss with you the
building construction type/classification of this facility.  **We want to make sure that we are
working the issue correctly and that we have an open dialogue with DSI as the process
moves forward.  If you could please find the time in your busy schedule to contact me, [I]**

**would greatly appreciate it**.”  [PX174 (June 27, 2018 D. Major email to C. Schlegel) (emphasis added)].

966.  Mr. Major provided Mr. Schlegel an overview of Tower Health's preliminary investigation into the life safety deficiencies at Pottstown Hospital and that “[w]e are proceeding with an engineering assessment (Jensen Hughes LLC) to determine any deficiencies within the building elements.”  [PX174 (June 27, 2018 D. Major email to C. Schlegel)].

967.  Mr. Major concluded his email, “The process will most likely need to include time limited waivers to perform the engineering assessment and then time to make the applicable deficiency repairs. . . . I look forward to our conversation and working towards rectification of this issue.”  [PX174 (June 27, 2018 D. Major email to C. Schlegel)].

968.  Mr. Major wanted Mr. Schlegel to know “it was going to take longer than the 60 days to get it started.  And that we needed to work with them, to make sure that we are doing it correctly.”  [May 5, Major, at 39:19 – 40:4].

969.  Mr. Major “never heard back from Mr. Schlegel,” even though Pa. DOH received a copy of his email.  [May 5, Major, at 40:10-22, 67:4-6].

970.  Mr. Major also never received a response from Ami Shappell at Pa. DOH, to whom Mr. Schlegel forwarded Mr. Major's June 27, 2018 email.  [May 5, Major, at 40:23 – 41:4, 67:7-8].

971.  Ms. Keown separately contacted Pa. DOH given the 10-day deadline and the approaching July 4th holiday because, although the survey was emailed to Mr. Newell, the survey was not yet posted to the Pa. DOH website.  “This was, I'll be honest, uncharted territory for me.  I never had a CMS validation survey before. . . . So I had multiple calls to my surveyor,

203

on the clinical side, saying, you know, 'Oh, my God, we got this letter, how am I to respond to it?'"  [May 13, Keown, at 75:7 – 76:2].

972.   Notwithstanding Pa. DOH's failure to respond to Tower Health's outreach, Tower Health put together its plan of correction to the K-tags, including the K-161 tag, in accordance with the directions provided by the June 2018 CMS Important Notice.  Tower Health provided a draft of the proposed plan of correction to its life safety consultant Jensen Hughes for review and comment.  [PX176 (June 28, 2018 D. Major email); May 5, Major, at 69:2 – 70:21].

973.   As of June 28, 2018, Tower Health did not know the extent of the problem or the extent of the repairs that might need to be made to Pottstown Hospital.  [May 5, Major, at 73:3-10].

974.   On July 2, 2018, Mr. Major emailed Charles Schlegel at Pa. DOH DSI again.  Mr. Major had not heard back from Mr. Schlegel in response to his June 27, 2018 email.  [May 5, Major, at 73:13-17; PX179 (July 2, 2018 D. Major email to C. Schlegel)].

975.   Mr. Major submitted Limited Time Waivers to Mr. Schlegel for approval, which would allow Pottstown Hospital additional time beyond the required 60 days to complete its remediation of the K-161 tag.  [May 5, Major, at 73:18-23; PX179 (July 2, 2018 D. Major email to C. Schlegel)].

976.   Mr. Major wrote to Mr. Schlegel:  "There are several issues that we need to work closely with you and your team members to resolve.  These issues include the building construction types, long lead materials, engineering analysis, etc. and several items will require time limited waivers in order to remediate, resolve and close the K Tags."  [PX179 (July 2, 2018 D. Major email to C. Schlegel)].

204

977.  Mr. Major concluded his July 2, 2018 email, "I am once again seeking your guidance on how we resolve these issues together and move us forward.  I believe that a sit down with yourself, members of your staff and members of the Tower Health/Pottstown Hospital would go a long way in achieving this goal.  Your assistance will be greatly appreciated."  [PX179 (July 2, 2018 D. Major email to C. Schlegel)].

978.  Mr. Major testified:

> Q.  Did you hear back from Mr. Schlegel?
>
> A.  We did not.
>
> Q.  Did you hear back from anybody at the Department of Health?
>
> A.  We did not.
>
> Q.  Have you ever tried to telephone Mr. Schlegel?
>
> A.  We did on several occasions.
>
> Q.  And what was the response?
>
> A.  He was not available.
>
> Q.  Did he ever return your call?
>
> A.  No.

[May 5, Major, at 74:17 – 75:2].

979.  Pottstown Hospital submitted its Plan of Correction within ten days, or by July 3, 2018, as required by Pa. DOH on behalf of CMS.  [May 3, Judge, at 246:16 – 247:1; May 5, Major, at 75:3-5; PX157 (March 2018 survey with plan of correction); May 10, Koffel, at 53:14-23].

980.  After she posted the Plan of Correction to the Pa. DOH website, Ms. Keown emailed Ms. Hilliard from Pa. DOH, using the same email address, with a copy of the full Plan of

Correction because the full K-tag responses had not been posted properly.  [May 13, Keown, 76:6 – 77:7; PX181 (July 3, 2018 S. Keown email to G. Hilliard)].  Ms. Hilliard responded to Ms. Keown, either by email or phone call.  [May 13, Keown, at 76:14-20].

981.  Ms. Keown concluded her email to Ms. Hilliard, "I look forward to working with you on this plan of correction."  [PX181 (July 3, 2018 S. Keown email to G. Hilliard), at 2].

982.  With respect to the K-161 tag deficiency (building failed to have "a minimum two-hour resistive rating of structural components throughout the building"), Pottstown Hospital's submitted Plan of Correction included engaging professionals to, among other things, (1) inspect the building; (2) determine the building construction type (based on construction drawings indicating the building has the necessary elements of a Type II (222) hospital; and (3) identify the deficiencies; and make corrective action plans.  This included conducting "systematic repairs and/or replacement of existing structure(s) that are not within compliance," meaning to "repair or replace the structural elements, as required to achieve the appropriate fire resistance rating for the structural elements."  [PX157 (March 2018 CMS validation survey with plan of correction), at "Provider's Plan of Correction" column, CHS_PADOH0000285 – 288; May 10, Koffel, at 107:17-23].

983.  At the time Pottstown Hospital submitted the Plan of Correction, it had already completed the first step in the Plan of Correction (hiring TSIG to update the life safety drawings) and the second step in the Plan of Correction (hiring Jensen Hughes to inspect the building and determine the deficiencies).  [May 10, Koffel, at 102:12 – 103:17, 104:25 – 105:4].

984.  Mr. Carson testified that Pottstown Hospital could have contested the survey findings. Mr. Carson did not testify about what he specifically would have recommended to contest the findings, which is understandable since CHS concedes the hospital has been "in the exact same

condition it's in today" as to the deficient fireproofing condition.  [May 5, Dodson, at 122].
Given that Defendants have never contested the March 2018 survey report's deficiencies, the
Court finds it reasonable that Tower Health did not contest the findings, particularly the
information learned by June 2018 regarding the building construction type and the inability
(according to Jensen Hughes and TSIG) to obtain an FSES.

985.  The K-161 tag plan of correction was finally approved by Pa. DOH on January 30,
2019, timing, according to Ms. Keown, which was "bizarre."  [May 5, Major, at 75:8-14; May 3,
Judge, at 247:2-6; PX157 (March 2018 CMS validation survey with plan of correction), at
CHS_PADOH0000285 (column five); May 13, Keown, at 78:9 – 79:17, 81:2-13 (typically
approval for a plan of correction took days and not months); May 10, Koffel, at 110:3-13].

986.  Ms. Keown "reached out because I like to see everything on the website as approved,
and it wasn't approved.  So I reached out to Gwen [Hilliard] multiple times and left her
voicemail messages."  [May 13, Keown, at 79:18-22].

987.  Ms. Keown was told "they were waiting for CMS, you know, approval," from both
Ms. Hilliard and another person in Harrisburg at Pa. DOH.  [May 13, Keown, at 79:24 – 80:11;
*see also* PX207 (Oct. 23, 2018 S. Keown email) (writing that Amy Shappell at Pa. DOH DSI
"did share with me that she emailed Charlie at DOH last week asking if she can approve
outstanding responses, but they are waiting on CMS approval.  She also stated that CMS has
requested information from DOH about Pottstown Hospital.")].

988.  Pa. DOH has granted Pottstown Hospital a time limited waiver to complete the plan
of correction through December 31, 2023.  [PX157 (March 2018 CMS validation survey with
plan of correction), at CHS_PADOH0000288; May 5, Major, at 104:4 – 105:25; May 10, Koffel,
at 102:6-9, 104:12-20, 108:18 – 109:21].  Pottstown Hospital requested the additional time to

address the "deficiency that's pervasive throughout the facility" while remaining an operating hospital that "needs to be able to deliver patient care." [May 10, Koffel, at 106:2-13].

989. As of today, Pottstown Hospital remains operating and accepting Medicare reimbursement payments. However, Pottstown Hospital is not in compliance even though it submitted its plan of correction because it is required by CMS to implement the approved plan of correction (i.e., fix the deficiencies) to obtain compliance with CMS COP. [May 3, Judge, at 77:23 – 79:12, 250:18-25 - 251:2, 258:16 – 259:2; *see also* PX173 (June 25, 2018 CMS email to R. Newell, at TOWER-CHS-PMMC-015516 – 15517]. "The Department recognizes the enormity of this problem, and so it gave Tower Health until December 31st of 2023. An extension of time, basically, to complete the repair and fix the deficiency." [May 3, Judge, at 258:4 – 259:2].

### C. Tower Health Carefully Considered Other Alternatives to Address the K-161 Tag Deficiency.

990. Pottstown Hospital's approved plan of correction of the K-161 deficiency is to "conduct systematic repairs and/or replacement to existing structure(s) that are not in compliance." [PX157 (March 2018 CMS validation survey with plan of correction), at CHS_PADOH0000287].

991. As discussed in **Section XI(A)**, Tower Health first determined it could not use an FSES under the 2013 edition of NFPA 101A to address the deficient building construction type.

992. CHS's experts concede that Pottstown Hospital cannot pass a 2013 FSES under the 2013 FSES Form. [May 26, Carson, at 199:1-7; June 10, Hofmeister, at 35:5-13 (FSES can pass only if he applies the TIA change to mandatory value), 84:4-6].

993. Tower Health's Board and senior management have considered different alternatives. As explained by Ms. Judge, "[T]he – the fix for the problem is – very expensive and very

208

invasive in terms of the ability to continue patient care while the remediation is going on."
[May 3, Judge, at 255:16-20].

994. After it received the CMS validation survey and CMS Important Notice on June 25,
2018, "Tower looked to see if there was more of a remedial action that could be taken, similar to
the ones that you pointed to from the 2015 Joint Commission survey that would be . . . less
invasive to opening all the ceilings and walls, and then was quickly told by its experts that that
would not solve the problem." [May 4, Judge, at 108:24 – 109:5].

995. These options were discussed in detail by David Major at trial and evidenced in the
various presentations to Tower Health senior management. [PX204 (Oct. 2018 D. Major
Presentation); PX208 (Nov. 2018 D. Major Presentation); PX212 (Jan. 20, 2019 D. Major
Presentation); PX213 (Jan. 22, 2019 Pottstown Hospital Facility Assessment Presentation)].

### 1. Tower Health Considered Alternative Solutions and Attempted Discussions with Pa. DOH.

996. As of August 2018, Tower Health didn't "know the extent of what the damages are.
So this is an attempt to understand where we would be, based off of different work . . . . So if
you only needed to lift a couple ceiling tiles up, do repairs across the entire institution, the cost
would be this. If you needed to bring down all the ceiling tiles and everything above it, do a
remediation, it would be this, and if you needed to gut renovate to bring the building in
compliance, it would be this. It was a goal to provide, basically, administration an avenue of
what we were looking at from a cost structure, depending on what we found." [May 5, Major, at
82:18 – 83:5].

997. As of August 2018, Mr. Major did not know which option to recommend. To make a
recommendation, "We needed the engineering review to tell us what the actual issues were,"
which was determined by Jensen Hughes. [May 5, Major, at 83:6-18].

998.  One option Tower Health considered was whether it could patch the deficient fireproofing.  [*See* PX188 (Aug. 1, 2018 D. Major email), at 40; *see also* PX199 (Sept. 12, 2018 D. Major email), at TOWER-CHS-PMMC031059].

999.  Mr. Major developed preliminary cost estimates of those three levels of remediation. For minor patching / repairing, he estimated it would cost \$4,877,256.59.  For mid-level renovations with ceilings, he estimated it would cost \$38,703,843.32.  And for a gut renovation, he estimated it would cost \$101,941,108.75.  [PX188 (Aug. 1, 2018 D. Major email), at 40].

1000.  The estimates included the various engineering and study costs (\$152,000.00) and the cost of Tower Health manpower (between \$31,200.00 and \$124,800.00, depending on the level of remediation necessary).  [PX188 (Aug. 1, 2018 D. Major email), at 40].

1001.  Mr. Major emailed Pa. DOH's Mr. Schlegel again on August 21, 2018.  [PX195 (Aug. 21, 2018 D. Major email to C. Schlegel)].  He wrote:  "Just wanted to confirm that you have received my previous emails regarding Pottstown Hospital and that you are in agreement with our course of action.  It is also our understanding, based on the conversation that you had w/ Dave Wolfskill last week, that we are still waiting/pending CMS review of our submission." [*Id.*]

1002.  Yet again, Mr. Schlegel did not respond to Mr. Major's email.  [May 5, Major, at 84:21-23].

1003.  Mr. Major attempted to call Mr. Schlegel "on several occasions."  [May 5, Major, at 85:1-2].

1004.  In August 2018, Jensen Hughes began its "deep dive" inspection of Pottstown Hospital, which was "a complete study and survey of the building" to confirm "whatever repair criteria needed to be done."  [May 5, Major, at 85:11 – 86:2].

210

1005. Jensen Hughes summarized its findings during the August 20-24, 2018 inspections and confirmed "the fire spray is not meeting the criteria for [Type II] (222) compliance." [May 5, Major, at 87:12-15].

1006. Following its "deep dive," Jensen Hughes determined in August 2018, "For a 40+ year old building that has gone through renovations and utility and infrastructure upgrades over the years, there is visible degradation of the fireproofing. This includes delamination of the SFRM from the metal substrate, fall off, thinning, selective removal of SFRM for clamp attachment and wall construction, and completely missing SFRM." [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031258-59].

1007. Jensen Hughes contrasted the original applied fireproofing with the more recently applied fireproofing applied during CHS's renovation of certain floors of the hospital. "The original fireproofing material application at several locations within the building (beams, decks, and columns) was not applied correctly when the building was built. The SFRM was not uniformly applied over all surfaces. There are locations where the beam web is completely unprotected for several feet because of an inappropriate spray angle. Also, the fluted deck was only sprayed from one direction, leaving the back side of the flute unprotected." [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259].

1008. On the other hand, "Locations that have gone through more recent renovations (8-10 years ago) had the original SFRM removed and a more modern SFRM applied. This would include portions of the 3rd floor and most of the 4th floor. This more modern SFRM is in much better shape, but further investigation into the exact product used and the required thicknesses per the UL designs current at the time is still needed to determine if the applications in those

211

renovated areas are acceptable." [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259].

1009. Jensen Hughes determined that during CHS's renovation of certain floors of Pottstown Hospital, CHS had not "patched" the deficient fireproofing but had completely removed and replaced all the original fireproofing with a new application.

1010. Jensen Hughes also observed inadequate fire protection coverage of the columns at the hospital, which were wrapped with a plaster or stucco enclosure. [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259].

1011. Jensen Hughes' inspection revealed that "popping ceiling tiles up and doing simple repairs" was not an option. "So we knew at this stage that we were somewhere between pulling ceiling tiles down to do repairs and/or potential gut renovation." [May 5, Major, at 88:23 – 89:4].

1012. Jensen Hughes also advised Tower Health, "Due to the extent of the observed delamination and missing SFRM, **hand patching will not be a viable method of remediation**." [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259 (emphasis added)].

1013. Additionally, Jensen Hughes cautioned Tower Health, "It is likely that a significant amount of mechanical, plumbing, and electrical infrastructure will need to be removed from ceiling spaces in order to allow for any SFRM remediation option to be accomplished." [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259].

1014. As of late August 2018, Tower Health had not decided on a specific plan for the remediation required by its approved plan of correction. [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259 ("Further analysis and inspection needs to be

conducted in order to determine what remediation methods would be most appropriate to restore or upgrade the fire-resistance rating of the steel."); May 5, Major, at 88:19-22].

1015. Based on Jensen Hughes' initial conclusions following its August 2018 inspection, Mr. Major updated his cost estimates ($4.8 million for a minor patch / repair; $38.7 million for removal of ceiling and patch / repair; and $101.8 million for a gut renovation) to include a fourth column to address the issues identified by Jensen Hughes. Mr. Major estimated the cost of that scope of work at $63,539,189. [PX199 (Sept. 12, 2018 D. Major email), at TOWER-CHS-PMMC-031059; May 5, Major, at 90:5-16].

1016. On October 5, 2018, Mr. Major updated Tower Health's senior management about Jensen Hughes' findings and the potential options available to remediate the K-161 tag deficiency of the deficient building construction type of Type II (000). [PX204 (Oct. 5, 2018 D. Major Presentation); May 5, Major, at 91:8-12].

1017. First, Mr. Major reminded senior management that Pottstown Hospital did not qualify for an FSES under the 2013 edition of NFPA 101A, as determined by Jensen Hughes. [PX204 (Oct. 5, 2018 D. Major Presentation), at 4].

1018. Jensen Hughes updated its findings in September 2018 and concluded the building needed to be corrected from a Type II (000) to a Type II (222) construction to meet the 2012 edition of NFPA 101, Life Safety Code requirements. [May 5, Major, at 92:11 – 93:10; PX204 (Oct. 5, 2018 D. Major Presentation), at 5].

1019. Mr. Major advised senior management that based on Jensen Hughes' findings as of September 2018, "The current projected remediation requirements will be to gain access to and remove all fire spray and fire rated wrap assemblies to all steel columns, beams and deck back to original structure. The applicable fire rating assembly fire spray and/or wall assemblies will

213

need to be installed and then all building systems restored.  The remediation will be required to be done at all levels."  [PX204 (Oct. 5, 2018 D. Major Presentation), at 6].  Removal of existing fireproofing and re-application was determined to be necessary by Jensen Hughes because of the extent of delamination of the existing fireproofing, which meant that patching would not be effective.  [PX198 (Aug. 27, 2018 email from Jensen Hughes), at TOWER-CHS-PMMC031259].

1020.  Mr. Major reported that the estimated costs to perform that level of remediation was $63.5 million and would take three to four years to complete.  He also noted that the remediation would include "little to no improvements in aesthetics to hospital or infrastructure."  [PX204 (Oct. 5, 2018 D. Major Presentation), at 7].

1021.  The other alternatives Tower Health considered besides remediating the building construction type from a Type II (000) to a Type II (222) were (1) remove the top three floors of the hospital so it was no longer a high-rise and building an attached patient tower, and (2) building a replacement hospital on another site to avoid spending money "on the current 1972 structure."  [May 3, Judge, at 255:20 – 256:2; *see also* May 5, Major, at 94:8-14; PX204 (Oct. 5, 2018 D. Major Presentation), at 8; May 13, Newell, at 122:9 – 124:15].

1022.  As of October 2018, Mr. Major estimated that the cost of building an entirely new hospital to replace Pottstown Hospital would be $330,000,000 and take between four to five years.  [PX204, at 8].  Included in the $330 million number to build a new hospital were design costs of $20,880,000 and land development costs of $15,000,000.  [PX204 (Oct. 5, 2018 D. Major Presentation), at 9].

1023.  Mr. Major and his team continued to refine the cost estimates and presented updated options and price estimates to Tower Health management on November 15, 2018.  [PX208 (Nov. 15, 2018 D. Major Presentation)].

1024.  As of November 15, 2018, Mr. Major estimated that it would cost $77,500,000 million to complete the remediation, including installing sprinklers to accommodate a fully sprinkled designation.  [PX208 (Nov. 15, 2018 D. Major Presentation), at 8].

1025.  He advised senior management that the remediation would require "[r]enovation to existing patient units to bring the hospital up to code," resulting in a "loss of 92 licensed beds due to private room requirement."  [PX208 (Nov. 15, 2018 D. Major Presentation), at 8].  As explained by Mr. Major, "The issue here is now, based off of our conversations, we have hit the tipping point that we need to basically bring, that the FGI guidelines that we spoke about earlier and yesterday afternoon were now taking effect, and that we have to bring that building and those rooms up to total new compliance within that guideline."  [May 5, Major, at 97:18 – 98:4].

1026.  He also advised senior management that the cost for a replacement hospital—as an alternative to remediation—would be approximately $275 million, without the land acquisition.  [PX208 (Nov. 15, 2018 D. Major Presentation), at 9].

1027.  Mr. Major told senior management that one of the next steps in the process was to "[d]etermine remediation vs. replacement."  [PX208 (Nov. 15, 2018 D. Major Presentation), at 11].

1028.  In January 2019, Mr. Major further refined his explanation to senior management of the options available to address Pottstown Hospital and the costs through a "business decision matrix."  [PX212 (Jan. 20, 2019 D. Major email to M. McNash); May 5, Major, at 99:15-24].

215

1029.  Mr. Major summarized the five options available to address the life safety deficiencies at Pottstown Hospital:  (1) remediating the Type II (000) construction to bring the facility to a Type II (222) construction; (2) replace and demo the structure; (3) replace and convert the structure to an ambulatory surgical center; (4) add a five-story structure to the existing building and remove four floors; and (5) replace the existing bed tower with a four-story bed tower and remove six floors.  [PX212 (Jan. 20, 2019 D. Major email to M. McNash), at TOWER-CHS-PMMC034305-17].  He estimated the costs of the options—not including pre-determined infrastructure costs—as follows:

| Option | Construction and Renovation Costs |
|---|---|
| Modify existing structure (remediate) | $77,461,000 |
| Replace hospital and demo existing structure | $293,100,000 |
| Replace hospital and convert to ASC | $361,340,000 |
| Add bed/OR tower and remove four floors | $224,637,169 |
| Add bed/OR tower and remove six floors | $241,595,000 |

[*Id.* at TOWER-CHS-PMMC-034305].

1030.  Mr. Major ultimately winnowed down the five options to three options in a January 22, 2019 presentation to senior management:  remediate the existing hospital, build a replacement hospital and demolish the old structure, or add a freestanding tower with patient beds and operating rooms and remove six floors of the existing hospital.  [PX213 (Jan. 22, 2019 D. Major Presentation), at 3].

1031.  The cost of building a replacement hospital for the Pottstown community are consistent with the recent addition to Reading Hospital, HealthPlex.  HealthPlex cost over $350 million, which included 150 private rooms, expanded ER, and various surgical suites.  [May 4, Major, at 216:18 – 217:22; May 24, Ahern, at 136:17 – 137:7].

1032.  Along with presenting those options to senior management, on February 21, 2019, Tower Health in a letter to Charles Schlegel, Director of DSI at Pa. DOH, also advised Pa. DOH

216

about the options to address the deficient life safety conditions at Pottstown Hospital.  [PX216

(Feb. 21, 2019 R. Newell and M. McNash letter to Pa. DOH), at CHS-TOWER00087886 ("This

letter is to inform the Department of Health (DOH) on the status of Pottstown Hospital, LLC

response to its recent CMS validation survey.  Specially, we would like to present the status of

our response to K-tag 161-Building Construction Type and Height."); May 5, Major, at 106:21-

25].

1033.  As Mr. Newell described the letter, "[I]t was a summary of the three different options

that were being considered for what we had to do to meet the plan of correction, and also an

update on things that we had already accomplished in terms of the planning and scheduling and

different avenues . . . . it was more of an update to Charlie on . . . the immensity of the project

that we were going to have to undertake.  I mean, all three options that were offered are

incredibly expensive and incredibly disruptive to operations of a hospital."  [May 13, Newell, at

128:6-21].

1034.  In this letter, Pa. DOH was informed of three options that were developed following

the review by Jensen Hughes:  (1) remediating the facility (opening the walls and ceilings to

install fireproofing and bringing renovated patient rooms up to code); (2) constructing a new

patient tower to replace five existing patient floors, and remediating the bottom two floors; or (3)

constructing a new 150-bed replacement hospital.  [PX216 (Feb. 21, 2019 R. Newell and

M. McNash letter to Pa. DOH), at CHS-TOWER00087886].

1035.  The Tower Health letter to Mr. Schlegel explained that Tower Health was still

reviewing the options, and requested additional time for a response "that is reasonable and

satisfactory for both DOH and CMS."  [PX216 (Feb. 21, 2019 R. Newell and M. McNash letter

to Pa. DOH), at CHS-TOWER00087887].

217

1036.  Neither Mr. Schlegel nor anyone else from Pa. DOH responded to Tower Health "in regards to direct responses to our inquiries, letters, emails, phone calls."  [May 5, Major, at 107:17-23; *see also id.* at 107:1-12].

1037.  Ms. Judge testified that Tower Health looked at the option of removing Pottstown Hospital from a high rise, but "was advised by its experts that it would require closing the top three floors in order to comply" and "closing three floors was just out of the question."  [May 4, Judge, at 109:6-20].

### 2.  Tower Health Considered Building a New Hospital but Decided to Remediate Pottstown Hospital as the Lowest Cost Alternative.

1038.  After Tower Health received the Important Notice from CMS in June 2018, Mr. Ahern, Tower Health's Executive Vice President, was tasked with re-visiting "alternative scenarios for Pottstown Hospital, should the difficulty with the facility not be able to be corrected."  [May 24, Ahern, at 146:6-11].

1039.  In 2015, Mr. Ahern's team prepared a "back of the envelope" estimate to build a modular facility of between 85-100 beds, totaling $85 - $100 million.  This rough estimate did not include the permits, land cost (which could be tens of millions of dollars), and drawings and construction plans.  [May 24, Ahern, at 108:25 – 109:13, 111:9-14, 170:2-8].

1040.  The market remained vital to Tower Health's continued success and operations. Mr. Ahern revisited whether there was an alternative site available to construct a new inpatient facility as well as outpatient support.  [May 24, Ahern, at 146:6-18, 169:3-10].

1041.  However, Tower Health's financial results dramatically impacted the options available to Tower Health, given the projected costs.

1042.  First, Tower Health's costs to integrate the five hospitals was significantly more than Tower Health had previously forecasted, in terms of additional capital expenditures, the cost of

218

Epic (a computer system), and increasing staff salaries to retain employees.  [May 4, Judge, at 133:23 – 134:17; May 24, Ahern, at 149:23 – 150:1, 155:8-16, 171:15-16 ("We lost 190 million on the integration issues in June of 2019.")].

1043.  Although it took longer than anticipated, by January and February of 2020, the Tower Health hospitals were performing well and "hitting the peak in the upper quartile of our control charts."  [May 24, Ahern, at 148:16-22].

1044.  Second, the "devastating" impact of COVID beginning in March 2020 dramatically changed the landscape.  As Ms. Judge testified, "I'm not sure devastating is too strong of a word because a number of things happened from COVID starting with the fact that the Governor appropriately caused hospitals to stop doing any elective procedures for a period of time in the spring of 2020.  Basically shut down anything that was elective."  [May 3, Judge, at 70:7-11].

1045.  Mr. Ahern explained, after COVID hit in March 2020, "our hospitals lost on average, between 40 and 45 percent of their inpatient volume, primarily – and all of the elected volume, at the request of the Pennsylvania governor."  [May 24, Ahern, at 148:23 – 149:1].

1046.  Tower Health had patients admitted because of COVID that were longer-staying patients, and "the payment doesn't really sync up with the length of time that you stay.  So it had a very negative impact in man[y] respect[s]."  [May 3, Judge, at 70:17-24].

1047.  At the same time, Tower Health increased its expenses because of additional PPE required to protect its healthcare professionals and hiring additional workers.  "[E]ssentially expenses were significantly up, and revenue was significantly down."  [May 3, Judge, at 71:6-8].

1048.  Tower Health suffered the financial impact more than hospitals closer to Philadelphia.  "So Reading Hospital . . . and Pottstown and Phoenixville, we all eliminated significant numbers of cases, especially elective cases, yet we were in markets that didn't have the density to replace

those cases with COVID cases.  So we didn't get COVID reimbursement as a replacement, we didn't get the premium reimbursement, and we got a small percentage of the CARES fund allocation.  So those factors added up to about $320 million in net operating income impact." [May 24, Ahern, at 149:2-20].

1049.  After those two financial blows, Tower Health's only viable alternative was to keep the hospital and remediate the deficient fireproofing because it was the lowest cost option. [May 24, Ahern, at 148:3-9, 171:2-12 ("[O]nce we encountered financial difficulty, there were no real options to be able to fund the growth of a new hospital.  So that alternative was off the table."); May 3, Judge, at 256:3-9].

1050.  Tower Health has given no consideration to abandoning Pottstown Hospital, an alternative advocated by CHS:  "[T]he marketplace is important to us, not just because of all the statistical things I've talked about, but also serving the patients who live in that market, you know, we believe that it's our mission to serve the community in Pottstown."  [May 24, Ahern, at 150:12-20].

1051.  Pottstown Hospital remains "high priority and critically important" to Tower Health's strategic plan.  As a result, Tower Health has no choice but to repair the hospital.  [May 24, Ahern, at 150:21 – 151:5].

1052.  The Court finds that Tower Health undertook a methodical review of the various options available to address Pottstown Hospital and that Tower Health made a business decision—not a litigation decision—to move forward with the plan to remediate the deficient fireproofing.

### 3. Tower Health Does Not Have the Financial Resources to Pay for the Remediation.

1053. Ms. Judge and Mr. Ahern both testified that Tower Health has not yet started the remediation efforts because it does not have the financial resources to pay for it, and it does not have the borrowing capacity to increase its debt to do so. [May 3, Judge, at 257:17 – 258:5; May 24, Ahern, at 150:3-11].

1054. Tower Health has made multi-million dollar investments into Pottstown Hospital to improve it. Those capital expenditures were already earmarked as necessary before Tower Health acquired Pottstown Hospital. [May 3, Judge, at 257:20 – 258:1; May 4, Judge, at 73:16 – 74:15 (noting that the electronic health record update was "the most expensive item")].

1055. CHS complains that Tower Health has not started the remediation yet, but the Court finds the unrebutted testimony from Tower Health's witnesses—including on cross—about Tower Health's financial condition credible.

1056. CHS questioned several of Tower Health's witnesses about Tower Health's financial condition, including Tower Health's sale of assets in the first quarter 2021. That evidence is now moot and lost whatever relevance it had at the trial: Tower Health recently publicly announced the end of the sale process and its decision to remain independent. *See* Harold Brubaker, Tower Health to remain independent; expects to align with Penn Medicine, *Philadelphia Inquirer*, July 30, 2021.[5]

1057. CHS argued during its opening statement that Tower Health pursued this litigation because it is motivated solely to obtain as much money as possible, calling it a "money grab." Ms. Judge, who was not in the courtroom during the opening statements, testified that CHS's accusation is not true: "First of all, the scope of the cost to fix this problem is enormous. And

---

[5] https://www.inquirer.com/business/health/tower-health-penn-medicine-alliance-alignment-reading-hospital-20210730.html.

Tower had made a commitment to investing a lot of capital in these five hospitals, which CHS did not do for the prior 12 years.  It doesn't have a spare $100 million to fix this problem.  So it's relying on the fact that CHS, basically, owns this as a liability."  [May 3, Judge, at 259:3-14].

### 4.  Tower Health Attempted to Confer with Pa. DOH.

1058.  CHS criticized Tower Health for not discussing the citation and the various options to address the deficiency with Pa. DOH.  The Court finds that Tower Health attempted on multiple occasions to collaborate with Pa. DOH, but Pa. DOH did not respond to these efforts.

1059.  From its first inspection of Pottstown Hospital with Jensen Hughes following the March 2018 validation survey, Mr. Major understood the need for "regulatory cooperation." [PX166 (April 24, 2018 D. Major email), at TOWER-CHS-PMMC034382 ("Unfortunately we are going to have to overcome the decision to go to the FSES which will take regulatory cooperation, time and funding.")].

1060.  Immediately following the CMS validation survey in March 2018, Mr. Major testified that he reached out to Pa. DOH "to get an understanding of the circumstances" as they moved forward.  [May 4, Major, at 239:19-21].

1061.  Ms. Keown testified about multiple attempts to contact Pa. DOH after the March 2018 validation survey, while waiting for the survey to post on the Pa. DOH website, and while waiting for Pa. DOH to approve the plan of correction, all without a substantive response from Pa. DOH.  [May 13, Keown, at 68:10 – 69:21, 70:5 – 71:10, 75:7 – 76:2, 79:18-22, 79:24 – 80:11; PX160 (March 19, 2018 S. Keown email); PX207 (Oct. 23, 2018 S. Keown email)].

1062.  Mr. Major described multiple letters and telephone calls to Pa. DOH requesting meetings to discuss the proposed plan of correction and remediation plan, all of which went unanswered.  [May 5, Major, at 37:2-5, 37:22 – 38:1, 39:19 – 40:4, 40:10 – 41:4, 67:4-8, 73:13-23, 74:17 – 75:2, 84:21-23, 85:1-2; PX174 (June 27, 2018 D. Major email to C. Schlegel);

222

PX179 (July 2, 2018 D. Major email to C. Schlegel); PX195 (Aug. 21, 2018 D. Major email to C. Schlegel)].

1063.   Pa. DOH also did not respond to the February 2019 letter sent by Mr. McNash and Mr. Newell, which outlined various options.  [May 5, Major, at 106:21-25, 107:1-23; May 13, Newell, at 128:6-21; PX216 (Feb. 21, 2019 letter to C. Schlegel)].

1064.   Although CHS presented testimony that Mr. Schlegel was generally accessible, the undisputed evidence at trial demonstrated that Mr. Schlegel did not respond to Tower Health in this situation.

1065.   Tower Health presented evidence that CMS was coordinating with Pa. DOH, which explained the delay in approving the plan of correction.  Regardless, it does not matter why Mr. Schlegel or anyone else from Pa. DOH did not respond.

1066.   CHS presented no evidence that anyone from CHS would have received a different response from CMS or Pa. DOH.

1067.   Mr. Carlisle testified that he would have suggested contacting Pa. DOH together with Tower Health had Tower Health discussed the issue with him prior to litigation.  However, the lawsuit was filed in May 2019, and CHS has never made such an offer to Tower Health at any time between May 2019 and May 3, 2021, when trial began.

1068.   While Mr. Carlisle was particularly critical of Tower Health for not conferring with Pa. DOH, he conceded that he never himself attempted to contact Mr. Schlegel at Pa. DOH about Pottstown Hospital.  [June 11, Carlisle, at 127:7-11].

1069.   It is undisputed that CHS never attempted to contact Pa. DOH on Tower Health's behalf.

223

1070.  The Court rejects Defendants' argument that Tower Health should have worked with Pa. DOH to find another solution to address Pottstown Hospital's life safety deficiencies because notwithstanding multiple attempts to do so by Tower Health, Pa. DOH was not amenable to working with Tower Health.

## XII.  Tower Health Sent a Timely Indemnification Demand to CHS, and CHS Refused to Assist Tower Health.

1071.  After Tower Health received the March 2018 validation survey on June 25, 2018, it determined that Pottstown Hospital was not in compliance in all material respects with the LSC, the Medicare COP, and its Pennsylvania licensing requirements as of May 30, 2017 (date of APA execution) and as of October 1, 2017 (date of closing on the transaction), as the Seller Entities had represented and warranted and CHS had guaranteed in the APA.  [*See* May 3, Judge, at 204:8-21].

1072.  Ms. Judge testified that after she received the survey, she evaluated if Tower Health was entitled to contractual relief under the APA "within a really short period of time.  Although, Tower did not know the full scope of the remediation as I mentioned.  It certainly seemed as though it was a severe problem that was going to require a fair amount of work to – to remediate."  [May 3, Judge, at 247:8-15].

1073.  By email and letter dated July 24, 2018, Tower Health placed CHS on notice of its indemnification claim (the "**Notice of Claim**"), as the APA required.  [PX186 (Notice of Claim); May 3, Judge, at 248:2-23; June 9, Braun, at 140:7-16].  Ms. Judge's undisputed testimony was that the timing of the Notice of Claim and the lawsuit itself had nothing to do with the financial situation of Pottstown Hospital, contrary to CHS's counsel's contention in his opening statement. [May 3, Judge, at 248:24 – 249:9].

224

1074.  Tower Health sent the Notice of Claim within 30 days of the date it received the March 2018 validation survey (June 25, 2018).  [PX173 (June 25, 2018 CMS email to R. Newell)].

1075.  Tower Health sent the Notice of Claim "for two reasons.  One was Tower quickly identified that the . . . likely remediation to satisfy what was necessary under the NFPA code was going to be substantially in excess of the floor for an indemnification claim.  And it was clearly an issue about which Tower was absolutely unaware on the date of execution or the date of closing."  [May 3, Judge, at 248:15-23].

1076.  The Notice of Claim was directed to the individuals identified in the "Notice" provision of the APA, including Terry Hendon of CHS.  [DX111 (APA), § 12.13; PX186 (Notice of Claim)].

1077.  The Notice of Claim placed "CHS on notice of a potential claim for breach of the representations or warranties of the Agreement," including Section 3.8, based on the March 2018 validation survey and the June 25, 2018 Important Notice from CMS finding Pottstown Hospital not in compliance with federal regulations.  [PX186 (Notice of Claim), at CHS-Tower00280938].  The Notice of Claim included a copy of the CMS Important Notice.  [*Id.* at CHS-TOWER00280939].

1078.  Mr. Hendon forwarded the Claim Notice to a number of individuals, including CHS's attorney, Mr. Braun.  Mr. Braun responded the following day and requested additional information:  "Please forward the relevant report(s) of deficiencies and plan of correction as soon as possible.  I am afraid your Notice of Claim does not provide much in the way of information, other than the fact that your client failed a sample validation survey roughly six months after acquiring the particular hospital.  We will not be able to respond to the Notice of Claim in the

225

absence of the requested information."  [PX187 (July 25, 2018 S. Braun email to D. Huyett); June 9, Braun, at 140:21 – 141:2].

1079.  Based in part on CHS's response requesting the March 2018 validation survey to evaluate the Notice of Claim, the Court finds that June 25, 2018, when Pottstown Hospital first received the March 2018 CMS validation survey and the CMS June 25, 2018 Important Notice, is the earliest date that Tower Health could have submitted its Notice of Claim to CHS under the APA.

1080.  Therefore, the Court finds that the July 24, 2018 Notice of Claim—served within 30 days of June 25, 2018—was timely under the APA.

1081.  On August 3, 2018, Tower Health's counsel provided CHS with the requested "reports of deficiencies" (March 2018 validation survey) and "the Plans of Correction (the Word document) submitted to the Pennsylvania Department of Health and the Pennsylvania Division of Safety Inspection, **which have not yet been accepted**.  We look forward to your response." [PX189 (Aug. 3, 2018 D. Huyett email to S. Braun) (emphasis added); May 3, Judge, at 250:4-17; June 9, Braun, at 141:3-9].

1082.  The plan of correction for the K-161 tag, as noted earlier, was not accepted by Pa. DOH until January 30, 2019.  [PX157 (March 2018 CMS validation survey with plan of correction), at CHS_PADOH000285].

A.  **CHS's Response to the Notice of Claim Was Designed to Deceive Tower Health.**

1083.  Two months later, on October 4, 2018, Mr. Braun responded to the Notice of Claim and the additional information provided by Tower Health on August 3, 2018.  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett)].

1084.  Mr. Braun provided Tower Health (1) an August 29, 2018 memorandum from
Dean Tiratto (Senior Director, Project Management) regarding the notice of deficiencies;
(2) copies of "an Assessment of Compliance with High Risk Standards report" of Mr. Ridall
from his January 2016 site visit of Pottstown Hospital; and (3) "the Life Safety Plans for
Pottstown Memorial Medical Center."  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett);
June 9, Braun, at 139:20-24].

1085.  Neither Mr. Tiratto nor Mr. Braun addressed Pottstown Hospital's proposed plan of
correction to remediate the hospital's deficient fireproofing, which was submitted to Pa. DOH
and had not yet been approved by Pa. DOH.  Instead, they criticized Pottstown Hospital's
response to the Pa. DOH surveyors in March 2018 by not showing them the invalid 2009 FSES
and the NHA life safety plans that CHS had determined in November 2016 were "way out of
compliance."

1086.  In his August 29, 2018 memo, Mr. Tiratto represented: "Other issues can possibly
have been extinguished or be corrected with ease by the hospital having employed their life
safety plans that allow for what is known as a Fire Safety Evaluation System (FSES) which is an
approved documented approach by the hospital and the state (on file with the state) that creates
an equivalency for life safety conditions in the field.  Even without a hard copy of the FSES, the
existence of the FSES is clearly stated on the Life Safety Plans.  In our opinion, the hospital must
not have used the FSES or the life safety plans during the inspection."  [PX203 (Oct. 4, 2018
S. Braun email), at 3].

1087.  Mr. Braun responded to Tower Health in his October 4, 2018 email:  "For other
conditions noted, we do not believe that the folks at the hospital participating in the survey
provided the Life Safety Plans to the surveyors.  As I understand it, the Life Safety Plans allow

227

for what is known as a Fire Safety Evaluation System (FSES), which is an approved, documented approach by the hospital and the state (on file with the state) that creates an equivalency for life safety conditions in the field.  **In summary, we believe that the survey problems were either a result of poor practices at the facility, or the failure to provide the FSES to the inspectors in connection with the inspection**."  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett), at 1 (emphasis added)].

1088.  Mr. Braun's response, based on the information provided by CHS, was that "people at the hospital must have messed up by not showing the Life Safety plans to the surveyors" and by not showing the FSES.  [June 9, Braun, at 144:20 – 145:7].

1089.  Although Mr. Braun chastised the hospital for not providing a copy of the FSES to the Pa. DOH surveyors, the evidence at trial demonstrated that Pottstown Hospital could not locate the 2009 FSES, because it was hidden in a storage room and buried among files.  [*See* **Section V(I)**].

1090.  Mr. Braun did not offer assistance to address the June 25, 2018 CMS Important Notice or the proposed plan of correction submitted, but not yet accepted by, Pa. DOH.  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett)].

1091.  Mr. Braun did not identify any contractual reasons why CHS denied Tower Health's request for indemnification.  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett)].

1092.  Noted as an attachment to Mr. Tiratto's August 29, 2018 memorandum was the "Life Safety Plans," which Mr. Braun attached to his October 4, 2018 email response.  [PX203 (Oct. 4, 2018 S. Braun email to D. Huyett)].  The Life Safety Plans attached to the Tiratto memorandum and the Braun email were the 2015 NHA Life Safety Plans.  [*Id.* at 6-11].

228

1093.  The NHA 2015 Life Safety Plans were the same life safety plans that were the subject of the November 2016 CER submitted to CHS, which had informed CHS that the NHA life safety plans were "way out of compliance."  [*See* **Section VII(B)**; PX89 (Nov. 21, 2016 CER), at TOWER-CHS-PMMC-011545].  In addition, the NHA plans themselves noted and relied on, the invalid 2009 FSES, and were prepared under the then-obsolete 2000 edition of NFPA 101, Life Safety Code.  [PX203 (Oct. 4, 2018 S. Braun email), at 7; DX10 (NHA life safety plans), at CHS-TOWER-0011557].

1094.  Mr. Tiratto himself signed off on the January 13, 2017 CHS approval of the November 2016 CER [PX96 (Jan. 16, 2017 CHS approved CER), at TOWER-CHS-PMMC-005651], demonstrating that as of at least January 2017 he also knew the 2015 NHA life safety plans were "way out of compliance."

1095.  Neither Mr. Braun nor Mr. Tiratto provided Tower Health with a copy of the April 2017 BDA life safety plans, which were not approved by Pa. DOH in May 2017 because Pottstown Hospital had not updated its FSES "to use the most current FSES forms that dovetail into the 2012 NFPA 101 Life Safety Code."  [PX128 (May 1, 2017 D. Sanders email to R. Gostkowski and J. Ridall), at TOWER-CHS-PMMC-005347].

1096.  Pa. DOH's refusal to approve the April 2017 BDA life safety plans without a 2013 FSES was known to CHS by May 1, 2017.  [PX128 (May 1, 2017 D. Sanders email to R. Gostkowski and J. Ridall); *see also* May 6, Sanders, at 65:11 – 66:9; May 24, Ridall, at 62:5 – 63:13, 64:7 – 65:1 (Mr. Ridall understood Mr. Sanders recommended a new FSES for Pottstown Hospital based on his communications with Pa. DOH)].

1097.  When he testified at trial, Mr. Braun did not know that BDA prepared new life safety plans for Pottstown Hospital in April 2017 or that the plans were prepared because the 2015 NHA plans were "way out of compliance."

1098.  Mr. Braun would not have provided the 2015 NHA plans to Tower Health had he been informed by CHS that the plans were not current.  [June 9, Braun, at 143:22 – 144:15].

1099.  Mr. Braun testified that he did not know that Pa. DOH told Pottstown Hospital and CHS that Pottstown Hospital should prepare a new FSES under the 2013 edition of NFPA 101A because Pa. DOH was not sure the old FSES complied with the life safety code or that Pa. DOH had returned the plans as "preliminary" until Pottstown Hospital, then owned by CHS, prepared a new FSES under the 2013 edition of NFPA 101A.  [June 9, Braun, at 145:11 – 147:8; PX128 (May 2017 D. Sanders email to R. Gostkowski and J. Ridall), at TOWER-CHS-PMMC-005347, 005353].

1100.  CHS did not present Mr. Tiratto to testify during the trial.  Mr. Tiratto was still employed by CHS, under CHS's control, and located in Tennessee, outside the Court's subpoena reach.

1101.  In short, in response to Tower Health's Notice of Claim, Defendants advised Tower Health that had it submitted an invalid 2009 FSES and the 2015 NHA life safety plans they knew were "way out of compliance" to Pa. DOH, Pa. DOH would have never cited Pottstown Hospital in the CMS March 2018 Validation Survey for its life safety deficiencies.  However, Defendants never informed Tower Health that the 2009 FSES was invalid and never informed Tower Health the NHA life safety plans were "way out of compliance."  And instead of providing the April 2017 BDA life safety plans that Pa. DOH had rejected because Pottstown Hospital did not have a

230

current FSES, Defendants continued to conceal from Tower Health the existence of these life

safety plans and the reason for Pa. DOH's rejection.

1102.  The Court finds that CHS's October 4, 2018 response denying Tower Health's Notice

of Claim was designed to deceive Tower Health.

**B.  CHS Did Not Offer to or Provide Assistance to Tower Health.**

1103.  CHS presented no evidence that it offered any alternative solutions to Tower Health's

plan to remediate the life safety deficiencies at Pottstown Hospital.

1104.  To the contrary, Ms. Judge testified:

> Q.  . . . Ms. Judge, to your knowledge, at any time before Tower Health
> filed this lawsuit, did the Defendants ever ask to consult with Tower
> Health on the methods of remediation?
>
> A.  Not to my knowledge.
>
> Q.  And to your knowledge did Defendants ever ask to consult with Tower
> Health on the proposed plan of corrections?
>
> A.  No.
>
> Q.  To your knowledge, did the Defendants ever offer to indemnify Tower
> Health for any expenses associated with remediating the life safety
> conditions for which it was cited?
>
> A.  They did not.

[May 3, Judge, at 253:19 – 254:4].

1105.  Mr. Major testified that no one from CHS called Tower Health to help with

determining the appropriate remediation option, and no one from CHS offered any alternative

options.  [May 5, Major, at 95:6-15].

1106.  Mr. Hammond testified that he reached out to Mr. Conti to discuss attempting to

resolve this matter before Tower Health filed a lawsuit.  [TA-D-8, Hammond Dep., at 98:21 –

101:12].  The message delivered by Mr. Hammond to Mr. Conti "was to try to facilitate a

231

discussion with CHS and to avoid litigation." [*Id.* at 101:4-12]. Mr. Conti responded that he would get back to Mr. Hammond or to Clint Matthews, Tower Health's then-CEO, but there was no evidence presented at trial that Mr. Conti ever contacted Mr. Matthews, and he did not respond to Mr. Hammond. [*Id.* at 100:9-13].

1107. Mr. Conti never testified about his discussion with Mr. Hammond or his reaction to the request, nor did Mr. Conti testify at all about any attempt to work with Tower Health to develop a solution.

1108. The first visit to the hospital by CHS's experts or any CHS representative after Tower Health sent its Notice of Claim (on July 24, 2018) was December 2019. [May 26, Carson, at 146:22-23, 216:10-16; June 10, Hofmeister, at 15:6-15].

1109. The Court finds this timing undermines CHS's contention that CHS could have helped Tower Health develop alternative remediation options and rejects this contention.

1110. The Court also finds that CHS's response to the Notice of Claim was not commercially reasonable, as required by the APA. [DX111 (APA), § 11.6 ("[E]ach party shall respond to such liability in the same manner that it would respond to such liability in the absence of the indemnification provided for in this Agreement")]. The Court finds that CHS's response left Tower Health with no choice but to file this lawsuit.

## XIII. Expert Testimony Established Defendants' Liability for Breaches of the APA.

1111. The three code compliance experts presented by the parties—William Koffel for Plaintiffs and Wayne Carson and Craig Hofmeister for Defendants—testified, in large part, consistently about the NFPA 101, 2012 edition and the NFPA 101A, 2013 edition.

1112. Mr. Koffel was offered and accepted as an expert in fire protection engineering without objection. [May 10, Koffel, at 34:20 – 35:7; *see also* May 10, at 21:23-24 (CHS's counsel stated for the record that Mr. Koffel is "adequately qualified as an expert"); PX260 &

232

PX261 (Mr. Koffel CV and relevant experience)]. Mr. Koffel testified to each of his opinions at trial within a reasonable degree of fire protection engineering for an expert in his field. [May 10, Koffel, at 43:18 – 44:4].

1113. Mr. Koffel is a registered professional engineer in a number of states, including Pennsylvania. Mr. Koffel has a Bachelor of Science degree in fire protection engineering. [May 10, Koffel, at 5:5-16].

1114. Mr. Koffel is also a former firefighter and taught firefighting courses in Pennsylvania. Since 1982, and since 1986 at his own firm, Mr. Koffel has worked at a general practice fire protection engineering and code consulting firm. Among other things, as a code consultant, Mr. Koffel "would evaluate buildings, survey buildings, for compliance with the applicable code." [May 10, Koffel, at 5:17 – 13:23].

1115. Mr. Koffel has experience in teaching seminars (including to the NFPA) regarding the 2012 edition of the life safety code and training CMS surveyors, as well as other technical publications and presentations. Mr. Koffel has also performed licensure surveys to the Maryland state requirements and on behalf of CMS. [May 10, Koffel, at 10:8 – 13:23; PX261 (Mr. Koffel experience)]. Mr. Koffel was trained by CMS in preparing an FSES. [May 10, Koffel, at 22:15 – 23:6].

1116. Mr. Koffel has been a member of NFPA as well as a number of NFPA technical committees, including the NFPA 101A Committee. [May 10, Koffel, at 23:3 – 33:4; PX261 (Mr. Koffel experience)]. Mr. Koffel was the Chair of the Technical Correlating Committee for the 2012 edition of NFPA 101. [May 10, Koffel, at 26:13-25; PX41 (Life Safety Code, at 101-4]. Mr. Koffel was also the Chair of the Technical Correlating Committee and a member of the Technical Committee on Alternative Approaches to Life Safety responsible for the 2013 edition

of NFPA 101A.  [May 10, Koffel, at 30:6-13; PX46 (NFPA 101A, 2013 edition), at 101A-2 –
101A-3].

1117.  Mr. Hofmeister and Mr. Carson were also qualified and accepted as fire protection
engineering experts for Defendants.

1118.  The experts presented different opinions on the compliance of Pottstown Hospital
with the Life Safety Code.  The breach of contract claim asserted by Tower Health depends, in
part, on whether Pottstown Hospital was in compliance with the 2012 edition of NFPA 101, Life
Safety Code as of the date of the sale of Pottstown Hospital on October 1, 2017 to Tower Health,
as Defendants represented and warranted in the APA.

1119.  Mr. Koffel testified that as of October 1, 2017, compliance with NFPA 101 2012
edition was a CMS condition of participation for healthcare facilities, including Pottstown
Hospital, whether or not a facility had been subjected to a licensure or certification survey after
July 5, 2016.  [May 10, Koffel, at 37:13-19].

1120.  The federal regulation adopting the 2012 edition of NFPA 101, Life Safety Code, was
effective July 5, 2016 and "eliminate[d] references in [CMS] to all earlier editions of the Life
Safety Code."  [PX67 (Federal Register), at 26872; *see also* PX72 (June 2016 CMS S&C Memo)
("The final rule eliminates all references to the previously adopted 2000 edition of the LSC, and
requires providers . . . to comply with the 2012 LSC . . . by the effective date of July 5, 2016.")].
It does not state that, as argued by CHS, a hospital was not required to comply with the 2012
edition of NFPA 101, Life Safety Code until its next regulatory survey.  [May 10, Koffel, at
241:2-16].

1121.  Mr. Koffel testified that CHS's corporate policies, effective November 2016, in its
hospital compliance program supported his opinion.  Those policies required ongoing

compliance with regulatory requirements between surveys, provided that "corporate" (meaning CHS) had a responsibility to verify the compliance of the facilities, and mandated compliance with the 2012 edition of the life safety code.  [May 10, Koffel, at 241:25 – 245:1; May 11, Koffel, at 4:17 – 13:15; PX147 (Pottstown Hospital adoption of CHS Policy EC.01.01.01.6); PX87 (CHS Policy EC.01.01.01.6); PX88 (CHS Policy LS.02.01.10); *see also* **Section VI(A)**].

1122.  On the other hand, Defendants argue that the term "compliance" in each of the three relevant sections of the APA equates to a "status" that can only be determined by a regulator.

1123.  CHS's experts Mr. Carson and Mr. Hofmeister testified that, as of the date of closing, Pottstown Hospital had a valid TJC accreditation, CMS certification, and Pennsylvania license, and therefore were in "compliance" because compliance is a "status" determined only by a regulator.  [*See, e.g.*, June 10, Hofmeister, at 24:25 – 25:13].

1124.  Mr. Carson and Mr. Hofmeister admitted that one of the life safety consulting services they provide to hospitals is to determine whether the hospital is in compliance with the Life Safety Code.  [**Section VI(E)**].

1125.  As discussed earlier, the Court finds Defendants' suggested meaning of compliance too narrow, finds Defendants' definition conflicts with its ordinary meaning as demonstrated by CHS's internal policies and procedures, and would defeat the purpose of the APA's representations to sell Tower Health compliant hospitals as of the date of closing.  And, as stated in the Conclusions of Law, the APA itself is unambiguous and the plain meaning of the contractual terms, considering the purpose of the transaction, does not support the definition urged by Defendants.

1126.  The Court rejects Defendants' proposed meaning of compliance and rejects Defendants' experts' opinions on whether Pottstown Hospital was compliant with the Life Safety Code at the time of closing.

1127.  Under the APA, it was the Seller Entities who represented and warranted, as CHS guaranteed, compliance of Pottstown Hospital in all material respects as of the date of closing. The "regulators" did not represent and warrant compliance as of the date of closing under the APA.

1128.  Tower Health also relied on Defendants' representations that Defendants were selling hospitals that were in compliance in all material respects as of the date of closing, not as of some date set by "regulators" (which here was two years before closing and under an outdated Life Safety Code).

1129.  The Court also rejects Defendants' contention that "compliance" has a defined industry meaning that is based solely on the "regulatory status" as determined by Pa. DOH, CMS, or TJC as of the date of the APA's closing.

1130.  The Court finds that Defendants represented and warranted that Pottstown Hospital was in compliance in all material respects with its licensing and regulatory requirements as of May 30, 2017 and October 1, 2017, which is a wholly separate and independent representation than Pottstown Hospital having a valid accreditation, certification, or license.

1131.  The Court's rejection of Defendants' litigation interpretation of "compliance" also makes common sense.  As the Court stated during trial, "[I]n a much broader sense, the idea of your hospital being compliant with the code isn't just so you pass a survey.  It is to make sure your hospital is safe.  And isn't that really what this is all about?  Is making sure that there is fire safety in the hospital. . . . **So to say that you only need to come into compliance every three**

236

years, if you know your hospital isn't safe, you need to fix it.  You can't just wait until the next survey." [May 11, 38:7-18 (emphasis added); *see also* May 11, 39:8-10 ("Not just safe every three years when it gets surveyed, but safe every day of operation, always.")].

1132.  With the plain English definition of "compliance" in mind, the Court turns to determining whether Pottstown Hospital was in compliance with its licensing requirements, the Medicare COP (including the 2012 edition of the Life Safety Code which all parties agree is part of the Medicare COP), and all other regulations applicable to the hospital as of the date of execution of the APA and of closing.

## XIV.  It is Undisputed that the Same Building Construction Type Deficiency Existed at Pottstown Hospital on October 1, 2017 as March 15, 2018.

1133.  The Court finds that the evidence is undisputed that the Building Construction Type (Type II (000)) life safety deficiencies identified by Pa. DOH in its March 2018 Validation Survey, acting on behalf of CMS, were also present at Pottstown Hospital as of October 1, 2017.

1134.  Mr. Major, who was in charge of hospital construction for Tower Health, testified that there were no major construction projects at the hospital after October 1, 2017 and before March 2018 and certainly none that changed the Building Construction Type from a compliant Type II (222) to a non-compliant Type II (000).  He testified that the condition of the building was "the same." [May 4, Major, at 238:14 – 239:9].

1135.  It is undisputed that (1) Pottstown Hospital has had the same building construction type deficiency (Type II (000)) for almost two decades; (2) Pottstown Hospital has been a seven-story facility since CHS, through its subsidiaries, acquired the hospital in 2003; and (3) Pottstown Hospital is, and has been, a "high-rise" hospital under the Life Safety Code since the time it was built in the 1970s. [PX334 (summary of Pa. DOH licensure surveys); May 4, Major, at 282:4-24; PX221 (Def. Answer to Am. Compl.), ¶¶ 39-40].

1136.  In Mr. Koffel's testimony about the building condition of Pottstown Hospital, based on his multiple days of visits to Pottstown Hospital, Mr. Koffel saw nothing Tower Health did to the hospital that would have changed the building construction type from a Type II (222) to a Type II (000).  "The Jensen Hughes report, again, all the historical surveys have indicated that that is a condition that existed in that building since at least 2005."  [May 10, Koffel, at 180:22 – 181:9].

1137.  Arthur Parker, Plaintiffs' expert from Jensen Hughes, testified that the original dry-fiber SFRM he observed in Pottstown Hospital in 2020 is in the same condition as it was on October 1, 2017, the time of the sale.  [May 7, Parker, at 179:17 – 180:10].

1138.  Mr. Koffel testified that, had CMS or Pa. DOH performed a survey of Pottstown Hospital at any time between November 1, 2016 (the date CMS said it would begin surveying to the 2012 edition of LSC) and October 1, 2017, the K-161 Tag (the deficiency for the building construction type) would be the same as that identified by Pa. DOH during its March 2018 validation survey.  [May 10, Koffel, at 41:2 – 42:10; May 11, Koffel, at 56:23 – 57:4, 59:24 – 60:5].  The K-161 tag deficiency is based on Pa. DOH and CMS's finding that "since patients are located four or more stories above the level of exit discharge, in an existing healthcare occupancy, the building was required to be of Type II (222) construction."  [May 11, Koffel, at 58:24 – 59:6; PX41 (Life Safety Code), at 101-203 (Table 19.1.6.1 providing construction type limitations)].

1139.  The deficiency cited by the March 2018 validation survey was the identical deficiency cited in many previous Pa. DOH surveys:  that Pottstown Hospital was not in compliance with the minimum construction type required by the LSC.  [May 10, Koffel, at 42:2-10].  Mr. Koffel testified:

238

> All of the . . . documentation I have seen – and I've heard some other discussion here the past several days – but based upon the documentation that I have seen, the building construction type deficiency existed at Pottstown Hospital at least . . . back to 2005.  We also know that it had -- the same deficiency existed in March 2018.  The Jensen Hughes report has confirmed that nothing changed between October 1 of 2017, in which the building would have been in compliance with building construction and then March of 2018 it's out of compliance again.  So based upon the documentation, with a reasonable degree of engineering certainty, the building construction deficiency that was cited in prior surveys and was cited in March of 2018, was in existence [on] October 1 of 2017.

[May 11, Koffel, at 58:9-22].

1140.  CHS presented no evidence at trial to rebut any of the evidence presented by Tower Health concerning the condition of the hospital.  CHS's counsel admitted CHS knew about Pottstown Hospital having a Type II (000) building construction type:  "Actually, since 1997, Your Honor, it had operated since 1997 or before with an FSES **in the exact same condition it's in today**."  [May 5, at 122 (emphasis added); *see also* May 26, Carson, at 44:20-23; June 10, Hofmeister, at 20:20 – 21:4 (testifying about the 2013 Pa. DOH survey, PX47)].

1141.  No one from CHS testified about the building condition of Pottstown Hospital, including its condition as of October 1, 2017.  Mr. Hofmeister conceded he was not retained to determine if Pottstown Hospital had deficiencies as of October 1, 2017 under NFPA 101.  [June 10, Hofmeister, at 95:20 – 97:6].

1142.  Rather than contest the condition of the building in October 1, 2017, Defendants' argument is wholly based on their "compliance is a status" argument, and the fact that no regulator had "declared" the hospital out of compliance as of October 1, 2017.  [*See, e.g.*, June 10, Hofmeister, at 97:23 – 98:14].

1143.  CMS and Pa. DOH are permitted to conduct unannounced surveys of facilities, and a surveyor could have done a survey of Pottstown Hospital between November 1, 2016 and October 1, 2017.  [May 11, Koffel, at 60:15 – 61:9].

239

1144.  The Court accepts Plaintiffs' testimony as unrebutted and credible that the condition of Pottstown Hospital remained in substantially the same condition on October 1, 2017 as it was in March 2018, and that the K-161 tag deficiency (Building Construction Type II (000)) cited in the March 2018 validation survey existed as of October 1, 2017.

## XV.  Pottstown Hospital Was Not in Compliance at the Time of Closing Because the 2009 FSES Was Invalid and Pottstown Hospital Could Not Achieve Equivalency Using a 2013 FSES.

1145.  There is no dispute that the Building Construction Type of Pottstown Hospital, Type II (000), rendered Pottstown Hospital non-compliant with the minimum prescriptive requirements of the Life Safety Code as of October 1, 2017.

1146.  The Court finds that Pottstown Hospital was not in compliance with the 2012 edition of the Life Safety Code as of October 1, 2017 because (1) it had a deficient Building Construction Type of Type II (000) and (2) the 2009 FSES was not valid to achieve equivalency with the Life Safety Code.

1147.  The Court finds that Defendants could have, and should have, prepared an FSES using the 2013 edition of NFPA 101A prior to October 1, 2017 to determine whether their representations to Tower Health about Pottstown Hospital's compliance with the Life Safety Code were accurate.

1148.  The Court also finds that Pottstown Hospital could not have achieved equivalency with the Life Safety Code using a 2013 FSES as of October 1, 2017.

### A.  The 2009 FSES Could Not Be Used by Pottstown Hospital to Demonstrate Equivalency with the Life Safety Code as of October 1, 2017.

1149.  Mr. Koffel testified that Pottstown Hospital was not in compliance in all material respects with the requirements of the 2012 edition of NFPA 101, Life Safety Code, as of October 1, 2017.  [May 10, Koffel, at 36:3-5].

1150.  Mr. Koffel, Mr. Carson, and Mr. Hofmeister all agree that the applicable edition of the Life Safety Code as of October 1, 2017 was the 2012 edition of NFPA 101.  [May 10, Koffel, at 37:13 – 38:14; May 26, Carson, at 29:18-25, 167:18 – 168:3, 174:9-22, 189:16 – 190:11, 192:21 – 193:1; June 10, Hofmeister, at 25:14 – 26:4].].

1151.  The Building Construction Type for Pottstown Hospital had been Type II (000) for many years, and Pottstown Hospital had been cited by Pa. DOH since at least 2005 for the same deficiency and non-compliance with the prescriptive requirements of the Life Safety Code.  [PX8 (April 2005 Pa. DOH survey); PX23 (June 2009 Pa. DOH survey); PX38 (May 2011 Pa. DOH survey); PX47 (May 2013 Pa. DOH survey); PX334 (summary of Pa. DOH surveys)].  Pottstown Hospital was required to be a Type II (222) building to occupy the third through seventh floors of the hospital.  [May 10, Koffel, at 169:8-20; May 11, Koffel, at 27:11 – 28:1 (Pottstown Hospital was not in compliance with the Life Safety Code requirements as a Type II (000) Building Construction Type even though it had sprinklers)].

1152.  The Building Construction Type requirements for a health care occupancy over two stories did not change between the 2000 and the 2012 editions of NFPA 101.  [May 10, Koffel, at 169:16-19].

1153.  In past surveys prior to the adoption of the 2012 edition of NFPA 101 in 2016, Pottstown Hospital relied on the 2009 FSES to demonstrate equivalency with the Life Safety Code.  [PX334 (summary of Pa. DOH surveys)].

1154.  The 2009 FSES prepared by Mr. Peters was prepared using the 2001 edition of NFPA 101A, and it cannot be used as an equivalency to satisfy the 2012 edition of the Life Safety Code.  [May 10, Koffel, at 129:4-22].  Mr. Peters testified, without rebuttal, that he specifically told Mr. Gamler the 2009 FSES could not be submitted, but Mr. Gamler submitted the 2009

241

FSES to Pa. DOH anyway.  [May 6, Peters, at 140:9-22, 141:24 – 142:7, 143:5-20, 143:23 – 144:9].

1155.  Mr. Koffel testified that the removal of the reference to the 2009 FSES from the Pa. DOH Occupancy Surveys after November 2016 "combined with Mr. Sanders' testimony, would indicate to me that DOH did not have a valid FSES on file to demonstrate an equivalency to the 2012 edition of the life safety code."  [May 10, Koffel, at 177:14-20; PX335 (summary exhibit of Pa. DOH Occupancy Surveys)].

1156.  Mr. Koffel testified that the 2009 FSES itself was invalid, inaccurate, and should never have been submitted to Pa. DOH, and therefore did not demonstrate equivalency to the 2000 edition of NFPA 101.  [May 10, Koffel, at 40:7-18, 149:19 – 154:2, 197:17-24].

1157.  Therefore, the Court finds that as of October 1, 2017, Pottstown Hospital was not compliant with the 2012 edition of the Life Safety Code by utilizing the 2009 FSES.  [May 10, Koffel, at 36:6 – 37:3, 181:13-24].

1158.  To address its deficiencies under the 2012 edition of the Life Safety Code using an FSES, Pottstown Hospital was required to use the 2013 edition of NFPA 101A.  [May 10, Koffel, at 129:23 – 130:2].

1159. Mr. Koffel testified, "NFPA 101A is very clear and the committee has been very clear that you are not to use an older version to the FSES to demonstrate equivalency with a new edition of the code.  In fact, the committee voted on that specific issue during the development of the 2019 edition of the FSES."  [May 10, Koffel, at 186:4 – 187:3; *see also* PX94 (CMS S&C memo requiring use of NFPA 101A, 2013 edition); PX45 (NFPA 101A, 2013 edition Handbook), at 99-100; PX178 (CMS 2013 FSES Form)].

242

1160.  Defendants' experts agreed with Mr. Koffel that the 2013 edition of NFPA 101A was required to be used to demonstrate equivalency with the 2012 edition of NFPA 101 after its effective date on July 5, 2016.  [May 26, Carson, at 68:1-2; June 10, Hofmeister, at 29:8 – 30:7].

1161.  The Court accepts the testimony from all three code compliance experts that as of October 1, 2017, the 2013 edition of NFPA 101A should be used to demonstrate equivalency with the 2012 edition of the Life Safety Code.

### B.  Pottstown Hospital Should Have Prepared an Updated 2013 FSES Before October 1, 2017.

1162.  The evidence is unrebutted that CHS never prepared an FSES for Pottstown Hospital using the 2013 edition of NFPA 101A.  [May 10, Koffel, at 169:21 – 170:1, 177:24 – 178:5, 183:4-6, 185:12-18; *see generally* **Section VII**].

1163.  The Court's conclusion that Pottstown Hospital could have, and should have, prepared an updated FSES, using the 2013 FSES Form, after the adoption of the 2012 edition of the Life Safety Code is supported by multiple reasons.

1164.  First, the NFPA 101A Guide, the NFPA 101A Handbook, and the December 16, 2016 CMS S&C memo both state that an FSES must be "prepared" using the 2013 edition of NFPA 101A after the adoption of the 2012 edition of the Life Safety Code, which was effective July 5, 2016.  [PX45 (NFPA 101A, 2013 edition Handbook), at 99-100; PX94 (Dec. 16, 2016 CMS S&C Memo); PX46 (NFPA 101A, 2013 edition), at 1.3.1 (the FSES 2013 edition must be used in conjunction with the 2012 edition of the life safety code); May 10, Koffel, at 129:17-22].

1165.  The NFPA 101A, 2013 edition Handbook supports the requirement to prepare a new FSES when a new edition of the LSC is adopted:  "[S]uch equivalency is relative to compliance with the provisions of a specific edition of NFPA 101.  Where a jurisdiction adopts a newer edition of NFPA 101, the equivalency submittal will need to conducted anew, utilizing the

243

applicable editions of NFPA 101 and NFPA 101A. For example, in a jurisdiction that enforces the 2000 edition of NFPA 101, an equivalency submittal is prepared using the 2001 edition of NFPA 101A. **The jurisdiction then updates to the 2012 edition of NFPA 101, and a new equivalency submittal is prepared using the 2013 edition of NFPA 101A**." [PX45 (NFPA 101A, 2013 edition Handbook), at 99-100 (emphasis added); May 11, Koffel, at 50-51].

1166. Second, during Mr. Sanders' discussions with Pa. DOH in April and May 2017, Pa. DOH advised Pottstown Hospital and CHS that to have its life safety plans prepared with the 2012 LSC approved, Pottstown Hospital needed a new FSES "completed" under the 2012 Life Safety Code. [PX128 (May 1, 2017 D. Sanders email to R. Gostkowski and J. Ridall), at TOWER-CHS-PMMC-005347 ("As we discussed, the plan reviewer Bill Gutches said that he is only stamping the plans as 'Preliminary' until such time that the FSES for your facility is updated to use the most current FSES forms that dovetail into the 2012 NFPA 101 Life Safety Code."); *id.* at TOWER-CHS-PMMC0005353 (Pa. DOH: "An FSES per the 2012 Life Safety Code has not been completed we do not know that this meets an FSES any longer.")].

1167. Third, Mr. Koffel testified, and CHS does not dispute, that nothing prevented CHS from "preparing" an FSES under the 2013 edition of NFPA 101A, whether or not CHS believed it could be "submitted." [May 10, Koffel, at 155:1-18; May 11, Koffel, at 29:1-6].

> Q. . . . Was there anything that prevented CHS from updating their FSES . . . to determine whether they were still in compliance after the law changed?
>
> A. There is nothing that would have prevented them from doing so. As I previously testified, we did that, as our routine policy to make sure our clients were properly prepared for any pending surveys. If we look at the surveying process, if you wait until the survey is done, you have 60 days to correct a deficiency. . . .
>
> If I had a . . . deficiency that is significant enough that it requires an FSES, the ability to correct that within 60 days, one might not be able to do that. So my option then, if within 30 days after the survey, I have to apply for a

244

> waiver, or say I'm requesting a time-limited waiver.  That's a very short
> time period.  That the hospital could have clearly, and then, in course with
> their own policy, prepared for the survey.

[May 11, Koffel, at 37:3 – 38:3].  As Mr. Koffel testified, "I have seen nothing published by

DOH or CMS that would prevent a hospital from using the 2013 edition of NFPA" even if the

hospital was not first surveyed or cited.  [May 10, Koffel, at 39:12-19, 155:1-18].

1168.  Regardless whether Pa. DOH or CMS can approve an equivalency without a hospital

first being cited during a survey, "it does not in any way prevent a facility from preparing an

FSES to determine equivalency.  Their [CHS] own corporate policies required compliance.  So

clearly, if I'm going to represent on October 1st of 2017 that a facility is in compliance with the

applicable requirements, the 2012 edition of life safety code, it is my opinion they should have

evaluated that facility for compliance with that code."  [May 11, Koffel, at 52:6-16; *id.* at

105:15-18 ("[D]id the healthcare organization have an obligation to determine if they are in

compliance with the new edition of the code, and the answer to that is yes.")].

1169.  Additionally, Mr. Koffel testified that in his experience, even before late 2016, "we

would routinely prepare an FSES where appropriate, and we would submit it to the Joint

Commission for approval without any surveyed [deficiency] having been identified at that time.

We identified the deficiency."  [May 11, Koffel, at 97:1-5].

1170.  Fourth, CHS prepared new FSESs for its Sharon Hospital and Moses Taylor Hospital,

both located in Pennsylvania, and without ever having been first cited by a regulator during a

survey.  As discussed in more detail in **Section VII(D)**, when CHS itself discovered deficiencies

at both Sharon Hospital and Moses Taylor Hospital—without having been first cited by Pa.

DOH—CHS retained BDA to prepare or facilitate the preparation of an FSES under the 2013

edition of NFPA 101A.  In those instances, CHS did not wait for Pa. DOH or CMS to first find

the hospital was non-compliant with the Life Safety Code.

1171.  Even though Pa. DOH advised CHS that it should prepare an FSES under the 2012 Life Safety Code for Pottstown Hospital and even though CHS took steps to do so for its other Pennsylvania hospitals, CHS never attempted to evaluate whether Pottstown Hospital would achieve equivalency under NFPA 101A, 2013 edition.

1172.  CHS was well aware of the "significant" changes in the mandatory values to the 2013 FSES with respect to high-rise health care occupancies like Pottstown Hospital, and in February 2017 received information from Mr. Sanders explaining the differences.  [May 10, Koffel, at 204:9-16; PX100 (Jan. 24, 2017 email string between J. Ridall and D. Sanders), at CHS-TOWER00224362, 00224367].

1173.  The Court finds that CHS made the conscious decision not to prepare an FSES using the 2013 FSES Form because it was selling Pottstown Hospital and did not want to be required to disclose Pottstown Hospital's non-compliance to potential buyers.

1174.  <u>Fifth</u>, CHS's expert, Mr. Carson, testified that, if he became aware of the facts surrounding the 2009 FSES as of October 1, 2017 during a mock survey for Pottstown Hospital, "**I'd probably have told them they should do another FSES**."  [May 26, Carson, at 203:9-23]. Mr. Carson also "would have probably told them to submit . . . a new FSES" had he performed the mock survey of Pottstown Hospital as of May 29, 2017.  [*Id.* at 204:7 – 205:2].

1175.  Mr. Carson also testified that, had he been working with a client and received the communications from Pa. DOH about the lack of a new FSES, he "probably would have" advised his client to get a new FSES.  [May 26, Carson, at 209:10-22].  If Mr. Carson had been working with a client as of May 29, 2017 and received the Pa. DOH Preliminary Stamp on the BDA life safety plans, "I'm sure I would have.  Yes, sir" told the client to look into getting a new

FSES. This is because "the Pennsylvania Department of Health thinks" the hospital may not be in compliance with the new code, and he would have advised his client. [*Id.* at 210:8-19].

1176. Mr. Carson agreed with the Court that "you can do it, you just couldn't submit it" when questioned about his advice to prepare a new FSES. [May 26, Carson, at 205:7-17].

1177. Sixth, CHS presented no evidence it was unable to prepare an FSES under the 2013 edition of NFPA 101A.

1178. Last, as testified by Mr. Carson, the reason for the requirement that the FSES cannot be submitted until after a citation is received is so that the person preparing the equivalency understands the cited deficiency and can assess whether there is an equivalent level of life safety to achieve compliance: "[Y]ou have to know what the problem is. So they have to go out and survey the building and find out what the problem is before you can submit a FSES to resolve that problem." After the surveyor identifies the deficiencies, "[t]hen you can submit an FSES and see if it qualifies to be the equivalent . . . to the code, once you know that deficiency." [May 26, Carson, at 147:21 – 148:8].

1179. Here, however, CHS had been utilizing an FSES under the prior editions of the life safety code to address the well-known life safety deficiency of Pottstown Hospital's non-compliant Building Construction Type II (000). [**Section V(G)**; PX334 (summary of Pa. DOH surveys); *see also* May 26, Carson, at 145:13 – 146:6].

1180. The Court rejects CHS's position that it was unable to prepare an FSES for Pottstown Hospital because it was never cited for a Type II (000) deficiency. CHS had been aware of Pottstown Hospital's Building Construction Type deficiency of Type II (000) for many years, and Pottstown Hospital had been cited many times by Pa. DOH for its Building Construction Type deficiency. CHS knew—because Pa. DOH so advised in April 2017—that it needed a new

FSES under the 2012 edition of the Life Safety Code, and that it was representing Pottstown Hospital's regulatory compliance in the APA.

1181.  The Court finds that in connection with CHS's sale of Pottstown Hospital and its APA compliance representations, nothing prevented CHS from preparing a 2013 FSES to determine whether Pottstown Hospital complied with the 2012 edition of the Life Safety Code and from making an appropriate disclosure of non-compliance on Schedule 3.8 to the APA.

### C. Pottstown Hospital Could Not Achieve Equivalency with the Life Safety Code Using a 2013 FSES as of October 1, 2017.

1182.  The Court finds that as of October 1, 2017, Pottstown Hospital could not achieve equivalency with the 2012 edition of the LSC through the use of a 2013 FSES.

1183.  The parties' expert witnesses all agree that Pottstown Hospital could not achieve an FSES passing score under the 2013 edition of NFPA 101A, as it existed as of October 1, 2017. [May 10, Koffel, at 37:4-12, 143:21 – 144:21; PX178 (CMS 2013 Form FSES), at 5 (higher mandatory values for high-rise hospitals); May 26, Carson, at 93:19 – 94:12 (applying the "wrong" high-rise line values in the 2013 NFPA 101A FSES without the TIA "under this provision, the added benefit of sprinklers do not offset the negative of the construction"), 107:11-13 (agreeing "[t]he FSES form, at the time of this survey, didn't look like it does now"); *see also* June 10, Hofmeister, at 35:5-13 (Pottstown Hospital could achieve equivalency through an FSES only "[a]ssuming that the TIA is appropriate and applicable")].

1184.  Based on NFPA 101A, 2013 edition as of October 1, 2017 and the mandatory high-rise values, "[i]t would be mathematically impossible for Pottstown Hospital to achieve an equivalency using the 2013 edition of NFPA101A.  Given the construction type of the building at that time.  This does not say that applies to all high-rise buildings, but that would be the application of the FSES to Pottstown Hospital."  [May 10, Koffel, at 204:3-8].

248

1185.  The Building Construction Type deficiency of Pottstown Hospital results in a "pretty severe negative deficiency" that must be overcome to achieve a passing score in the FSES. [June 10, Hofmeister, at 40:11-15].

1186.  The NFPA Tentative Interim Amendment to the 2013 FSES Form proposed by CHS's experts ("**TIA**") (discussed in more detail below) did not exist in October 2017.  [May 10, Koffel, at 204:2-3; *see also* May 26, Carson, at 81:3-10 (TIA issue date of August 11, 2020 and effective date of August 31, 2020)].

1187.  The parties' experts' conclusion that Pottstown Hospital could not achieve equivalency with the Life Safety Code as of October 1, 2017 is validated by both Jensen Hughes and TSIG.

1188.  Therefore, the Court finds the TIA would not have allowed Pottstown Hospital to demonstrate compliance with the 2012 edition of the Life Safety Code as of October 1, 2017. [May 10, Koffel, at 238:16-24].

## XVI.   Pottstown Hospital Must be Converted to a Type II (222) Building Construction Type To Be In Compliance with the Life Safety Code.

1189.  Without an FSES, Pottstown Hospital must comply with the prescriptive requirements of the Life Safety Code and convert to a Type II (222) Building Construction Type and height to qualify as a healthcare occupancy above the second floor.  [May 10, Koffel, at 148:24 – 149:5; *see* May 13, Newell, at 114:6-10 (the Pa. DOH surveyor "said that we are a Type II (000) building is what we're reported as, but we should be a Type II (222) building")].

1190.  NFPA 101 requires health care occupancies to be "limited to the building construction types specified in Table 19.1.6.1."  [PX41 (Life Safety Code), at 101-203, § 19.1.6.1].

1191. Pottstown Hospital has four or more stories. NFPA 101's Table 19.1.6.1 allows for only three types of construction permitted under the Life Safety Code for a seven-story building like Pottstown Hospital:  Type I (442), Type I (332), and Type II (222).  [PX41 (Life Safety Code), at 101-203, § 19.1.6.1].

1192. Type II (222) is the least restrictive of these three permissible construction types, meaning it has the lowest fire resistance required ratings of the three options provided in the Life Safety Code.  [May 11, Koffel, at 62:5 – 63:23].

1193. Mr. Koffel testified, "As of October 1, 2017, the only way Pottstown Hospital could have complied with the 2012 edition of Life Safety Code would be to address that Building Construction Type deficiency in that the building was considered a Type II (000) building, and it would need to be rehabilitated so that the construction of the building could now be classified as Type II (222) construction.  And again, that was the minimum type of construction permitted for an existing healthcare occupancy containing a healthcare occupancy three or more stories above the level of exit discharge."  [May 10, Koffel, at 42:12-23; May 11, Koffel, at 61:10-19].

1194. In preparing his proposed remediation plans to convert Pottstown Hospital into a Type II (222) building, Mr. Parker relied on a registered architect, Kit Bryant of Jensen Hughes, who also concluded that as a high-rise healthcare occupancy, Pottstown Hospital was required to have a Type II (222) building construction under NFPA 101, 2012 edition and NFPA 220, 2012 edition.  [May 7, Parker, at 116:12-20, 120:18 – 121:8].

1195. Both Mr. Carson and Mr. Hofmeister agreed that bringing the building to a Type II (222) was one way to address Pottstown Hospital's Building Construction Type deficiency. [May 26, Carson, at 106:15 – 107:10 (repairing the fireproofing to make the building a Type II (222) is an option available to Tower Health in response to the K-161 tag deficiency); June 10,

Hofmeister, at 71:11-22, 77:22 – 78:7 (if Pottstown Hospital "meets the construction type of Type II (222) for its structural frame it would meet the minimum requirements for the Life Safety Code")].

1196.  After determining that Pottstown Hospital must be converted to a Type II (222) building to comply with the Life Safety Code, Mr. Koffel testified that he was asked "if there were other options that could potentially be considered with a reasonable degree of engineering certainty."  He "considered all [the statutes and regulations] that I had identified as being applicable" in identifying solutions to remediating Pottstown Hospital.  [May 11, Koffel, at 94:18 – 95:3; *see also id.* at 174:21 – 176:16 (testifying that he would not support installing additional smoke detectors, implementing a fire resistant ceiling, or patching the SFRM in the mechanical areas from a technical perspective)].

1197.  Other than converting Pottstown Hospital to a Type II (222) Building Construction Type, CHS did not present any expert testimony that any other proposed solutions could achieve compliance with the 2012 edition of the Life Safety Code.

1198.  The Court finds that, because Pottstown Hospital did not achieve compliance with the prescriptive requirements of the Life Safety Code, did not achieve equivalency with the 2012 edition of the Life Safety Code using the 2009 FSES, and could not achieve equivalency using an FSES under the 2013 edition of NFPA 101A, Pottstown Hospital, as a seven-story Type II (000) Building Construction Type, must be converted to a Type II (222) building to comply with the 2012 edition of the Life Safety Code.

### A.  CHS's TIA Does Not Solve Pottstown Hospital's Compliance Deficiencies Because It Has Not Been Adopted by CMS, Pa. DOH, and TJC and Just Delays the Remediation.

1199.  Conceding an FSES using the 2013 FSES Form will not achieve equivalency for Pottstown Hospital, CHS's experts testified about a 2020 TIA proposed by Mr. Carson as

support for their position that Pottstown Hospital could obtain an FSES under the "amended" guide.  [May 26, Carson, at 87:13-20, 90:5-10; June 10, Hofmeister, at 35:5-13 (using the TIA)].

1200.  The Court refuses to consider CHS's TIA as a potential remedy in this case for three reasons.  First, it was passed by the NFPA as a result of CHS's trickery and fraud.  Second, it has not been adopted by CMS, Pa. DOH, or TJC.  Third, applying the TIA would only delay the cost of converting Pottstown Hospital to a Type II (222) Building Construction Type until 2028.

1201.  In April 2020, after he had been retained as an expert witness by CHS, Wayne Carson submitted to the NFPA Technical Committee on Alternative Approaches to Life Safety a "Tentative Interim Amendment" (the TIA) to revise Worksheet 4.7.8A in NFPA 101A and include a footnote c.  [PX227 (April 2020 NFPA Memo on Proposed TIA); May 26, Carson, at 228:3-6; May 10, Koffel, at 233:19-22].  His amendment (footnote c) would defer the imposition of the increased mandatory values for high-rise hospitals in the 2013 FSES Form until 2028.

1202.  A Tentative Interim Amendment is "a change to an NFPA document, code or standard, or in this case a guide, that is processed through the regulations governing committee projects in between revision cycles.  And it is deemed to be so important or such an emergent nature, that it can't wait until the next edition of the document."  [May 10, Koffel, at 206:16-22].

1203.  Mr. Carson testified that, in connection with his work as an expert on this case relating to Pottstown Hospital, "[i]t quickly dawned on me" when he was completing the FSES "for the 2012 edition of the code, that would be NFPA 101A 2013 edition," that the requirement of high-rise hospitals implementing sprinkler systems was not a requirement until 12 years after the code is adopted.  [May 26, Carson, at 68:1-14, 228:3-15].

1204. Mr. Carson testified that the first thing he did after he had his "ah-ha moment" when preparing an FSES for Pottstown Hospital under the 2013 FSES Form was to call the CHS lawyers. [May 26, Carson, at 228:10-18].

1205. CHS has admitted that it arranged to have Mr. Carson submit a TIA to the NFPA Technical Committee as a CHS litigation solution to this case: "And you think they would thank us for doing them a favor to get this to where they could get an FSES if they couldn't before or traditional equivalency before. **We've had it amended** and now all they do is complain that we did something that would benefit . . . ." [May 10, Dodson, 191:9-15 (emphasis added)].

1206. The Guide for the Conduct of Participants in the NFPA Standards Development Process requires NFPA members on NFPA committees, as Mr. Carson was, not to participate in certain NFPA matters if they have a potential conflict of interest. Mr. Carson agreed the Conduct Guide applied to him when he submitted his proposed TIA for consideration. [May 26, Carson, at 229:16 – 230:11; PX44 (Conduct Guide)].

1207. However, Mr. Carson never disclosed his and CHS's motive when submitting his proposed TIA to the members of the NFPA Technical Committee, in violation of his ethical obligations as a member of a NFPA committee.

1208. Mr. Carson's TIA was supported by two other members of the Technical Committee. But Mr. Carson never disclosed to either of them that the reason for his TIA was to provide a litigation solution for CHS in this lawsuit. "I just said there was a mistake in the FSES and this was the appropriate correction for the mistake." [May 26, Carson, at 72:7-18].

1209. When Mr. Carson submitted his proposed TIA for consideration, he did not disclose to anyone that he was working as a paid litigation expert for CHS in a matter directly affected by his proposed TIA. [May 26, Carson, at 230:12-16]. Mr. Carson admitted during cross

examination that he had a conflict of interest, and that he never disclosed his conflict as a paid litigation expert for CHS to the Technical Committee.  [*Id.* at 232:12 – 233:16].

1210.  Mr. Carson's proposed TIA was intended to change the mandatory values for existing, high-rise hospitals to lower numbers during the 12-year phase-in period for sprinkler installation when the requirement for sprinklers in 19.4.2 of NFPA 101 has not yet elapsed. [PX227 (April  2020 NFPA Memo on Proposed TIA), at 2; May 26, Carson, at 68:23 – 69:2, 71:12-22].  Mr. Carson proposed the 17 value be reduced to 9; the 16 value be reduced to 6; and the 7 value be reduced to 3.  [PX227 (April 2020 NFPA Memo on Proposed TIA), at 2; May 10, Koffel, at 210:6-20].

1211.  High-rise hospitals are permitted 12 years to achieve the sprinkler requirement in Section 19.4 of the Life Safety Code.  Because the Life Safety Code was adopted July 5, 2016, high-rise hospitals have until July 2028 to become fully sprinklered.  [May 10, Koffel, at 211:4-25; PX41 (Life Safety Code), at 101-214, § 19.4.2.1].

1212.  Mr. Carson's proposal was that until 2028, existing high-rise hospitals, like Pottstown Hospital, could apply the lower mandatory safety values when evaluating the 2013 FSES instead of the mandatory values now required in NFPA 101A, 2013 edition.  [May 10, Koffel, at 211:24-25 ("[I]f CMS allowed the use of this TIA, I could only use it until July of 2028.")].

1213.  The TIA expires in 2028 after existing high-rise hospitals are required to become fully sprinklered, after which Pottstown Hospital would no longer be in compliance by using the 2013 FSES with the TIA.  In 2028, "[u]nless I had done something else to the building, the building would not be in compliance with the code, and the FSES would not demonstrate equivalency to the requirements of the Life Safety Code."  [May 10, Koffel, at 212:1-5].

Mr. Carson agrees that his TIA expires, so that in December 2028, Pottstown will not be in compliance with the FSES.  [May 26, Carson, at 212:5 – 213:9].

1214.  By July 5, 2028, Pottstown Hospital would be required to have made the renovations necessary to achieve a Type II (222) building construction type.  [May 10, Koffel, at 212:6-11, 213:9 – 214:8, 224:13-17; *see also* May 26, Carson, at 213:10-15 ("It expires and they would [be] require[d] to do something else to accommodate the construction issue.")].

1215.  The NFPA Conduct Guide also prohibited Committee members like Mr. Carson from "disseminating false or misleading information or from withholding information necessary to a full, fair, and complete consideration of the issues before their committee."  [PX44 (NFPA Conduct Guide), at 2].

1216.  The NFPA criteria to pass a TIA by a NFPA Committee is two-fold:  the TIA must be of an "emergent" nature and it must have "technical" merit.  [May 10, Koffel, at 208:13-18; May 26, Carson, at 65:22 – 66:5].

1217.  Mr. Carson's alleged "Substantiation" for his TIA to the NFPA Technical Committee was based on the 12-year deadline to install the sprinklers in high-rise hospitals.  [PX227 (April 2020 NFPA Memo on Proposed TIA), at 2 ("An existing high-rise building containing a health care occupancy that is not protected with automatic sprinklers is not in violation of 19.4.2 of NFPA 101-2009 until the 12-year deadline has been reached.  Therefore, Worksheet 4.7.8 should not require the use of a higher mandatory value until that deadline has passed.")].

1218.  Mr. Carson represented to the Technical Committee that his TIA was of an "emergent nature" because "the standard contains an error or an omission that was overlooked during the regular process."  [PX227 (April 2020 NFPA Memo on Proposed TIA), at 2].

1219.  As he admitted at trial, the actual "emergent" nature that was never disclosed to the Technical Committee was that Mr. Carson learned—when preparing an FSES for use in this case—about the mandatory values for high-rise hospitals, and presumably the inability of Pottstown Hospital to pass the 2013 FSES Form.  [May 26, Carson, 228:3-18; May 10, Koffel, at 226:14-20].

1220.  Mr. Carson provided misleading information to the Technical Committee when he represented that he was correcting an error that was overlooked in the past.  Mr. Carson has been a member of the Technical Committee on Alternative Approaches to Life Safety for years, including during the 2009 Annual Revision Cycle of NFPA 101 when the Committee was recalibrating the FSES form to the 2012 edition of NFPA 101 by adding the high-rise mandatory value line.  Mr. Carson did not propose any amendments or changes at that time.  [May 10, Koffel, at 217:18 – 218:2; PX22 (2009 NFPA annual meeting report), at 11].  Mr. Carson admitted "we missed that totally" in the 2010, 2013, 2016, and 2019 revision cycles.  [May 26, Carson, at 69:9-18, 74:1-5].

1221.  In connection with the 2019 edition of NFPA 101A, the Technical Committee for Alternative Approaches to Life Safety voted against a proposal to change the mandatory value for high-rise buildings for all healthcare occupancies.  [May 10, Koffel, at 198:9 – 200:11, 200:23 – 201:8, 202:1-9; May 26, Carson, at 69:16-18, 196:3-14].

1222.  Both Mr. Koffel and Mr. Carson were on this Committee, and Mr. Carson voted against the proposed amendment at that time to reduce the mandatory values for high-rise hospitals.  [May 10, Koffel, at 202:19 – 203:1 ("On those changes, he supported the committee's position to not change the high-rise value."); May 26, Carson, at 196:15-23].

256

1223.  Mr. Koffel, who has served on the Technical Committee since 1991, testified that there was no error or omission that "was overlooked during the regulator process," based in part on the Committee's action in developing the 2019 edition and rejecting the proposal to change the mandatory high-rise values at that time.  [May 10, Koffel, at 221:8-22].

1224.  Mr. Koffel was unaware of anyone else suggesting there was an error or omission in the standard before Mr. Carson first did in 2020.  [May 10, Koffel, at 221:24 – 222:6].

1225.  There was no "error or omission" qualifying as an "emergent" reason for the Carson TIA.

1226.  The TIA is supposed to have general application, and not be addressed to a specific hospital, as this one is.  [May 10, Koffel, at 222:15 – 223:6; *see* PX227 (April 2020 NFPA Memo on Proposed TIA), at 2-3 (Mr. Carson noting "sudden" capital expenditure requirements for high-rise hospitals that use an FSES)].

1227.  In his TIA proposal, Mr. Carson represented to the Technical Committee that the standard impacted "high-rise buildings containing health care occupancies" [PX227 (April 24, 2020 NFPA Memo on Proposed TIA), at 2-3] and "puts many existing hospitals out of compliance."  [PX228 (May 11, 2020 NFPA Memo on TIA voting), at 3].

1228.  However, instead of "many existing hospitals" that would be impacted by the so-called uncorrected error, Mr. Carson could only identify Pottstown Hospital.  [May 26, Carson, at 229:3-11].

1229.  The Life Safety Code changed in July 2016, and its forthcoming adoption was well-publicized for years before then.  There was nothing "sudden" about the prospect of undertaking capital improvements to bring the building into compliance with Type II (222) given the long-cited deficiency.  [May 10, Koffel, at 225:22 – 226:9].

1230.  In representing that there were "many existing hospitals" that would be impacted, when the testimony is that there is only one, Pottstown Hospital, Mr. Carson disseminated "false or misleading information" to the Technical Committee.

1231.  The TIA voting is conducted through two votes, both of which are submitted electronically.  "There's an initial vote the committee, and then that vote is recirculated and members can change their vote if – based on comments from other members of the committee being made, they may change their vote."  [May 26, Carson, at 73:8-17].

1232.  The initial voting on the TIA proposed by Mr. Carson showed his proposal as passing, with 11 "agrees" on technical merit and 11 "agrees" on emergent nature.  [PX228 (May 11, 2020 NFPA Memo with TIA voting), at 1].

1233.  Notwithstanding his admitted conflict of interest, Mr. Carson did not abstain from voting on the initial ballot and voted in favor of his TIA.  [PX228 (May 11, 2020 NFPA Memo with TIA voting), at 3-4; May 26, Carson, at 231:23-24, 232:12-14].

1234.  Mr. Koffel abstained from voting because, as a retained expert in this matter by Tower Health, he had a conflict of interest.  [PX228 (May 11, 2020 NFPA Memo with TIA voting), at 3-4; *see also* May 26, Carson, at 75:15-19 (Mr. Koffel and Mr. Crowley abstained "because of their involvement with this case")].  "[T]he conduct of an NFPA technical committee member requires that if I have a vested interest in the outcome of an item, that [I] am to disclose that interest and I am to abstain from voting. . . . My interest was I had been retained as an expert in this case and it appeared that this TIA was trying to specifically address issues that were contentious in this case."  [May 10, Koffel, at 228:16-24].

1235.  Mr. Koffel also abstained from voicing his opinion to others on the Committee, including his review that the TIA did not address an error or omission that was overlooked during the regular process.  [May 10, Koffel, at 228:25 – 230:1].

1236.  The other abstention on the initial ballot was Michael Crowley, an employee of Jensen Hughes, who was retained by Tower Health.  [PX228 (May 11, 2020 NFPA Memo with TIA voting), at 3-4; May 10, Koffel, at 233:9-18].

1237.  At trial, Mr. Carson admitted he "should have abstained. . . . And when I voted on this, I just voted yes, not even thinking that I was – had a conflict with work on this – this case here."  [May 26, Carson, at 75:20 – 76:6, 232:18-24].

1238.  In the final vote on the TIA, Mr. Carson along with Mr. Koffel and Mr. Crowley abstained from voting because of "client interest."  [PX229 (May 19, 2020 NFPA Memo on TIA voting), at 2-3; May 10, Koffel, at 237:3-21].  Mr. Carson changed his vote after he saw that Mr. Koffel and Mr. Crowley had abstained.  [May 26, Carson, at 76:12-18].

1239.  Mr. Carson did not disclose his conflict of interest to the Committee until this ballot. Mr. Carson never disclosed when his client interest arose and that he had been retained as an expert witness on issues directly related to the TIA when he submitted the TIA proposal.  When he realized he should have abstained, he did not inform the other Committee members of the circumstances of his conflict.  [May 26, Carson, 233:4-16].

1240.  Mr. Carson's name alone as a sponsor for the TIA reflects his approval of the TIA, even if he belatedly abstained from voting on the last ballot.  He never withdrew his name as the sponsor.

1241.  If Mr. Koffel had not abstained from voting, he would have voted negative on both the technical merit and the emergent nature of the TIA.  [May 11, Koffel, at 15:5 – 16:6].

259

Among other things, Mr. Koffel was unaware of widespread issues such that the TIA was needed, other than Pottstown Hospital.  [*Id.* at 15:21-23].

1242.  Mr. Carson could have proposed the amendment during the next full revision of the entire code, in the development of the 2022 edition, in which there is more discussion among the Committee as opposed to the electronic balloting process with the TIA.  [May 11, Koffel, at 16:15 – 17:4].

1243.  CHS argues the TIA was passed by an overwhelming majority; but that majority did not know that the TIA was meant to provide a potential litigation solution for CHS in this lawsuit.

1244.  The Court finds that CHS and Mr. Carson violated the NFPA Conduct Guide by (1) never disclosing Mr. Carson's conflict of interest as a paid litigation expert for CHS, who arranged to have him submit the TIA as a potential litigation solution for CHS in this case; and (2) misrepresenting or omitting material information to the NFPA Technical Committee in support of Mr. Carson's TIA.

1245.  The Carson TIA passed and became part of NFPA 101A on August 31, 2020, and is available on NFPA's website.  [May 26, Carson, at 66:11 – 67:22, 81:3-10].

1246.  The Carson TIA does not amend the version of NFPA 101, Life Safety Code adopted by CMS.  [May 26, Carson, at 81:11-15].

1247.  There has been no public notice issued by CMS through an S&C memo or otherwise indicating that CMS would apply the Carson TIA to the 2013 FSES Form, unlike the S&C memo sent by CMS when it announced the use of the 2013 edition of NFPA 101A for preparation of an FSES.  [May 10, Koffel, at 239:18 – 240:1; PX94 (Dec. 2016 CMS S&C Memo); June 10,

Hofmeister, at 144:19-21]. There has been nothing in the Federal Register suggesting CMS intends to adopt the TIA. [May 10, Koffel, at 240:2-5].

1248. Further, the S&C memo on the adoption of NFPA 101, 2012 edition and the Federal Register specifically reference the TIAs that will be included. [*See* PX72 (June 2016 CMS S&C Memo); PX296, 42 C.F.R. § 482.41(b)(1)(i) ("The hospital must meet the applicable provisions and must proceed in accordance with the Life Safety Code (NFPA 101 and Tentative Interim Amendments TIA 12-1, TIA 12-2, TIA 12-3, and TIA 12-4.)"].

1249. There has been no notice from Pa. DOH, whether through a Pennsylvania Bulletin or otherwise, indicating that Pa. DOH would apply the Carson TIA to the 2013 FSES Form. [May 10, Koffel, at 206:6-11, 240:6-9].

1250. TJC has not issued anything indicating that it will accept the 2013 FSES Form along with Mr. Carson's TIA. [May 10, Koffel, at 240:10-13].

1251. Mr. Koffel testified—without rebuttal from the CHS experts—that he has "seen nothing from CMS or Pennsylvania Department of Health that would indicate that I may use the NFPA 101A 2013 edition with this TIA." [May 10, Koffel, at 239:1-5].

1252. Even though the TIA amends the NFPA 101A, 2013 Edition, "it does not necessarily change a regulation that's adopted by a state agency or by the federal government, because that governmental entity cannot transfer their responsibility in the regulatory process to this nongovernmental entity in Quincy, Massachusetts. So a change to an NFPA document does not automatically find its way into the regulatory world." [May 10, Koffel, at 225:12-18].

1253. The current CMS form for an FSES available on CMS's website (as of May 10, 2021) does not reference the TIA and includes the mandatory values applicable to high-rise hospitals, without Mr. Carson's "note c." [PX178 (current CMS 2013 FSES Form), at 5; May 10, Koffel,

at 205:3 – 206:5; May 26, Carson, at 197:5-12 (the TIA is not referenced or reflected on the CMS website FSES forms); June 10, Hofmeister, at 143:22 – 144:18, 155:10 – 156:8 (admitting no reference to the TIA on the CMS website as of June 10, 2021)].

1254.   Mr. Hofmeister was unaware of anything advising hospitals to use the Carson TIA when completing an FSES, and conceded "CMS has provided guidance to say you should use the 2013 NFPA 101A" based on the S&C memo and the form on its website, neither of which incorporate the TIA.  [June 10, Hofmeister, at 147:20 – 148:10].

1255.   Although Mr. Carson testified that the FSES with his TIA would be accepted by regulatory agencies, Mr. Carson is not qualified to render this opinion and the Court rejects his opinion as unsupported and speculative.

1256.   Pottstown Hospital is already classified as a fully sprinklered building, and there is no need for Pottstown Hospital to have a 12-year phase-in period to install sprinklers.  [May 10, Koffel, at 217:3-8; May 26, Carson, at 228:19-25].

1257.   Mr. Carson has never worked with Pa. DOH and has never worked on a situation where an FSES was submitted to Pa. DOH.  [May 26, Carson, at 168:18 – 169:22].

1258.   Mr. Carson testified that it has been nine or ten years since he last submitted an FSES for any hospital.  [May 26, Carson, at 198:23-25].

1259.   Mr. Hofmeister is not a member of any NFPA Technical Committees relating to NFPA 101 or NFPA 101A.  Mr. Hofmeister has never personally submitted an FSES under NFPA 101A to any jurisdiction, including to Pa. DOH.  Mr. Hofmeister has never worked with Pa. DOH in any context.  [June 10, Hofmeister, at 81:20 – 82:21, 140:25 – 141:6].

1260.   Mr. Hofmeister told the Court, "I see no reason why it wouldn't be accepted" in terms of the FSES using the Carson TIA for Pottstown Hospital.  [June 10, Hofmeister, at 50:9-12].

The Court also rejects his opinion because he lacks the requisite expertise and support to render this opinion.

1261.  Therefore, Mr. Hofmeister's opinion that CMS and Pa. DOH would accept the FSES with the Carson TIA to achieve equivalency is also speculative, without any factual basis, and is rejected.

1262.  Given CHS and Mr. Carson's unethical conduct in arranging to have the TIA passed, the Court questions if the TIA was an appropriate amendment and whether a 2013 FSES with Mr. Carson's TIA would be accepted by CMS or by Pa. DOH.

1263.  Regardless, even if the Court found the TIA applied, it expires in 2028.  [May 26, Carson, 227:6-25 (the TIA defers the problem to 2028)].  Therefore, the Court finds CHS remains responsible for addressing the building deficiencies under the indemnification provision of the APA.

## B.  A Traditional Equivalency Is Not an Option To Address Compliance Deficiencies at Pottstown Hospital.

1264.  Defendants' position is that Pottstown Hospital could submit a "traditional equivalency" to Pa. DOH that would supply the equivalency to compliance with the Life Safety Code and avoid remediating the fireproofing on Pottstown Hospital's structural steel members.

1265.  However, Mr. Carson testified generically about a traditional equivalency and with no specific application to Pottstown Hospital.  He admitted he never prepared a written traditional equivalency with supporting document that would be accepted by a regulator.  Without describing a traditional equivalency in any detail, Mr. Carson appears to argue that he would submit an FSES along with his TIA, or the justification for his TIA, as a traditional equivalency. [May 26, Carson, at 49:12 – 50:12, 106:24 – 107:1, 107:11-23].

263

1266.  A Traditional Equivalency is a device accepted by TJC and not by CMS or Pa. DOH. As testified by Mr. Koffel, "I am not aware that CMS uses the term traditional equivalency.  I've not seen anything in the State Department of Health literature that refers to a traditional equivalency.  So a traditional equivalency is a mechanism identified by the Joint Commission." [May 11, Koffel, at 64:2-10, 137:25 – 138:3].

1267.  However, Mr. Carson admitted:  "I have not submitted a traditional equivalency to the joint commission, so I do not know exactly what they would permit . . . ."  [May 26, Carson, at 235:18 – 236:1].  Mr. Carson conceded in his deposition he did not know what the standard is for submitting a traditional equivalency used by TJC.  [TA-P-9, Carson Dep., at 77:18 – 79:8; May 26, Carson, at 236:23-25].

1268.  Mr. Carson agreed that a traditional equivalency is a TJC concept, and there is nothing in the CMS or Pa. DOH literature or regulations that adopts anything called a traditional equivalency.  [May 26, Carson, at 234:2-8].

1269.  Because Pottstown Hospital has lost its "deemed status" (via the June 25, 2018 CMS Important Notice), Pottstown Hospital can no longer utilize TJC as an accrediting agency to "deem" compliance with CMS conditions of participation, to recommend certification to CMS, or to meet the Pa. DOH licensing requirements.  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516; May 11, Koffel, at 64:11-18].

1270.  As of today, Pottstown Hospital remains under "state agency jurisdiction" [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015516], and TJC is no longer involved in anything with certifying compliance with CMS COP or compliance with Pennsylvania licensing requirements.  [May 3, Judge, at 83:17 – 84:4; May 13, Keown, at 72:6 – 73:20].

1271.  For licensure purposes, Pa. DOH determines today if Pottstown Hospital is in compliance with its licensing requirements, and for CMS certification, Pa. DOH determines if Pottstown Hospital has met the COP.  [May 11, Koffel, at 65:7-14; May 26, Carson, at 234:9 – 235:17].

1272.  Mr. Koffel is unaware of CMS accepting a traditional equivalency; instead, his personal experience is that CMS accepts an FSES to demonstrate equivalency, which CMS calls a waiver.  [May 11, Koffel, at 65:15 – 66:10, 126:10-19 (CMS defines equivalency as a waiver request in his personal experience since 1979), 138:9-21, 151:17-18].

1273.  In Mr. Koffel's personal experience, CMS will not accept a waiver of an LSC requirement other than with an FSES.  [May 11, Koffel, at 142:10-25 ("I've been asked to do an FSES when I told them it's wrong.  The FSES won't address that issue.  They've told me I had to do an FSES if I want the waiver to be considered.")].

1274.  Mr. Carson testified that he has never worked with Pa. DOH at all.  He has never worked with a plan of correction submitted to Pa. DOH, never worked on a situation where an FSES was submitted to Pa. DOH, and never submitted a traditional equivalency to Pa. DOH.  [May 26, Carson, at 168:14 – 169:25].  Mr. Carson has not submitted a traditional equivalency to any agency on behalf of any client in the last 11 years.  [May 26, Carson, at 170:1-9].  The Court finds Mr. Carson has no basis to support an opinion as to whether or not Pa. DOH would accept a traditional equivalency.

1275.  Mr. Carson lacks the requisite qualifications and experience to render an opinion on whether a traditional equivalency would be accepted by Pa. DOH, and his opinion is speculation.  The Court rejects Mr. Carson's opinion that a Traditional Equivalency could be used to achieve Pottstown Hospital's compliance with the Life Safety Code and address the K-161 deficiency.

1276.  The Court finds that because neither Pa. DOH nor CMS recognize a traditional equivalency as a method to comply with the Life Safety Code, a traditional equivalency cannot be used by Pottstown Hospital to achieve compliance with the Life Safety Code.

1277.  The Court finds no evidence to support the position that a traditional equivalency would be accepted by Pa. DOH or CMS as a method to achieve compliance with the 2012 edition of the Life Safety Code.

### C.  A Hardship Waiver is Not an Option to Remediate the K-161 Tag Deficiency.

1278.  CHS argues that Pottstown Hospital can apply for a "hardship waiver" and avoid remediating any of the hospital's deficient fireproofing that Pa. DOH found failed to provide "a minimum two-hour fire resistive rating of structural components throughout the building, affecting the entire component."  [PX173 (June 25, 2018 CMS email to R. Newell), at TOWER-CHS-PMMC-015441].

1279.  In violation of Fed. R. Civ. P. 26(a)(2)(B), Mr. Carson did not prepare a written expert report that addressed the ability of Tower Health to obtain a hardship waiver, yet testified about this topic at trial.  [D.E. 144-3, at 18-19].  Mr. Hofmeister did not provide any opinions at trial about the ability of Pottstown Hospital to obtain a hardship waiver.

1280.  CMS's regulations provide for a hardship waiver of specific provisions of the Life Safety Code "for periods deemed appropriate . . . which would result in unreasonable hardship upon a hospital, but only if the waiver will not adversely affect the health and safety of patients."  [PX296, 42 C.F.R. § 482.41(b)(2)].

1281.  CMS's regulations also provide that it is within the Secretary's discretion, or in consideration of a recommendation by the state surveying agency, to waive the specific provisions of the Life Safety Code.  [PX296, 42 C.F.R. § 482.41(b)(2)].

1282.  On cross examination, Mr. Koffel disagreed that Pottstown Hospital would qualify for a hardship waiver of the Life Safety Code provisions for which Pottstown Hospital was cited. [May 11, Koffel, at 143:19 – 144:12, 145:2-15].

1283.  No CHS witness testified about the details of a hardship waiver they would propose to have the Secretary accept in its "discretion," and no CHS witness testified about a proposed written submission with documentation supporting the submission of a hardship waiver request to have the Secretary waive a fire safety requirement of the Life Safety Code.

1284.  No CHS witness testified to having any experience with Pa. DOH or CMS as to whether, given this particular situation, CMS would exercise its "discretion" to waive or whether Pa. DOH would "recommend" a waiver.  No CHS witness testified about any experience with hardship waivers, their experience submitting hardship waivers to regulators, or their experience as to whether a hardship waiver would be accepted by a regulator to address a K-161 Building Construction Type deficiency of the kind in this case.

1285.  No CHS witness testified about what "period deemed appropriate" they would propose to CMS and Pa. DOH for a hardship waiver and about whether CMS or Pa. DOH would accept the length of the proposed waiver.

1286.  Although Mr. Carson was asked whether a waiver for Pottstown Hospital would "adversely affect the health and safety of the patients" [May 26, Carson, at 149:22 – 150:4, 151:17-23], he was not asked about—and did not provide—any factual information to support his opinion.  He did not testify about any experience with CMS or Pa. DOH in situations similar to Pottstown Hospital's.  For these reasons, the Court rejects his opinion.

1287.  Although Defendants, including Mr. Carson, never identified what Life Safety Code requirement they would ask to have waived, presumably they would ask to have Pa. DOH and

CMS waive Pottstown Hospital's Building Construction Type II (000) deficiency, which, because of Pottstown Hospital's widespread fireproofing deficiencies, prevent Pottstown Hospital from occupying any floor above the second floor.

1288.  There is no factual record to support CHS's position that CMS and Pa. DOH would waive such a safety requirement.

1289.  Even though Pottstown Hospital is still operating, still receiving Medicare payments, and still has its Pennsylvania hospital license, there is no evidence that a hardship waiver would "not adversely affect the health and safety of patients."  But there is evidence to show that such a hardship waiver would adversely affect the health and safety of Pottstown Hospital's patients. And Pottstown Hospital is only permitted to continue to operate with the hospital license and receive Medicare payments because it has submitted a plan of correction to remediate the deficient fireproofing by December 31, 2023.

1290.  As a high-rise hospital with such deficient fireproofing that it fails to provide a minimum two-hour fire resistive rating for its structural components, Pottstown Hospital currently is violating both CMS COP requirements and Pa. DOH's licensing requirements.

1291.  Mr. Koffel disagreed that Pottstown Hospital could demonstrate that requesting a waiver of the Building Construction Type II (000) deficiency did "not adversely affect the health and safety of the patients."  "Because CMS adopted a regulation that specifically required an increase in the level of safety to the patient. . . . And therefore, I can't compare it to what they did for the past 20 years.  I can compare it to the current regulation.  That's exactly what they did when they mandated all existing nursing homes to be sprinklered, as of a certain date.  They changed the rules.  And therefore the comparison has to be to what would be required by the regulation at the time of the request." [May 11, Koffel, at 145:2-15].

1292.  Because, and no one disputes, that it is unable to obtain an FSES using the 2013 FSES Form, Pottstown Hospital submitted a plan of correction to address its Life Safety Code violations, which has been accepted by both CMS and Pa. DOH and must be implemented by December 31, 2023.

1293.  Both CMS and Pa. DOH have allowed Pottstown Hospital to operate and receive Medicare payments only because they approved Pottstown Hospital's plan of correction with a time limited waiver expiring on December 31, 2023.

1294.  The Court finds that given CMS and Pa. DOH's approval of Pottstown Hospital's plan of correction with a time limited waiver expiring December 31, 2023, there is no evidence to support CMS's position that either CMS or Pa. DOH would exercise their discretion to waive Pottstown Hospital's violations of the Life Safety Code regarding the Type II (000) Building Construction Type deficiency forever.

1295.  Therefore, the Court finds that a hardship waiver would not be accepted to waive the Pottstown Hospital Building Construction Type II (000) deficiency and eliminate the necessity of remediating the deficient fireproofing at Pottstown Hospital consistent with a Type II (222) construction.

### D.  Removing Pottstown Hospital from its High-Rise Designation Is Not a Viable Alternative to Remediation.

1296.  CHS proposed another alternative measure of addressing the life safety deficiencies at Pottstown Hospital, which is to remove Pottstown Hospital from its status as a high-rise building. [D.E. 144:4, at 2-4].[6]  According to CHS, this would allow Pottstown Hospital to successfully use an FSES to achieve equivalency, without reliance on the Carson TIA change in mandatory values.  [June 10, Hofmeister, at 68:14-20; May 11, Koffel, at 72:6 – 73:10].

---

[6] Tower Health objected at trial to Mr. Carson testifying about the high-rise option because it was not in his expert report, an objection the Court sustained.  [May 26, Carson, at 134:23 - 138:11].

1297.  The Court rejects this alternative remedy as a viable method of achieving compliance with the Life Safety Code.

1298.  "High rise" is defined in NFPA 101 as:  "A building where the floor of an occupiable story is greater than 75 ft (23 m) above the lowest level of fire department vehicle access." [PX41 (Life Safety Code), at 101-28, § 3.3.36.7].

1299.  Mr. Hofmeister opined that the seventh floor of Pottstown Hospital could be abandoned and reclassified as an unoccupied story, which would remove Pottstown Hospital from the definition of a high-rise building, based on a reading of the Annex to NFPA 101. [June 10, Hofmeister, 66:4 – 67:10, 170:13-15].

1300.  Mr. Koffel disagreed with Mr. Hofmeister.  Instead, Mr. Koffel determined Pottstown Hospital would need to vacate the top three stories (5, 6, and 7) of the hospital to avoid being classified as a high-rise building.  [May 11, Koffel, at 69:8-18; June 10, Hofmeister, at 170:7-12].

1301.  One difference between the Mr. Koffel and Mr. Hofmeister's opinions is which location is the lowest level of fire department vehicle access that should be used to measure 75 feet to determine an occupiable story for the purposes of classifying the building as a high-rise under the Life Safety Code.

1302.  Mr. Hofmeister opined that the lowest level of fire department vehicle access to use to measure from is the main entrance or front of Pottstown Hospital, based on the existence of a fire lane in the front of the building, the access to more areas of the building through the front, and information from the Pottstown Fire Department that its "primary response" is through the main entrance.  [June 10, Hofmeister, at 51:9 – 57:2].

270

1303.  In formulating his initial written expert opinion, Mr. Hofmeister never spoke with Chief Frank Hand of the Pottstown Fire Department, but instead called him "in April or May of this year," after receiving Mr. Koffel's supplemental rebuttal report.  [June 10, Hofmeister, at 149:8-20].

1304.  Significantly, Chief Hand did not tell Mr. Hofmeister that the front entrance of Pottstown Hospital would be the exclusive response to a fire, but instead told him that the Pottstown Fire Department vehicles would access the back of the hospital.  [June 10, Hofmeister, at 160:11-16, 163:22-25].

1305.  Mr. Hofmeister has never been a firefighter, has no experience in firefighting techniques, and lacks expertise in how fire departments develop their fire response plans. [June 10, Hofmeister, at 157:9-14, 167:12 – 168:1].

1306.  Mr. Koffel, however, who has significant firefighting practical and teaching experience, determined that the lowest level of fire department vehicle access was the back of Pottstown Hospital on the east side of the building.

1307.  In that location, there is vehicle access available to the fire department as well as a hydrant located on the east side of the building.  [PX317 (photographs of Pottstown Hospital), at PX317-4 – 317-9 (photographs); May 11, Koffel, at 74:13 – 76:10].

1308.  To help in facilitating his opinion, Mr. Koffel interviewed Chief Hand and retained an engineering firm to measure the height of Pottstown Hospital at the back of the building.

1309.  Mr. Hofmeister agreed that fire department vehicle access can be obtained from the rear of the building, which was confirmed by Chief Hand.  [June 10, Hofmeister, at 158:20-23].

1310.  Mr. Koffel relied on the following information provided by Chief Hand of the Pottstown Fire Department to form his opinion.  Chief Hand described to Mr. Koffel the standard

271

fire department response to a fire at Pottstown Hospital:  "Chief Hand indicated that the first
two-engine company would immediately go to the rear of the building, which is what we're
looking at right now, the east side of the building.  And that the first ladder truck or air ladder
apparatus would go to the west side of the building.  So his response, to me, clearly indicated
that Pottstown Fire Department uses the east side of the building as a level of fire department
vehicle access."  [May 11, Koffel, at 77:3-10; *see also* PX346 (March 11, 2021 email from Chief
Hand confirming the standard current procedure of Pottstown Fire Department); May 11, Koffel,
at 169:16-23].

1311.  Mr. Koffel sent a confirming email to Chief Hand (which Chief Hand acknowledged
in writing) following their conversation [PX346 (March 11, 2021 emails between W. Koffel and
F. Hand), unlike Mr. Hofmeister, who has no documentary support to verify his conversation
with Chief Hand.  [June 10, Hofmeister, at 160:17-20].

1312.  Significantly Mr. Koffel testified that recently the Pottstown Fire Department
followed its response plan as confirmed by Chief Hand because at Pottstown Hospital's recent
fire, the first-in ladder truck for Pottstown Fire Department went to the rear of the building.
[May 11, Koffel, at 159:18 – 161:5, 171:12-17].

1313.  Mr. Koffel's experience as a firefighter, as a code consultant, and based on his
consultation with Chief Hand, support his conclusion that, considering the fire department
vehicle access and the hydrant in the rear of the building, the lowest level of fire department
vehicle access is the back of Pottstown Hospital.  Importantly, "there are portions of the patient
tower that cannot be reached by aerial apparatus other than accessing the east side of the
building."  [May 11, Koffel, at 77:17 – 78:3, 161:15-22].

272

1314.  Mr. Koffel's opinion to use the rear or east side of the hospital to measure 75 feet is also supported by the example illustrated in the NFPA 101, 2012 Edition Handbook.  In that illustration, where fire department vehicles could access both the front and the back of a sloping site, the Handbook provides that the 75-foot measurement is taken from the lowest elevation. [PX347 (NFPA 101, 2012 Edition Handbook), at 480; June 10, Hofmeister, at 164:12 – 167:2].

1315.  The photographs of Pottstown Hospital show the ground slopes down from the front of the building to the rear.  [PX317-4 – 317-9 (photographs of Pottstown Hospital)].

1316.  To aid Mr. Koffel in forming his opinion, Tower Health retained an engineering firm, Bogia Engineering, who made the elevation measurements to determine Pottstown Hospital's high-rise status.  [May 11, Koffel, at 78:13 – 84:3].  Neither Mr. Hofmeister nor CHS retained an engineering firm to determine the evaluation measurements.

1317.  Mr. Koffel took an average of four of the measurements from the east or rear side of the building that in his experience as a firefighter would be the most likely place an aerial apparatus would be located.  He calculated the lowest level of fire department vehicle access as 154.87 feet.  [May 11, Koffel, at 84:13 – 85:6].

1318.  The elevations, as measured by Bogia Engineering, of the fifth floor is 236.63 feet and of the sixth floor is 267.79 feet.  [May 11, Koffel, at 85:6-8].

1319.  Using the lowest level of fire department vehicle access of 154.87, any occupied floor above 229.87 feet qualifies Pottstown Hospital as a high-rise building.  According to Mr. Koffel, to de-classify Pottstown Hospital as a high-rise building, Pottstown Hospital's fifth, sixth, and seventh floors would have to be rendered unoccupiable, meaning those floors could not be regularly occupied by patients or anyone else.  [May 11, Koffel, at 85:13 – 86:22; *see also* DX234 (elevations of Pottstown Hospital floors prepared by Mr. Carson)].

273

1320.  This would leave three floors—out of the current seven floors—available for patient sleeping or treatment in Pottstown Hospital.  [May 11, Koffel, at 86:23 – 87:12].

1321.  The Court accepts the testimony of Mr. Koffel about the number of floors that would be required to be removed to de-classify Pottstown Hospital as a high-rise building.

1322.  Mr. Koffel also pointed out additional flaws in Mr. Hofmeister's opinion.  First, Pa. DOH, CMS, and TJC all would need to agree that the east or rear side of the hospital, which provides fire department vehicle access, is not the lowest point to make the high-rise determination.  [May 11, Koffel, at 88:3-10].

1323.  Second, Pa. DOH, CMS, and TJC all would need to provide approval to render the top three floors as unoccupiable stories of the hospital (with most instances, CMS relies on Pa. DOH).  [May 11, Koffel, at 87:13 – 88:2, 109:5-16].

1324.  Third, if Pottstown Hospital decided in the future to use those vacated stories for healthcare or another use, the building would be required to be classified as a high-rise again, and because this would be a change of "use," the building would need to meet the requirements of new construction, not existing.  [May 11, Koffel, at 88:14 – 89:13].  Pottstown Hospital would then be back in the same situation is it today:  unable to qualify for an FSES (because an FSES does not apply to new buildings) and requiring conversion to a Type II (222) Building Construction Type.  [May 11, Koffel, at 89:13 – 90:4].

1325.  Mr. Koffel is aware of no instance where a plan like Mr. Hofmeister's has been accepted by CMS, Pa. DOH, or by TJC.  [May 11, Koffel, at 90:5-11].

1326.  Mr. Hofmeister testified that he had never had a plan of the type he proposes approved by a regulator, let alone Pa. DOH.  In response to a question by the Court,

274

Mr. Hofmeister admitted that it "does not make sense . . . to shut down the seventh floor over this particular issue."  [June 10, Hofmeister, at 69:12-14].

1327.  The Court rejects CHS's plan to de-classify Pottstown Hospital as a high-rise building as a viable alternative to remediating Pottstown Hospital's structural fireproofing deficiencies.

## XVII.  Tower Health Is Entitled to the Costs of Remediating Pottstown Hospital As Damages.

1328.  Tower Health has presented evidence that it will cost $114,236,355 to complete the construction necessary to remediate the deficient fireproofing at Pottstown Hospital to bring the building into compliance with the Life Safety Code.  [May 18, Miller, at 179:15-22; PX257 (R. Miller Estimate), at 3].

1329.  Tower Health engaged Arthur Parker, a fire protection engineer, to test the existing fireproofing and recommend the appropriate remediation methods and determine the areas in the building where remediation was required.  Tower Health engaged Brian Tracy, a healthcare architect, to use Mr. Parker's recommendations and develop architectural plans to remediate the fireproofing in a way that allows the hospital to remain operational during construction.  Tower Health engaged Robert Miller, a healthcare construction estimator, to develop an estimate of the expected cost to complete the construction set forth in the architectural plans developed by Mr. Tracy.

1330.  Mr. Tracy and Mr. Miller testified that they followed the same procedures they would if addressing the same situation outside of litigation.  [May 13, Tracy, at 170:21-24; May 18, Miller, at 181:21-23].

1331.  CHS's experts conceded that the work performed by Mr. Parker and his company, Jensen Hughes, was performed correctly and they had no criticisms of that work.  [May 25, Worrell, at 5-11; May 25, Galassini, at 49:11-20; June 11, Carlisle, at 80:4-12].  CHS did not

275

offer any testimony to rebut the opinions based upon the work performed by Jensen Hughes.  As noted below, Jensen Hughes was the only engineering firm hired to perform testing of the deficient fireproofing and the Jensen Hughes conclusions that the fireproofing required extensive remediation was unrebutted by CHS.

### A. Tower Health Presented Unrebutted Testimony from Jensen Hughes To Convert Pottstown Hospital's Deficient Type II (000) Building Construction Type to a Compliant Type II (222) Building Construction Type.

1332.  Daniel Martin and Arthur Parker from the international engineering firm Jensen Hughes testified about (1) their examination, inspection, and testing of the condition of the fireproofing on the structural steel components of Pottstown Hospital; (2) the specific locations of the deficient fireproofing that required remediation; (3) the degree of remediation necessary in each deficient location to upgrade the Building Construction Type to Type II (222) to comply with the Life Safety Code; and (4) the available methods for performing the necessary remediation work.

1333.  The Court accepted Mr. Parker as an expert in fire protection engineering.  [May 7, at 91:21-22].

1334.  Mr. Martin, who conducted the examination, inspection, and testing of the condition of Pottstown Hospital's structural steel members, who prepared several graphic trial exhibits and took numerous photographs and videos of the building's condition, also provided the testing data on which Mr. Parker based his opinions regarding the type of remediation necessary for each deficient location to convert the hospital to a Type II (222) Building Construction Type.

1335.  CHS did not cross examine Mr. Martin on his direct examination or any of the graphic trial exhibits he prepared, which were introduced and admitted into evidence.  [May 7, Wolfe, at 73:1-3].  Thus, the Court accepts all of Mr. Martin's testimony.

276

1336.  CHS did not present the testimony of a competing engineering expert and did not offer any evidence contradicting Mr. Martin's testimony on the remediation of the fireproofing required at Pottstown Hospital.  Mr. Carson agreed that he has respect for Jensen Hughes as a testing agency, that Jensen Hughes prepared a comprehensive report that he reviewed, and that an expert in his field generally relies on testing agencies like Jensen Hughes.  [May 26, Carson, at 218:19 – 219:19, 220:14-25].  Mr. Hofmeister likewise testified that he did not review the Jensen Hughes testing in any detail and did not review the Jensen Hughes testing parameters. [June 10, Hofmeister, at 97:7-20].

1337.  CHS did not present a fire protection engineer to testify about Mr. Martin's findings and data, to which CHS offered to stipulate.  [May 7, Dodson, at 40:8-24; May 7, Dodson, at 127:8-9 ("We'll stipulate that what Mr. Martin did was correct.")].

1338.  As described in more detail below, Hubert Worrell, a CHS expert who addressed the type of remediation he opined was required, is not a fire protection engineer (he is a retired manufacturer's representative); never visited Pottstown Hospital, even though he asked CHS's counsel to do so; and never addressed Mr. Martin's data on which locations of the hospital needed remediation.

1339.  The Court finds Mr. Martin's testimony, the graphic trial exhibits he prepared, the drawings on which Mr. Parker and Mr. Tracy relied, and his photographs and videos, described more fully below, to be accurate and the Court relies on that evidence.

1340.  The March 2018 Pa. DOH Validation Survey, conducted when Tower Health owned Pottstown Hospital, cited the hospital for, among other things, as a seven-story hospital, having a deficient Building Construction Type of Type II (000) that exceeded the maximum story height

allowed (two stories).  [PX173 (June 25, 2018 CMS email with survey and Important Notice), at TOWER-CHS-PMMC-015440-41].

1341.  The March 2018 Pa. DOH Validation Survey based this deficiency citation on its determination that "the facility failed to maintain building construction requirements, such as a minimum two-hour fire resistive rating of structural components throughout the building, affecting the entire component."  [PX173 (June 25, 2018 CMS email with survey and Important Notice), at TOWER-CHS-PMMC-015441].

1342.  Sprayed Fire Resistant Material, or SFRM, is designed to "insulate the structural steel and prevent excessive temperature rise of that steel during a fire."  [May 7, Parker, at 114:16-25].

1343.  SFRM is intended to "prevent building collapse" and protects the structural steel skeleton of the building so that the other features of the building are intact and can provide the protection needed for building occupants.  [May 7, Parker, at 115:1-14].

1344.  Where the SFRM protecting a floor deck fails to meet the required hourly fire resistive rating, "excessive heat from the deck is going to permeate through the deck to the floor above, which is where we don't want the fire to be."  [May 7, Parker, at 148:22 – 149:2].

1345.  SFRM is particularly important to occupants of a high-rise hospital building because "patients are not capable of self-preservation and not capable -- they're not mobile, so they can't save themselves as we all can here in an office building . . ." and the patients "will remain in place during a fire . . . ."  [May 7, Parker, at 115:1 – 116:4].

1346.  Mr. Martin conducted his testing and inspections at Pottstown Hospital in August and September 2018, on December 10 and 11, 2019, August 24 to 28, 2020, and on September 10, and 11, 2020.  [May 6, Martin, at 175:13 – 176:25].  In total, Mr. Martin personally spent weeks

at Pottstown Hospital surveying the condition of the fireproofing on the hospital's structural members.

1347.  Mr. Martin's observations of the condition of the fireproofing at Pottstown Hospital on the un-renovated floors are consistent with what CHS's former Life Safety consultant, Mr. Peters, observed years ago:  the fireproofing is missing from the structural steel, the fireproofing had fallen off and not adhered to the steel, and the fireproofing easily flaked off when touched. [May 6, Peters, at 114:12-23; *see also* PX316 (Jensen Hughes photographs)].

1348.  Mr. Parker testified that in his opinion the condition of the fireproofing at Pottstown Hospital as of the dates of Mr. Martin's testing and inspections was not materially different than the condition of the hospital's fireproofing as of October 1, 2017.  [May 7, Parker, at 179:17 – 180:10].

1349.  The Court finds that the conditions of the deficient fireproofing and their locations in Pottstown Hospital as testified to by Mr. Martin existed on October 1, 2017, the date of CHS's sale of Pottstown Hospital to Tower Health.

## 1.  Daniel Martin's Testing and Methodology Was Accepted by CHS Without Objection or Cross Examination.

1350.  Daniel Martin of Jensen Hughes, a licensed professional engineer with a master's degree in fire safety engineering, described thoroughly his multiple inspections of Pottstown Hospital and his testing methodology.  [May 6, Martin, at 159-166].  He testified that his testing in this case was conducted pursuant to the training he received at Jensen Hughes and consistent with testing he performed in similar investigations.  [May 6, Martin, at 167-169].

1351.  Mr. Parker, who incorporated Mr. Martin's testing into his expert opinions, confirmed that Mr. Martin's methodology was appropriate and consistent with the applicable codes and

standards.  [May 7, Parker, at 124:15 – 125:21, 128:9 – 129:2].  As noted, CHS stipulated to the accuracy of Mr. Martin's work.

1352.  Mr. Martin inspected the building's columns, beams, and decking, specifically the underside of the floor deck, as part of his inspection and testing of the fireproofing of the structural members at Pottstown Hospital.  [May 6, Martin, at 182:20 – 183:2].

1353.  Mr. Martin collected both qualitative and quantitative data from Pottstown Hospital to present to Mr. Parker.  [May 6, Martin, at 163:11-20].

1354.  Mr. Martin's qualitative review involved a visual inspection of the fireproofing above the ceiling, described as a "thorough 360 degree view" to determine the fireproofing's coverage, color, and texture, including identifying any areas of bare steel.  [May 6, Martin, at 191:17 – 192:13].

1355.  Mr. Martin's qualitative review also involved a physical inspection, where Mr. Martin touched the fireproofing to see if it had flex, if it was soft or hard, and whether any of fireproofing would flake off when touched.  [May 6, Martin, at 192:22 – 193:7].  Additionally, Mr. Martin assessed whether there was any accumulation of material that could affect his thickness measurements and whether there was loose material that had fallen off and was not adhered to the steel.  [May 6, Martin, at 196:13 – 197:24].  Part of the reason for his physical inspection was to assess if there was delamination between the fireproofing and the steel "[b]ecause sometimes when you push on it, you can actually feel movement as it hits the steel." [May 6, Martin, at 198:24 – 199:7].

1356.  Mr. Martin's quantitative review involved collecting samples and measurements of the existing fireproofing to conduct testing in accordance with industry guidelines and standards.

1357.  Mr. Martin collected the data from Pottstown Hospital in accordance with recognized industry standards, such as the International Building Code, ASTM E605, and ASTM E736, which are the standards in the industry for experts performing these types of inspections.  [May 6, Martin, at 190:12-17; May 7, Parker, at 140:14-22].

1358.  The International Building Code provided guidance on inspecting the physical and visual aspects of the fireproofing, including observing the thickness and uniform coverage on the particular structure.  [May 6, Martin, at 190:18 – 191:4; May 7, Parker, at 86:25 – 87:6 (Section 1705.14 of the IBC)].

1359.  ASTM E605 provided the requirements for how and where to take thickness and density measurements on the structural members, and ASTM E736 provided requirements for the testing to determine the bond strength of the fireproofing to the structural steel.  [May 6, Martin, at 191:5-11, 212:19-21; May 7, Parker, at 87:8-18, 141:19-22].

1360.  The over 250 areas of the hospital where Mr. Martin conducted his visual and physical inspections and his thickness and bond strength testing are accurately depicted in Mr. Martin's Site Inspection Location Drawings (PX236).  [May 6, Martin, at 272-288; May 7, Parker, at 147:4-6; PX236 (Martin Site Inspection Location Drawings)].

1361.  Mr. Martin tested beams, columns, and decks in numerous locations on every floor of Pottstown Hospital.  [PX236 (Martin Site Inspection Location Drawings)].

1362.  Mr. Parker opined that "we were able to access sufficient number of spaces to generate enough data to get a … good opinion on the condition of the existing dry fiber material."  [May 7, Parker, at 140:23 – 141:5].

1363.  Mr. Parker opined that Mr. Martin was able to access sufficient locations to conduct visual, physical, and thickness tests to satisfy the applicable ASTM and IBC standards.  [May 7,

Parker, at 135:20 – 136:19].  No contrary evidence was offered by CHS, and several of CHS's experts agreed that Jensen Hughes performed its testing in accordance with such standards. [May 25, Worrell, at 5-11; May 25, Galassini, at 49:11-20].

1364.  Jensen Hughes exceeded the number of tests required by the ASTM standards (E605 and E736) and the Special Inspections Section in the International Building Code that provide the minimum square footage area for testing.  [May 7, Parker, at 135:20 – 136:19].

1365.  The Court finds that Jensen Hughes performed a sufficient number of tests and tested a sufficient number of locations to satisfy the applicable ASTM and IBC standards.

### a.  Mr. Martin's Qualitative Testing.

1366.  Mr. Martin visually observed two different types of SFRM or fireproofing at Pottstown Hospital, dry-fiber (a fibrous material that "looks kind of like oatmeal") and cementitious ("wet-applied material" that is a concrete slurry akin to "spraying mud").  [May 6, Martin, at 183:25 – 185:6].

1367.  Mr. Martin observed dry-fiber SFRM throughout the hospital in the sections of the hospital that had not been renovated (that is, the original construction) as well as in some of the renovated sections.  The cementitious SFRM was only found in the areas of the third, floor, and seventh floors that had been previously renovated.  [May 6, Martin, at 185:7 – 186:7, 236:2 – 237:13, 251:4-8, 252:8-11].  The fireproofing had been remediated in some, but not all, of the renovated areas of the hospital.  [May 7, Parker, at 134:6-14].

1368.  Mr. Martin confirmed that the third floor, fourth floor, and portions of the seventh floor had been renovated based on his review of construction drawings and his visual inspection, which showed newer construction walls, new ductwork, new plumbing, and new ceiling systems. In the renovated parts of Pottstown Hospital, "the metal pan ceilings that is found throughout the

building had been removed and your traditional tile drop ceilings had been replaced in lieu of the metal pans." [May 6, Martin, at 186:8-25].

1369.  From various construction records at Pottstown Hospital, Jensen Hughes could not identify a specific manufacturer and product type for the dry-fiber SFRM.  [May 6, Martin, at 188:18-21; May 7, Parker, at 129:20 – 130:9, 130:21 – 131:2].  To conduct the thickness analysis of the building's original dry-fiber fireproofing, Mr. Martin needed to reference certain UL Design listings for a particular dry-fiber SFRM product.  [May 7, Parker, at 131:3-9].

1370.  Because a product called Isolatek Blaze-Shield II is a very similar product to the original dry-fiber SFRM found on the hospital's structural members, Mr. Martin used the UL Design listing for this product to conduct the analysis to determine whether the original dry-fiber SFRM in each location meets the required minimum thickness necessary to obtain the required hourly fire resistance rating.  [May 6, Parker, at 130:10 – 133:9].  CHS did not dispute Mr. Parker's decision to use Isolatek Blaze-Shield II as a surrogate.

1371.  A UL Design listing provides the minimum design thickness needed to obtain various fire resistance ratings of fireproofing materials based on testing conducted by Underwriters Laboratories, a commercial testing lab.  [May 7, Parker, at 132:18 – 133:3].

1372.  As for the cementitious SFRM Mr. Martin observed in the hospital building, Pottstown Hospital's construction records identified the material as Southwest Fireproofing Type 5.  [May 6, Martin, at 188:22 – 189:1; May 7, Parker, at 133:10-17].  Identifying the particular cementitious fireproofing allowed the identification of the appropriate UL Design listing for that fireproofing to calculate the minimum thicknesses and fire resistance ratings of the structural members to which the cementitious fireproofing was applied.  [May 7, Parker, at 133:18-24].

283

1373. Mr. Martin testified extensively at trial—without any evidence to the contrary—that because of the existing infrastructure above the ceiling, obtaining access to the structural steel members to remove the existing fireproofing and apply new fireproofing is difficult, and in many cases, impossible given the proximity of the existing infrastructure to the structural members.

1374. As depicted in the videos he prepared, the areas above the ceilings at Pottstown Hospital are filled with ductwork, mechanical systems, electrical wiring, and plumbing, making access for remediation difficult and in many cases, impossible. [May 6, Martin, at 200-222; PX338-04; PX338-13; PX338-08 (videos depicting above ceiling conditions at Pottstown Hospital)].

1375. Access to the fireproofing on the structural members in the un-renovated areas of Pottstown Hospital is particularly difficult because of the access issues caused by the existing metal pan ceiling system. Mr. Martin explained that this is an "interconnected metal pan ceiling system that has copper piping and water through it. And that's what's used to heat and cool the room. So they're all interconnected. And this one panel is the only panel that can be easily removed to gain access to the upper portion of this space." [May 6, Martin, at 202:5-12]. Unlike a drop ceiling, only one tile from the ceiling can be removed; "[o]therwise you have to disconnect all the waterpipes that are up above the drain the water from the system to be able to remove the remaining of the – the panels." [May 6, Martin, at 203:7-15].

1376. CHS did not challenge any of Mr. Martin's qualitative findings, did not cross examine Mr. Martin, and did not present a competing fact or expert witness to rebut Mr. Martin's testimony on his qualitative findings, even though two of CHS's expert engineers visited Pottstown Hospital to assess the condition of the fireproofing.

1377.  The Court finds Mr. Martin's testimony on his qualitative findings at Pottstown Hospital to be accurate and adopts this evidence.

### b.  Mr. Martin's Quantitative Testing.

1378.  Along with his qualitative visual and physical testing, Mr. Martin performed quantitative testing of both the thickness and bond strength of the SFRM on the structural members at Pottstown Hospital.

1379.  For his thickness testing, Mr. Martin measured the thickness of the fireproofing on the structural members using the prescribed thickness gauge.  [May 7, Martin, at 38:2-18; PX338-04 (video depicting thickness measurements)].

1380.  The IBC Special Inspections Section, which addresses the requirements for measuring SFRM, provided the guidance Mr. Martin followed to evaluate the thickness of the fireproofing on various structural steel members.  [May 7, Martin, at 42:24 – 43:6, 44:17 – 45:12].

1381.  Mr. Martin also followed the directives of ASTM E605 to perform his thickness testing.  ASTM E605 provides "the standard method for measuring thickness and density of spray applied fire resistant material on structural members.  It also gives the frequency that is needed."  [May 7, Martin, at 45:13-24; May 7, Parker, at 140:23 – 141:18].

1382.  The ASTM E605 standard provides the number of measurements needed for each structural steel component (columns, beams, and decking).  For example, the standard provides that 12 measurements are needed for each column tested.  Mr. Martin testified that he took 12 measurements in a ring around each column tested, and then moved 12 inches along the member and took another 12 measurements, taking measurements in two concentric rings.  He followed the same process when testing the beams (minimum 9 measurements) and decks (minimum 4 measurements).  [May 6, Martin, at 46:3 – 47:20, 59:5-21, 60:3-13, 66:2-10].

285

1383.  Mr. Martin's raw thickness measurements for the columns, beams, and decking are summarized over 17 pages in PX238 and were unchallenged by CHS.  [May 7, Martin, at 47-69, 67:22 – 68:16; PX238 (Raw SFRM Thickness Measurements)].

1384.  The data on PX238 includes notations for "INA," meaning that a portion of the structural component was inaccessible and unable to be tested.  [PX238 (Raw SFRM Thickness Measurements)].  "It could be a number of things, like the video we just showed where the beam itself is actually part of the wall construction . . . Other things would be the hole that I can get up into, especially the patient rooms that have the metal-pan ceilings, that is the one tile that could be removed easily and readily, and if, for example, the beam is two feet away from me from the hole while I'm above the ceiling, I might not be able to reach around the beam all the way, to reach around the surfaces just because it's physically not possible."  [May 7, Martin, at 58:8-20].

1385.  Jensen Hughes disregarded the "INA" testing results for the purposes of its remediation recommendations.  "[W]e didn't have any data to support enough for adequate fireproofing or not, so we conservatively just assumed it's ok."  [May 7, Parker, at 164:14 – 165:10].

1386.  The Court accepts Mr. Martin's testimony on his quantitative findings at Pottstown Hospital to be accurate and adopts this evidence.

## 2.  Mr. Parker's Analysis of Mr. Martin's Data Was Also Accepted by CHS.

### a.  Thickness Testing.

1387.  Using Mr. Martin's data, Mr. Parker calculated the minimum thickness needed to achieve the required fire resistance rating based on the mass of each individual structural steel member by reviewing the hospital's structural steel drawings from the original 1970s construction.  [May 7, Parker, at 154:1 – 155:3].

1388.  From those calculations, Mr. Parker used the UL Design listings for the two types of
fireproofing (dry-fiber and cementitious) to calculate the minimum required SFRM thickness on
each structural steel member necessary to achieve the required fire resistance rating for that
member.  [May 7, Parker, at 134:18 – 135:19, 155:3-6].

1389.  The results of Jensen Hughes' SFRM thickness analysis are summarized in PX239.
[PX239 (Adjusted SFRM Thickness Measurements); s*ee* May 7, Parker, at 153 – 170; *see also*
May 7, Parker, at 161:10-13].  The Court finds that PX239 is a correct representation of the
testing and analysis of Jensen Hughes.

1390.  The analysis in PX239 is color coded: "[A]nything that's in white was a value that we
measured and determined to be above the minimum value, so that's good.  That's acceptable . . .
A yellow box indicates that the value was less than the UL required minimum, so that is a
deficient thickness measurement that was made on the piece of steel.  The red boxes indicate
values that we measured that were below the . . . building code individual minimum value and
the UL minimum thickness, so there are two – sort of two sets of criteria that have to be followed
when evaluating this."  [May 7, Parker, at 159:22 – 160:9; PX239 (Adjusted SFRM Thickness
Measurements), at 4-15].

1391.  Mr. Parker compared each SFRM thickness measurement to the minimum required
thickness under the IBC and ASTM standards; the "pass/fail" column shows whether the SFRM
in each location achieves the required hourly fire resistance rating.  [May 7, Parker, at 161:15 –
162:12].  Anything in "red" on PX239 means that structural steel member did not achieve the
minimum value.  [May 7, Parker, at 162:5-7; PX239 (Adjusted SFRM Thickness
Measurements), at 4-15].

287

1392.  Of the 124 SFRM thickness tests of the structural steel beams at Pottstown Hospital conducted by Mr. Martin, only 9 beams achieved the required fire resistance rating and the rest (115) failed.  [*See* PX239 (Adjusted SFRM Thickness Measurements), at 4-8; May 7, Parker, at 162:21 – 166:3].

1393.  Only one of 44 SFRM thickness tests of the columns at Pottstown Hospital conducted by Mr. Martin passed, while 40 failed and 3 were INA.  [PX239 (Adjusted SFRM Thickness Measurements), at 9-10; May 7, Parker, at 166:10 – 169:1].

1394.  Of the 90 SFRM thickness tests of the decking at Pottstown Hospital conducted by Mr. Martin, 31 passed and the rest (59) failed.  [PX239 (Adjusted SFRM Thickness Measurements), at 11-15; May 7, Parker, at 169:2 – 170:3].

1395.  Mr. Parker summarized the tests results by the type of SFRM (dry-fiber vs. cementitious).  For the dry-fiber SFRM, 100% of the columns tested failed, 99% of the beams tested failed, and 67% of the deck locations tested failed, meaning that the structural members in those locations failed to provide the required hourly fire resistance rating.  [May 7, Parker, at 170:19 – 171:6; PX234 (Parker Thickness Test Tables), at Table 1].  For the cementitious SFRM in the renovated areas of the hospital, 7 of 8 columns tested, 9 or 17 beams tested, and 6 of 13 decks tested failed to achieve the required hourly fire resistance rating.  [PX234 (Parker Thickness Test Tables), at Table 2; May 7, Parker, at 172:13 – 173:3].

1396.  The Court finds Mr. Parker's analysis of Mr. Martin's data in PX239 to be accurate and adopts this evidence.

### b.  Bond Strength Testing.

1397.  In addition to thickness testing, Jensen Hughes also conducted bond strength testing of the fireproofing on the structural members at Pottstown Hospital.  According to Mr. Parker,

288

"Based on the visual inspections that we were conducting, we noticed that the material was very soft, very fluffy.  It was – it was falling off with our fingers like it should not be – the original dry fiber material.  So that was telling me that this potentially was old material that had very, very low bond strength, which is a concern of mine for that ability to – it will impact my remediation decisions."  [May 7, Parker, at 137:16-24].

1398.  To achieve the required fire resistive rating, the SFRM must have sufficient adhesion (the ability of the SFRM to stick to the structural steel) as well as cohesion (the bonding together of the layer of SFRM).  The intent of the building codes and ASTM standards is for the SFRM to remain attached to the steel.  [May 7, Parker, at 137:25 – 138:13].

1399.  Both Mr. Martin and Mr. Parker visually observed "weak cohesive material" at Pottstown Hospital.  [May 7, Parker, at 138:14-23].

1400.  The results of Jensen Hughes' bond strength testing are accurately summarized in PX240.  [May 7, Parker, at 173:18 – 176:14; PX240 (Bond Strength Test Data)].

1401.  The testing of bond strength of the fireproofing differed between the cementitious and the dry-fiber SFRM.  "[T]he bond strength values on the existing [cementitious] material was very good, which is what I would expect but the bond strength values that we obtained for the original dry fiber material were extremely low, very low.  I very rarely have seen values this low."  [May 7, Parker, at 138:24 – 139:9].

1402.  Jensen Hughes conducted the bond strength testing in accordance with ASTM E736 by spraying a three-and-a-quarter inch diameter black cap with foam, and then pulling on the cap with a scale at a constant pull rate of 11 pounds per minute until achieving failure.  The cap size is within the ASTM E736 specifications and was selected by Jensen Hughes' based on years of experience conducting these types of tests.  [May 7, Parker, at 141:19 – 145:5].

289

1403. None of CHS's experts presented evidence to contradict Mr. Parker's conclusions regarding the extremely low bond strength values of the original dry-fiber SFRM at Pottstown Hospital.

1404. The Court finds this testimony regarding bond strength testing to be accurate and adopts this evidence.

### 3. Mr. Parker's Opinions Regarding the Required Remediation.

1405. Mr. Parker was retained to inspect the fireproofing at Pottstown Hospital, evaluate the results from the inspections, and "to determine compliance" by analyzing whether the fireproofing on the structural members at Pottstown Hospital provided the required hourly fire resistive rating. Mr. Parker also developed a remediation plan based on the results of Mr. Martin's inspections and testing. [May 7, Parker, at 76:10-22].

1406. Mr. Parker is a fire protection engineer employed at Jensen Hughes for the last 25 years. He is the head of Jensen Hughes' materials analysis and testing group, "where we do code consulting, materials and flammability testing and analyses, as well as engineering analyses for code compliance." [May 7, Parker, at 75:19 – 76:9].

1407. Mr. Parker received a bachelor's degree in mechanical engineering and a master's degree in fire protection engineering. He is a registered professional engineer in 13 states, including Pennsylvania. He is a member of the ASTM, NFPA, the Society of Fire Protection Engineers, and the International Code Council. With respect to ASTM and NFPA, he is an active member and served on various committees and subcommittees within those organizations. He has also published papers and made presentations on fire protection issues. [May 7, Parker, at 78:5 – 81:12, 83:6-13; PX235 (Parker resume)].

1408. Mr. Parker has worked on similar projects to Pottstown Hospital in his role at Jensen Hughes where he was asked to determine compliance and recommend a plan of remediation,

290

including for hospitals.  [May 7, Parker, at 75:25 – 76:3, 85:7-22].  He has completed 50-60 projects that involved evaluating fireproofing, determining the hourly rating of the structural steel, and providing a recommendation for remediation different types of occupancies.  [May 7, Parker, at 85:19 – 86:8].

1409.  As an expert fire protection engineer, Mr. Parker routinely relies on the field testing data collected by engineers such as Mr. Martin.  In this case, he also relied on the assistance of Kit Bryant of Jensen Hughes, a registered architect who provided expertise in determining the requirements for code compliance for Pottstown Hospital.  [May 7, Parker, at 88:4 – 89:21].

1410.  After reviewing the testing data provided by Mr. Martin, Mr. Parker reached six opinions relating to Pottstown Hospital and the scope of remediation required to upgrade Pottstown Hospital from Type II (000) to Type II (222) Building Construction Type.  Mr. Parker offered all of his opinions with a reasonable degree of fire protection engineering certainty. [May 7, Parker, at 114:3-5].

1411.  Defendants did not present an engineering expert to challenge Mr. Parker's opinions, and the Court accepts the following opinions of Mr. Parker.

1412.  Opinion 1.  As of October 1, 2017, the existing SFRM application throughout Pottstown Hospital failed to provide the required hourly fire-resistance ratings required by NFPA 101, 2012 edition and NFPA 220, 2012 edition for Pottstown Hospital to qualify as a Type II (222) Building Construction for an existing high-rise healthcare occupancy.  [May 7, Parker, at 93:20 – 94:7].  The "existing SFRM application" means the original dry-fiber fireproofing material observed on the structural steel members.  [May 7, Parker, at 96:16-20].

1413.  Mr. Parker's first opinion was based on Mr. Martin's field testing results of the original dry-fiber SFRM that demonstrated the SFRM (1) failed to meet the minimum bond

strength requirements; (2) was missing from multiple areas of the structural members; and (3) was thinly applied to other structural members and did not achieve the required thickness necessary to provide the required hourly fire resistance rating.  [May 7, Parker, at 94:1-7, 153:9-22; PX239 (Adjusted SFRM Thickness Measurements)].

1414.  The poor condition of the original dry-fiber SFRM in Pottstown Hospital resulted from missing fireproofing, thin fireproofing, exposed bare steel, and soft material that fell off from a light touch, which was a "systemic" issue throughout the hospital.  [*See, e.g.*, PX237 (photographs of SFRM deficiencies); May 7, Parker, at 147:8 – 150:22].

1415.  Mr. Parker concluded that the original dry-fiber SFRM at Pottstown Hospital had been improperly applied, [May 7, Parker, at 148:16 – 149:1, 149:22-23, 150:20-22], a conclusion CHS's expert with which Mr. Worrell agreed.  [May 25, Worrell, at 232:10-15 (original SFRM application was incorrect and SFRM manufacturer would have pulled applicator's license as a result)].

1416.  According to Mr. Parker, "The extensive testing that we did that was demonstrated in the site location drawings and all of the . . . thickness data that we presented in the appendices leads me to feel confident to say that the dry fiber material throughout the hospital is severely deficient."  [May 7, Parker, at 171:10-18].  This means "almost all of the columns and beams . . . are not protected two a two-hour fire resistance rating and two-thirds of the deck locations don't have sufficient fireproofing applied to them to meet that two-hour fire resistance rating."  [May 7, Parker, at 171:19 – 172:1].

1417.  The bond strength testing likewise demonstrated that the original dry-fiber SFRM failed to meet the minimum bond strength values and thus, did not provide the required fire resistance rating.  "[W]hat these indicate, to me, is that we have extremely low bond strength

292

values. And they do not, in coordination with the thickness measurements, will not provide that two-hour fire resistance rating and it leads more back into my opinion number one, which says that the original dry fiber material needs to be completely removed and replaced with something of a better quality." [May 7, Parker, at 176:17 – 177:3; PX240 (Bond Strength Test Data)].

1418. The dry-fiber SFRM material was applied at the original time of construction of Pottstown Hospital in the 1970s. "[T]he fireproofing materials don't materially degrade over time, so something was going wrong with this. So this is what we tested in 2018, '19, and '20, was very similar" to what he would have expected to see in October 2017. Mr. Parker opined that the original dry-fiber SFRM he observed in Pottstown Hospital between 2018 and 2020 was in the same condition as it was on October 1, 2017, the time of the sale. [May 7, Parker, at 179:17 – 180:10].

1419. Opinion 2. To achieve the required structural steel protection classification for a Building Construction of Type II (222), Pottstown Hospital must remediate the original dry-fiber SFRM as set forth in the Jensen Hughes remediation drawings (PX241) and the construction specifications provided in (PX242). [May 7, Parker, at 96:21 – 97:6; PX241 (Jensen Hughes Remediation Drawings); PX242 (Jensen Hughes Construction Specs)].

1420. Mr. Martin prepared remediation drawings that are life safety floor plans marked up, by color, to reflect the areas of Pottstown Hospital that require remediation, and show the specific repairs necessary in each location. [PX241 (Jensen Hughes Remediation Drawings); May 7, Parker, at 97:7 – 98:2, 101:3-13, 180:14 – 181:3].

1421. Mr. Martin's testimony was never challenged by Defendants, who, as noted above, twice agreed to stipulate to it.

293

1422.  The Jensen Hughes remediation drawings (PX241) were prepared to provide information to "contractors and architects, who could look at it and determine and estimate the costs associated" with the remediation.  [May 7, Parker, at 101:14-25; PX241 (Jensen Hughes Remediation Drawings)].

1423.  The areas shaded in green represent locations where the original dry-fiber SFRM needs to be removed and replaced to achieve the required fire resistance rating.  [May 7, Parker, at 98:14-23; *see* PX241 (Jensen Hughes Remediation Drawings), at 1].

1424.  The areas shaded in blue represent locations where CHS replaced the original dry-with cementitious SFRM when it owned the hospital, and these areas require no further remediation.  However, the pink lines and squares identify specific deficiencies in the cementitious SFRM that can be patched or repaired.  [May 7, Parker, at 98:25 – 99:11, 151:8-23; *see* PX241 (Jensen Hughes Remediation Drawings), at 5 (showing specific patient rooms on the fourth floor that require remediation)].

1425.  The fireproofing remediation only addresses the main hospital building and does not include any work to the emergency department, outpatient clinic, or Pharmacy.  [May 6, Martin, at 277:10 – 279:7].

1426.  The Jensen Hughes remediation drawings, admitted into evidence as PX241, are incorporated herein as unrebutted evidence of the scope of remediation necessary at Pottstown Hospital.  [May 7, Parker, at 183-189, 202 – 209].

1427.  Jensen Hughes also prepared construction specifications—including specifications relating to applying the fireproofing—to supplement the remediation drawings and provide general contractors and architects the information needed to determine the scope of their

respective work and develop cost estimates, which were admitted into evidence without objection as PX242.  [May 7, Parker, at 102:12-24; PX242 (Jensen Hughes Construction Specs)].

1428.  Opinion 3.  The green shaded areas on the remediation drawings (PX241) show the locations in Pottstown Hospital where all of the original dry-fiber SFRM on each structural member must be completely removed and replaced.  The Jensen Hughes construction specifications require that SFRM reapplication must be done in accordance with the appropriate UL Design listing and the manufacturer's installation instructions to provide the minimum required fire resistance ratings for a Type II (222) Building Construction Type.  [May 7, Parker, at 105:8-21; PX241 (Jensen Hughes Remediation Drawings); PX242 (Jensen Hughes Construction Specifications)].

1429.  Mr. Parker opined that the original dry-fiber SFRM applied in the 1970s must be removed and replaced in all locations other than certain areas of the third, fourth, and seventh floors where CHS previously removed and replaced the original dry-fiber SFRM with cementitious fireproofing during its 2008-2010 renovation of Pottstown Hospital.  [May 7, Parker, at 106:13-24, 182:2-3].

1430.  The construction specifications (PX242) provide instructions for how the original dry-fiber SFRM throughout the hospital must be removed and how the new SFRM must be applied to the hospital's structural members.  [May 7, Parker, at 106:25 – 107:7; PX242 (Jensen Hughes Construction Specifications), at 14].

1431.  The construction specifications set forth the "Performance Requirements" for the "Fire Resistance Rating" and require that SFRM re-installation shall provide the following ratings: "1. Columns: 2-hour rated.  2. Floor Construction (including girders, beams, and

slab/deck): 2-hour rated.  3. Roof Construction (including girders, beams, and deck): 1-hour rated."  [PX242 (Jensen Hughes Construction Specifications), at 4-5].

1432.  For the areas of Pottstown Hospital with dry-fiber SFRM, Mr. Parker testified that the construction specifications (PX242) require:  "All that infrastructure needs to be removed so that the contractor has the ability to get up and access the steel, remove the material, clean the structural steel members, and then prepare them for the new application."  [May 7, Parker, at 107:8-13; *see also* PX242 (Jensen Hughes Construction Specifications), at 2-3].

1433.  When CHS owned Pottstown Hospital, CHS renovated parts of the third, fourth, and seventh floors between 2008 and 2010.  In performing those renovations, which included removing all the original dry-fiber SFRM and replacing it with cementitious SFRM, CHS removed and replaced all of the utilities, mechanicals, piping, and ductwork above the ceilings and replaced the existing metal pan ceiling system.  [May 7, Parker, at 185:2 – 187:23].

1434.  In requiring the removal of all infrastructure, the construction specifications (PX242) offered by Mr. Parker and Jensen Hughes are consistent with the approach taken by CHS when it renovated the third, fourth, and seventh floors of Pottstown Hospital.  [May 7, Parker, at 185:6 – 186:25; PX242 (Jensen Hughes Construction Specs)].  In other words, when CHS performed a similar remediation, it followed the same procedures recommended by Mr. Parker and Jensen Hughes.

1435.  Mr. Parker's remediation plans do not require a wholesale gut renovation of Pottstown Hospital to complete the remediation.  "What I'm suggesting is that some remediation of utilities infrastructure may be necessary – whatever is necessary to allow the contractor to be able to access – physically get to the steel, remove all the old fireproofing material, and reapply new material completely to all surfaces.  So you may not have to remove everything but

there's . . . some things going to need to be removed to be able to access that."  [May 7, Parker, at 196:4 – 197:4].

1436.  Mr. Parker's conclusion that the original dry-fiber SFRM must be completely removed and replaced is supported by Mr. Martin's bond strength testing.  "[W]e saw a lot of very thin[] material, a lot of bare spots of the fireproofing applied to the steel.  In conjunction with the bond strength testing that I – that we then conducted, those two things told me that the fireproofing was in very poor condition.  I can't fix bond strength.  If I have a very, very low bond strength, I can't fix that.  If I have a low thickness or a low density, there are means to correct that but when I have this extremely low bond strength, we can't do remediation efforts on that."  [May 7, Parker, at 139:15-25, 171:19 – 172:5].

1437.  In Mr. Parker's expert opinion, which the Court accepts, hand patching or overspraying the SFRM on the structural members in the areas with the original dry-fiber SFRM will not be sufficient to attain the fire resistive ratings required under NFPA 101, 2012 edition and NFPA 220, 2012 edition.  [May 7, Parker, at 106:7-12].

1438.  The Court finds that spraying additional fireproofing material on top of the original dry-fiber SFRM will not be sufficient to attain the required fire resistive ratings at Pottstown Hospital because it is undisputed that the original dry-fiber SFRM at Pottstown Hospital has extremely low bond strength and thus, lacks a sufficient base to support additional fireproofing material.

1439.  Mr. Parker based his opinion regarding hand patching and overspraying the SFRM on three reasons.  First, the UL Design specifications limit the use of hand-patching.  "For the wet mix material, we can hand-patch nominally about a one square foot area. **The dry fiber materials, we could hand-patch up to about a three square foot area**.  We have a large

number of areas that need to be patched, that can't be hand-patched." [May 7, Parker, at 110:18 – 111:3 (emphasis added)].

1440. "Hand-patching is provided as an option in the UL fire resistance directories as a means to patch things like beam clamps . . . It's not intended to address large, wholesale areas of steel that need to be remediated. There are limits in the UL fire resistance directory . . . ." [May 7, Parker, at 201:12 – 202:4]. Thus, hand-patching is not available where entire floors of a healthcare facility have deficient fireproofing.

1441. Second, Mr. Parker concluded that overspraying, which CHS's expert Mr. Worrell recommends, was not an option for remediating the original dry-fiber SFRM at Pottstown Hospital based on the extremely low bond strengths and the weak materials on the existing structural members, including as demonstrated by the delaminating SFRM observed by Mr. Martin. [May 7, Parker, at 111:3-5].

1442. The Court accepts Mr. Parker's opinion that overspraying the original dry-fiber SFRM will not be sufficient to achieve the required fire-resistance rating at Pottstown Hospital. Unlike Mr. Worrell, who never visited the hospital to perform an inspection to determine if any of his offered options would actually work, Jensen Hughes performed extensive testing to support Mr. Parker's opinions.

1443. Third, because Jensen Hughes was unable to definitively determine the manufacturer of the original dry-fiber SFRM, Mr. Parker did not have the data necessary to submit to a building official a plan that would achieve the required fire resistance rating if he were to overspray the original dry-fiber SFRM with additional fireproofing material. [May 7, Parker, at 111:5-11].

1444.  Although Mr. Worrell challenged Mr. Parker's opinion that overspraying will not be sufficient to remediate the deficiencies in the original dry-fiber SFRM at Pottstown Hospital, CHS never cross-examined Mr. Parker concerning the other two bases supporting his opinion that overspraying is insufficient described above.  And as stated earlier, CHS offered to stipulate to the test results upon which Mr. Parker based his opinion that overspraying will not work.

1445.  Opinion 4.  Mr. Parker testified that the previously renovated areas of Pottstown Hospital also required remediation.  As of October 1, 2017, "the areas that were renovated on the third, fourth, and seventh floors used the new cementitious material, but it was improperly applied, resulting in thin spots.  We saw areas of exposed beam clamps and we did see areas of missing fireproofing on that steel.  Thickness measurements and visual observations confirm that this was a noncompliant installation and confirmed that the required two-hour fire resistance rating for the structural steel elements would not be provided with the current condition of this SFRM material."  [May 7, Parker, at 111:12 – 112:1].

1446.  In the areas of Pottstown Hospital where the dry-fiber SFRM was removed and replaced with cementitious SFRM (parts of the third, fourth, and seventh floors), the cementitious SFRM was "generally" in good condition based on visual inspections, "but there were still areas where the fireproofing was thin or missing, or had been removed."  [May 7, Parker, at 151:8-16; *see e.g.*, PX241 (Jensen Hughes Remediation Drawings), at 4-5, 8].

1447.  Mr. Martin's thickness testing supports Mr. Parker's conclusion that remediation in certain areas with cementitious SFRM was required for Pottstown Hospital to achieve the required fire resistive rating.  [May 7, Parker, at 153:9-22; PX239 (Adjusted SFRM Thickness Measurements)].  For example, in the areas with cementitious SFRM, 87.5% of the columns,

52.9% of the beams, and 46.2% of the decks tested failed to meet the required thickness. [PX234 (Parker Thickness Test Tables), at Table 2].

1448.  In the previously renovated areas of the hospital, Mr. Martin observed thin SFRM application in which the minimum thickness of the material was not applied in accordance with the UL Design listing, and also observed missing fireproofing spots where the contractor did not spray all areas of the steel.  [May 7, Parker, at 112:7-18].

1449.  Opinion 5.  Mr. Parker testified that the fireproofing on the perimeter beams and columns at Pottstown Hospital was not remediated during prior renovations and requires remediation.  As of October 1, 2017, "it's our opinion that the areas that were renovated on the third, fourth, and seventh floors . . . did not include the renovation to the perimeter structural steel elements of columns and the beams and those identified areas are . . . inadequately protected with the existing SFRM and will not provide the required two-hour fire resistance rating to those structural steel elements."  [May 7, Parker, at 112:21 – 113:6; PX241 (Jensen Hughes Remediation Drawings)].

1450.  As part of the qualitative inspection, Mr. Martin reviewed the existing gypsum wall board and plaster column protection to assess whether the columns had the required fire resistance ratings.  [May 7, Parker, at 177:14 – 178:7].

1451.  Jensen Hughes was unable to locate a UL Design listing that matched the gypsum and plaster column installation at Pottstown Hospital and therefore was unable to verify that the columns met the required two-hour fire resistance rating.  Mr. Parker's concern was that the column enclosures went up to the drop ceiling and then terminated, so that the bare steel was visible.  In other cases, Mr. Parker actually observed that the steel metal studs used to support the gypsum was not connected properly.  [May 7, Parker, at 178:8 – 179:6].

300

1452.  Mr. Parker concluded, "From what we could find from design listings that were close, it . . . would not provide the required two-hour fire resistance rating. And . . . because of the transitions . . . the[re] were weak spots or openings that would allow heat to get in and – and result in that structural steel member not attaining the required fire resistance rating."  [May 7, Parker, at 179:7-16].

1453.  Opinion 6.  The blue shaded areas in the remediation drawings (PX241), in which the cementitious SFRM was applied when those floors of the hospital were remediated, need remediation in accordance with the General Remediation Notes in PX241 and the construction specifications in PX242.  [May 7, Parker, at 113:8-17; PX241 (Jensen Hughes Remediation Drawings) at 4-5, 8; PX242 (Jensen Hughes Construction Specs)].

1454.  In some instances in the blue shaded areas, the cementitious SFRM can be remediated through patching, and removal of the SFRM is not required, unlike the original dry-fiber SFRM. [May 7, Parker, at 113:18-24].

1455.  The "General Remediation Notes" in PX241 provide detailed instructions for the blue shaded areas regarding which structural members require remediation and what must be done to each.  [*See*, *e.g.*, PX241 (Jensen Hughes Remediation Drawings) at 4 ("Room 319 – Patching required on beam clamp, beam flange tip, and deck")].

1456.  In the deficient locations, identified in the remediation drawings (PX241) by pink lines and squares, "[t]he existing material that's been applied does not provide the required two-hour fire resistance rating and mainly it was due to a lot of thin spots and missing material that could be remediated, does not need to be totally ripped out and started over.  But it can – it needs to be patched, needs to be fixed."  [May 7, Parker, at 173:4-13, 182:4-9; *see*, *e.g.*, PX241 (Jensen Hughes Remediation Drawings)].

301

1457.  The blue shaded areas that need to be remediated "is not a . . . wholesale tear out of what's up there on three, four, and seven.  It – It's mainly – mostly good.  We can use – we could use that and just build off of it and fix some minor areas that we found."  [May 7, Parker, at 182:21 – 183:5].

1458.  The Jensen Hughes construction specifications (PX242) provide detailed instructions for remediating the deficiencies in the cementitious SFRM, where patching and re-application is sufficient.  [PX242 (Jensen Hughes Construction Specs), at 5].

1459.  The Court adopts as its findings the accuracy of PX241, and incorporates it, as to the locations in Pottstown Hospital where the SFRM is deficient and the type of remediation required to bring Pottstown Hospital up to a Type II (222) Building Construction Type.

1460.  The Court adopts as its findings the accuracy of PX242, and incorporates it, as to the manner in which the deficient SFRM in Pottstown Hospital must be repaired.

### B.  CHS Completed Gut Renovations of Parts of the Third, Fourth, and Seventh Floors of Pottstown Hospital and Did Not Patch or Overspray the Fireproofing.

1461.  Mr. Parker's proposed method of remediating the dry-fiber SFRM at Pottstown Hospital is consistent with the approach taken by CHS when it renovated portions of Pottstown Hospital outside of this litigation.

1462.  It is undisputed that CHS renovated certain floors of Pottstown Hospital during its ownership of the hospital.

1463.  Mr. Major testified that he located construction plans during his April 2018 inspection of Pottstown Hospital showing that parts of the third, fourth, and seventh floors had been gut renovated.  [PX166 (April 2018 D. Major email), at TOWER-CHS-PMMC034381].

1464.  According to Mr. Major, in those locations, the "structure and system [were] brought to a 2,2,2 standard, which would have been required under the FSES." [PX166 (April 2018 D. Major email), at TOWER-CHS-PMMC034381].

1465.  Mr. Martin testified about his review of the renovated portions of the hospital. Among other things, he observed that the metal pan ceilings had been removed in the renovation and replaced with a new tile drop ceiling.  He also saw newer ductwork and plumbing above the ceiling in those areas.  [May 6, Martin, at 186:8-25].

1466.  The replacement of the wiring, ductwork, plumbing, and ceiling is evidence that when CHS removed the original dry-fiber SFRM and applied new cementitious fireproofing, it did not re-use any of the existing mechanical systems.  [May 7, Parker, at 185:6 – 186:2].

1467.  On those floors, Jensen Hughes confirmed that the original dry-fiber SFRM had been removed and replaced with cementitious SFRM, and not patched, during the renovations.  [May 7, Parker, at 186:15-21].

1468.  Tower Health's plan to remediate the deficient SFRM does not include gut renovating those portions of the hospital, as Mr. Martin and Mr. Parker explained.

1469.  CHS did not present any contrary evidence at trial concerning the renovations it made to Pottstown Hospital in 2008 and 2010, even though Mr. Ridall and Mr. Carlisle testified at trial and were both employed by CHS at that time.

### C.  CHS's Expert Mr. Worrell is Neither Reliable Nor Credible.

1470.  In contrast to Tower Health's world-renowned engineering experts who were hired to perform extensive testing and reach conclusions regarding the extent of the remediation necessary to bring Pottstown Hospital into compliance with the NFPA 101 Life Safety Code, CHS presented Hubert Worrell, an expert in the application of fireproofing material.

1471.  Mr. Worrell's testimony changed from his deposition to trial on several occasions:

(a)  First, at his deposition, Mr. Worrell testified he did not do Bond Strength testing at the Medical Center at Bowling Green project.  [TA-P-8, Worrell Dep. at 28:17-20].  At trial, Mr. Worrell testified that he did Bond Strength testing at that site.  [May 25, Worrell, at 204:18 – 204:13].  Mr. Worrell explained this inconsistency in his testimony by saying, "I guess I was just confused."  [May 25, Worrell, at 205:11-13].

(b)  Second, at his deposition, Mr. Worrell testified that he had never personally performed testing in accordance with ASTM E119 or UL 263 standards.  [TA-P-8, Worrell Dep. at 32:19 – 33:11].  At trial, Mr. Worrell testified that he has performed testing in accordance with those same standards.  [May 25, Worrell, at 204:18 – 204:13].  Mr. Worrell explained this inconsistency in his testimony at trial:

> Q.  That's what you testified to at your deposition, isn't it sir?
>
> A.  I was in error at the deposition.
>
> Q.  That was an error also?
>
> A.  Yes.

[May 25, Worrell, 205:11-13].

(c)  Third, at his deposition, Mr. Worrell testified he would not know if his proposed method would work until he could spray Bondseal and then do testing.  [TA-P-8, Worrell Dep. at 46:21 – 47:11].  At trial, Mr. Worrell originally testified that he believed his proposal would work without first visiting the hospital, but later admitted that he "would have to go and actually do it to make sure -- to test it to make sure it's going to work . . . ."  [May 25, Worrell, at 212:11-23].  In other words, Mr. Worrell conceded during cross-examination that he did not know if his proposed method of remediating the deficient SFRM at Pottstown Hospital would actually work.

(d)  Fourth, at his deposition, Mr. Worrell testified that he did not know whether the Sprayed-On Type JN fireproofing product, a competitor product to dry-fiber Isolatek

304

fireproofing, had different properties than the Isolatek fireproofing.  [TA-P-8, Worrell Dep. at 54:7 – 55:5].  At trial, Mr. Worrell testified that the Sprayed-On Type JN fireproofing had "pretty much identical" performance specifications as the Isolatek fireproofing.  [May 25, Worrell, at 217:13 – 218:13].

1472.  Mr. Worrell offered expert opinions regarding: (1) the method and cost of remediating the deficient fireproofing at Pottstown Hospital; and (2) accessing the hospital's structural members to remediate the deficient fireproofing.  [May 25, Worrell, at 192:19 – 193:2].

1473.  Because Mr. Worrell never visited Pottstown Hospital, his opinions are unreliable and speculative and must be rejected.

1474.  In his first opinion, Mr. Worrell proposed a solution of remediating the fireproofing at Pottstown Hospital by going area by area, taking a broom and sweeping off loose fireproofing material, spraying Bondseal on the remaining fireproofing, letting it cure, testing bond strength, and overspraying the existing fireproofing with additional BLAZE-SHIELD material.  [May 25, Worrell, at 148:19 – 150:4].

1475.  During his career, Mr. Worrell has only done one remediation project in a healthcare facility.  [May 25, Worrell, at 204:18-20].

1476.  Unlike Mr. Parker and Mr. Martin, Mr. Worrell never performed a site visit of Pottstown Hospital to survey the fireproofing, [May 25, Worrell, at 207:24 – 208:1], even though he knew it was important to visit the hospital:

> Q.  Did you ever ask to go visit the Pottstown site?
>
> A.  Actually, I did.
>
> Q.  And what'd they tell you?
>
> A.  That it wasn't available.

305

> Q. Okay. So you told the defense team that it would be helpful and you would prefer to go visit the jobsite, right?
>
> A. Yes.

[May 25, Worrell, at 209:13-19]. CHS did not offer any explanation as to why Mr. Worrell could not visit the site whereas its other, non-remediation, experts did.

1477. Mr. Worrell's admitted that his opinion in this matter was the first time he estimated a renovation project without visiting the jobsite. [May 25, Worrell, at 208:23 – 209:2].

1478. Mr. Worrell admitted he does not know if his proposed method would work without first going to Pottstown Hospital to conduct testing. [May 25, Worrell, at 212:21-23].

1479. Because he had not performed any testing at Pottstown Hospital, Mr. Worrell admitted that he did not know whether the existing fireproofing at Pottstown Hospital needs to be removed before new fireproofing is applied. [May 25, Worrell, at 151:6-14].

1480. Because he had not performed a site visit of Pottstown Hospital, Mr. Worrell admitted that he does not know exactly which areas require remediation. [May 25, Worrell, at 195:18-20].

1481. Mr. Worrell is a former insulator and fireproofing applicator, not a fire protection engineer like Mr. Parker. [May 25, Worrell, at 133:12-20].

1482. Mr. Parker testified that overspraying the existing SFRM was not a viable option for remediating the fireproofing deficiencies at Pottstown Hospital because of the extremely low bond strength values identified during his testing. [May 7, Parker, at 111:3-5; *see also* PX240 (PX240 Bond Strength Test Data)].

1483. Mr. Parker testified that Mr. Worrell's proposed method of using Bondseal would not work wherever there are adhesion issues or extremely low bond strengths in the existing fireproofing, and that given the condition of the existing fireproofing at Pottstown Hospital, Mr.

306

Worrell's method is "not applicable" per Isolatek's documentation. [May 7, Parker, at 193:18 – 195:2]. Mr. Worrell conceded that he agreed with Mr. Parker's opinion that his proposed method of using Bondseal would not work where the original bond strength failures are extremely low. [May 25, Worrell, at 223:21 – 224:1].

1484. As noted above, Mr. Parker testified that the bond strengths at Pottstown Hospital "were extremely low, very low" and that he had "very rarely … seen values this low." [May 7, Parker, at 138:24 – 139:9].

1485. CHS offered no evidence to contradict the bond strength testing of Jensen Hughes that Mr. Parker relied on in his opinions.

1486. Mr. Worrell, not having visited Pottstown Hospital, admitted he did not know the extent of the problems with the bond strength at Pottstown Hospital, but he was aware that Jensen Hughes found extremely low bond strength values. [May 25, Worrell, at 212:5-7].

1487. Mr. Worrell's proposed method is inconsistent with CHS's remediation of the dry-fiber SFRM during its renovation of parts of the third, fourth, and seventh floors at Pottstown Hospital, where it removed the existing dry-fiber SFRM and replaced it with new cementitious SFRM. [May 7, Parker, at 185:6 – 186:25].

1488. Mr. Worrell based his proposed Bondseal method on his belief that "there may be untested surfaces that might be fine" in the areas where Jensen Hughes did not conduct testing. [May 25, Worrell, at 214:23 – 215:3].

1489. The Court rejects this testimony because Mr. Worrell admitted that Jensen Hughes tested locations in the exact same way that a third party testing agent he would rely on would perform those tests, and because Mr. Worrell admitted that Jensen Hughes performed its testing

307

in accordance with the standards applicable to a testing agent in the industry, such as the ASTM standards. [May 25, Worrell, at 214:1-7, 215:4-15].

1490. The cost of the fireproofing alone is the same under Mr. Worrell's proposed method of applying Bondseal and overspraying the existing material and Mr. Parker's proposed method of removing and replacing the fireproofing. [May 25, Worrell, at 195:2-9].

1491. Mr. Worrell, who is not an engineer, did not testify that his method for remediating the fireproofing would result in Pottstown Hospital achieving the required Type II (222) building construction type.

1492. No CHS expert, including Mr. Hofmeister and Mr. Carson, opined that Mr. Worrell's proposed method of remediating the fireproofing deficiencies would bring Pottstown Hospital into compliance with the Life Safety Code.

1493. The Court rejects Mr. Worrell's opinion regarding the proposed method of remediating the fireproofing because CHS presented no testimony or evidence that Mr. Worrell's method would result in Pottstown Hospital achieving the required Type II (222) building construction type and resolve the deficiencies.

1494. The Court also rejects Mr. Worrell's proposed method of remediating the fireproofing at Pottstown Hospital because it is speculative and unreliable.

1495. In his second opinion, Mr. Worrell testified that the walls and some of the infrastructure above the ceiling at Pottstown Hospital do not need to be removed in order to provide access to the hospital's structural members that need to be remediated. [May 25, Worrell, at 152:9 – 153:21].

1496. Mr. Worrell never visited Pottstown Hospital at any time, [May 25, Worrell, at 207:24 – 208:1], including during the time he was in Pennsylvania waiting to testify and only an

308

hour away from Pottstown Hospital.  Because he never surveyed Pottstown Hospital, Mr.

Worrell's opinion is speculative and must be rejected.

1497.  Mr. Worrell admitted that the mechanical, electrical, and plumbing infrastructure at

Pottstown Hospital would obstruct the ability to apply fireproofing to the decks and beams, but

testified that "generally piping wires, things of that nature you can spray around."  [May 25,

Worrell, at 152:4-16].

1498.  By Mr. Worrell's own admission, his opinion regarding access to the structural

members at Pottstown Hospital is speculative because he has not performed the observations

required to determine what infrastructure must be removed:

> Q.  So tell us -- tell the court how you plan to approach that and to deal
> with the equipment that's in your way.
>
> A.  So working with the general contractor, **we would have them take
> out the ceiling**, whether it's the hydronic pipe ceiling or a simple acoustic
> tile ceiling, **and then we would observe what's up there** ….

[May 25, Worrell, at 152:9-16 (emphasis added)].

1499.  Mr. Worrell's assumption that the ceilings at Pottstown Hospital can be taken down

to provide the access needed to assess the existing SFRM is inconsistent with the testimony of

Mr. Martin, who spent weeks above the ceilings at Pottstown Hospital.  Mr. Martin testified that

only one panel of the metal pan ceiling system can be removed to gain access above the ceiling

unless the entire heating and cooling system is disconnected and drained.  [May 6, Martin, at

203:7-15].

1500.  Mr. Worrell testified that remediating the fireproofing in a room where the pipes and

conduit are tight to the ceiling would get "a little tricky" and that "**without being there** I'd have

to say it's very possible that some of this conduit would have to come down."  [May 25, Worrell,

at 180:8-15 (emphasis added)].  According to Mr. Tracy, this exact condition – "banks of pipes

where it's pipe, next to pipe, next to pipe, next to pipe, and that's all tied to the structure," which makes it "impossible to access the structure to apply fireproofing" – was found throughout Pottstown Hospital.  [May 13, Tracy, at 198:9 – 199:9].

1501.  Mr. Worrell testified that there is "no reason to take partition walls down" and that instead, "you just spray on each side of the wall" because the wall itself is "actually protecting what's there anyway, especially in a case of plaster."  [May 25, Worrell, at 155:22 – 153:5].

1502.  Mr. Worrell based this testimony on the assumption that the wall was "rated":

> Q.  Okay. So you've got -- **is that in a case of a rated wall, you just spray to the wall**?
>
> A.  **Right, just spray to the wall**. There's no reason to -- to do otherwise.

[May 25, Worrell, at 153:10-13 (emphasis added)].

1503.  The Court rejects this testimony because Mr. Worrell's assumption that the partition walls at Pottstown Hospital are "rated" is inconsistent with the testimony of Mr. Tracy, who actually inspected Pottstown Hospital and determined that less than 5 percent of the walls throughout the hospital are fire rated walls.  [May 17, Tracy, at 96:6-8].

1504.  In addition, Mr. Worrell admitted that you may need to take down walls in order to access the deck and the beams at Pottstown Hospital.  [May 25, Worrell, at 153:14-21].

1505.  Mr. Tracy testified that the infrastructure and walls obstructing remediation of the fireproofing present the same issues with accessing the hospital's structural members under Mr. Worrell's and Mr. Parker's proposed methods of remediating the fireproofing.  [May 13, Tracy, at 241:18 – 242:5].

1506.  Instead of removing the obstructions to the fireproofing on the structural members, Mr. Worrell would use a fireproofing applicator who was "a little hundred-pound woman named

Tara" to access tight spaces above the ceiling, "where a grown man might not be able to do it." [May 25, Worrell, at 181:9-12].

1507.  Unlike Mr. Tracy, Mr. Worrell is not an architect and he did not consult and architect for his opinions in this case.  Mr. Worrell agreed that in the course of his work in the real world, he would rely on an architect like Mr. Tracy to give him instructions on what remediation must be done and in what areas.  [May 25, Worrell, at 240:18-23].

1508.  Mr. Worrell admitted that "to do [his] job correctly" he needs instructions from the architect about "where to spray, what to spray, and what testing to do . . . ."  [May 25, Worrell, at 207:14-17].

1509.  Mr. Worrell admitted that he relies on the testing specifications and instructions by the architect to make sure his job is done correctly and can pass third-party inspectors' testing. [May 25, Worrell, at 207:18-21].  In this case, Mr. Worrell did not consult with or rely upon the very experts he admitted he would rely upon if he were doing this work outside of the litigation context.

1510.  The Court rejects Mr. Worrell's opinion regarding accessing the structural members at Pottstown Hospital to perform the required remediation because it is speculative and unreliable.

### D.  Tower Health's Expert, Brian Tracy, Presented Credible and Reliable Expert Testimony on the Plans to Implement Jensen Hughes' Proposed Remediation.

1511.  Mr. Tracy is a registered architect, [May 13, Tracy, at 160:5-16], and was the only architect to testify.

1512.  Mr. Tracy founded BKT Architects in 1999 and at least 90% of BKT's work is in the healthcare field.  [May 13, Tracy, at 160:19 – 161:16].

311

1513.  Mr. Tracy has prior experience working on healthcare projects involving a change in building construction type that required increasing the fire rating of the building's structural members.  [May 13, Tracy, at 166:8-25].

1514.  Mr. Tracy has submitted "over a hundred projects" to Pa. DOH for plan approval and has a "100 percent success rate on approvals."  [May 13, Tracy, at 162:15-19].  Mr. Tracy was the only witness to testify who has experience submitting architectural plans to Pa. DOH for approval.

1515.  The Court accepted Mr. Tracy from BKT Architects without objection as an expert in architectural design, with a specialty focus on healthcare.  [May 13, Tracy, at 168:19-20].

1516.  Mr. Tracy provided opinions regarding the most-cost effective way to remediate the fireproofing deficiencies at Pottstown Hospital in the locations identified by Jensen Hughes while allowing the hospital to continue operating during construction.

1517.  Mr. Tracy developed phasing plans, demolition plans, and new work plans (PX245), to provide to Tower Health's construction estimator, Robert Miller, to develop a schematic cost estimate.  [May 13, Tracy, at 216:21 – 217:7; *see* PX245 (Tracy Plans)].

1518.  Mr. Tracy testified that he "approached this project like we approach every project. And if we were asked tomorrow to do this project again, for -- by another hospital, we would approach it exactly the same way."  [May 13, Tracy, at 170:21-24].

1519.  Mr. Tracy performed two site visits at Pottstown Hospital and "investigated how partitions were built, whether they went to the underside of the structure above, how ceiling access might work if we had to apply fireproofing and looked to see how much above-ceiling obstruction we should expect to run into when it's time to actually do the work."  [May 13, Tracy, at 180:10-13, 182:20-24].

312

1520.  Mr. Tracy developed demolition plans for each floor of Pottstown Hospital to "illustrate[] the scope of materials that need to be removed or demolished to facilitate the work." [May 13, Tracy, at 227:2-4; PX245 (Tracy Plans), at 22-29].

1521.  To obtain the access required to remove and replace the fireproofing at Pottstown Hospital, the walls, ceilings, ductwork, piping, conduit, med gas piping, and other obstructions in the interstitial space above the ceiling must be removed.  [May 13, Tracy, at 219:8 – 220:4; May 18, Miller, at 135:15-22].

1522.  There is no dispute among the experts that the nozzle used to apply fireproofing at Pottstown Hospital must be between 18 and 24 inches away from structural elements when applying SFRM to comply with the fireproofing manufacturer's application standards and guidelines.  [May 25, Worrell, at 153:22-24; May 13, Tracy, at 189:15-20; May 18, Miller, at 115:3-5].

1523.  Mr. Tracy testified that "the space you need to apply the spray fireproofing's going to exceed that, much like the Worrell report called for 3 feet, because Worrell recognized that the apparatus it takes to spray, to keep this nozzle 24 inches from the substrate, you need room below the nozzle for that, for this hose . . . ."  [May 18, Tracy, at 14:3-9].  In other words, although the nozzle must be 18 to 24 inches away from the structural member, you need additional clearance to account for the application mechanism itself.

1524.  Mr. Parker testified that to remove and replace the original dry-fiber SFRM (like CHS did when it renovated portions of the hospital), "All that infrastructure needs to be removed so that the contractor has the ability to get up and access the steel, remove the material, clean the structural steel members, and then prepare them for the new application."  [May 7, Parker, at 107:8-13].

313

1525.  The photographs, videos, and testimony presented at trial demonstrate accessibility issues that would obstruct the ability to remove and replace the existing fireproofing in accordance with the fireproofing manufacturer's application standards and guidelines.  [PX338-02; PX338-05; PX338-01; PX338-13 (videos depicting accessibility issues); May 13, Tracy, at 186:16 – 189:3, 190:15 – 192:18, 193:6 – 195:18, 197:10 – 198:22, 221:12-22].

1526.  Mr. Tracy testified that the videos played at trial (PX338-01, PX338-02, PX338-05, PX338-08, and PX333-13) fairly and accurately reflect the conditions he observed when he walked through the hospital, and that the accessibility issues resulting from the infrastructure above the ceilings depicted in the videos were not "isolated conditions":

> Q.  And were those isolated conditions?
>
> A.  No.
>
> Q.  What do you mean?
>
> A.  **Everywhere we looked -- on every floor we looked above ceiling we found, as expected, duct work, piping, conduit, sprinkler pipe, med gas pipe, and so on between the finished ceiling and the underside of the floor above**.

[May 13, Tracy, at 202:11-21 (emphasis added)].

1527.  Mr. Tracy testified that, after looking at photographs and videos of the fireproofing at Pottstown Hospital, and visiting the site himself, he determined that "this wasn't a spotty problem occurring in one or two places due to some specific condition, but that it was endemic." [May 13, Tracy, at 196:2-13].

1528.  Mr. Tracy testified that fireproofing could not be sprayed around the obstructions because, "in many, many cases, these obstructions are tied up against the structure so that it – there's absolutely no space."  [May 13, Tracy, at 198:9-22].

1529.  Mr. Tracy testified that, based on his survey and investigation, "the only way to access the underside of all those floors and beams was to get the duct, the pipes, the conduit, the med gas piping, the electrical out of the way."  [May 13, Tracy, at 219:21 – 220:3]

1530.  Mr. Tracy testified that "the only way to get that stuff out of the way was to take ceilings and walls down", and therefore, the ceilings and walls must also be removed.  [May 13, Tracy, at 191:1-11, 220:3-4].

1531.  Mr. Tracy testified that the interior walls at Pottstown Hospital that terminate at the underside of a beam will obstruct access to apply the fireproofing in accordance with the fireproofing manufacturer's application standards and guidelines.  [May 13, Tracy, at 191:16-20].

1532.  Mr. Tracy determined fireproofing could not be applied to the hospital's structural members in accordance with the manufacturer's application guidelines without first removing the existing metal pan ceilings:  "From the bottom of the beams on the perimeter, maybe not this one, but in many case[s], the distance from the bottom of the beam to the finished ceiling is less than two feet, 21 inches.  So there isn't room to apply spray applied fireproofing as required by the manufacturer where you need 18 to 24 inches."  [May 13, Tracy, at 187:21 – 188:1].

1533.  Mr. Tracy testified that "every patient room that hasn't been recently renovated, and that's almost all the patient rooms has these metal pan ceilings that need hydronic piping to them."  [May 13, Tracy, at 201:22-25].

1534.  Mr. Tracy testified that "the design approach in this project was largely driven by the fact that the hospital has to remain operational" because "there's certain facilities and services that a hospital always has to provide" such as operating rooms, registration, and waiting space.

315

"There are things called essential services that are part of the license for a hospital that they have to provide all of those."  [May 13, Tracy, at 215:5-13].

1535.  The structural steel must be cleaned and prepared prior to application of new fireproofing materials to ensure proper adherence.  [May 13, Tracy, at 223:4-7].

1536.  The process of remediating fireproofing "makes a heck of a mess", including dust and odor, which requires areas needing remediation to be completely isolated when the work is done. [May 13, Tracy, at 192:4-18].

1537.  The process of remediating fireproofing cannot be completed in an occupied space; Mr. Tracy testified that no matter what proposed method is used "whether it's overspray, take down, drywall assembly . . ." entire departments will have to be taken out of service for months at a time and moved to a new location in the hospital.  [May 13, Tracy, at 219:23 – 220:12].

1538.  Mr. Tracy discussed with David Major, the designated Owners' Representative for the proposed remediation work, the hospital's operational and programmatic needs.  [May 13, Tracy, at 271:21 – 272:6; May 5, Major, at 109:2-11].

1539.  Mr. Tracy developed phasing plans for every floor of Pottstown Hospital that phase the renovation in a manner that allows the hospital to continue operations during construction. [May 13, Tracy, at 224:17 – 226:18; PX245 (Tracy Plans), at 4-21].  The opinions concerning phasing of the construction offered by CHS's construction expert, Mr. Galassini, ignored the operational concerns at Pottstown Hospital addressed in Mr. Tracy's phasing plans.  [May 25, Galassini, at 57:19 – 58:5].

1540.  Mr. Tracy's phasing plans take into account the departments in the hospital that must remain operational, in part or in full, during construction for the hospital to be able to remain

open, including Operating Rooms, CT Scan Rooms, Sterile Processing (SPD), morgue, kitchen, patient registration, and others.  [PX245 (Tracy Plans), at 4-21].

1541.  Mr. Tracy's phasing plans took into account the hospital's reduced bed count as a result of the construction work and his "objective was to minimize the maximum number of beds out of service at any one time."  [May 17, Tracy, at 127:21 – 128:9].

1542.  Mr. Tracy's phasing plans stacked the plumbing to improve the efficiency of the construction process and reduce costs.  [May 13, Tracy, at 215:24 – 216:5].

1543.  The Court finds that Mr. Tracy's phasing plans present a reasonable and cost-effective method for Pottstown Hospital to continue operations while construction is ongoing and adopts them as evidence.  [PX245 (Tracy Plans), at 4-21; May 13, Tracy, at 215:5 – 216:8].

1544.  The Court finds that Pottstown Hospital must be renovated in the manner proposed in Mr. Tracy's architectural plans (PX245) to continue operations during the required construction work.

1545.  Mr. Tracy developed "new work" plans for each floor of Pottstown Hospital to provide "general scope notes for the entire project, which is what we would typically do on a schematic level for a project . . . it describes the responsibility of the contractor to price things . . . ."  [May 13, Tracy, at 230:8 – 233:7; PX245 (Tracy Plans), at 30-37].

1546.  Mr. Tracy opined that after replacing the deficient fireproofing, Pottstown Hospital must be renovated and reconstructed in accordance with applicable codes in order to obtain plan approval for this project from Pa. DOH.  [May 13, Tracy, at 223:24 – 224:8].

1547.  Every construction project in a Pennsylvania hospital "requires plan approval from the Pennsylvania Department of Health."  [May 13, Tracy, at 200:8-14].  "The established procedure requires the submission of construction plans and the issuance of a final construction

317

plan approval by the Division of Safety Inspection (Division) prior to the start of any new construction, renovation, modernization or changes in usage.  Blueprints are to be submitted to the Division and are reviewed for compliance with the NFPA 101, Life Safety Code and the requirements in the [Guidelines for Design and Construction of Hospitals]." *See* 48 Pa. Bulletin 2347.

1548.  Mr. Tracy opined that the scope of the work required at Pottstown Hospital would raise this project to a level which Pa. DOH will require the hospital to comply with NFPA 101, 2012 Edition and the FGI Guidelines.  [May 13, Tracy, at 282:6-14].

1549.  Mr. Tracy's opinion that his architectural plans must comply with the FGI Guidelines is consistent with Tower Health's approach in the normal course of business, long before litigation began.  [May 5, Major, at 97:18 – 98:4; PX204 (Oct. 2018 D. Major Presentation); PX208 (Nov. 2018 D. Major Presentation)].

1550.  Pottstown Hospital's remediation plans will also be subject to the approval of local authorities, such as the local building code officials and fire marshals, who will inspect the building on a regular basis.  [May 17, Tracy, at 105:19 – 106:16].

1551.  Mr. Tracy prepared his architectural plans (PX245) "with the assumption that this project is going to get built with the understanding that it will, eventually, go to the Pennsylvania Department of Health" for approval, and that "ultimately we have to get these drawings approved by the Department of Health."  [May 13, Tracy, at 201:5-12, 214:6-24].

1552.  Mr. Tracy, who has successfully submitted hundreds construction plans to Pa. DOH for approval, developed architectural plans for the remediation of Pottstown Hospital that will be accepted by Pa. DOH when necessary.  Mr. Tracy testified that the "basis of [his] design documents" was that "the Department of Health will require we comply with the code."  [May

318

13, Tracy, at 282:6-14 (referring to "NFPA 101, 2012, and FGI Guidelines, 2018."].  According
to Mr. Tracy, "in order to keep a fully operational hospital that's safe and isolates construction
from patients, staff, and visitors, as is required in the building codes, and by the Department of
Health, and to remediate the fireproofing, that this is the responsible, cost effective way to
achieve all of those goals.  I can't separate two of the three, or three of the five goals.  So it has to
be cost effective and keep the -- in a way that keeps the hospital operational and I can get
approvals of the state officials and the local officials."  [May 17, Tracy, at 108:9-18].

1553.  None of CHS's experts has any experience with submitting construction plans to Pa.
DOH.  Neither Mr. Galassini, from Tennessee, where CHS is located, nor Mr. Worrell, from
Michigan, nor Mr. Carlisle from CHS's corporate headquarters in Tennessee, has ever even
attempted to talk to Pa. DOH about this project.

1554.  The existing semi-private patient rooms in Pottstown Hospital that require having
their fireproofing remediated must be rebuilt as private rooms to comply with the FGI
Guidelines. [May 13, Tracy, at 233:22 – 234:3].

1555.  As a result of the requirement to convert Pottstown Hospital's semi-private rooms to
private rooms, Pottstown Hospital will have fewer patient beds as a result of the requirement to
rebuild the renovated areas in compliance with the FGI Guidelines. [May 13, Tracy, at 233:10-
15].

1556.  CHS's expert, Mr. Carlisle, criticized Mr. Tracy's architectural plans because they
require compliance with the FGI Guidelines and include bringing the renovated areas of the
hospital up to current code standards.

1557.  The Court rejects Mr. Carlisle's assertion because Mr. Carlisle, who is not an
architect, conceded that he must rely on the expertise of architects in a local jurisdiction, such as

319

Mr. Tracy, to prepare construction plans in compliance with codes and submit them to the state for approval.  [June 11, Carlisle, at 77:24 – 78:5].

1558.  The Court further rejects Mr. Carlisle's assertion because, Mr. Carlisle did not offer any testimony that he surveyed the existing conditions at Pottstown Hospital, while Mr. Tracy visited the hospital several times in an attempt to determine how the required fireproofing remediation could be completed.

1559.  The Court adopts Mr. Tracy's determination that Pottstown Hospital's construction plans for remediating the deficient fireproofing must comply with the FGI Guidelines, which require any area being renovated to be brought up to compliance with current code to obtain approval from Pa. DOH.

1560.  Thus, the Court finds that the architectural plans prepared by Mr. Tracy (PX245) present the most cost-effective approach to remediating the fireproofing at Pottstown Hospital in the deficient locations identified by Jensen Hughes to bring Pottstown Hospital into compliance with the Life Safety Code.  [May 13, Tracy, at 234:4-8; PX245 (Tracy Plans)].

1561.  Contrary to CHS's argument, Mr. Tracy's plan does not require a gut renovation of the entire hospital and Mr. Tracy's plans "preserved . . . completely intact" the areas in which Jensen Hughes determined that the fireproofing was not deficient, including parts of the third floor, fourth floor, and seventh floor, and other previously renovated areas such as the Pharmacy.  [May 13, Tracy, at 217-22; May 13, Tracy, at 227:5 – 230:1].

1562.  Tower Health's remediation plans do not involve any work in the Pharmacy at Pottstown Hospital, which Tower Health upgraded after purchasing Pottstown Hospital to comply with the new USP797800 criteria.  [May 5, Major, at 76:13 – 77:5, 78:5-6; May 7,

320

Parker, at 100:3-12; PX241 (Jensen Hughes Remediation Drawings), at 1; PX245 (Tracy Plans), at 7].

1563.  Mr. Tracy's plans provide for replicating existing features to a similar quality to the extent it is not prohibited by current code and include reusing existing equipment and fixtures to the extent possible.  [May 13, Tracy, at 203:6-18].

1564.  Mr. Tracy's plans retain all major infrastructure at Pottstown Hospital, such as the existing air handling units, transformers, and switch gears.  [May 18, Tracy, at 7:11-20].

1565.  Under Mr. Tracy's plans, the hospital may remove and re-use all non-affixed equipment, which includes items such as rolling wire shelves and metro carts.  [May 17, Tracy, at 162:23 – 163:5].

1566.  The Court accepts Mr. Tracy's architectural plans (PX245) as the most cost-effective approach to remediate the fireproofing deficiencies in the areas identified by Jensen Hughes and bring Pottstown Hospital into compliance with the Life Safety Code while the hospital continues to operate.

### E.  Tower Health Presented Credible and Reliable Cost Estimates from its Building Construction Expert to Complete Mr. Tracy's Plans.

1567.  The Court accepted Mr. Miller from L.F. Driscoll without objection as an expert in healthcare construction, costing, and estimating.  [May 18, Miller, at 95:25 – 96:5].

1568.  Beginning in 1992, Mr. Miller was the Vice President of Estimating at L.F. Driscoll, "the largest construction management builder in the Philadelphia Metropolitan Region."  [May 18, Miller, at 87:16 – 89:18].

1569.  Mr. Miller has done over $6 billion of healthcare work in which he was responsible for the pricing and/or operation of the project, and has worked in the healthcare construction

industry since joining L.F. Driscoll as a carpenter apprentice in 1978.  [May 18, Miller, at 88:8-21].

1570.  Mr. Miller has worked on renovation projects that included remediation of spray-applied fireproofing dozens of times.  [May 18, Miller, at 136:7-11].

1571.  Mr. Miller has worked on over a thousand fireproofing projects over the course of his career.  [May 18, Miller, at 136:12-14].

1572.  Mr. Miller's cost estimates at the schematic level have historically been within "one to two percent" of the cost of completing the final construction documents.  [May 18, Miller, at 93:19 – 94:15].

1573.  Mr. Miller, who has extensive experience in the Philadelphia market, was the only expert offered by the parties who has personally been directly responsible for bidding, pricing, and managing health care construction projects in the geographic locale relevant to this matter.  CHS's construction expert, Mr. Galassini, has never been involved with a construction project in Pennsylvania, much less the Philadelphia metropolitan region.  [May 25, Galassini, at 39:15-16].

1574.  Mr. Miller performed three site visits of Pottstown Hospital, each lasting three to four hours, and "did a really thorough examination and poked our heads up in the ceilings with flashlights to see exactly what it is we would be encountering."  [May 18, Miller, at 101:21 – 102:7].

1575.  Mr. Miller testified that the existing wall construction in a hospital, which he personally inspected at Pottstown Hospital, must be inspected before providing a construction estimate to a healthcare facility because the wall construction will affect pricing.  [May 18, Miller, at 100:6-15].  Mr. Galassini, CHS's construction expert, has never been to Pottstown

322

Hospital, much less examined the "wall construction" at Pottstown Hospital.  [May 25, Galassini, at 40:6-8].

1576.  Mr. Miller testified that he needed to personally look above the ceilings "to have total faith and confidence in [his] estimate."  [May 18, Miller, at 117:3-11].  Mr. Galassini never visited Pottstown Hospital, much less looked above the ceilings.  [May 25, Galassini, at 40:6-8].

1577.  In his career, Mr. Miller has never issued a schematic design cost estimate for a client to rely on without him or his team first doing a site visit.  [May 18, Miller, at 109:17-20].

1578.  Following multiple site visits at Pottstown Hospital, Mr. Miller estimated the cost and length of completing the required renovations set forth in Mr. Tracy's phasing plans, demolition plans, and new work plans (PX245).  [May 18, Miller, at 102:15-17; *see* PX245 (Tracy Plans)].

1579.  The purpose of Mr. Miller's proposed construction plan is to "fix the fireproofing", and to do what is necessary to provide the required access to the hospital's structural members that require remediation.  [May 18, Miller, at 113:19 – 114:16].

1580.  Mr. Miller developed an estimate regarding the length of the project by looking at each space and estimating how long it would take to build the space based on his history and experience doing similar projects.  Mr. Miller followed the "same procedure" as he does in his other construction work outside of litigation.  [May 18, Miller, at 176:13-23].

1581.  Mr. Miller worked with David Major, as the Tower Health's Owner's Representative for this project, to develop his construction plans and estimate for Pottstown Hospital.  [May 5, Major, at 109:2-11].

1582.  Mr. Major provided Mr. Miller with a hypothetical start date of six months after Pa. DOH approved Pottstown Hospital's Plan of Correction to provide Mr. Miller with time "to get design drawings done.  We needed to start the planning process, get all of the preconstruction

items done from the conceptual plans and drawings, put the work out to bid, get the bids back, and begin the work."  [May 5, Major, at 110:5-24].

1583.  Mr. Miller used the hypothetical start date from Mr. Major, "[b]ecause we were uncertain at this stage in the game what the resolution to the situation was, how we were going to resolve the situation."  [May 5, Major, at 110:25 – 111:3].

1584.  Mr. Miller determined that the construction necessary to remediate the fireproofing deficiencies at Pottstown Hospital will take 54 months to complete.  [May 18, Miller, at 173:19-21; PX254 (R. Miller Project Schedule)].

1585.  Mr. Miller developed a schematic cost estimate to complete the work set forth in Mr. Tracy's plans (PX245) from a construction standpoint, which excludes furnishings, architect's costs, and other cost items.  [May 18, Miller, at 179:2-22; PX257 (R. Miller Estimate)].

1586.  Mr. Miller relied on the construction specifications prepared by Jensen Hughes (PX242) for guidance regarding how the original dry-fiber SFRM throughout the hospital should be removed and replaced and determined that removing and replacing the fireproofing could be achieved using a "blended number" of $7 per square foot.  [May 18, Miller, at 191:20 – 193:12; PX242 (Jensen Hughes Construction Specs)].

1587.  Mr. Miller estimated unit costs for this project by averaging LF Driscoll's cost history on recent prior projects in the Philadelphia metropolitan region.  Mr. Miller obtained the unit cost information from "the thousands of iterations of hospital projects" LF Driscoll has done and used the exact same method as when he normally does this work.  [May 18, Miller, at 179:25 – 180:5, 180:24 – 181:23].

1588.  Mr. Miller testified that he prepared his cost estimate the "Exact same way" as he normally does in the real world.  [May 18, Miller, at 181:21-23].

324

1589.  Mr. Miller opined that the construction necessary to remediate the fireproofing deficiencies will cost $114,236,355.  [May 18, Miller, at 179:15-22; PX257 (R. Miller Estimate), at 3].  The Court accepts Mr. Miller's cost estimate (PX257) as accurate and adopts it as evidence.

1590.  Mr. Miller has the same level of confidence in his cost estimate for Pottstown Hospital as he did with every other project in his career; Mr. Miller testified that "I have full confidence in what we priced here."  [May 18, Miller, at 109:3-8].

1591.  The Court finds Mr. Miller's explanation of the importance of developing a cost estimate for a client that is not too high, or as Mr. Miller put it, not to "safe it out and overprice" the project to be credible: "We have to give the client a price that they could take to the bank, that they could go to the board and get approval. **We need that price to be accurate, and we also don't want to give a client a price that is exorbitant, that doesn't make sense.  So a project wouldn't be built or -- they submit that price.  They get that amount of money approved and then don't spend anywhere near that kind of money**.  It's not as bad as not giving them an accurate price that's right on the money and not too low, **but it's not a good thing to safe it out and overprice a project as well**."  [May 18, Miller, at 110:1-10 (emphasis added)].  In other words, Mr. Miller was cognizant of the risks associated with providing Tower Health with an exorbitant estimate to remediate the fireproofing deficiencies.

1592.  The Court finds that Mr. Miller's cost estimate (PX257) accurately presents the construction costs associated with completing the construction proposed in Mr. Tracy's architectural plans (PX245).  [May 18, Miller, at 113:1 – 114:16 PX257 (R. Miller Estimate), at 3].

1593.  Mr. Miller's cost estimate of $114,236,355 to remediate the fireproofing deficiencies is more cost effective than building a new hospital facility, which Tower Health estimated would cost approximately $330,000,000 before litigation began.  [PX257 (R. Miller Estimate), at 3; PX204 Oct. 2018 D. Major Presentation), at 8].

1594.  The Court finds that the cost to remediate the fireproofing deficiencies is a loss, liability, damage, cost, or expense that Tower Health incurred as a result of, or with respect to any misrepresentation or breach of warranty by the Seller Entities pursuant to Section 11.2 of the APA.  [DX111 (APA), at 43-44].

### F.  CHS's Critiques of Mr. Miller's Construction Costs.

1595.  CHS criticized various line items in Mr. Tracy's architectural plans and Mr. Miller's cost estimate.  Significantly, CHS did not, as noted above, challenge the scope of remediation as determined by Jensen Hughes.

1596.  The Court rejects CHS's critiques of Mr. Miller's cost estimates for the reasons discussed below.  But even if the Court were to accept each and every criticism below, the total cost to complete the required remediation set forth in Mr. Tracy's architectural plans and Jensen Hughes' remediation drawings would be $96,108,539.78.

1597.  CHS challenged the following items included in Mr. Tracy's architectural plans and Mr. Miller's cost estimate:

(a)  CHS contends that one existing CT Room does not require remediation.  [May 17, Tracy, at 183:13-14].  Deducting 1,000 SF from the renovation area to account for the area purportedly in compliance at $350/SF and the associated escalation costs would reduce Mr. Miller's estimate by $387,595.46.  [PX257 (R. Miller Estimate), at 2].  The Court rejects CHS's position because there was no testimony or evidence to contradict Mr. Parker's opinion and Mr. Martin's determination that the fireproofing above the existing CT Room requires remediation.

(b)  CHS contends that the temporary CT Trailer is unnecessary because one of two existing CT Rooms did not require remediation.  [May 17, Tracy, at 186:8-12].  Deducting the entire cost of the temporary CT Trailer from Mr. Miller's estimate would reduce Mr. Miller's estimate by $685,311.  [PX257 (R. Miller Estimate), at 1].  The Court rejects CHS's position because there was no testimony or evidence to contradict Mr. Parker's opinion and Mr. Martin's determination that the fireproofing above the existing CT Room requires remediation and that Pottstown Hospital requires two working CT scanners to remain operational.  [May 17, Tracy, at 187:11-22].

(c)  CHS contends that the anti-ligature equipment on the 7th floor should be preserved.  [May 18, Tracy, at 71:3-12].  Providing a credit for the entire amount would reduce Mr. Miller's estimate by $800,000.  [May 18, Tracy, at 71:7-8].  The Court rejects CHS's position because not all of the seventh floor is being renovated, [May 18, Tracy, at 208:1-3], not all of the $800,000 was used strictly for anti-ligature equipment, and Mr. Tracy's plans preserve as much of that equipment as possible.  [May 18, Tracy, at 71:13 – 72:7].

(d)  CHS challenges the cost of building a new Gift Shop and Vestibule.  [May 18, Tracy, at 242:15 – 244:4].  Deducting the entire cost for the Gift Shop and Vestibule ($828,000) and the cost of modifications to the existing front entrance ($23,300) would reduce Mr. Miller's estimate by $851,300.  [PX257 (R. Miller Estimate), at 2-3].  The Court rejects CHS's position because the fireproofing above the existing Gift Shop needs to be remediated, and relocating it to a new area is necessary to create soft space to facilitate Mr. Tracy's phasing plans and allow Pottstown Hospital to remain operational.  [May 18, Tracy, at 242:17-22].

(e)  CHS contends that replacing the existing SPD equipment is unnecessary. Deducting the entire allowance for SPD equipment would reduce Mr. Miller's estimate by

327

$723,465.  [PX257 (R. Miller Estimate), at 1].  The Court rejects CHS's position because the SPD area requires remediation and at least a part of the existing SPD equipment cannot be reused.  [May 17, Tracy, at 217:25 – 218:17; May 18, Miller, at 186:25 – 187:15].

(f)  CHS contends that Rad Room 6 does not require remediation.  [May 18, Tracy, at 65:15 – 66:14].  Deducting 400 SF from the renovation area to account for the area allegedly in compliance, at $400/SF, would reduce Mr. Miller's estimate by $160,000.  [PX257 (R. Miller Estimate), at 1].  The Court rejects CHS's position because there was no testimony or evidence to contradict Mr. Parker's opinion and Mr. Martin's determination that the existing fireproofing above Radiation Room 6 requires remediation.

(g)  CHS contends that the addition of a two-stop elevator is unnecessary.  [May 17, Tracy, at 211:24 – 212:3].  Deducting the entire cost of the two-stop elevator and necessary modifications would reduce Mr. Miller's estimate by $407,750.  [PX257 (R. Miller Estimate), at 2].  The Court rejects CHS's position because the two-stop elevator will improve the hospital's code compliance and help the hospital obtain plan approval from Pa. DOH.  [May 17, Tracy, at 212:4 – 214:7].

(h)  CHS contends that five existing Operating Rooms do not require remediation.  [May 18, Tracy, at 45:1 – 46:21].  Deducting 3,000 SF from the renovation area to account for the area purportedly in compliance (based on 5 Operating Rooms at 600 SF each) at $700/SF would reduce Mr. Miller's estimate by $2,100,000.  [PX257 (R. Miller Estimate), at 2].  The Court rejects CHS's position because there was no testimony or evidence to contradict Mr. Parker's opinion and Mr. Martin's determination that the fireproofing above the existing Operating Rooms requires remediation.

328

(i)  CHS contends that the phasing premiums in Mr. Miller's cost estimate are unnecessary.  [June 11, Carlisle, at 40:3 – 41:4].  Deducting the entire cost of phasing premiums reduces Mr. Miller's estimate by $1,386,915.  [PX257 (R. Miller Estimate), at 1].  The Court rejects CHS's position because the phasing premiums account for costs not already covered in Mr. Miller's estimate and Mr. Miller's determination that such premiums were necessary was reasonable given his extensive experience renovating healthcare facilities.  [May 18, Miller, at 208:14 – 209:14].

(j)  CHS contends that the ICRA and demolition costs should be "3 or $4 million" rather than $5 million.  [June 11, Carlisle, at 41:19-25].  Taking the larger suggested deduction would decrease Mr. Miller's estimate by $2,000,000.  The Court rejects CHS's position because Mr. Carlisle does not have any basis to challenge Mr. Miller's ICRA and demolition costs, and because Mr. Miller's determination that ICRA and demolition costs were required is reasonable given Mr. Miller's extensive experience renovating healthcare facilities and familiarity with Pottstown Hospital.

(k)  CHS contends that purchasing a triple-wide trailer for $100,000 would be more cost-effective than renting.  [June 11, Carlisle, at 42:21-25].  Purchasing a triple-wide trailer for $100,000 and deducting the cost of renting a trailer would reduce Mr. Miller's estimate by $255,442.  [PX257 (R. Miller Estimate), at 1].  The Court rejects CHS's position because Mr. Miller has years of experience on healthcare construction projects in the Philadelphia market and his determination to rent a trailer is reasonable given his familiarity with the existing conditions at Pottstown Hospital and his related experience on past projects.  [May 18, Miller, at 184:6 – 185:13].

(l) CHS contends that the inpatient oncology wing on the second floor is unnecessary, [May 17, Tracy, at 177:6-20]; Mr. Miller's fit-out cost for Inpatient Oncology is $400/SF, totaling $7,319,200. [PX257 (R. Miller Estimate), at 3]. The Court rejects CHS's position because it is undisputed that the existing space requires remediation, and at a minimum, Tower Health is required to replace the existing patient rooms with patient rooms, at a cost of $380/SF, which would reduce Mr. Miller's estimate by $369,560. [PX257 (R. Miller Estimate), at 3 ("Med Surge" fit-out costs)].

(m) CHS contends that building a new outpatient oncology clinic on the second floor is unnecessary. [May 17, Tracy, at 178:3 – 179:13]. Mr. Miller's fit-out cost estimate for Outpatient Oncology is $425/SF, totaling $8,222,868. The Court rejects CHS's position because it is undisputed that the existing space requires remediation, and at a minimum, Tower Health is required to replace the existing space with similar "Admin/Support" space, at cost of $300/SF, which would reduce Mr. Miller's estimate by $2,358,490.46. [PX257 (R. Miller Estimate), at 3].

(n) CHS contends that purchasing an exterior material hoist will be more cost-effective than renting one. [June 11, Carlisle, at 43:13-22]. Deducting the entire cost of the exterior material hoist would reduce Mr. Miller's estimate by $1,258,200. [PX257 (R. Miller Estimate), at 1]. The Court rejects CHS's position because an exterior material hoist is necessary for the proposed renovations and 80% of the cost associated with the hoist in Mr. Miller's estimate is for the hoist operator, not the hoist rental. [May 18, Miller, at 185:14 – 186:18].

(o) CHS contends that the kitchen equipment (freezers and walk-in coolers) does not need to be replaced and relocated. [May 17, Tracy, at 217:25 – 218:17]. Deducting the entire cost of renovating the kitchen would reduce Mr. Miller's estimate by $3,520,557. [PX257 (R. Miller Estimate), at 1]. The Court rejects CHS's position because Mr. Tracy's determination that

the existing kitchen equipment will need to be relocated and replaced is reasonable and credible given Mr. Tracy's years of experience developing renovation plans for healthcare facilities. Additionally, the fit-out cost for the kitchen is not based solely on replacing the equipment, but also includes the entire interior renovation, which according to Mr. Tracy, includes "when you take a . . . space that's empty and build the whole thing", [May 18, Tracy, at 27:23 – 28:11]; and CHS offered no evidence of the amount Mr. Miller's estimate would decrease as a result of reusing the existing kitchen equipment.

1598.  If each of CHS's criticisms were accepted by the Court, it would reduce Mr. Miller's estimate by $17,264,585.92, plus an additional reduction of $863,229.30 to account for the 5% contingency cost in Mr. Miller's estimate, and result in a reduced total cost of $96,108,539.78 to complete the required fireproofing remediation at Pottstown Hospital.

1599.  The Court rejects CHS's objections to Mr. Miller's construction costs for the reasons set forth above, and because Mr. Tracy and Mr. Miller inspected and surveyed the facility on multiple occasions and have years of developing plans for and estimating the cost of renovations to healthcare facilities in the Philadelphia market.

1600.  Alternatively, CHS contends Mr. Miller's estimate is "20 to 25 percent" too high, and that the cost to complete Mr. Miller's scope of work should be "between 80 and 112 million." [TA-P-5, Carlisle Feb. 4 Dep. at 41:15 – 42:8].

1601.  If the Court were to accept CHS's criticism, Mr. Miller's estimate would be reduced by 25% ($28,599,088.75) and would result in a reduced total cost of $85,677,266.25 to complete the required fireproofing remediation at Pottstown Hospital.

1602.  The Court rejects Mr. Carlisle's criticism because Mr. Miller's opinions regarding the construction costs associated with this project are more reliable and credible.  Mr. Carlisle did

not offer any testimony that he surveyed the existing conditions at Pottstown Hospital, while Mr. Miller performed multiple site visits to survey the existing conditions at Pottstown Hospital before rendering his opinion on the estimated construction costs. In addition, Mr. Carlisle has been an employee of the Defendants for more than 15 years, while Mr. Miller, on the other hand, is an experienced healthcare construction estimator in the relevant geographic locale.

### G. The Court Rejects the Galassini Alternative Approach to Remediation.

1603. Mr. Galassini opined that his renovation plan for Pottstown Hospital would take 33 months to complete and would cost $27,378,503 to remediate the fireproofing, plus an additional $1,480,750 to remediate the columns. [May 24, Galassini, at 226:15-17; May 25, Galassini, at 4:14 – 5:3].

1604. However, Mr. Galassini never visited Pottstown Hospital at any time, [May 25, Galassini, at 40:6-8], including during the time he was in Pennsylvania waiting to testify and only an hour away from Pottstown.

1605. Because Mr. Galassini never surveyed Pottstown Hospital, given the basis for his opinions regarding the proposed method of remediation and cost, his opinions are speculative and must be rejected.

1606. Mr. Galassini's approach to remediating the deficient fireproofing and gaining access to the structural steel members, on which he based his cost estimate, is to take a tour of each hospital room, along with various contractors and the owner; take down the ceiling in each room (which Mr. Tracy testified was not possible in the patient rooms containing metal pan ceilings, which includes all patient rooms in the un-renovated areas) to assess the condition of the fireproofing; cut down the hospital's interior walls by three feet; and remove the mechanical, electrical, and plumbing systems to gain access to the structural members. [May 24, Galassini, at

332

221:24 – 225:19]. In other words, as noted below, Mr. Galassini never performed the inspections that were done by Mr. Tracy and Mr. Miller to support their conclusions.

1607. Mr. Galassini never conducted his tour of each hospital room, yet he estimated a cost as though he had, making his cost estimate entirely speculative and unacceptable.

1608. Mr. Galassini admitted that his cost estimate is "preliminary because no on-site assessment has been completed to verify all existing conditions to support the budgeted cost." [May 25, Galassini, at 59:18-22].

1609. Unlike Mr. Miller's "schematic" estimate, Mr. Galassini offered a "conceptual" estimate, which is the earliest design stage. [May 24, Galassini, at 197:13-14; May 25, Galassini, at 52:19-22; DX213-A (Galassini "Conceptual Estimate Summary")]. In other words, at the conceptual level, Mr. Galassini's opinions are less developed than Mr. Miller's.

1610. Mr. Galassini is not an "estimator" and is unsure how unit costs are actually determined because he is not involved in coming up with those numbers. [May 24, Galassini, at 207:12 – 208:11].

1611. Unlike Mr. Miller and Mr. Tracy, Mr. Galassini never performed a site visit at Pottstown Hospital, even though he admitted it "definitely" would have been helpful for him to do so. [May 25, Galassini, at 40:6-14].

1612. Mr. Galassini suggested a site visit in this case because, "It would have been beneficial but I knew the circumstances probably wouldn't allow for us to do that." [May 25, Galassini, at 40:19-22]. The Court rejects that Mr. Galassini could not have performed a site visit because the Court is aware that other CHS experts did, indeed, visit the hospital to perform inspections and there is no reason to believe that Mr. Galassini could not also have done so.

1613.   The Court accepts Mr. Miller's testimony that it is irresponsible for an estimator to develop a cost estimate for a construction project without first conducting a thorough site visit. [May 18, Miller, at 109:9-20; May 18, Miller, at 126:2-15].

1614.   Mr. Galassini admitted that all of his construction plans are based on his assumptions of the existing conditions at Pottstown Hospital.  [May 25, Galassini, at 40:9-11].

1615.   Mr. Galassini based his entire proposal and estimate on his assumption that walls at Pottstown Hospital, constructed in the 1970s, could be cut down three feet, even though he had never visited Pottstown Hospital, let alone inspected the walls.  [May 25, Galassini, at 64:20:23, 66:15-25].

1616.   Mr. Galassini explained that cutting drywall can be done easily by using a blade to cut the wall, [May 25, Galassini, at 81:1-2], which perhaps explains why Mr. Galassini's estimate assumed the existing walls at Pottstown were drywall, not plaster.  [May 25, Galassini, at 86:16-21; DX213-D (Galassini Quantity Take-Off Detail), at p. 27 (renovations include "Demo Drywall Partition" on every floor, but not plaster)].

1617.   Although Mr. Galassini testified that he was not aware the existing walls at Pottstown Hospital were plaster, "without me going and putting my eyes on it," [May 25, Galassini, at 87:2-4], Mr. Miller and Mr. Tracy both testified that the interior walls at Pottstown Hospital are constructed of plaster, not drywall, making Mr. Galassini's assumption regarding Pottstown Hospital's wall construction false.

1618.   Mr. Galassini conceded that cutting plaster walls would take longer and be more expensive than cutting drywall walls.  [May 25, Galassini, at 80:24 – 81:5].

334

1619.  Because he had not visited Pottstown Hospital, Mr. Galassini does not know if his proposed method of cutting three feet down a plaster wall would degrade the plaster and degrade the old walls.  [May 25, Galassini, at 66:15-25].

1620.  Mr. Galassini assumed that all existing walls can remain in place, regardless of any issues with the top track or plaster construction.  [May 25, Galassini, at 77:7-18].

1621.  Mr. Galassini's estimate does not include the cost of removing the walls at Pottstown Hospital if the top track has to be removed.  [May 25, Galassini, at 76:24 – 77:3].

1622.  Mr. Tracy and Mr. Miller inspected the wall construction at Pottstown Hospital and testified that Mr. Galassini's proposed method of cutting the walls down three feet to provide access to the structural steel will not work at Pottstown Hospital, in part because the walls are constructed of plaster, which is very difficult to cut and would crack when cut, not drywall. [May 13, Tracy, at 242:23 – 244:8; May 18, Miller, at 171:22 – 172:11].

1623.  Mr. Miller testified that Mr. Galassini's proposed method of cutting the existing plaster walls down three feet would "crack all the plaster" and "destroy the wall."  [May 18, Miller, at 172:3-11].

1624.  Mr. Galassini did not offer an opinion that his proposed method of remediating the fireproofing at Pottstown Hospital will result in a code compliant building because "***that's not [his] expertise***."  [May 25, Galassini, at 47:3-16 (emphasis added)].

1625.  Unlike Mr. Tracy, Mr. Galassini has no experience working with the Pennsylvania Department of Health and has not "personally worked in the state of Pennsylvania."  [May 25, Galassini, at 39:13-16].

1626.  Mr. Galassini based his estimate on assumptions regarding Pa. DOH, yet he did not contact Pa. DOH to verify that they would do the things he assumes they might, do even though

335

that is something he normally does when planning a project such as this one.  [May 25, Galassini, at 39:17 – 40:5].

1627.  Although Mr. Galassini testified that he would normally follow the instructions of a material testing contractor, like Jensen Hughes, to give direction regarding "what can stay and what has to be removed and replaced" and that he would normally rely on the recommendation of a professional like Mr. Parker, [May 25, Galassini, at 48:9 – 49:2], Mr. Galassini ignored the findings of Mr. Parker and determinations of Mr. Martin that were inconsistent with his scope of work.  [May 25, Galassini, at 72:3-7].  Because he did not visit the hospital to perform an inspection of the existing conditions, which he noted would be necessary to support the work actually performed, the Court rejects Mr. Galassini's opinions as speculative and unreliable.

1628.  Mr. Galassini's estimate ignored Mr. Parker's conclusions and assumed that "**all existing SFRM will remain in place** and a bonding sealer agent will be applied, and then an allowance included **for minor removal of existing SFRM where delamination has already begun** . . . ."  [May 25, Galassini, at 90:1-6; DX213-B (Galassini Estimate Qualifications), at p. 7 (emphasis added)].  The Court rejects Mr. Galassini's assumption because the evidence shows that that areas "where delamination has already begun" will require much more than "minor removal of existing SFRM."  [*See, e.g.*, PX316 (Jensen Hughes photographs)].

1629.  Mr. Galassini agrees with Mr. Tracy and Mr. Miller that for the fireproofing to be remediated, the ceilings in each room will have to come down.  [May 25, Galassini, at 61:15-18].

1630.  Mr. Galassini assumed the ceilings at Pottstown Hospital were acoustical ceilings and his estimate does not cover the cost of removing and replacing the existing metal pan ceilings, which he concedes would increase the scope of work from simply taking down acoustical ceilings temporarily.  [May 25, Galassini, at 83:16 – 84:16].

1631. Mr. Galassini did not know whether he would have to renovate an entire area at once due to the interconnected nature of the HVAC at Pottstown Hospital because "[t]hat would be part of our due diligence onsite…" [May 25, Galassini, at 85:8-15].

1632. Unlike Mr. Tracy, Mr. Galassini does not know whether his phasing plan on which his cost estimate relies will satisfy the Pottstown Hospital's operational needs hospital. [May 25, Galassini, at 58:6-14]. In other words, Mr. Galassini does not know whether his construction plan could be completed without having to shut down Pottstown Hospital.

1633. Mr. Galassini's phasing plans ignored the operational concerns addressed in Mr. Tracy's phasing plans. [May 25, Galassini, at 57:19 – 58:5].

1634. Mr. Galassini based his estimate on the assumption that departments could be renovated in place by renovating smaller portions of rooms in each department; however, he testified he would typically review this type of phasing decision with the owner, facilities department, and staff in those departments that would be impacted. [May 24, Galassini, at 223:6-19].

1635. Unlike Mr. Tracy and Mr. Miller, Mr. Galassini did not speak with the hospital owner about the project, even though this is something he would do outside of litigation. [May 25, Galassini, at 57:11-18].

1636. Mr. Galassini was not provided, and did not review, Pottstown Hospital's Plan of Correction even though he conceded it would have been helpful for him to know what Pottstown Hospital told the regulators. [May 25, Galassini, at 58:22 – 59:2].

1637. Mr. Galassini's proposed renovation plan will not be completed until February 2024. [May 25, Galassini, at 56:2-9].

1638.  Mr. Galassini conceded that his cost estimate will be impacted by having to compress his construction schedule to complete the renovations before the December 2023 deadline set forth in the Plan of Correction, a deadline he was not aware of until trial.  [May 25, Galassini, at 56:10-25].

1639.  Mr. Galassini testified that he routinely relies on architects like Mr. Tracy, as well as engineering experts like Jensen Hughes, to determine the scope of work of a project.  [May 25, Galassini, at 51 – 53].

1640.  Mr. Galassini testified that a design professional, like Mr. Tracy, would determine whether the scope of work will accomplish the purpose in this case of achieving a code-compliant building.  [May 25, Galassini, at 55:2-7].

1641.  However, Mr. Galassini did not consult an architect regarding his opinions for remediating the fireproofing at Pottstown Hospital and the corresponding cost.  [May 25, Galassini, at 71:24 – 72:2, 50:25 – 51:15].

1642.  Although Pa. DOH regulations require that all renovation work proposed for hospitals comply with the FGI Guidelines, s*ee* 48 Pa. Bulletin 2347, Mr. Galassini's estimate does not take into account any additional work that may be required to bring the renovated areas up to current code (i.e., the FGI Guidelines) as part of his renovation plans.  [May 25, Galassini, at 103:4-10].

1643.  CHS's expert, Mr. Carlisle, agreed the FGI Guidelines apply to a "renovation" and the FGI Guidelines require the areas being renovated to be brought up to current code standards. [June 11, Carlisle, at 103:3-11].

1644.  When describing his proposed construction work, Mr. Galassini testified that "all this falls under renovation work."  [May 24, Galassini, at 224:20 – 225:1].

338

1645.  CHS's counsel conceded that "it clearly states in [Mr. Galassini's] estimate that this is a renovation."  [May 25, Dodson, at 70:16-17].

1646.  Mr. Galassini did not opine that his proposed plan of remediation, on which he based his cost estimate, would comply with the FGI Guidelines.  Mr. Galassini did not offer an opinion that his proposed method of remediating the fireproofing at Pottstown Hospital will result in a code compliant building because "***that's not my expertise***."  [May 25, Galassini, at 47:3-16 (emphasis added)].

1647.  This case involves renovation work that Tower Health has established must comply with the FGI Guidelines to obtain plan approval from Pa. DOH.  Mr. Galassini, in contrast, has proposed a construction plan that does not bring the renovated areas of the building up to current code, as required by the FGI Guidelines.

1648.  Pa. DOH regulations require that all renovation work proposed for hospitals comply with the NFPA 101 Life Safety Code.  *See* 48 Pa. Bulletin 2347.

1649.  This case involves Life Safety Code deficiencies that Tower Health has established must be remediated by converting Pottstown Hospital into a Type II (222) building. Mr. Galassini, in contrast, has proposed a method of renovating the building that does not resolve the issues because there is no evidence that Pottstown Hospital would be converted to a Type II (222) building following completion of Mr. Galassini's proposed construction plans.

1650.  There is no testimony that Mr. Galassini's construction plans comply with the NFPA 101 Life Safety Code.

1651.  CHS failed to introduce the testimony of an architectural expert to offer opinions regarding whether Mr. Galassini's plans would meet the requirements for approval of Pa. DOH.

339

1652.  The Court finds that Mr. Galassini's opinion regarding the proposed method of remediating the fireproofing deficiencies does not fit the facts of this case because CHS presented no testimony or evidence that Mr. Galassini's construction plans would comply with the FGI Guidelines or the NFPA 101 Life Safety Code, both of which are requirements for approval by Pa. DOH.

1653.  CHS's counsel conceded that Mr. Galassini would not be offering an opinion that performing the remediation he suggested over the timeframe he suggested would result in the hospital being compliant with NFPA 101.  [May 25, Dodson, at 16:25 – 17:7].

1654.  CHS's counsel conceded that code issues were not included in Mr. Galassini's scope of work.  [May 25, Galassini, at 102:18-22].

1655.  The Court finds it significant that CHS did not present any expert witness testimony that Mr. Galassini's conceptual plans would resolve the Life Safety Code deficiencies at Pottstown Hospital.

1656.  The Court rejects Mr. Galassini's opinions regarding the proposed method of remediating the fireproofing and his corresponding cost estimate because CHS presented no testimony or evidence that Mr. Galassini's construction plans would result in Pottstown Hospital achieving the required Type II (222) Building Construction Type.

### H. The Court Rejects Mr. Galassini's Proposal to Abandon the Seventh Floor of Pottstown Hospital and Relocate the Behavioral Health Unit to An Off-Site Location as a Viable Remediation Alternative.

1657.  Mr. Galassini provided an alternative cost estimate for Mr. Hofmeister's proposed alternative of removing Pottstown Hospital as a high-rise building by converting the seventh floor of Pottstown Hospital into "shell space" and building a freestanding behavioral health hospital or unit at an offsite location.  [May 25, Galassini, at 30:3-9; DX215 (Galassini Estimate Proposal)].

340

1658. Mr. Galassini's estimates for converting the seventh floor into shell space and building a freestanding behavioral health facility are "preliminary as no onsite assessment has been completed to verify all existing conditions to support the budgeted costs." [May 25, Galassini, at 120:23 – 121:2; DX215 (Galassini Estimate Qualifications), at 14].

1659. Mr. Galassini's opinions are speculative because he never visited the seventh floor of Pottstown Hospital, never did an inspection of any prospective building sites for a free standing behavioral health unit, and by is his own admission, his opinions are "preliminary." [May 25, Galassini, at 120:23 – 121:2].

1660. Mr. Galassini estimated that reducing the seventh floor down to bare concrete, including removing walls, infrastructure, and finishes, would cost $916,879. [May 25, Galassini, at 31:7-22].

1661. Mr. Galassini estimated that building a freestanding behavioral health unit would cost $12,726,240. [May 25, Galassini, at 35:2-20].

1662. Mr. Galassini's estimate only covers the costs **of building** a freestanding behavioral health unit and does not include other costs that Tower Health would incur if completing this proposed project. [May 25, Galassini, at 114:24 – 118:2].

1663. Although Tower Health would need to purchase and improve land to complete this project, Mr. Galassini's estimate does not include any land development or acquisition costs. [May 25, Galassini, at 115:4 – 116:12].

1664. Mr. Galassini's proposal to build a freestanding behavioral health unit would require additional land, development, zoning, regulatory, moving, equipment, consulting, and IT costs. [June 11, Carlisle, at 90:10 – 91:18].

341

1665. Mr. Galassini conceded that to have a "more firm estimate for a client to rely on" he would need a design team of an architect, mechanical engineer, structural engineer, and civil engineer to develop a package for pricing. Mr. Galassini never engaged such a design team and his estimate does not include the cost of doing so. [May 25, Galassini, at 117:5-17].

1666. The Court rejects Mr. Galassini's opinions of the estimate for removing Pottstown Hospital as a high-rise building by converting the seventh floor of Pottstown Hospital into shell space and building a freestanding behavioral health hospital or unit at an offsite location because they are speculative.

## XVIII. Tower Health Presented Credible Evidence of Alternative Contractual Damages.

1667. Tower Health presented evidence at trial that the fair market value of Pottstown Hospital decreased by $87,844,350 as a result of the non-compliant condition of Pottstown Hospital as of October 1, 2017, and Defendants' breaches of the APA. [PX274 (T. Zigrang Summary of Damages)].

### A. The Court Accepts the Damages Presented by Tower Health's Expert Todd Zigrang.

1668. The Court accepted Todd Zigrang without objection as an expert in business valuation with an expertise in healthcare business valuation. [May 12, Zigrang, at 184:16-19].

1669. Mr. Zigrang is the President of Health Capital Consultants, a financial and economic consulting firm that specializes in valuation of businesses, services, and assets exclusively in the healthcare industry. [May 12, Zigrang, at 176:18 – 177:1].

1670. Mr. Zigrang has been involved with over 2,000 valuation projects in the healthcare industry over the course of his career. [May 12, Zigrang, at 181:4-7].

1671. Mr. Zigrang calculated the loss in value of Pottstown Hospital based on the difference between the price paid and the value of the hospital in the condition it was received. [May 12, Zigrang, at 186:7-12].

1672. Mr. Zigrang determined the price Tower Health paid for Pottstown Hospital using the APA purchase price of $423 million for five hospitals, the purchase price allocation provided by Tower Health's Senior Vice President of Financial Operations, Robert Ehinger, an allocation of goodwill, and an appraisal of the workforce and custodial rights to patient charts. [May 12, Zigrang, at 202:19 – 203:5; PX177 (June 30, 2018 Final Asset Values)].

1673. In determining the price Tower Health paid for Pottstown Hospital, Mr. Zigrang relied on "the allocation of the purchase price between the five hospitals" provided by Mr. Ehinger. [PX177 (June 30, 2018 Final Asset Values); May 11, Ehinger, at 189:10-13; May 12, Zigrang, at 202:19 – 203:3].

1674. The "fixed assets" column in Mr. Ehinger's document "was determined by an independent fair market value analysis by KPMG." [PX177 (June 30, 2018 Final Asset Values); May 11, Ehinger, at 190:5-8].

1675. The purchase price allocation for Pottstown Hospital received from Mr. Ehinger was $148,911,787. [PX177 (June 30, 2018 Final Asset Values); May 12, Zigrang, at 206:11-13].

1676. Mr. Zigrang did a separate analysis to ensure he was accurately and validly appraising Pottstown Hospital's business assets and independently appraised the individual assets, including the Trained and Assembled Workforce and Custodial Rights to Patient Charts. [May 12, Zigrang, at 206:14 – 210:4].

1677. Mr. Zigrang testified that his calculation of damages would still be approximately $87 million even if used the $148,911,787 figure in the purchase price allocation provided by Mr.

343

Ehinger.  [May 12, Zigrang, at 238:18 – 240:3; PX274 (T. Zigrang Summary of Damages)].  In other words, the diminution in value is the same using either number.

1678.  Mr. Zigrang determined that the purchase price Tower Health paid for Pottstown Hospital was $157,623,081, including $105,875,882 in tangible assets; $40,636,645 in Goodwill; $10,168,314 in Trained and Assembled Workforce; and $942,240 in Custodial Rights to Patient Medical Records.  [May 12, Zigrang, at 188:7 – 189:1; PX274 (T. Zigrang Summary of Damages)].

1679.  Mr. Zigrang determined the value of Pottstown Hospital in the condition it was received on October 1, 2017 as a hospital not in compliance with CMS requirements by using an asset approach to appraise the individual assets of the business.  [May 12, Zigrang, at 225:12-20, 233:3-6].

1680.  Mr. Zigrang used an "income approach" to appraise the hospital (as opposed to an asset approach) because using an asset approach would not have resulted in the highest value of Pottstown Hospital, and therefore, would have resulted in higher damages attributable to CHS.  [May 12, Zigrang, at 230:15 – 232:11, 256:2-5]

1681.  For goodwill to exist, there must be income.  [May 12, Zigrang, at 237:14-15].  Mr. Zigrang determined that the goodwill purchased by Tower Health was not present at Pottstown Hospital in the condition it was received because the hospital cannot continue to generate income without incurring extensive construction costs.  [May 12, Zigrang, at 237:12-17].

1682.  Mr. Zigrang retained a certified appraiser to value the Pottstown Hospital building in two conditions, the condition it was received, and a hypothetical condition assuming the hospital was in compliance with CMS requirements.  [May 12, Zigrang, at 234:1-18].

1683.  Mr. Zigrang testified that value of the Pottstown Hospital building under the hypothetical condition that it was compliant as of October 1, 2017 was $53,400,000.  [May 12, Zigrang, at 235:17-25].

1684.  Mr. Zigrang testified that the value of the Pottstown Hospital building as of October 1, 2017 as a non-compliant hospital was $9,200,000, resulting in a loss of value of $44,200,000 in tangible assets.  [May 12, Zigrang, at 235:17-25].

1685.  Mr. Zigrang determined that value of Pottstown Hospital in the condition it was received by Tower Health was $69,788,731, comprised of $61,675,882 in Tangible Assets, $7,160,608 in Trained and Assembled Workforce, $942,240 in Custodial Rights to Patient Medical Records, and $0 in Allocated Goodwill value.  [May 12, Zigrang, at 189:2 – 190:9; PX284 (T. Zigrang Received Value); PX274 (T. Zigrang Summary of Damages)].

1686.  The difference between the price Tower Health paid for Pottstown Hospital ($157,623,081) and the actual value of Pottstown Hospital in the condition it was received ($69,788,731) is $87,844,350.  [May 12, Zigrang, at 188:7 – 190:9; PX274 (T. Zigrang Summary of Damages)].

1687.  The Court finds that Tower Health sustained a loss of $87,844,350 based on the diminution in the fair market value of Pottstown Hospital as a result of the non-compliant condition of Pottstown Hospital as of October 1, 2017.

### B. Corrections to Mr. Zigrang's Calculations Based on Mr. Barbo's Criticisms May Reduce, But Do Not Eliminate, Tower Health's Damages.

1688.  CHS's expert, Gary Barbo, was offered strictly to review Mr. Zigrang's opinions. [June 9, Barbo, at 200:6-12].  Mr. Barbo did not perform a valuation of Pottstown Hospital and did not offer any alternative number to Mr. Zigrang's calculation of the diminution in fair market value of Pottstown Hospital.  [June 9, Barbo, at 200:13-22].

345

1689.  Mr. Barbo did not personally do any analysis to determine what Mr. Zigrang referred to as the APA value.  [June 9, Barbo, at 202:2-18].

1690.  Mr. Barbo suggested Mr. Zigrang should have utilized $110,600,000 instead of $157,623,081 as the starting point for calculating Plaintiffs' damages.  [June 9, Barbo, at 182:20-24].

1691.  Mr. Barbo contends the parties agreed to allocate $110,600,000 to Pottstown Hospital, including $77,142,897 allocated to fixed assets and $33,457,103 allocated to Goodwill. [June 9, Barbo, at 178:24 – 180:19; DX178 (Sept. 2018 T. Hendon email)].

1692.  Assuming Mr. Barbo is correct and Mr. Zigrang's starting point should have been $110,600,000, then the starting point of the value of fixed assets in Mr. Zigrang's calculation must also be reduced from $105,875,882 to $77,142,897.  [DX178 (Sept. 2018 T. Hendon email)].  In other words, if you reduce Mr. Zigrang's starting point to the value in DX178, you must also the value of fixed assets in Mr. Zigrang's calculation.

1693.  CHS did not challenge Mr. Zigrang's opinion at trial that Tower Health suffered a $44,200,000 loss in tangible assets due to the decreased value of the Pottstown Hospital building.

1694.  Due to the undisputed $44,200,000 loss in value of the Pottstown Hospital building, the value of tangible assets received by Tower Health ($77,142,897) was diminished by $44,200,000, resulting in a received value of $32,942,897.  [May 12, Zigrang, at 235:17-25; DX178 (Sept. 2018 T. Hendon email)].

1695.  Assuming Mr. Barbo is correct and Mr. Zigrang's starting point should have been $110,600,000, then the starting point of the Goodwill value in Mr. Zigrang's calculation must also be changed from $40,636,645 to $33,457,103, which would reduce Mr. Zigrang's

346

calculation of loss in Goodwill value ($40,363,645), by $7,179,542. [DX178 (Sept. 2018 T. Hendon email)]. [DX178 (Sept. 2018 T. Hendon email)].

1696. Taking into account the above criticisms and replacing Mr. Zigrang's starting point with the $110,600,000 allocation, Mr. Zigrang's calculation of the difference between the price Tower Health paid for Pottstown Hospital and the actual value of Pottstown Hospital in the condition it was received would be reduced from $87,884,350 to $77,657,103.

1697. The Court rejects Mr. Barbo's assertion because Mr. Zigrang's starting point is consistent with the testimony of Ms. Judge and Mr. Ehinger. Ms. Judge and Mr. Ehinger testified that Exhibits DX198 and PX177 are the actual allocation recorded on Tower Health's books and records and based on FTI's assessment. [May 3, Judge, at 226:1-227:13; May 4, Judge, at 81:4-24, 84:8-12; May 11, Ehinger, at 190:9-14].

1698. Ms. Judge testified, "I've seen it implemented in the balance sheets of each of the five hospitals. So I recognize that this was the purchase price that was used for establishing the balance sheets of each of the hospitals." [May 4, Judge, at 83:3-7].

1699. In addition, the allocation attached to the APA as Schedule 10.1 was preliminary and was prepared for tax purposes. [May 3, Judge, at 224:8-13].

1700. A tax allocation agreed to by the parties is not the same as the fair market value or the book value of those assets. As Ms. Judge and Mr. Ehinger both testified, Tower Health did not care about the tax allocation that CHS wanted for the assets it sold. [May 3, Judge, at 224:8-25; May 12, Ehinger, at 191:1-10].

1701. Ms. Judge testified that she did not know if there was a separate written document where the parties agreed upon the fair market value of the assets purchased by Tower Health.

[May 4, Judge, at 91:14-17].  CHS presented no testimony or evidence that any document reflecting an agreement between the parties as to the fair market value of the assets exists.

1702.  The fact that the tax allocation was not based on fair market value is evidenced by CHS's request in September 2018, over a year after closing, to reallocate $22.6 million in goodwill from Chestnut Hill Hospital to Phoenixville and Pottstown.  [DX178 (Sept. 2018 T. Hendon email); May 4, Judge, at 85:18-23, 87:17 – 88:1 ("I'm saying that Tower agreed to CHS's request to reallocate the tax allocation for this $22.6 million, but it has nothing to do with the allocation for book purposes."); May 4, Judge, at 165:9 – 166:11].

1703.  The Court further rejects Mr. Barbo's assertion because Mr. Zigrang's opinion on the market value of Pottstown Hospital had it been delivered in a compliant condition ($157,623,081) is consistent with the "Fair Market Value Assessment of the Business Enterprise" performed on April 3, 2017 by FTI Consulting, which estimated a fair market value range of $139,407,000 to $164,747,000 for Pottstown Hospital.  [PX118 (April 2017 FTI fair market value assessment) at 3].

## XIX.    The Seller Entities, as Guaranteed by CHS, Did Not Comply with their Financial Statements Representations in Section 3.4 of the APA, Causing Tower Health to Suffer Substantial Damages.

### A.  Defendants Breached Section 3.4 of the APA.

1704.  Pursuant to Section 3.4 of the APA, the Seller Entities were required to deliver to the Buyer Entities "Financial Statements" of the Seller Entities and the Acquired Companies, defined as the Unaudited Balance Sheet as of March 31, 2017; the Unaudited Income Statement for the three months period ending on March 31, 2017; and the Unaudited Balance Sheets and Income statements for the fiscal years ended December 31, 2016 and 2015.  [DX111 (APA), § 3.4].

348

1705.  Defendants represented and warranted to Plaintiffs that, "Except as set forth in Schedule 3.4, such Financial Statements have been (and the monthly financial statements delivered pursuant to Section 5.6 will be) prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated."  [DX111 (APA), § 3.4].

1706.  Defendants represented and warranted that the "Income Statements present fairly in all material respects (and, in the case of financial statements delivered pursuant to Section 5.6, will present fairly in all material respects) the results of operations of each Seller Entity and Acquired Company for the periods indicated thereon."  [DX111 (APA), § 3.4].

1707.  According to the APA, Defendants delivered to Tower Health the Financial Statements of Pottstown Memorial Medical Center (PMMC, now known as Pottstown Hospital).

1708.  The representations and warranties in Section 3.4 applied to Pottstown Hospital and not CHSI, the publically traded company that owns Defendant CHS.  [DX111 (APA), § 3.4].

1709.  Defendants represented and warranted that the "Income Statements present fairly in all material respects (and, in the case of financial statements delivered pursuant to Section 5.6, will present fairly in all material respects) the results of operations of each Seller Entity and Acquired Company for the periods indicated thereon."  [DX111 (APA), § 3.4].

1710.  For the Pottstown Hospital Income Statements provided pursuant to Section 3.4 to present fairly in all material respects the results of operations, they must accurately present Pottstown Hospital's revenue and allowances.  [May 11, Pocalyko, at 230:12 – 231:4].

1711.  Defendants represented and warranted that the "Balance Sheets present fairly in all material respects (and, in the case of financial statements delivered pursuant to Section 5.6, will present fairly in all material respects) the financial condition of each Seller Entity and Acquired Company as of the dates indicated thereon . . . ."  [DX111 (APA), § 3.4].

349

1712.  For the Pottstown Hospital Balance Sheets provided pursuant to Section 3.4 to present fairly in all material respects the financial condition of Pottstown Hospital, the assets, liabilities, and obligations must be properly stated.  [May 11, Pocalyko, at 232:17-22].

1713.  CHS's expert, Mr. Kruskol, agrees that "the numbers in the balance sheets and the numbers in the income statements that were provided would need to be fair in all material respects."  [June 8, Kruskol, at 35:9-18].

1714.  Schedule 3.4 provides that the Financial Statements do not include footnotes. [DX111 (APA), at Schedule 3.4].

1715.  However, in the last sentence of Section 3.4 (most relevant in this case), the Seller Entities represented and warranted, and CHS guaranteed, "Except as disclosed on Schedule 3.4, no Seller Entity or Acquired Company has any material liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a type required to be disclosed or reflected in financial statements of a Seller Entity or Acquired Company in accordance with GAAP except for (i) liabilities reflected or reserved against in the Financial Statements, and (ii) liabilities incurred in the ordinary course of business since [March 31, 2017]."  [DX111 (APA), § 3.4; May 3, Judge, at 215:3-11].

1716.  Section 3.4 represents and warrants that there are no material liabilities that are not disclosed in Schedule 3.4, and that the Financial Statements of Pottstown Hospital provided to Tower Health disclose all of the material liabilities of any nature, accrued, absolute, contingent, or otherwise.  [May 11, Pocalyko, at 238:20 – 239:5].

1717.  Mr. Kruskol agreed that the last sentence of Section 3.4 requires the disclosure in Schedule 3.4 of any material contingent liabilities not already reflected on the balance sheets. [June 8, Kruskol, at 41:12 – 42:11].

350

1718.  Mr. Kruskol conceded that the parties agreed that anything that might end up in a footnote, such as any contingent liability, would be set forth on Schedule 3.4.  [June 8, Kruskol, at 64:11-17].

1719.  The Court finds that, even though footnotes were not required to be provided pursuant to Section 3.4, CHS was nevertheless required to disclose any contingent liabilities to be in compliance with GAAP.  [May 11, Pocalyko, at 242:6-12].

1720.  GAAP requires "a rigorous set of disclosures and accruals and other accounting functionality in order to make things understandable by users of financial statements."  [May 11, Pocalyko, at 228:14-17].

1721.  GAAP requires disclosure of a loss contingency when the loss is reasonably possible, or more likely than not to occur, [May 11, Pocalyko, at 250:5-18], and where the effect of the change would be material to the financial statements.  [May 11, Pocalyko, at 256:1-3].

1722.  The risk of impairment need not be a "certain absolute known risk" to trigger disclosure requirements under GAAP.  [May 12, Pocalyko, at 15:6-9].

1723.  GAAP requires disclosure of contingent liabilities even when a precise amount cannot be quantified.  [May 11, Pocalyko, at 240:2-11].

1724.  As set forth below, Pottstown Hospital's Financial Statements, provided by Defendants pursuant to the APA, were not prepared in conformance with GAAP as represented and warranted in Section 3.4.  [May 12, Pocalyko, at 50:8-14].

## 1. The Seller Entities, Guaranteed by CHS, failed to disclose a contingent liability associated with accounts receivable and revenue recognition issues.

1725.  The Court finds that Pottstown Hospital's Financial Statements, provided by Defendants pursuant to the APA, were not prepared in conformance with GAAP and did not comply with Section 3.4 because the Seller Entities failed to disclose to Tower Health the

351

allowances associated with bad debts and the corresponding decrease in net patient revenues. [May 12, Pocalyko, at 24:24 – 26:3].

1726.  Tower Health presented Paul Pocalyko to provide expert testimony relating to Defendants' breach of Section 3.4.  Mr. Pocalyko is as an expert in the field of forensic accounting, including GAAP accounting, lost profits, forensic analysis, and financial accounting. [May 11, Pocalyko, at 221:13 – 222:8].

1727.  Mr. Pocalyko is a Certified Public Accountant licensed in the state of Pennsylvania who has worked on hundreds of engagements involving financial modeling, damages, analytical procedures, and financial information.  [May 11, Pocalyko, at 214:4 – 215:11].

1728.  Mr. Pocalyko has worked on more than 100 construction cases that involved GAAP matters, including cases involving a known liability with an unknown amount.  [May 11, Pocalyko, at 254:8 – 255:3].

1729.  From October 1, 2017 (the date of closing) through August 2019, Pottstown Hospital utilized MEDHOST, the same accounts receivable system as it used while owned and operated by CHS.  [May 11, Ehinger, at 192:2 – 193:21].

1730.  Using CHS's MEDHOST system, Pottstown Hospital was overvaluing accounts receivable.  [May 11, Ehinger, at 198:22 – 199:1].

1731.  In August 2019, Pottstown Hospital converted from MEDHOST, the former CHS system, to the Epic system for its accounts receivable system.  [May 11, Ehinger, at 194:1-4].

1732.  Mr. Ehinger testified that he learned that the accounts receivable on Pottstown Hospital's financial statements as of October 1, 2017 were overvalued as a result of the transition from the prior CHS system (MEDHOST) to the Epic system.  [May 11, Ehinger, at 194:12-16].

352

1733.  Mr. Ehinger explained that the Epic system nets down accounts to what the contract is at the time of billing, while the gross charges would sit in the accounts receivable ledger under the MEDHOST system.  [May 11, Ehinger, at 194:17 – 194:14].  Thus, under the MEDHOST system Tower Health inherited from CHS, the actual accounts receivable were overstated.

1734.  Tower Health had to write down Pottstown Hospital's accounts receivable from October 1, 2017 through August 2019 by $50 million due to the error in MEDHOST relating to overvalued accounts receivable.  [May 11, Ehinger, at 199:11-15; May 12, Pocalyko, at 149:19 – 150:2].

1735.  According to an April 14, 2017 report prepared by FTI, a consultant retained to assist Tower Health with assessing Pottstown Hospital's financial information, FTI determined that Pottstown Hospital's revenues were overstated.  [May 12, Pocalyko, at 27:13-25; PX115 (FTI Quality of Earnings Report)].

1736.  FTI's analysis noted "a significant over-accrual of AR for each historical period end," and "FTI requested, but did not receive, a schedule of reconciling items to AR similar to those noted in our revenue analyses."  [PX115 (FTI Quality of Earnings Report), at 19].

1737.  KPMG, another consultant Tower Health retained to provide financial assistance related to the transaction, issued a May 1, 2017 report that identified a shortfall in Pottstown Hospital's revenue and requested, but never received an explanation from CHS management. [May 12, Pocalyko, at 32:11 – 34:4; PX124 (KPMG May 1, 2015 Report) at 15].

1738.  Mr. Pocalyko, Tower Health's expert, testified that CHS "masked this problem and the timing differences for a very extensive period of time.  That resulted in a write-off related to these prior periods of over $500 million in the parent company financial statements.  So they

353

were improperly presenting revenue on a system-wide basis that flowed down to all the hospitals, including Pottstown."  [May 12, Pocalyko, at 30:10-16].

1739.  Before the transaction closed, Pottstown Hospital relied on the accounts receivable numbers in its analysis of the revenue generating capacity of Pottstown Hospital.  [May 12, Pocalyko, at 56:9-21].

1740.  In its Form 10-K for the year ended December 31, 2016 filed with the Securities and Exchange Commission on February 21, 2017, CHS's parent company, CHSI, announced that it expected to adopt ASU 2014-09 and was developing a plan for the adoption and the impact on its revenue recognition policies, procedures and control framework and the resulting impact on its consolidated financial position, results of operations and cash flows.  [PX308-01 (Dec. 2016 CHSI 10-K), at 9, 103-104; June 7, Summar, at 68:3-18].

1741.  In its Form 10-Q for the quarterly period ended June 30, 2017, filed with the Securities and Exchange Commission on August 2, 2017, CHS's parent company, CHSI, announced that "the adoption of the new accounting standard **will impact the presentation on the Company's statement of operations for a significant component of its provision for bad debts**."  [PX309-02 (June 2017 CHSI 10-Q), at 9 (emphasis added)].  CHSI included this qualitative disclosure so the financial statements would comply with GAAP and fairly and accurately reflect the financial condition of the company.  [June 7, Summar, at 76:15 – 77:23].

1742.  CHSI's Form 10-Q for the quarterly period ended September 30, 2017, filed with the Securities and Exchange Commission on November 2, 2017, disclosed that a material adjustment could be made to reduce the amount of net patient accounts receivable and consolidated financial position of the company.  [May 12, Pocalyko, at 43:15 – 44:7; PX309-3 (Sept. 2017 CHSI 10-Q)].

1743.  In its Form 10-K for the year ended December 31, 2017, filed with the Securities and Exchange Commission on February 28, 2018, CHS's parent company, CHSI, adjusted its expected net operating revenue as a result of an increase in contractual allowances and the provision for bad debts by approximately $591 million.  [PX308-2 (Dec. 2016 CSHI 10-K), at 61].

1744.  Pottstown Hospital's share of the $591 million adjustment was approximately $6 million for the time period between January 1, 2017 and October 1, 2017.  [June 7, Summar, at 33:7-9, 48:11 – 49:1].

1745.  Mr. Kruskol admitted that Balance Sheets issued pursuant to Section 3.4 would not present fairly in all material respects the financial condition of the Seller Entities if they overstated accounts receivable by a material amount.  [June 8, Kruskol, at 39:7-25].

1746.  Prior to October 1, 2017, it was reasonably possible, or probable, that the overstated accounts receivable would affect Pottstown Hospital's Financial Statements, and that effect would be material to these Financial Statements.  [May 11, Pocalyko, at 47:9 – 48:9].

1747.  Mr. Pocalyko testified that he "saw no such disclosures" relating to the accounts receivable issue in any of the Financial Statements for Pottstown Hospital or any of the financial information that he reviewed for Pottstown Hospital.  [May 12, Pocalyko, at 166:6-11].

1748.  Although CHSI engaged in an effort to accurately reflect the potential negative impact to net existing patient revenues in its public filings throughout 2017, Defendants provided no disclosure of the potential impact to Tower Heath before October 1, 2017.  Schedule 3.4 to the APA does not disclose the contingent liability related to the allowances associated with bad debts and corresponding decrease in net patient revenues at Pottstown Hospital.  [DX111 (APA), at Schedule 3.4; May 12, Pocalyko, at 24:24 – 25:8].

**2. The Seller Entities, as Guaranteed by CHS, failed to disclose a contingent liability related to Pottstown Hospital's lack of compliance with the Life Safety Code.**

1749.   The Court finds that Pottstown Hospital's Financial Statements disclosed by Defendants to Tower Health were not in conformance with GAAP because they failed to include disclosures related to the contingent liability associated with Pottstown Hospital's Life Safety Code deficiencies and its obligation to perform corrective work to make the hospital compliant. [May 11, Pocalyko, at 246:4-11].

1750.   The net effect of Pottstown Hospital's failure to comply with the Life Safety Code would be material to Pottstown Hospital's financial condition because it had the potential to significantly disrupt Pottstown Hospital's ability to participate in the Medicare/Medicaid program.  [May 12, Pocalyko, at 15:23 – 16:3].

1751.   In addition, the net effect is material to Pottstown Hospital's financial condition because Mr. Miller, Tower Health's construction expert, estimated that the cost of construction to bring Pottstown Hospital into compliance with the Life Safety Code would exceed $100 million.  [May 11, Pocalyko, at 256:4-23].

1752.   Even without Mr. Miller's estimate, which CHS did not have prior to the October 1, 2017 closing, the Life Safety Code deficiencies involving fireproofing are still considered "material" and were required to be disclosed by Defendants to Plaintiffs under GAAP.  [May 11, Pocalyko, at 257:5-10].

1753.   According to Mr. Pocalyko, "Materiality" is more than just the aggregate dollar amount – it "also goes to abnormal or unusual things."  [May 11, Pocalyko, at 239:6-17].

1754.   Mr. Pocalyko determined that it was reasonably possible, or probable, that Pottstown Hospital would be required to do corrective construction work as a result of its lack of compliance with the Life Safety Code.  [May 11, Pocalyko, at 256:4-13].

1755.  The evidence shows that Defendants were aware of the Life Safety Code deficiencies at Pottstown Hospital prior to October 1, 2017 based on Pottstown Hospital's Capital Expenditure Report (PX89; PX96) and communications from BDA Architects to CHS (PX121; PX128).

1756.  In November 2016, Pottstown Hospital notified CHS that its Life Safety Plans were "way out of compliance" and needed to be updated via a "Capital Expenditure Request."  [PX89 (Nov. 2016 email with CER)].  CHS approved the request in January 2017 and hired an architect to prepare new plans.  [PX96 (Jan. 16, 2017 approved CER)].

1757.  Then in April 2017, Pa. DOH advised CHS's architect that it could not approve the submitted plans because Pottstown Hospital needed a new FSES under the 2012 NFPA 101 Life Safety Code.  [PX121 (April 27, 2017 email from D. Sanders to Pa. DOH)].  CHS's architect immediately reported Pa. DOH's requirement for an updated FSES to both CHS and Pottstown Hospital.  [PX128 (May 1, 2017 email from D. Sanders to R. Gostkowski and J. Ridall)].

1758.  Mr. Pocalyko testified that a disclosure under Section 3.4 would still be required in Pottstown Hospital's Financial Statements even if the required remediation work were delayed until 2028; "whether it's going to take a day, a week or five years, there should be a disclosure." [May 11, Pocalyko, at 246:18 – 247:2].

1759.  To comply with GAAP, Pottstown Hospital's Financial Statements delivered to Tower Health pursuant to Section 3.4 should have included a disclosure related to the contingent liability to do corrective work to bring the hospital into compliance by providing "an explanation of the obligation, an explanation of the deficiencies, and if possible a range associated with the repair … and if not possible, and explanation as to why that range could not be provided."  [May 11, Pocalyko, at 257:24 – 258:6].

1760.  Mr. Pocalyko testified that he "saw no such disclosures" relating to the Life Safety Code Deficiencies in any of Pottstown Hospital's Financial Statements or any of the financial information that he reviewed related to Pottstown Hospital.  [May 12, Pocalyko, at 166:6-11].

1761.  Schedule 3.4 does not disclose a contingent liability related to Pottstown Hospital's lack of compliance with the Life Safety Code.  [DX111 (APA), at Schedule 3.4; May 4, Judge, at 184:5-14].

1762.  The Court finds that Defendants breached Section 3.4 because the Seller Entities failed to disclose a material contingent liability related to Pottstown Hospital's lack of compliance with the Life Safety Code.  [DX111 (APA), at Schedule 3.4; May 4, Judge, at 184:5-14].

### B.  Plaintiffs Are Entitled To Recover Lost Contribution Damages Because of Defendants' Failure to Disclose Contingent Liabilities.

1763.  Tower Health presented evidence that it sustained economic harm for the loss of contribution on a present value discounted basis of $28,322,000 as a result of the Seller Entities' failure to disclose material contingent liabilities as required by Section 3.4 of the APA and GAAP.  [May 11, Pocalyko, at 225:2 – 227:1; PX270 (Pocalyko Excess Loss Calculation), at 2].

### 1.  Lost Contribution Resulting from the Required Remediation Construction.

1764.  Mr. Pocalyko calculated the lost contribution as a result of the required remediation construction based on losses to each area of operation of the hospital and the component parts that will be out of service during the period of construction.  [May 11, Pocalyko, at 259:13-18; PX271 (Pocalyko Losses Due to Construction)].

1765.  Mr. Pocalyko relied on Pottstown Hospital's actual patient census rather than assuming 100% occupancy when calculating the loss of contribution due to lost patient beds resulting from the required remediation construction work.  [May 11, Pocalyko, at 269:17-20].

1766. Mr. Pocalyko consulted with Tower Health's Senior Vice President of Financial Operations, Mr. Ehinger, and others at Pottstown Hospital to understand the impact of the remediation construction on the hospital's bed count and relied on a spreadsheet showing the loss of beds in each area of the hospital (PX262). [May 11, Pocalyko, at 262:8 – 263:5; PX262 (Bed Loss Due to Construction)].

1767. Mr. Pocalyko determined that Pottstown Hospital would lose $6,137,000 in revenue as a result of the required remediation construction and would avoid $3,103,000 in costs. [May 11, Pocalyko, at 267:14 – 268:10; PX271 (Pocalyko Losses Due to Construction)].

1768. Mr. Pocalyko testified that: "If the period of correction was done in a shorter timeframe, the loss contribution would go up [increase] because more beds would be unavailable. You would have to take more out. So the -- the loss would be greater." [May 11, Pocalyko, at 269:9-16].

1769. Mr. Pocalyko's calculation of damages resulting from lost hospital beds ends at the time construction was to be completed, in 2023, although Pottstown Hospital will have fewer licensed beds as a result of the required remediation construction. [May 11, Pocalyko, at 263:14 – 264:10; PX271 (Pocalyko Losses Due to Construction)].

1770. Mr. Pocalyko's damages calculations exclude the revenue lost from the loss of licensed beds from February 2020 through the 12 months ended June 30, 2021, to account for the uncertainty of the impact of COVID 19. [May 11, Pocalyko, at 265:4 – 267:13; PX271 (Pocalyko Losses Due to Construction)].

1771. As a result of the construction necessary to remediate the fireproofing deficiencies, which CHS did not disclose as required under Section 3.4, Tower Health will sustain a loss of

$6,137,000 in revenue, but avoid $3,103,000 in costs, resulting in a net loss of contribution of $3,034,000.  [May 11, Pocalyko, at 267:14 – 268:10].

### 2. Lost Contribution Resulting from the Overstatement of Accounts Receivable.

1772.  Mr. Pocalyko, after analyzing the comparative financial statements of Pottstown Hospital for the pre- and post-acquisition periods, determined that Pottstown Hospital suffered a "very significant decline in gross revenue, and a very significant decline in total revenue" as a result of the overstated accounts receivable.  "The hospital, when the adjustments were finally made, did not perform at a level, as represented in the pre-transaction period."  [May 12, Pocalyko, at 50:23 – 52:9].

1773.  Mr. Pocalyko calculated the decrease in Pottstown Hospital's anticipated revenue as a result of the Seller Entities' failure to disclose Pottstown Hospital's revenue recognition issues related to the increased allowances for bad debts and corresponding decrease in net patient revenues.  [May 12, Pocalyko, at 52:12-16; PX270 (Pocalyko Excess Loss Calculation)].

1774.  Mr. Pocalyko found that CHSI had a 3.71% reduction in net operating revenue as a result of the improper revenue recognition procedures by comparing the $591 million adjustment to CHSI's net operating revenue of $15,353,000,000.  [May 12, Pocalyko, at 54:21-25, 131:1-14].

1775.  Mr. Pocalyko used 3.71% to calculate Pottstown Hospital's lost contribution as a result of the Seller Entities' failure to disclose, as required by Section 3.4, Pottstown Hospital's revenue recognition issue and determined that Pottstown Hospital lost on average approximately $7 million per year in revenue, which is "one percent or less of the total $591 million."  [May 12, Pocalyko, at 54:16-22, 137:14-17; PX270 (Pocalyko Excess Loss Calculation), at 2].

1776.  Mr. Pocalyko's determination that Pottstown Hospital has lost roughly $7,000,000 per year due to same revenue recognition issue is consistent with the testimony of CHS's witnesses that Pottstown Hospital's share of CHSI's $591 million adjustment was approximately $6,000,000 for the time period between January 1, 2017 and October 1, 2017.  [June 7, Summar, at 33:7-9, 48:11 – 49:1].

1777.  CHSI's net operating revenue for 2017 of roughly $15.5 billion decreased by 3.5% to 4% as a result of CHSI's $591 million adjustment.  [June 7, Summar, at 33:25 – 34:5].  Pottstown Hospital's share of this adjustment was approximately $6 million for the nine-month time period between January 1, 2017 and October 1, 2017.  [June 7, Summar, at 33:7-9, 48:11 – 49:1].

1778.  Mr. Pocalyko testified that 3.71% "is a very conservative amount" because it is a "small percentage of the overall billings of the hospital."  [May 12, Pocalyko, at 56:4-8].

1779.  As a result of the increased allowances for bad debts, which the Seller Entities did not disclose as required under Section 3.4, Tower Health will sustain a loss of $37,318,000 in contribution.  [PX270 (Pocalyko Excess Loss Calculation), at 2].

1780.  The Court finds that Tower Health sustained a loss of contribution as a result of the Seller Entities' failure to disclose contingent liabilities in the amount of $40,352,000, which, discounted at a rate of 12.2 percent to present day value, results in a total loss of contribution of $28,322,000.  [May 12, Pocalyko, at 53:2 – 54:14; PX270 (Pocalyko Excess Loss Calculation), at 2].

## C.  <u>The Court Rejects Mr. Kruskol's Criticisms of Mr. Pocalyko.</u>

1781.  CHS's expert, Sean Kruskol, was retained to rebut the opinions of Mr. Pocalyko and Mr. Zigrang.  [June 7, Kruskol, at 151:10-22].

1782.  Mr. Kruskol opined that GAAP did not require a contingent liability disclosure of Pottstown Hospital's revenue recognition and accounts receivable issues, [June 7, Kruskol, at 168:14-16] or its lack of compliance with Life Safety Code requirements.  [June 7, Kruskol, at 169:5-11].

1783.  Mr. Kruskol based these opinions on a determination that CHSI, CHS's parent company, had sufficient internal controls in place.  [June 7, Kruskol, at 146:19 – 149:2, 186:21 – 187:4].

1784.  In violation of Fed. R. Civ. P. 26(a)(2)(B), Mr. Kruskol opinions regarding Pottstown Hospital's Financial Statements were offered for the first time at trial.  [June 8, Kruskol, at 30:12-22; June 7, Kruskol, at 153:15 – 154:6].

1785.  Mr. Kruskol admitted that nowhere in his expert report issued before trial on January 19, 2021 did he opine that Pottstown Hospital's Financial Statements were prepared in accordance with GAAP.  [June 8, Kruskol, at 69:1-5].

1786.  Mr. Kruskol's opinions in his January 19, 2021 expert report regarding GAAP compliance were limited to the financial statements of CHS's parent company, CHSI, and did not address those of Pottstown Hospital.  [June 7, Kruskol, at 156:19-22].

1787.  Mr. Pocalyko did not offer any opinions that the financial statements of CHS's parent company, CHSI resulted in a breach of Section 3.4.  [May 12, Pocalyko, at 35:4-7].

1788.  This case involves questions whether Pottstown Hospital's Financial Statements provided to Tower Health pursuant to Section 3.4 were in compliance with GAAP.  Mr. Kruskol's opinions (i.e., those he issued in advance of trial in his January 19, 2021 expert report) only address the financial statements of CHSI and do not address the Pottstown Hospital Financial Statements Defendants disclosed to Plaintiffs pursuant to Section 3.4.

1789.  The Court finds that Mr. Kruskol's opinions on Pottstown Hospital's Financial Statements are inadmissible and excluded because Mr. Kruskol did not identify these opinions prior to trial in his January 19, 2021 expert report.

1790.  Mr. Kruskol also opined that Defendants did not breach Section 3.4 because GAAP does not allow "second guessing" of management's "best judgment" when deciding whether a potential liability must be disclosed in financial statements.  [June 7, Kruskol, at 229:10 – 23].

1791.  The Court rejects Mr. Kruskol's testimony because, even if GAAP does not allow "second guessing" of a decision to not disclose a contingent liability, CHS presented no evidence that it ever made a determination not to disclose the overstated accounts receivable or Life Safety Code deficiencies to Tower Health as contingent liabilities under Section 3.4.

1792.  Mr. Kruskol also based his opinions on Tower Health's failure to disclose a contingent liability related to Pottstown Hospital's Life Safety Code deficiencies in its own financial statements.  [June 7, Kruskol, at 262:15-22].

1793.  The Court rejects Mr. Kruskol's testimony because: (1) it is irrelevant in that the Section 3.4 breach relates to Pottstown Hospital's Financial Statements delivered to Tower Health prior to closing; and (2) Ms. Judge testified that Tower Health's independent accountant, KPMG, advised Tower Health that such a disclosure does not belong on its Balance Sheet because as long as Tower Health has a claim, the expense really is attributable to CHS, not Pottstown Hospital or Tower Health.  [May 4, Judge, at 161:11 – 162:10].

1794.  Mr. Kruskol also testified that a disclosure related to Pottstown Hospital's overstated accounts receivable was not required because Tower Health did not purchase Pottstown Hospital's accounts receivable in the APA.  [June 7, Kruskol, at 172:9-24].

363

1795.  The Court rejects this assertion because Tower Health relied on the accounts receivable numbers in Pottstown Hospital's Financial Statements during its analysis of the revenue generating capacity of Pottstown Hospital.  [May 12, Pocalyko, at 56:9-21; PX115 (FTI Quality of Earnings Report); PX124 (KPMG May 1, 2015 Report)].  Tower Health's claim is *not* that it purchased Pottstown Hospital's accounts receivable from CHS, but rather that it used the accounts receivable in Pottstown Hospital's Financial Statements prior to the acquisition to determine future financial performance.

1796.  Mr. Kruskol also opined that Mr. Pocalyko's damages calculation "potentially like double-dipped in damages and double counted damages" by failing to reduce the projected revenue by the amount of revenue lost due to construction.  Mr. Kruskol suggested that Mr. Pocalyko should have reduced the net patient revenue number ($130,879) by the revenue loss due to construction and multiplied that result by 3.71%.  [June 7, Kruskol, at 210:19 – 211:9].

1797.  Mr. Kruskol admitted that his "double-dipping" criticism of Mr. Pocalyko's damages calculations would only reduce Tower Health's loss of contribution ($40,352,000) by $228,000 before discounting, which, discounted to net present value is only a third of that ($126,800).  [June 8, Kruskol, at 81:1 – 82:24; PX373 (Pocalyko Revised Attachment 6)].

1798.  If the Court were to accept Mr. Kruskol's criticism, Tower Health's loss of contribution, discounted to present value, resulting from Defendants' breach of Section 3.4 in the amount of $28,332,000 would only be reduced by $126,800 (or **0.44%**), which the Court finds to be *de minimus*.  [PX373 (Pocalyko Revised Attachment 6)].

## XX.  Summary of Damages Suffered by Tower Health Because of Defendants' Breaches of the APA

1799.  The construction and renovations required to bring Pottstown Hospital into compliance with NFPA 101, 2012 Edition will cost Tower Health $114,236,355.

364

1800.  Even accepting CHS's criticisms, the construction and renovations required to bring Pottstown Hospital into compliance with NFPA 101, 2012 Edition will cost Tower Health $96,108,539.78.

1801.  Alternatively, the fair market value of Pottstown Hospital was diminished by $87,844,350 as a result of as a result of the non-compliant condition of Pottstown Hospital as of October 1, 2017.

1802.  Even accepting CHS's criticisms, the diminution in the fair market value of Pottstown Hospital was $77,657,103.

1803.  Tower Health sustained economic harm for the loss contribution on a present value discounted basis of $28,322,000 as a result of the Seller Entities' failure to disclose contingent liabilities as required by GAAP and Section 3.4 of the APA.

1804.  As set forth in the Conclusions of Law, the Court finds the Basket Amount in Section 11.3 of the APA (1) does not apply to Tower Health's claim for breach of Section 1.4, relating to Excluded Liabilities, and (2) does not apply to Tower Health's claim for breaches of the covenants in Sections 5.2, 5.3, and 5.4.

1805.  As set forth in Conclusions of Law, the Court finds that the Basket Amount in Section 11.3 of the APA does not apply to Tower Health's claims for breach of the representations and warranties in Sections 3.4, 3.6, 3.7, and 3.8 of the APA because of CHS's intentional misrepresentations.

1806.  Tower Health is entitled to indemnification for its attorneys' fees, expert fees, costs, and expenses, to be provided after the Court's entry of judgment in Tower Health's favor. [DX111 (APA), §§ 11.2, 12.5; June 11, at 156:14 – 157:6].

STEVENS & LEE

Date:  August 31, 2021          By:  *s/ Julie E. Ravis*

Daniel B. Huyett (Pa. ID No. 21385)
Julie E. Ravis (Pa. ID No. 203101)
Matthew J. Banta (Pa. ID No. 326413)
111 North Sixth Street
Reading, PA  19601
Phone:  (610) 478-2219
Email:  dbh@stevenslee.com,
jera@stevenslee.com, mb@stevenslee.com

Joseph E. Wolfson (Pa. ID No. 44431)
1500 Market Street, East Tower, 18th Floor
Philadelphia, PA 19102
Phone:  (215) 751-1249
Fax:  (610) 988-0808
Email:  jwo@stevenslee.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2021, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Julie E. Ravis*
Julie E. Ravis