IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOWER HEALTH, f/k/a READING | : | |
| HEALTH SYSTEM; PI ONE, LLC, n/k/a | : | |
| BRANDYWINE HOSPITAL, LLC; PI TWO, | : | |
| LLC, n/k/a CHESTNUT HILL HOSPITAL, | : | |
| LLC; PI THREE, LLC, n/k/a | : | |
| JENNERSVILLE HOSPITAL, LLC; PI FOUR, | : | |
| LLC, n/k/a PHOENIXVILLE HOSPITAL, | : | |
| LLC; PI FIVE, LLC, n/k/a POTTSTOWN | : | |
| HOSPITAL, LLC; PI SIX, LLC, n/k/a | : | |
| TOWER HEALTH ENTERPRISES, LLC; and | : | |
| PI SEVEN, LLC, n/k/a TOWER HEALTH | : | |
| MEDICAL GROUP HOLDING COMPANY, | : | |
| LLC, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. 19-2782 |
| | : | |
| v. | : | |
| | : | |
| CHS COMMUNITY HEALTH SYSTEMS, | : | |
| INC.; PENNSYLVANIA HOSPITAL | : | |
| COMPANY, LLC; and POTTSTOWN | : | |
| HOSPITAL COMPANY, LLC, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                    September 6, 2022

The plaintiffs, a Pennsylvania health system and seven entities specifically formed to purchase assets, brought this action alleging the defendants breached an Asset and Membership Interest Purchase Agreement that the parties executed in May 2017 for the sale of five Pennsylvania hospitals, associated physician practices, and the related assets needed to operate the hospitals. The plaintiffs claim the defendants breached the agreement by selling one of the five hospitals, a community hospital located in Pottstown, Pennsylvania, in a noncompliant condition. Ultimately, the case turns on whether the Pottstown facility complied with the Centers for

Medicare and Medicaid Services ("CMS") conditions of participation ("COP") and the relevant Pennsylvania licensure requirements at all times prior to and at the closing of the agreement. Because the hospital was "in compliance," as that term is understood in the healthcare industry, the court finds the defendants did not breach the agreement and will enter judgment in favor of the defendants.

## I.   PROCEDURAL HISTORY

The plaintiffs, Tower Health f/k/a Reading Health System ("Tower Health"); PI One, LLC, n/k/a Brandywine Hospital, LLC ("Brandywine Hospital, LLC"); PI Two, LLC, n/k/a Chestnut Hill Hospital, LLC ("Chestnut Hill Hospital, LLC"); PI Three, LLC, n/k/a Jennersville Hospital, LLC ("Jennersville Hospital, LLC"); PI Four, LLC, n/k/a Phoenixville Hospital, LLC ("Phoenixville Hospital, LLC"); PI Five, LLC n/k/a Pottstown Hospital, LLC ("Pottstown Hospital, LLC"); PI Six, LLC, n/k/a Tower Health Enterprises, LLC ("Tower Health Enterprises"); and PI Seven, LLC, n/k/a Tower Health Medical Group Holding Company, LLC ("Tower Health Medical Group Holding Company") (collectively, the "plaintiffs" or "Tower Health"), commenced this action by filing a complaint against the defendants, CHS/Community Health Systems, Inc. ("CHS"), Pennsylvania Hospital Company, LLC, and Pottstown Hospital Company, LLC ("Pottstown HC") (collectively, the "defendants"), in the Court of Common Pleas of Berks County on May 30, 2019. Doc. No. 1-3. On June 25, 2019, the defendants removed the action to this court. Doc. No. 1. Shortly thereafter, on July 2, 2019, the defendants filed an answer with affirmative defenses to the complaint.[1] Doc. No. 6. The plaintiffs filed an amended complaint on July 22, 2019, *see* Doc. No. 19, to which the defendants filed an answer with affirmative defenses

---

[1] This pleading was titled as if it included a counterclaim; yet no counterclaim was included in the document. *See* Doc. No. 6.

and a counterclaim against the plaintiffs on August 16, 2019. Doc. No. 28. The plaintiffs filed an answer with affirmative defenses to the counterclaim on August 30, 2019. Doc. No. 29.

The defendants filed a motion for leave to file a third-party complaint on September 30, 2019.[2] Doc. No. 30. The plaintiffs filed a response in opposition to the motion on October 21, 2019, *see* Doc. No. 35, and the defendants filed a reply brief in support of the motion on October 25, 2019. Doc. No. 36. The court held oral argument on the motion on November 7, 2019, during which the defendants withdrew the motion. As the defendants withdrew the motion, the court entered an order denying the motion for leave to file a third-party complaint as moot. Doc. No. 39.

The parties engaged in discovery from mid-October 2019 through early January 2021. When the parties completed discovery, the defendants filed a motion to dismiss count I of the amended complaint to the extent the plaintiffs sought damages due to alleged accounting irregularities on January 18, 2021.[3] Doc. No. 102. On January 21, 2021, the defendants filed a motion for summary judgment on all the plaintiffs' claims. Doc. No. 106.  On the same date, the plaintiffs moved for partial summary judgment on their claims under three sections of the APA. Doc. No. 108. After full briefing, the court heard oral argument on the cross-motions for summary judgment on March 9, 2021. On April 30, 2021, the court denied the cross-motions for summary judgment.[4] Doc. No. 178.

---

[2] In this motion, the defendants sought to file a third-party complaint against the law firm which represented Tower Health in its purchase of assets under the APA. *See* Doc. No. 30.

[3] As an alternative to seeking dismissal of this portion of count I of the amended complaint, the defendants requested that the court exclude evidence related to "accounting irregularit[y]" damages including the relevant portions of one of the plaintiffs' expert's report. *See* Defs.' Mot. to Dismiss Count I of Pl.'s Am. Compl. Related to Alleged Accounting Irregularities, or in the Alternative to Exclude Certain Financial Damages and Related Expert Ops. at p. 2, Doc. No. 102.

[4] In this order, the court also converted the defendants' motion to dismiss part of count I of the amended complaint into a motion *in limine*. *See* Apr. 30, 2021 Order at 1, Doc. No. 178.

A 19-day trial began on May 3, 2021, and concluded on June 11, 2021.[5] On September 1, 2021, the parties submitted proposed findings of fact and conclusions of law, and the defendants filed a post-trial brief. *See* Doc. Nos. 245–248. The parties filed responses to the proposed findings of fact and conclusions of law on September 30, 2021. *See* Doc. No. 253–257. The court held oral argument on the parties' proposed findings of fact and conclusions of law on October 5, 2021. Today, all the plaintiffs' claims are ripe for disposition, except those claims arising under Section 3.10 of the APA, which the court dismissed during trial. Tr. of Nonjury Trial Day Twelve ("Day Twelve Tr.") at 190:18–21.

## II.     FINDINGS OF FACT

### A.     <u>Background</u>

### 1.     The Parties

1.     Tower Health; Brandywine Hospital, LLC; Chestnut Hill Hospital, LLC; Jennersville Hospital, LLC; Phoenixville Hospital, LLC; Pottstown Hospital, LLC; Tower Health Enterprises; and Tower Health Medical Group Holding Company are the named plaintiffs. Am. Compl. at p. 2, Doc. No. 19; Tr. of Nonjury Trial Day One ("Day One Tr."), at pp. 71:23–73:11.

2.     Tower Health is a Pennsylvania nonprofit healthcare system with its principal place of business in West Reading, Berks County, Pennsylvania. Am. Compl. at p. 1.

3.     Brandywine Hospital, LLC; Chestnut Hill Hospital, LLC; Jennersville Hospital, LLC; Phoenixville Hospital, LLC; Pottstown Hospital, LLC; Tower Health Enterprises, LLC; and Tower Health Medical Group Holding Company are Pennsylvania limited liability companies with all their members domiciled in Pennsylvania. See Doc. Nos. 10–16. Tower Health controls these

---

[5] Prior to trial, the parties filed multiple motions *in limine*. *See* Doc. Nos. 144, 152, 154, 155, 157, 174. On June 21, 2021, the court denied those motions (including the converted motion to dismiss) as moot, subject to any rulings made pretrial and during the course of the trial. Doc. No. 237.

legal entities, which were created to purchase certain assets in connection with the APA and are all parties to the APA as "Buyer Entities." Day One Tr. at p. 72:8–23; APA at Recital B & Ex. B.

4.      The defendants are CHS, Pennsylvania Hospital Company, LLC, and Pottstown HC. Am. Compl. at p. 3.

5.      CHS is a Delaware corporation with its principal place of business in Franklin, Tennessee. Am. Compl. at p. 3.

6.      Pottstown HC and Pennsylvania Hospital Company, LLC are limited liability companies; all their members are domiciled in Delaware and Tennessee. See Doc. No. 3.

7.      Community Health Systems, Inc. ("CHSI"), is a parent company that holds the assets of the defendants. Tr. of Nonjury Trial Day Fifteen ("Day Fifteen Tr.") at p. 127:19–24.

8.      CHSI and CHS are not the same entity, and CHSI is not a defendant in this matter. *Id.* at pp. 127:25–128:4; *see* Am. Compl.

###   2.      The Parties' Causes of Action and the Relevant Portions of the APA

9.      This civil action arises from an Asset and Membership Interest Purchase Agreement dated May 30, 2017 ("APA") wherein Tower Health and its affiliates purchased five hospitals from CHS and its affiliates. These hospitals include the Pottstown, Phoenixville, Jennersville, Brandywine, and Chestnut Hill hospitals.[6] APA at Recitals C, D, § 1.1, Doc. No. 19-1; Tr. of Nonjury Trial Day Sixteen ("Day Sixteen Tr.") at p. 195:9–13.

10.     In the amended complaint, the plaintiffs assert five claims arising from representations, warranties, and covenants contained within the APA. Am. Compl. at pp. 10–13.

---

[6] At the time of this transaction, Pottstown Hospital was known as Pottstown Memorial Medical Center ("PMMC"). Day One Tr. at p. 91:4–7. For clarity, the court will refer to this entity as Pottstown Hospital. Pottstown Hospital is currently owned by Pottstown Hospital, LLC. *Id.* at pp. 72:24–73:11.

11.     The first claim is a breach of contract claim, where the plaintiffs allege the defendants breached the representations and warranties under sections 3.4, 3.6, 3.7, and 3.8 of the APA and are thereby obligated to indemnify the plaintiffs for all damages incurred because of the defendants' alleged breaches. Am. Compl. at p. 10.

12.     In the APA, the defendants affirmatively represented and warranted to the plaintiffs that the five hospitals the defendants were selling, including Pottstown Hospital, complied in all material respects with their licensing requirements, the Medicare/Medicaid Conditions of Participation ("COP"), and regulatory requirements, among other things, as of October 1, 2017, the APA's closing date. APA at §§ 3.6, 3.7, 3.8.

13.     In Section 3.4 of the APA, the defendants represented and warranted that they prepared the Pottstown Hospital financial statements they provided to the plaintiffs in accordance with Generally Accepted Accounting Principles ("GAAP") and presented fairly in all material respects the financial condition of Pottstown Hospital. *Id.* at § 3.4.

14.     Section 3.4 of the APA states:

*Financial Statements*. The Seller Entities have delivered to the Buyer Entities copies of the following financial statements of the Seller Entities and the Acquired Companies ("Financial Statements"), which Financial Statements are maintained on an accrual basis:

*(a)*     Unaudited Balance Sheet dated as of March 31, 2017 (the "Balance Sheet Date");

*(b)*     Unaudited Income Statement for the three-month period ended on the Balance Sheet Date; and

*(c)*     Unaudited Balance Sheets and Income Statements for the fiscal years ended December 31, 2016 and 2015.

Except as set forth in <u>Schedule 3.4</u>, such Financial Statements have been (and the monthly financial statements delivered pursuant to <u>Section 5.6</u> will be) prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated. Such Balance Sheets present fairly in all material respects (and,

in the case of financial statements delivered pursuant to <u>Section 5.6</u>, will present fairly in all material respects) the financial condition of each Seller Entity and Acquired Company as of the dates indicated thereon, and such Income Statements present fairly in all material respects (and, in the case of financial statements delivered pursuant to <u>Section 5.6</u>, will present fairly in all material respects) the results of operations of each Seller Entity and Acquired Company for the periods indicated thereon. Except as disclosed on <u>Schedule 3.4</u>, no Seller Entity or Acquired Company has any material liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a type required to be disclosed or reflected in financial statements of a Seller Entity or Acquired Company in accordance with GAAP except for (i) liabilities reflected or reserved against the Financial Statements, and (ii) liabilities incurred in the ordinary course of business since the Balance Sheet Date.

*Id.*

15.     Schedule 3.4 of the APA explicitly excludes "footnotes to the financial statements."

Defs.' Ex. 111, APA at Schedule 3.4.

16.     Section 3.6 of the APA states:

***Licenses.*** Each Hospital is duly licensed as a hospital pursuant to the applicable laws of the Commonwealth of Pennsylvania. The pharmacies, laboratories, and all other ancillary departments owned or operated by the Seller Entities or the Acquired Companies and located at the Facilities or operated for the benefit of the Facilities which are required to be specially licensed are duly licensed by the Department of Health of the Commonwealth of Pennsylvania or other appropriate licensing agency (the "State Health Agency"). The Seller Entities and the Acquired Companies have all material licenses, registrations, permits, and approvals which are needed to operate the businesses owned or operated by them in the Facilities. The Seller Entities have delivered to the Buyer Entities an accurate list (<u>Schedule 3.6</u>) of all such licenses, registrations, permits and approvals (including approvals for all exception requests) owned or held by the Seller Entities or Acquired Companies relating to the ownership, development, or operation of the Facilities or the Assets, all of which are now and as of the Closing shall be in good standing and which are listed on <u>Schedule 3.6</u> ("Licenses"). The Seller Entities and the Acquired Companies are in compliance in all material respects with all Licenses, and no statement of deficiencies, survey report, inspection report, or other notice of noncompliance has been issued, received, proposed or threatened with respect to any such License which remains uncured.

APA at § 3.6.

17.     Section 3.7 of the APA provides in pertinent part:

***Medicare Participation/Accreditation.*** Each Hospital is qualified for participation in the Medicare, Medicaid and CHAMPUS/TRICARE programs, has current and valid provider contracts with such programs, is in compliance in all material respects with the conditions of participation in such programs, and has received all approvals or qualifications necessary for capital reimbursement for the Hospital. Each Hospital is duly accredited, with no contingencies (except as set forth on <u>Schedule 3.7</u>), by The Joint Commission. Copies of the most recent accreditation letters from The Joint Commission pertaining to the Hospitals have been made available to the Buyer Entities. . . . Except as set forth on <u>Schedule 3.7</u>, neither the Seller Entities nor the Acquired Companies have received any written notice from any of the Medicare, Medicaid or CHAMPUS/TRICARE programs, or any other third party payor programs of any pending or threatened investigations or surveys relating to the Facilities.

*Id.* at § 3.7.

18.     Section 3.8 of the APA states in relevant part:

***Regulatory Compliance.*** Except as set forth on <u>Schedule 3.8</u> hereto, the Seller Entities and the Acquired Companies are in compliance in all material respects with all applicable statutes, rules, regulations, and requirements of the Government Entities having jurisdiction over the Facilities and the operations of the Facilities. . . . None of the Seller Entities, the Acquired Companies nor any of their respective employees have committed a material violation of federal or state laws regulating fraud, including but not limited to the federal Anti-Kickback Law, the Stark Law, and the False Claims Act. . . . To the knowledge of the Seller Entities, the Seller Entities and the Acquired Companies are in compliance in all material respects with the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") . . . .

*Id.* at § 3.8.

19.     The plaintiffs' second claim is a breach of contract claim where they allege the defendants breached the covenants contained in sections 5.2, 5.3, and 5.4 of the APA. Am. Compl. at p. 11.

20.     Section 5.2 of the APA states:

***Operations.*** Neither the Seller Entities nor the Acquired Companies will engage in any practice, take any action, or enter into any transaction outside the ordinary course of business. Without limiting the generality of the foregoing, the Seller Entities and the Acquired Companies shall:

*(a)*     carry on their business pertaining to the Facilities in substantially the same manner as presently conducted and not make any material change in personnel, operations, finance, accounting policies, or real or personal property pertaining to the Facilities;

*(b)*     use commercially reasonable efforts to maintain the Facilities and all parts thereof in good operating condition, ordinary wear and tear excepted;

*(c)*     use commercially reasonable efforts to perform all of their obligations under agreements relating to or affecting the Facilities or the Assets;

*(d)*     use commercially reasonable efforts to keep in full force and effect present insurance policies or other comparable insurance pertaining to the Facilities; and

*(e)*     use commercially reasonable efforts to maintain and preserve their business organizations intact, retain their present employees at the Facilities and maintain their relationships with physicians, suppliers, customers, third party payors, referral sources and others having business relations with the Facilities.

APA at § 5.2.

21.     Section 5.3 of the APA states in pertinent part:

***Negative Covenants.*** The Seller Entities and the Acquired Companies shall not, with respect to the business or operation of the Facilities or otherwise regarding the Assets, without prior written consent of the Buyer Entities:

. . .

*(f)*     take any action that would result in any breach of the representations made herein.

*Id.* at § 5.3.

22.     Section 5.4 of the APA states in pertinent part:

***Governmental Approvals.*** The Seller Entities shall (i) use reasonable efforts to obtain all governmental approvals (or exemptions therefrom) necessary or required to allow the Seller Entities to perform its obligations under this Agreement . . . .

*Id.* at § 5.4.

23.     The plaintiff's third claim is a breach of contract claim where they allege the defendants breached the APA by selling Pottstown Hospital to the plaintiffs in a noncompliant condition. Am. Compl. at p. 12.

24.     For their fourth claim, the plaintiffs argue CHS guaranteed the obligations of the other defendant entities and, as such, CHS must pay any verdict or judgment against Pennsylvania Hospital Company, LLC, and Pottstown HC. *Id.*

25.     For their final claim, the plaintiffs seek their attorneys' fees under Section 12.5 of the APA for enforcement of the provisions of the APA. *Id.* at p. 13.

26.     Section 12.5 of the APA states:

> ***Legal Fees and Costs.*** In the event a party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing party will be entitled to recover such legal expenses, including, without limitation, reasonable attorneys' fees, costs, and necessary disbursements at all court levels, in addition to any other relief to which such party shall be entitled.

APA at § 12.5.

27.     Brandywine Hospital, LLC; Chestnut Hill Hospital, LLC; Jennersville Hospital, LLC; Phoenixville Hospital, LLC; Tower Health Enterprises, LLC; and Tower Health Medical Group Holding Company are not asserting any claims in this action. Tr. of Nonjury Trial Day Two ("Day Two Tr.") at pp. 129:25–130:14.

28.     In their answer to the amended complaint, the defendants assert a counterclaim under Section 12.5 of the APA. Answer to Am. Compl. ("Answer") at pp. 15–16, Doc. No. 28. They argue they are entitled to "reimbursement of all reasonable attorneys fees, costs, expert fees and other expenses and disbursements incurred with regard to this litigation in the event [they] are the substantially prevailing parties." *Id.* at p. 15.

**B.    Relevant Regulatory Agencies**

29.     Multiple entities regulate Pennsylvania hospitals, like Pottstown Hospital. Day One Tr. at pp. 73:15–76:8. Three of these—the Centers for Medicare and Medicaid Services ("CMS"), the Pennsylvania Department of Health ("PA DOH"), and the Joint Commission ("TJC")—have particular significance in this case.

**1.    CMS**

30.     CMS is a division of the U.S. Department of Health and Human Services ("HHS"), and it administers the Medicare and Medicaid programs, which pay for more than 50% of all healthcare in the United States. Day One Tr. at p. 74:11–20.

31.     To participate in the Medicare program, a hospital must obtain certification as "in compliance" with CMS's COP, set forth by federal regulations. One of the COP is compliance with the Life Safety Code ("LSC"), codified in NFPA 101, 2012 edition. 42 C.F.R. § 482.41(b)(1)(i); Day One Tr. at p. 77:10–14; Tr. of Nonjury Trial Day Six ("Day Six Tr.") at p. 37:22–24; Day Sixteen Tr. at p. 265:19–25.

32.     If a healthcare facility is found to be in compliance with the COP, CMS will grant the facility certification. Tr. of Nonjury Trial Day Seven ("Day Seven Tr.") at p. 51:16–17.

33.     Certification is necessary to receive Medicare and Medicaid reimbursement from CMS for services provided. Day Six Tr. at pp. 37:20–38:5.

**2.    PA DOH**

34.     In addition to certification from CMS, a Pennsylvania healthcare facility must also obtain a license from the PA DOH. Day One Tr. at pp. 73:22–74:1; Day Six Tr. at p. 79:19–22; Tr. of Nonjury Trial, Day Fourteen ("Day Fourteen Tr.") at p. 148:10–15.

35.     PA DOH's Division of Life Safety ("DSI") oversees matters related to the physical facility, such as fire protection and building code issues. Day One Tr. at p. 75:2–23.

36.     DSI, like CMS, requires compliance with "whatever the current fire code is" as a condition of the Pennsylvania licensing requirements. *Id.* at p. 76:7–15. Currently, the fire code is NFPA 101, 2012 edition. *Id.*

37.     Healthcare facilities maintain their PA DOH license through licensure surveys that verify "the facility is in compliance with the licensure requirements within the state." Pls.' Ex. 292, PA DOH Division of Safety Inspection Definitions; Day Six Tr. at p. 171:13–17.

38.     PA DOH also conducts certification surveys. In these surveys, PA DOH, on behalf of CMS, reviews the entire hospital to determine if the facility is in compliance with the Medicare COP. "Certification" is the term CMS uses with respect to its COP. Day Six Tr. at pp. 72:15–73:2; Pl.'s Ex. 292, Pa. DOH DSI Definitions at p. 1.

### 3.     TJC

39.     TJC administers a voluntary accreditation process for various types of healthcare facilities including hospitals. Day Six Tr. at p. 39:3–5.

40.     The TJC Hospital Accreditation Program "outlines the standards and elements of performance that a facility is required to meet in order to obtain accreditation from [TJC]." *Id.* at p. 38:20–25. TJC's accreditation program includes a life safety chapter. *Id.* at p. 166:5–8.

41.     The accreditation is akin to a "good housekeeping seal of approval," and most hospitals choose to seek TJC accreditation. Day One Tr. at pp. 79:19–80:16.

42.     The Social Security Act provides that hospitals TJC accredits thereby meet CMS's COP. 42 U.S.C. § 1395bb(a); Day Six Tr. at p. 89:11–20.

43.     Accordingly, TJC accreditation may result in "deemed status," meaning the hospital can rely on a TJC survey to satisfy CMS's COP and PA DOH's licensing requirements. Day One Tr. at pp. 81:21–82:15; Day Six Tr. at pp. 89:7–90:13; Tr. of Nonjury Trial ("Day Nine Tr.") at pp. 86:13–87:2.

44.     TJC typically surveys hospitals once every three years. Day One Tr. at pp. 80:24 – 81:5.

45.     However, CMS conducts "validation surveys" to test TJC and other accrediting agencies' work. *See id.* at 82:22–24 ("A validation survey is really . . . a test to see whether [TJC] is doing what it's supposed to be doing under the Deemed Status."); Day Six Tr. at pp. 49:12–22, 90:14–23; *see also* 42 C.F.R. § 488.9 (establishing regulations for validation surveys). A validation survey happens frequently when there is a change in ownership. Day One Tr. at p. 82:16–22.

### 4.     The National Fire Protection Association

46.     The National Fire Protection Association ("NFPA") is a non-profit entity that issues guides, standards, codes, recommended practices, and handbooks. Day Six Tr. at pp. 126:22–127:4; Day Fourteen Tr. at p. 27:14–17.

47.     A code, like the LSC, states when a facility must do something. Day Fourteen Tr. at p. 28:6–21. It becomes enforceable when an agency or government adopts it. *Id.* at p. 27:17–20.

48.     An asterisk beside an NFPA code section means an annex note accompanies the section. *Id.* at p. 35:15–24.

49.     Annex material provides additional guidance to help the user understand a particular code section and how to apply that code section correctly. Day Seven Tr. at p. 156:5–13; Day Fourteen Tr. at p. 35:15–24.

a.     The LSC

50.     The LSC is a code that addresses the fire protection construction required of different occupancies, including healthcare occupancies (like hospitals), and provides "minimum requirements . . . for the design, operation, and maintenance of buildings and structures for safety to life from fire." Pls.' Ex. 41, Life Safety Code ("LSC") at p. 101-22; Day Six Tr. at p. 25:9–10.

51.     The LSC "addresses those construction . . . features necessary to minimize danger to life from the effects of fire, including smoke, heat, and toxic gases created during a fire." LSC at p. 101-339.

52.     Generally, fire protection measures fall into two categories: active and passive. Active fire protection addresses systems like sprinklers, smoke detectors, fire alarms, fire detection, and evacuation procedures. Passive fire protection addresses the building's construction, such as fire resistance rated assemblies, fire doors, smoke barriers, penetration fire stopping systems, and spray fireproofing protection on steel structural components. Tr. of Nonjury Trial Day Four ("Day Four Tr.") at p. 161:10–23; Tr. of Nonjury Trial Day Five ("Day Five Tr.") at pp. 81:21–82:10; Day Fourteen Tr. at p. 20:13–25.

53.     A hospital's active fire protection does not eliminate the separate requirement under the LSC that the hospital maintain passive fire protection features at the minimum levels prescribed in the LSC. Day Five Tr. at pp. 119:13–120:17.

54.     The LSC provides "an overall package of protection" of both active and passive fire-resistant elements. "The Life Safety Code actually says that life safety should not depend on— on a single safety feature, that there should be, if you will, a belt and suspenders' approach to fire protection, so if one item fails, then we've got a backup." Day Fourteen Tr. at pp. 32:17–33:17.

55.     This case relates to the passive fire protection at Pottstown Hospital, and specifically the "SFRM" (spray applied fire-resistive material) on all the steel structural membranes of the building, such as beams, floor and ceiling decks, and columns.

56.     The purpose of fireproofing on the building's structural members is summarized as follows:

> Fireproofing is a material used to limit the temperature rise of structural steel in a fire event. You want to make sure that you maintain the stiffness and strength of the steel so you don't have a building collapse. So it allows the building to stay in place during a fire event, for people to evacuate, people to shelter in place, particularly with the hospital, patients to shelter in place since they're not as mobile as you and I or the other members in this room to make it out of the building, but it also allows the fire department time to get into the building and get water on the fire.

Day Four Tr. at 174:2–12.

57.     Chapter 19 of the LSC, which applies to existing healthcare facilities, applied to Pottstown Hospital at closing. Day Six Tr. at pp. 28:16–29:1.

i.     *Building construction types*

58.     The LSC identifies different building construction types: Type I is combustible and Type II is noncombustible. Day Six Tr. at p. 56:2–17.

59.     A Type II (222) building construction type is noncombustible with 2-hour rated walls, floors, and structural steel members. *See* LSC; Day Two Tr. at pp. 234:17–235:2; Day Six Tr. at p. 56:2–17; Day Five Tr. at pp. 121:12–122:3.

60.     A Type II (000) building construction type is noncombustible but with no hourly rating for the walls, floors, and structural steel members. *See* LSC; Day Six Tr. at pp. 52:22–53:2, 76:17–22; Day Fourteen Tr. at p. 147:13–15.

61.     The minimum type of construction allowed by the prescriptive requirements of the LSC for an existing high-rise building is Type II (222). Day Six Tr. at p. 42:14–23.

62.   Chapter 3 of the LSC defines a "high-rise building" as "[a] building where the floor of an occupiable story is greater than 75 ft (23 m) above the lowest level of fire department vehicle access." LSC at p. 101-28; Day Seven Tr. at pp. 70:14–71:10; Day Fourteen Tr. at p. 113:12–15.

63.   The annex note for a high-rise building explains:

> It is the intent of this definition that, in determining the level from which the highest occupiable floor is to be measured, the enforcing agency should exercise reasonable judgment, including consideration of overall accessibility to the building by fire department personnel and vehicular equipment. Where a building is situated on a sloping terrain and there is building access on more than one level, the enforcing agency might select the level that provides the most logical and adequate fire department access.

LSC at p. 101-341.

ii.   *The 2012 edition of the LSC*

64.   NFPA revises the LSC once every three years. Day Six Tr. at p. 199:15–18; Day Fourteen Tr. at p. 30:8–12.

65.   Although the NFPA regularly updates the LSC, CMS does not have a definitive cycle for adopting a new edition of the LSC. Day Six Tr. at p. 199:6–12.

66.   From March 2003 until July 5, 2016, CMS, PA DOH and TJC used the 2000 version of the LSC. Day Seven Tr. at p. 64:12–17; Day Fourteen Tr. at pp. 29:18–25, 52:2–10.

67.   In May 2016, CMS adopted the 2012 edition of the LSC, effective July 5, 2016. Pls.' Ex. 68, CMS Memo Re: Notification of Final Rule Published. At the same time, CMS issued a policy memo providing notice of the adoption of the 2012 edition of the LSC. *Id.*; Day Fourteen Tr. at pp. 52:4–7, 61:14–17.

68.   On June 4, 2016, PA DOH issued a notice that it was also adopting the 2012 edition of the LSC, effective July 5, 2016. Pls.' Ex. 69, PA DOH Notice: Adoption of the 2012 Edition of the Life Safety Code.

16

69.     On June 10, 2016, TJC identified November 7, 2016 as the starting date for TJC surveys to proceed under the 2012 LSC. Pls.' Ex. 70, Pelletier Letter Re: Adoption of 2012 Edition of NFPA 101; Day Six Tr. at pp. 119:24–120:9.

70.     On June 20, 2016, CMS distributed a policy memo ("June Policy Memo") which stated CMS would not commence surveying under the 2012 edition of the LSC until November 1, 2016. Pls.' Ex. 72, CMS Memo Re: Adoption of the 2012 Edition of NFPA 101.

71.     The adoption of the 2012 edition of the LSC did not impact a building's existing compliance status, and a building that was in compliance under the prior LSC remained in compliance until the time of that building's next survey. Day Fourteen Tr. at p. 62:7–10; Tr. of Nonjury Trial Day Eighteen ("Day Eighteen Tr.") at p. 26:20–24.

            iii.     *Relevant differences between the 2000 and 2012 LSC*

72.     The minimum construction type and height requirements provided in the LSC for existing healthcare occupancies (such as Type II (000) and Type II (222)) did not change between the 2000 and 2012 editions of the LSC. Day Six Tr. at pp. 82:19–83:11.

73.     For CMS's purposes, each deficient condition that correlates to an LSC requirement is referred to as a "K-tag." Tr. of Nonjury Trial Day Three ("Day Three Tr.") at p. 10:3–10; Day Six Tr. at pp. 46:22–47:4; Day Fourteen Tr. at pp. 53:22–54:1.

74.     Under the 2012 LSC, K-tag 0161 relates to the building construction type required for an existing healthcare occupancy. Day Seven Tr. at pp. 41:20–25, 56:6–11; Day Fourteen Tr. at p. 54:13–15. Under the 2000 LSC, the K-tag was K-12. Day Seven Tr. at pp. 68:22–69:7.

                        b.     NFPA 101A

75.     The NFPA 101A is the "Guide on Alternative Approaches to Life Safety." Pls.' Ex. 46, NFPA 101A 2013 Ed.; Day Six Tr. at pp. 29:5–30:9.

76.   NFPA 101A is not written in mandatory language, but rather provides a "series of methods that can be used to demonstrate equivalency to the [LSC]," because it is a guide and not a code or a standard. Day Seven Tr. at p. 29:9–13; Day Fourteen Tr. at p. 32:4–6.

77.   CMS can determine a facility is "in compliance" with the COP, even if the facility has deficiencies, if the facility meets the requirements for an equivalency. Day Six Tr. at pp. 36:18–37:3; Day Seven Tr. at p. 108:20–24.

78.   A building can obtain such an equivalency if it satisfies a level of overall safety equivalent to the level of safety achieved through meeting all prescriptive requirements. Day Seven Tr. at p. 36:18–24.

79.   Chapter 1, Section 1.4 of the LSC, entitled "Equivalency," states: "Nothing in this code is intended to prevent the use of systems, methods, or devices of equivalent or superior quality, strength, fire-resistance, effectiveness, durability, or safety over those prescribed by this code." LSC at p. 101-22.

80.   There are multiple types of equivalencies including a traditional equivalency and a fire safety evaluation system ("FSES"). Tr. of Dep. of Lori Dinney ("Dinney Dep.") at p. 55:14–25; Day Six Tr. at p. 29:13–15; *see also* Day Fourteen Tr. at p. 42:13–14 (testifying that an FSES is "one method of providing an equivalency and is not the only method.").

81.   If an Authority Having Jurisdiction ("AHJ") has approved an equivalency for a building, whether an FSES or traditional equivalency, the building is considered in compliance with the LSC. Day Fourteen Tr. at pp. 41:11–12, 50:10–12, 65:6–12.

82.   The LSC defines an AHJ as an "organization, office, or individual responsible for enforcing the requirements of a code or standard . . . ." LSC at p. 101-25.

83.     In Pennsylvania, the AHJs that can determine compliance are CMS, PA DOH, and a deeming authority like TJC. Day Seven Tr. at pp. 129:7–130:5.

84.     An FSES is one means by which a facility can show that it has the level of safety equivalent to that which would be provided if the building complied with the prescriptive requirements of the LSC. Day Six Tr. at pp. 23:10–13, 29:15–17.

85.     An FSES allows a facility to offset a deficiency in one category by exceeding the prescriptive requirement in another area. *Id.* at p. 139:16–25.

86.     When completing an FSES, numeric values are assigned on a worksheet for safety features in a building; negative values correspond to safety features that do not meet the prescriptive LSC and positive values correspond to features that meet or exceed the LSC. Day Fourteen Tr. at pp. 42:8–10, 45:25–46:3; Day Two Tr. at p. 245:5–17; Day Eighteen Tr. at p. 33:5–12.

87.     An FSES worksheet is required for every zone of the facility even if there is more than one zone on each floor. *See* Defs.' Ex. 237, FSES Scoring Demonstrative; Day Four Tr. at pp. 125:5–126:3; Day Fourteen Tr. at pp. 43:13–16, 44:1–17, 45:7–8.

88.     To complete an FSES worksheet, an individual assesses a facility's life safety features and assigns the facility certain point values accordingly. Day Eighteen Tr. at p. 33:1–12.

89.     To achieve compliance with the LSC using an FSES for equivalency, the FSES worksheet must equal zero or greater. Day Four Tr. at pp. 128:15–130:2; Day Fourteen Tr. at p. 48:4–16.

90.     An FSES can be prepared by someone at the facility "who has the appropriate credentials to be able to do it, or the [PA DOH]." Day Two Tr. at p. 253:9–12.

91.     There is no requirement to submit an FSES on an annual basis. Day Seven Tr. at pp. 97:15–17, 105:15–21.

92.     An FSES can only be submitted to an AHJ in response to a deficiency having been cited after a survey. Day Four Tr. at pp. 84:23–85:23; Day Fourteen Tr. at p. 148:6–8.

93.     On December 16, 2016, which was after the adoption of the 2012 LSC, CMS notified health care providers, including CHS, that they could comply with the 2012 LSC by submitting an FSES that complied with the 2013 edition of NFPA 101A, Guide on Alternative Approaches to Life Safety. Pls.' Ex. 94, Dec. 16, 2016 CMS S&C Memo; Day Fourteen Tr. at p. 193:6–18. The 2013 NFPA 101A would be used in place of the 2001 NFPA 101A, which was approved for use with the 2000 LSC. Pls.' Ex. 94, Dec. 16, 2016 CMS S&C Memo.

94.     If a building's existing LSC status was based upon an FSES at the time of the adoption of the 2012 LSC, the change did not invalidate that building's equivalency or the status based upon such equivalency. Day Fourteen Tr. at p. 62:11–13.

95.     The defendants understood that after the 2012 LSC was enacted, every FSES at any of their facilities remained valid until an AHJ told them the facility had a deficiency and they needed to resubmit the FSES. Tr. of Nonjury Trial Day Nineteen ("Day Nineteen Tr.") at pp. 16:21–25, 32:9–13.

96.     Under the 2000 LSC and the 2001 NFPA 101A, Pottstown Hospital met the requirements for an FSES. Day Six Tr. at p. 215:3–5.

c.      TIA No. 1501

97.     Between revision cycles of the LSC, the NFPA may adopt tentative interim amendments ("TIA"). *Id.* at p. 206:14–22.

98.     In April 2020, Wayne Carson, one of CHS's Life Safety Code experts, started working with the NFPA staff liaison to develop TIA No. 1501 to remedy mistaken values in the 2013 FSES worksheets so they would be consistent with the actual provisions in the 2012 LSC. Day Fourteen Tr. at pp. 68:19–69:2; Day Eighteen Tr. at p. 32:3–6.

99.     TIA No. 1501 was approved in August 2020 and became effective on August 31, 2020. Day Six Tr. at pp. 238:13–15, 240:16; Day Fourteen Tr. at p. 81:9–10.

100.    Since the NFPA adopted TIA No. 1501, a facility's life safety experts would use the 2013 NFPA 101A in conjunction with TIA No. 1501 to determine if the facility qualifies for an FSES equivalency. Day Fourteen Tr. at p. 83:3–4; Day Eighteen Tr. at p. 175:22–25.

### 5.      Financial Accounting Standards Board and its Generally Accepted Accounting Principles

101.    The Financial Accounting Standards Board ("FASB") establishes Generally Accepted Accounting Principles ("GAAP"), which allow users of financial statements to understand how companies prepare and record their business transactions. Day Fifteen Tr. at pp. 129:12–17, 124:6–16.

#### a.      Financial Statements

102.    A complete set of audited financial statements includes income statements, balance sheets, a statement of cash flows, a stockholders' equity statement, and footnotes. Day Fifteen Tr. at p. 106:16–22; Day Sixteen Tr. at p. 85:12–24.

103.    Financial statements contain two main types of disclosures: qualitative and quantitative. Day Fifteen Tr. at pp. 53:13–54:4; Day Sixteen Tr. at p. 86:9–10.

104.    Liability disclosures are one subcategory of disclosures. Day Sixteen Tr. at p. 87:6–14.

105.    Under GAAP, a contingent liability, also called a loss contingency, refers to the occurrence of an event that could lead to a future economic outflow of cash. Pls.' Ex. 303, ASU 450-20-25 Recognition; Day Fifteen Tr. at p. 139:17–24.

106.    GAAP does not require the disclosure of a contingent liability related to a change in revenue recognition estimate because this change is not a liability. Day Fifteen Tr. at pp. 167:24–168:16.

107.    A regulatory agency informing an entity that it needs to become compliant does not create a contingent liability. Day Sixteen Tr. at p. 89:12–22.

108.    For a contingent liability to exist, there first must be an event "that would give rise to a possible loss that is known or knowable as of the date of your financial statements." Day Fifteen Tr. at p. 214:4–10. You must also consider whether the amount is remote, reasonably possible, or probable, all three of which are different standards to assess the risk of a future cash outflow. *Id.* at p. 214:10–15.

109.    There is no specific percentage to determine whether something meets those categories because GAAP is about judgment and estimates; it provides management with the ability to make decisions based on the contemporaneous information available to them. *Id.* at pp. 214:16–21, 215:5–11.

110.    In the APA, CHS and the other defendants represented and warranted that the financial statements they provided to Tower Health concerning Pottstown Hospital were prepared in accordance with GAAP and presented fairly in all material respects the financial condition of Pottstown Hospital. APA at § 3.4.

111.     The plaintiffs claim the Pottstown Hospital financial statements disclosed to Tower Health before the October 1, 2017 closing did not comply with GAAP because they failed to disclose certain contingent liabilities, in breach of the APA.

b.     ASC 605 and ASC 606

112.     When FASB decides to change a standard, it issues a proposed standard. After a proposed standard has been out for public comment, it is called an Accounting Standards Update ("ASU"). Day Fifteen Tr. at p. 130:19–25.

113.     When an ASU becomes final and authoritative, it is known as an Accounting Standards Codification ("ASC"). *Id.* at pp. 131:12–15, 171:3–9.

114.     ASC 605 was the standard for recognizing revenue until December 31, 2017. *Id.* at pp. 18:15–19, 69:3–7, 131:14–23.

115.     On January 1, 2018, ASC 606 became the new effective standard for recognizing revenue. *Id.* at pp. 19:8–10, 131:23–24.

116.     A change in estimate due to the change from ASC 605 to ASC 606 would not result in a contingent liability. *Id.* at 88:7–89:23, 183:13–22.

117.     A lack of a disclosure related to the change from ASC 605 to ASC 606 would not result in any damages to the plaintiffs. *Id.* at 203:6–10.

C.     **Pottstown Hospital**

1.     **History of Pottstown Hospital**

118.     Pottstown Hospital, formerly known as PMMC, is a seven-story acute care community hospital with 232 patient beds in Pottstown, Pennsylvania. Day One Tr. at pp. 91:4–7, 72:24–73:4.

119.     Pottstown Hospital "had all of the earmarks for it being constructed as a Type II (222)" facility when it was originally constructed in 1972. Day Three Tr. at p. 6:19–21.

120.     Under both the 2000 and 2012 editions of the LSC, Pottstown Hospital is considered a high-rise building. Day Six Tr. at p. 132:22–24.

121.     At least as early as April 27, 2000, the then owners of Pottstown Hospital downgraded its building construction type to Type II (000). Day Four Tr. at pp. 103:25–104:23, 110:13–112:25.

122.     Even though a construction Type II (000) is unacceptable under the prescriptive requirements of the LSC, the deficiency was acceptable because Pottstown Hospital had an FSES that established equivalency dating back to at least 2004. Pls.' Ex. 8, DOH PMMC Re-Certification Survey; Day Six Tr. at pp. 69:12–17, 75:12–18.

### 2.     Pottstown HC's Ownership of Pottstown Hospital

123.     In 2003, Pottstown HC purchased Pottstown Hospital. Pls.' Ex. 6, CHS and Pottstown Asset Purchase Agreement; Tr. of Nonjury Trial, Day Seventeen ("Day Seventeen Tr.") at p. 22:15–24; Day Two Tr. at p. 88:7–23.

124.     On April 29, 2005, PA DOH performed a re-certification survey to determine the hospital's compliance with the COP with Medicare and Medicaid. *See* Pls.' Ex. 8, DOH PMMC Re-Certification Survey; Day Six Tr. at pp. 67:16–21, 72:13–15.

125.     The April 29, 2005 PA DOH re-certification survey cited Pottstown HC for a building construction type deficiency where the surveyor noted Pottstown Hospital's construction type was Type II (000). *See* Pls.' Ex. 8, DOH PMMC Re-Certification Survey; Day Six Tr. at pp. 68:15–19, 69:8–10.

126.     Although Type II (000) is unacceptable under the LSC, PA DOH's surveyor noted that Pottstown Hospital was acceptable despite such a deficiency because it had an FSES that established an equivalency dating back to at least 2004. *See* Pls.' Ex. 8, DOH PMMC Re-Certification Survey; Day Six Tr. at pp. 69:12–17, 75:12–18.

127.     According to PA DOH and CMS, after the April 29, 2005 survey, Pottstown HC complied with the LSC. Day Six Tr. at p. 75:4–18.

128.     Michael Peters, the current president of the life safety consulting firm Peters Rice Associates, prepared the FSES, which TJC accepted, for Pottstown Hospital in 2006. Day Four Tr. at pp. 123:21–24, 131:14–19.

129.     The 2006 FSES that Mr. Peters prepared for TJC was also submitted to PA DOH so Pottstown HC could obtain its license from PA DOH. *Id.* at pp. 132:25–133:19.

130.     PA DOH conducted another re-certification survey of Pottstown Hospital on May 2, 2006. Day Six Tr. at pp. 75:23–76:3.

131.     In the 2006 survey, PA DOH cited Pottstown HC for Pottstown Hospital's building construction type deficiency as a Type II (000) building, and again PA DOH noted Pottstown Hospital was acceptable despite its deficiency because an FSES was in place to address the deficiency. *Id.* at pp. 76:2–5, 76:17–22.

132.     On June 3, 2009, PA DOH conducted another re-certification survey at Pottstown Hospital. *Id.* at p. 77:5–13.

133.     Once again, PA DOH cited Pottstown HC for a building construction type deficiency as a Type II (000) building because Pottstown Hospital's structural components did not maintain a two-hour fire rating, but the surveyor observed that an FSES was in place to address the deficiency. *Id.* at pp. 77:9–78:11.

134.    On June 16, 2009, Pottstown HC submitted an FSES dated June 11, 2009 to PA DOH in response to the June 3, 2009 re-certification survey. *Id.* at p. 77:13–18.

135.    On May 31, 2011, PA DOH performed a re-licensure survey of Pottstown Hospital to determine Pottstown HC's compliance with the PA DOH licensure requirements. *Id.* at p. 79:16–23.

136.    The May 31, 2011 re-licensure survey noted the same building construction type deficiency at Pottstown Hospital that had been noted in the re-certification surveys and explained that "the facility has an acceptable Fire Safety Evaluation System reviewed on May 31, 2011 addressing this issue." Pls.' Ex. 38, DOH Relicensure Survey at p. 6.

137.    Approximately two years later, on May 13, 2013, PA DOH performed another re-licensure survey of Pottstown Hospital. Day Six Tr. at p. 81:11–16.

138.    As a result of the May 13, 2013 re-licensure survey, the surveyor cited Pottstown HC for Pottstown Hospital's failure to meet the building construction type prescribed by the LSC, but explained that the "Fire Safety Evaluation System reviewed on May 13, 2013, addressing this issue" was acceptable. Pls.' Ex. 47, DOH Relicensure Survey at p. 4.

139.    Despite the building construction type deficiency noted in the 2013 re-licensure survey, PA DOH again found Pottstown HC met the LSC requirements pursuant to an equivalency. Day Six Tr. at p. 82:2–3.

140.    In 2014, Pottstown HC opted to use TJC's deemed status to obtain CMS certification and PA DOH licensure. *Id.* at pp. 82:11–14, 179:19–22.

141.    After Pottstown HC opted into TJC's deemed status program, PA DOH did not survey Pottstown Hospital for re-licensure or re-certification. Day Six Tr. at pp. 82:8–14, 164:18–19; Day Seven Tr. at p. 117:13–22.

26

142.    From May 12–15, 2015, TJC conducted an unannounced accreditation survey of Pottstown HC at Pottstown Hospital and granted the hospital an accreditation decision of "Accredited" with an effective date of May 16, 2015, and an expiration date of May 16, 2018. *See* Pls.' Ex. 59, TJC Letter to PMMC re: Accreditation; Day Nine Tr. at pp. 41:9–42:7; Day Fourteen Tr. at pp. 55:24–25, 56:2–9; Day Eighteen Tr. at p. 23:14–19.

a.    <u>Pottstown HC's Fire Safety Management Plan</u>

143.    The defendants employ regional engineers who perform "[r]outine building inspections and environmental tours . . . to ensure compliance is ongoing." Day Twelve Tr. at 5:11–6:2, 42:4-43:6.

144.    The purpose of the defendants' Fire Safety Management Plan is "to protect building occupants from fire." Pls.' Ex. 87, CHS Policy EC.01.01.01.6 – Fire Safety Management Plan at p. 1.

145.    Life safety plans are floor plans that identify certain features in the hospital, including exits, fire barriers, smoke barriers, the construction type of the building, and where the hazardous areas are. Day Six Tr. at p. 158:2–14. Essentially, they are "plans of each floor of the hospital showing the conditions on that floor." *Id.*

146.    Pottstown HC submitted a capital expenditure request ("CER") to update the life safety plans in November 2016 and CHS approved the CER in January 2017. Pls.' Ex. 96, Newell Email to Gostkowski Attaching Approved January 6, 2017 CER; Day Four Tr. at pp. 53:1–54:1; Day Nine Tr. at pp. 102:22–104:10.

147.    On April 26, 2017, BDA Architects, on behalf of Pottstown HC, submitted "for record only" plans to PA DOH. Day Six Tr. at p. 160:9–19.

148.     Bill Gutches, one of PA DOH's plan reviewers, stamped the "for record only" plans as "Preliminary" and wrote the following statement on the life safety plans: "An FSES, per the 2012 Life Safety Code has not been completed. We do not know that this meets an FSES any longer." Pls.' Ex. 128, Sanders Email to Gostkowski and Ridall with DOH Preliminary Stamped LS Plans; Day Four Tr. at pp. 61:18–62:12, 65:5–14.

149.     Gordon Carlisle, CHS' Vice President for Facilities Management, testified that the "Preliminary" stamp on the life safety plans meant that the life safety plans had not been fully accepted yet, but did not mean that Pottstown HC was required to update its FSES because a new survey had not yet been performed. Day Nineteen Tr. at p. 112:9–24.

   b.     Status of Pottstown HC Until, and Including, October 1, 2017

150.     Compliance with the LSC is a status, and that status lasts until an AHJ says otherwise, or an expiration date is reached. Day Fourteen Tr. at pp. 58:10–59:1.

151.     Pottstown HC was in compliance with the LSC on May 30, 2017, when the APA was executed, and on October 1, 2017, when the APA closed. *Id.* at p. 153:2–25.

152.     Pottstown HC had an approved FSES for Pottstown Hospital up through and including October 1, 2017. Day Twelve Tr. at pp. 84:13–85:6.

153.     During the entire time Jesse Ridall was the regional engineer at Pottstown Hospital, he always understood Pottstown HC was in compliance with the PA DOH and TJC. *Id.* at pp. 85:7–87:25.

154.     On May 30, 2017, when the parties executed the APA, and on October 1, 2017, when the parties closed on the APA, Pottstown HC was licensed by PA DOH, had deemed status from TJC, and was certified by CMS. Day Seven Tr. at p. 115:9–13; Day One Tr. at p. 82:12–13; Day Nine Tr. at pp. 86:23–87:1, 88:1–10.

155.    After the closing in February 2018, Pottstown Hospital received accreditation from TJC. Day Nine Tr. at p. 137:1–7.

### D.    The APA

### 1.    Overview

156.    The parties used a code name, Project Independence, to protect the confidentiality of the transaction. Day One Tr. at p. 72:18–20.

157.    Prior to Project Independence, Tower Health only owned one hospital: Reading Hospital. *Id.* at p. 71:9–22.

158.    Tower Health wanted to expand its provider offerings by increasing the number of hospitals they operated. *Id.* at pp. 91:11–92:5.

159.    On May 30, 2017, CHS and the other defendants entered into the APA with Tower Health and the other plaintiffs. *See* APA.

160.    Pennsylvania Hospital Company, LLC and Pottstown HC, who owned the assets of Pottstown Hospital, are defined as the "Seller Entities" in the APA. Defendant CHS is a party to the APA and guaranteed the obligations of the seller entities. *Id.* at Recitals A, G, § 12.26 & Ex. A.

161.    The "Buyer Entities" referenced in the APA include Pottstown Hospital, LLC, which now owns the assets of Pottstown Hospital. *Id.* at Recital B. Pottstown Hospital, LLC, a Pennsylvania limited liability company, is owned by Tower Health, with Tower Health as its sole member. *Id.*; Day One Tr. at p. 72:17–23; Defs.' Ex. 98, May 2017 Board Presentation.

162.    The Buyer Entities purchased from the Seller Entities the assets described in the APA, which included the Pottstown, Phoenixville, Jennersville, Brandywine, and Chestnut Hill hospitals. APA at Recitals C, D, § 1.1; Day Sixteen Tr. at p. 195:9–13.

29

163.    Tower Health purchased the five operating hospital businesses and 14 physician practices as a "going concern" and all "the operating assets of the hospital[s] . . . includ[ing] everything that it–everything that was required to operate the hospitals as they were functioning." Day One Tr. at pp. 184:23–185:11, 140:5–15.

164.    The APA defined "effective time"—or closing on the APA—as 12:00:01 a.m., local time, on August 1, 2017, or at such other time as the parties may mutually designate in writing. APA at § 2.1.

165.    The parties agreed to extend the closing of the APA to October 1, 2017 in the First Amendment to the APA. Pls.' Ex. 136, First Amendment to APA at § 2; Day One Tr. at pp. 228:23–229:5.

## 2.    Representations and Warranties

166.    The Seller Entities provided 25 different categories of express representations and warranties to the Buyer Entities and Tower Health in Section 3 of the APA. *See* APA at § 3.

167.    The Seller Entities, as guaranteed by CHS, made the representations and warranties to Tower Health effective "on two different dates. The date that the agreement is executed and then again on the date that the agreement is closed." Day One Tr. at p. 188:2–16.

168.    Under Section 3.4 of the APA, the defendants were to provide certain financial statements to the plaintiffs, including income statements and balance sheets. APA at § 3.4.

169.    The defendants were to provide the income statements and balance sheets in accordance with GAAP applied on a consistent basis, except as excluded on Schedule 3.4 of the APA. Tr. of Nonjury Trial Day Eight ("Day Eight Tr.") at p. 8:20–22; Day Fifteen Tr. at p. 124:11–12; Day Sixteen Tr. at p. 34:5–10.

170.    Schedule 3.4 eliminates the requirement that the defendants provide statements of cash flow, shareholders' equity, and footnotes. Day Seven Tr. at p. 241:15–22; Day Eight Tr. at p. 71:18–21; Day Fifteen Tr. at pp.196:24–197:6.

171.    Footnotes are "the textual explanation of numbers, changes of the numbers that occurred on the balance sheet or statement of operations, or even cash flow" that "explain how you recognize revenue [or] how a company may be adopting new standards." Day Fifteen Tr. at p. 136:12–22. Contingent liabilities are disclosed in footnotes. Day Seventeen Tr. at 96:11–97:25.

172.    Because Schedule 3.4 excludes footnotes, the defendants were not obligated to disclose contingent liabilities. *Id.*

173.    Section 3.6 of the APA addresses, *inter alia*, the licensing of the purchased hospitals. APA at § 3.6. Section 3.6 defines "licenses" as those listed on Schedule 3.6. The first license for Pottstown Hospital listed is its "hospital license." *Id.*; Defs.' Ex. 111, APA at Schedule 3.6.

174.    Section 3.7 of the APA was included to show that the facilities were participating in the Medicare/Medicaid programs and have been operating in compliance with the Medicare requirements. Day Seventeen Tr. at pp. 46:11–22, 108:24–109:22.

175.    Complying with the LSC is a required COP for the Medicare program. *See* 42 C.F.R. § 482.41(b)(1)(i) ("The hospital must meet the applicable provisions and must proceed in accordance with the Life Safety Code . . . ."); Pls.' Ex. 72, May 6, 2016 CMS S&C Memo.

176.    Section 3.8 of the APA was included as a general representation that the operations of the sellers have been in compliance with the regulations applicable to hospitals and physicians. Day Seventeen Tr. at p. 47:11–25.

177.     Sections 3.6, 3.7, and 3.8 in the APA, each addressing distinct subject matters, are all qualified by the phrase "in compliance in all material respects." Day One Tr. at p. 199:11–14; APA at §§ 3.6, 3.7, 3.8.

178.     The APA does not define the term "compliance." *See generally* APA; Day One Tr. at p. 200:15–17.

### 3.     Covenants

179.     In Section 5 of the APA, the Seller Entities, as guaranteed by CHS, provided several covenants to Tower Health prior to closing.[7] APA at § 5.

### 4.     Other Relevant Provisions

180.     Under Section 3.22 of the APA, Tower Health purchased Pottstown Hospital's assets "AS IS." APA at § 3.22.

181.     Section 3.22 of the APA states:

> ***Condition of Assets.*** Other than with respect to the representations and warranties herein provided, the Seller Entities shall transfer the Assets to the Buyer Entities and the Buyer Entities shall accept the Assets from the Seller Entities and as owned by the Acquired Companies at the Closing AS IS WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, WITH RESPECT TO THE LAND, BUILDINGS AND IMPROVEMENTS, AND WITH NO WARRANTIES, INCLUDING WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WITH RESPECT TO THE EQUIPMENT, INVENTORY, AND SUPPLIES, AND ANY AND ALL OF WHICH WARRANTIES THE SELLER ENTITIES HEREBY DISCLAIM. The Seller Entities further explicitly do not represent that the Facilities are in compliance with the Americans with Disabilities Act. All of the Assets shall be further subject to normal wear and tear on the land, buildings, improvements and equipment and normal and customary use and disposal of inventory and supplies in the ordinary course of business up to the Closing Date.

*Id.*

---

[7] The court has provided the text of the relevant covenants (Sections 5.2, 5.3, and 5.4) above.

182.    Section 5.1 of the APA states:

*Information.* The Seller Entities shall afford to the officers and authorized representatives and agents (which shall include accountants, attorneys, bankers, and other consultants) of the Buyer Entities full and complete access to and the right to inspect the plants, properties, books, and records of the Facilities, and will allow the Buyer Entities reasonable access to the medical staff and personnel of the Facilities to confirm and establish relationships, and will furnish the Buyer Entities with such additional financial and operating data and other information as to the business and properties of the Seller Entities and the Acquired Companies which pertains to the Facilities and the Assets or their operations as the Buyer Entities may from time to time reasonably request. The Buyer Entities' right of access and inspection shall be exercised in such a manner as not to interfere unreasonably with the operations of the Facilities. The Buyer Entities agree that no inspections shall take place and no employees or other personnel of the Facilities shall be contacted by the Buyer Entities without the Buyer Entities first providing reasonable notice to the Seller Entities and coordinating such inspection or contact with the Seller Entities.

APA at § 5.1.

183.    Section 5.6 of the APA states:

*Additional Financial Information.* Within thirty (30) days following the end of each calendar month prior to closing, the Seller Entities shall deliver to the Buyer Entities true and complete copies of the unaudited balance sheets and the related unaudited statements of income of, or relating to, each Seller Entity and Acquired Company for each month then ended, together with a year-to-date compilation and the notes, if any, related thereto, which shall have been prepared from and in accordance with the books and records of the Seller Entity or the Acquired Company, and shall fairly present in all material respects the financial position and results of operations of the Seller Entity or the Acquired Company and of the related Facility as of the date and for the period indicated.

*Id.* at § 5.6.

184.    Section 10.1 of the APA states, in pertinent part:

*Allocation of Purchase Price.* The Purchase Price shall be allocated among the various classes of Assets in accordance with and as provided by Section 1060 of the [Internal Revenue] Code. The Buyer Entities and the Seller Entities shall agree on a proposed allocation among the various classes of Assets and by Hospital prior to closing, and shall list the proposed allocation on Schedule 10.1 to this Agreement. Within ninety (90) days of the Closing, the Seller Entities shall provide the Buyer Entities with a proposed final allocation of the Purchase Price for the Buyer Entities' review and approval . . . . The parties agree that any tax returns or

other tax information they may file or cause to be filed with any governmental agency shall be prepared and filed consistently with such agreed upon allocation.

*Id.* at § 10.1.

185.    Schedule 10.1 attached to the APA is the preliminary proposed allocation for tax purposes. Day One Tr. at pp. 223:19–225:15.

186.    Section 11 of the APA provides a right of indemnification to the Buyer Entities if there is a breach of the APA. APA at § 11.2.

187.    Under Section 11.3 of the APA, the plaintiffs are responsible for the first $2.5 million for any damages suffered for any reason. *Id.* at § 11.3.

188.    Section 11.3 of the APA states in relevant part:

> ***Limitations.*** The Buyer Entities and the Seller Entities shall be liable under Section 11.1(i) or Section 11.2(i) (i.e., for misrepresentations and breaches of warranties), as applicable, only when total indemnification claims exceed Two Million Five Hundred Thousand Dollars ($2,500,000) (the "Basket Amount"), after which the Buyer Entities or the Seller Entities, as applicable shall be liable only for the amount in excess of the Basket Amount. . . . Notwithstanding the foregoing provisions of this Section 11.3, the Basket Amount shall not apply to claims arising under Section 11.1(i) or Section 11.2(i) and resulting from intentional misrepresentation or fraud by the indemnifying party.

*Id.*

189.    The APA provides that notice of an indemnification claim should be provided within 30 days "after becoming aware of such breach or claim, specifying in detail the circumstances and facts which give rise to a claim under this Section 11." *Id.* at § 11.5.

190.    The failure to provide notice within 30 days does not eliminate the obligation of the indemnifying party to indemnify the indemnified party; instead, the APA provides that the indemnity "shall be limited to the damages that would have nonetheless resulted absent the Indemnified Party's failure to notify the Indemnifying Party in the time required above . . . ." *Id.*

191.     Under Section 11.6 of the APA, the plaintiffs were obligated to mitigate their damages, if any. *Id.* at § 11.6.

192.     Section 11.6 of the APA states in relevant part:

> ***Mitigation.*** The Indemnified Party shall take all reasonable steps to mitigate all liabilities and claims, and shall provide such evidence and documentation of the nature and extent of any liability as may be reasonably requested by the Indemnifying Party. Each party shall act in a commercially reasonable manner in addressing any liabilities that may provide the basis for an indemnifiable claim (that is, each party shall respond to such liability in the same manner that it would respond to such liability in the absence of the indemnification provided for in this Agreement).

*Id.*

193.     Under Section 11.7 of the APA, indemnification is the parties' exclusive remedy for any alleged breach of any representation or warranty in the APA. *Id.* at § 11.7. In this regard, Section 11.7 of the APA provides in pertinent part that "the sole and exclusive remedy for any breach or inaccuracy, or alleged breach or inaccuracy, of any representation and warranty made by the Seller Entities or the Buyer Entities shall be the remedies provided by this <u>Section 11</u>." *Id.*

194.     Section 12.21 of the APA provides that the agreement "is a result of negotiations between sophisticated parties of equal bargaining power represented by counsel." *Id.* at § 12.21.

195.     The parties agreed to an integration provision in the APA, including that the APA superseded any prior negotiations or representations not expressly incorporated into the agreement. *Id.* at § 12.23; Day One Tr. at pp. 181:16–182:5.

196.     In Section 12.26 of the APA, CHS "unconditionally and absolutely guarantees the prompt performance and observance by the Seller Entities of each and every obligation, covenant and agreement of the Seller Entities arising out of, connected with, or related to, this Agreement or any ancillary documents hereto and any extension, renewal and/or modification thereof." *Id.* at § 12.26.

197.   The APA makes clear CHS's unconditional and absolute guaranty is "a continuing guaranty and shall remain in effect." *Id.*

198.   Section 12.5 of the APA provides that the prevailing party in this litigation would be entitled to recover its reasonable attorneys' fees and costs. *Id.* at § 12.5.

199.   Under Section 12.6 of the APA, the parties agree Pennsylvania law will govern the APA, without regard to conflict of laws principles. *Id.* at § 12.6.

### E.   Pottstown Hospital, LLC's Ownership of Pottstown Hospital

#### 1.   Post-Closing Surveys at Pottstown Hospital

##### a.   TSIG Life Safety Assessment Survey

200.   In early 2018, Lori Dinney, TSIG Consulting's accreditation specialist, performed a life safety assessment and provided Pottstown Hospital, LLC with a plan for improvement that included 314 numbered deficiencies, the necessary corrective action, and the cost to correct the deficiencies. Dinney Dep. at pp. 47:4–20, 64:22–25, 66:15–67:18, 68:21–69:13, 73:12–74:18.

201.   Ms. Dinney testified that she did not consider any of the deficiencies to be out of the ordinary. *Id.* at 87:3–9.

202.   The plaintiffs never asked TSIG to perform any of the corrective actions noted in the plan for improvement. *Id.* at 91:11–16.

##### b.   TJC February 2018 Survey

203.   In preparation for a February 2018 survey from TJC, Tower Health sent a team of life safety specialists to Pottstown Hospital who found certain deficiencies related to fireproofing. Day Two Tr. at p. 229:3–8.

204.   In response to the fireproofing deficiencies, David Major, who is responsible for facilities at Tower Health, hired contractors to spray over the deficient areas with new SFRM, also

known as fireproofing, before the 2018 TJC survey occurred. *Id.* at p. 229:17–23; Day Three Tr. at p. 209:3–16; Day Four Tr. at p. 169:15–16; Day Five Tr. at p. 114:13–20.

205.    In anticipation of the February 2018 TJC survey, Mr. Major learned Pottstown Hospital was a Type II (000) building. Day Two Tr. at pp. 233:24–234:1; Day Three Tr. at pp. 210:12–212:25.

206.    From February 12–16, 2018, TJC performed their unannounced triannual accreditation survey ("February 2018 Survey") at Pottstown Hospital, for purposes of accreditation with TJC, certification with CMS, and licensure with PA DOH. Day Six Tr. at pp. 90:14–17, 92:14–20; Day Seven Tr. at p. 28:6–9; Day Nine Tr. at pp. 45:24–46:16, 56:17–22.

207.    The February 2018 survey "determine[d] that [Pottstown Hospital] substantially complied with the conditions of participation." Day Seven Tr. at pp. 110:21–23, 118:5–10.

208.    Pottstown Hospital, LLC maintained its deemed status in February 2018, meaning it was in substantial compliance with the COP for Medicare and Medicaid and its license with PA DOH. Day Seven Tr. at p. 111:4–9; Day Fourteen Tr. at pp. 100:24–101:1.

c.    CMS March 2018 Validation Survey

209.    From March 14–15, 2018, PA DOH completed an unannounced sample validation survey at Pottstown Hospital on behalf of CMS to validate the findings of TJC's February 2018 survey ("March 2018 Survey"). Day Six Tr. at pp. 49:6–11, 49:23–50:4; Day Nine Tr. at pp. 49:1–7, 56:23–57:6, 107:25–108:2.

210.    During the March 2018 Survey, PA DOH noted eleven deficiencies it identified in the main building of Pottstown Hospital. Pls.' Ex. 173, Email from Goodwin (CMS) to Newell re: Removal of Deemed Status with Attachment.

211.    The March 2018 Survey, consistent with prior documentation, indicated that the building was Type II (000) construction. Day Six Tr. at p. 169:7–10, 12–13.

212.    During the March 2018 Survey, the PA DOH surveyor told Richard Newell, the president of Pottstown Hospital, that Pottstown Hospital was safe for patients and staff because the hospital was fully sprinklered. Day Nine Tr. at p. 112:17–22.

## 2.    CMS's Notice to Pottstown Hospital LLC

213.    On June 25, 2018, CMS sent Pottstown Hospital, LLC notice that it was not in compliance with 42 C.F.R. § 482.41 (Physical Environment), among other things. *See* Pls.' Ex. 173, Email from Goodwin (CMS) to Newell re: Removal of Deemed Status with Attachment; Day Three Tr. at pp. 20:9–21:1. This section covers the LSC. *Id.* at 20:9–21:16.

214.    The CMS notice indicated that Pottstown Hospital, LLC needed to submit an acceptable Plan of Correction ("POC"). Pls.' Ex. 173, Email from Goodwin (CMS) to Newell re: Removal of Deemed Status with Attachment; Day Seven Tr. at p. 97:20–23.

215.    A POC must include a response to each deficiency and a date by which the facility will correct it. Day Six Tr. at p. 48:15–22; Day Sixteen Tr. at p. 252:22–24; Day Fourteen Tr. at p. 55:3–14.

216.    The CMS notice also indicated that Pottstown Hospital, LLC was determined to be out of compliance with the COP and that CMS was removing deemed status; it placed Pottstown Hospital, LLC under the state agency's survey jurisdiction. Pls.' Ex. 173, Email from Goodwin (CMS) to Newell re: Removal of Deemed Status with Attachment; Day Three Tr. at p. 20:9–18; Day Six Tr. at pp. 91:16–19, 97:4–6; Day Nine Tr. at pp. 49:21–25, 73:12–14.

217.    The CMS notice is not retroactive and, therefore, from closing until June 2018, Pottstown Hospital, LLC maintained its license for PA DOH and its certification with CMS. Day Seven Tr. at p. 117:13–22; Day Eighteen Tr. at pp. 172:24–173:8.

218.    To date, CMS's finding that Pottstown Hospital, LLC was not in compliance with the COP has not affected Pottstown Hospital, LLC's Medicare reimbursements or its status as a participating provider in the Medicare program. Day One Tr. at p. 258:8–12; Day Three Tr. at pp. 23:10–24:5.

### 3.    The Plaintiffs' Actions Since Receipt of CMS Notice

219.    On July 24, 2018, Tower Health sent an email to Terry Hendon at CHS and attached a Notice of Claim with the same date. Pls.' Ex. 186, Huyett Email to Hendon w/ Tower Health Notice of Claim.

220.    Tower Health's Notice of Claim was a single page that alleged CHS had breached Section 3.8 of the APA because CMS found Pottstown Hospital was not in compliance with certain federal regulations, and it attached the CMS notice. *See id.*

221.    In response to Tower Health's Notice of Claim, CHS responded and requested more details because the "Notice of Claim does not provide much in the way of information, other than the fact that your client failed a sample validation survey roughly six months after acquiring the particular hospital." Pls.' Ex. 187, Braun Email to Huyett re: Tower Health Notice of Claim.

222.    Dan Huyett, a Stevens & Lee attorney for Tower Health, sent a Draft Statement of Deficiencies and Plan of Correction to CHS on August 3, 2018. Pls.' Ex. 189, Huyett Email to Braun re: Tower Health Notice of Claim.

223.    In response to Mr. Huyett, on October 4, 2018, CHS sent the plaintiffs a memorandum that laid out the defendants' proposed responses to the noted deficiencies and

highlighted what appeared to be a failure on the part of Pottstown Hospital, LLC to address the deficiencies identified by the AHJ. Pls.' Ex. 203, Braun Email to Huyett Attaching Tiratto Memo; Day One Tr. at pp. 251:9–253:18.

224.    Eventually, Pottstown Hospital, LLC created and submitted a POC to PA DOH. *See* Pls.' Ex. 157, DOH Unannounced Medicare Sample Validation Survey with Approved POC; Day One Tr. at p. 246:16–17; Day Three Tr. at pp. 36:22–37:5, 75:3–5; Day Six Tr. at p. 101:23–24; Day Nine Tr. at pp. 74:4–81:13.

225.    PA DOH accepted the POC on January 30, 2019. Day Three Tr. at p. 75:8–14; Day Nine Tr. at p. 78:9–18; Day Six Tr. at pp. 110:9–13, 114:2–3.

226.    Updating Pottstown Hospital's life safety drawings was one of several elements of the POC. Day Six Tr. at p. 102:21–25.

227.    Pottstown Hospital, LLC also informed PA DOH that it would, in the future, "hire an engineer design consultant to determine the actual type of construction to the building" and inspect the structural elements so that they can "identify what corrective action they can take to correct that deficiency." *Id.* at pp. 102:23–25, 103:12–13, 104:3–7.

228.    Pottstown Hospital, LLC determined the planned corrective action would take a "significant period" to complete, so it requested a time-limited waiver of five years. *Id.* at p. 104:16–20.

229.    PA DOH granted the time-limited waiver. *Id.* at p. 102:6–9.

230.    Pottstown Hospital, LLC has continued to operate Pottstown Hospital at all times since. Day Seven Tr. at p. 146:1–12.

231.    After Pottstown Hospital, LLC received the CMS notice, it hired the fire protection engineering consulting firm, Jensen Hughes, to inspect and test the SFRM at Pottstown Hospital. Day Five Tr. at pp. 76:14–18, 91:21–22, 122:18–123:12.

232.    Hubert Worrell, the defendants' expert in the application of spray fireproofing material, reviewed the Jensen Hughes reports, as well as the structural plans for Pottstown Hospital, and formulated a plan for how he would approach repairing the fireproofing at the hospital. Tr. of Nonjury Trial Day Thirteen ("Day Thirteen Tr.,") at pp. 146:13–15, 147:2–9.

233.    In Mr. Worrell's opinion, the SFRM at Pottstown Hospital can be repaired by sweeping off the loose SFRM, spraying CAFCO Bondseal, letting it cure, performing a bond strength test to ensure the proper bond strength has been achieved, and then spraying new SFRM over the Bondseal to achieve the proper thickness. *Id.* at pp. 146:13–15, 148:11–150:7.

234.    Mr. Worrell prepared a fireproofing drawing report for each floor of Pottstown Hospital to create his estimate for the quantity and type of SFRM needed to achieve a two-hour fire rating for the steel beams and columns. *Id.* at pp. 183:23–188:7.

### F.    Accounting Claims

235.    In early 2020, the plaintiffs hired Paul Pocalyko as a forensic accounting expert. Day Seven Tr. at pp. 221:18–222:8; Day Eight Tr. at p. 66:8–10.

236.    Mr. Pocalyko testified that there are two contingent liability issues stemming from Pottstown HC's financial records: Pottstown Hospital's LSC building type deficiency ("K-tag Issue"); and an issue related to ASC 605/606 reporting ("ASC 605/606 Issue"). Day Eight Tr. at pp. 107:4–12, 107:17–25.

237.    Sean Kruskol, the defendants' forensic accounting expert, testified that Mr. Pocalyko's two opinions are baseless because his opinions are unsupported by the facts and

contradicted by contemporaneous management judgments. Day Fifteen Tr. at pp. 121:3–5, 168:6–10, 169:5–11.

### 1. The Defendants' GAAP Protocols, Processes, and Controls

238.   CHS has internal procedures to identify and disclose contingent liabilities and material liabilities. Day Fifteen Tr. at p. 98:3–5.

239.   After the hospital's CEO-CFO have identified a material liability or contingent liability, it is up to the corporate accounting department to determine if a liability should be recorded. *Id.* at p. 98:15–22.

240.   Occasionally, you do not need to record a liability, but you do have to disclose it in the financial statements. *Id.* at pp. 98:24–99:1.

241.   The accounting department prepares financial statements, including the footnotes to the financial statements where disclosures are noted. *Id.* at p. 99:15–18.

242.   CHS's disclosure committee reviews the draft financial statements and footnotes, and the CFO makes the final decision about what they disclose based on the recommendations from the disclosure committee. *Id.* at p. 100:10–25.

243.   Deloitte & Touche annually audits CHS's procedures for identifying and disclosing contingent and material liabilities. *Id.* at p. 101:7–16.

244.   Deloitte & Touche has never identified any material weaknesses in CHS's procedure. *Id.* at p. 101:17–20.

### 2. The ASC 605/606 Issue

245.   CHSI's estimates under ASC 605 were reviewed annually by independent auditors, which were never identified for any material weaknesses. *Id.* at pp. 15:11–16:1.

246.     CHSI completed the implementation of ASC 606 in January 2018. *Id.* at p. 30:10–12.

247.     As a result of implementing ASC 606, CHSI revised its contractual allowance and bad debt allowance calculations by a $591 million reduction in revenue, which is a quantitative disclosure. *Id.* at pp. 32:23–33:6, 46:23–47:2, 49:7–10, 54:12–15, 85:2–17.

248.     There is no way to know what portion of the $591 million dollar change in estimate related to any individual hospital, including Pottstown HC. *Id.* at p. 191:17–22.

249.     Neither CHS nor any individual hospital, including Pottstown HC, was required to make a disclosure related to the accounts receivable under the APA or GAAP. *Id.* at pp. 202:13–18, 203:3–6.

250.     No entity was required to implement ASC 606 until January 1, 2018; the continual use of ASC 605 standards was appropriate as of the October 1, 2017 closing. Day Eight Tr. at p. 70:19–22; Day Fifteen Tr. at p. 171:10–13.

### 3.     The K-Tag Issue

251.     Income statements are "a reflection of the current period of operations" for the specific time period identified. Day Seven Tr. at p. 232:12–16.

252.     As such, determinations regarding liabilities, contingent or otherwise, are made when the company prepares its financial statements. Day Fifteen Tr. at p. 141:16–20.

253.     A contingent liability needs to be disclosed when a loss is "reasonabl[y] possible and material." Day Eight Tr. at p. 94:5–9.

254.     Something qualifies as "material" based on the dollar amount and whether it is "unusual." *Id.* at p. 94:14–16.

255.    The combination of a change in the LSC, a capital expenditure request for updated Life Safety Plans, and the updated Life Safety Plans with a PA DOH note about the FSES, do not result in an event that requires a loss contingency analysis. Day Fifteen Tr. at p. 226:6–22.

256.    The lack of a contingent liability disclosure by the defendants, related to the K-tag issue or ASC 605/606 issue, was appropriate and did not violate GAAP. *Id.* at p. 229:18–23.

### III.    CONCLUSIONS OF LAW

257.    This court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1332(a), 1441.

258.    This court is the proper venue for this action as the plaintiffs brought the action in the Court of Common Pleas of Berks County, which is part of the Eastern District of Pennsylvania. *See* 28 U.S.C. § 118(a) ("The Eastern District comprises the counties of Berks, Bucks, Chester, Delaware, Lancaster, Lehigh, Montgomery, Northampton, and Philadelphia."); 28 U.S.C. § 1441(a) ("[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."); *Polizzi v. Cowles Magazines, Inc.*, 345 U.S. 663, 665–66 (1953) (explaining that 28 U.S.C. § 1441(a), and not the general venue provision, 28 U.S.C. § 1391(a), "provides . . . the proper venue [for] a removed action").

### A.    General Principles

#### 1.    Pennsylvania Contract Law

1.    Pennsylvania law applies to the interpretation of the APA because the contract includes a Pennsylvania choice of law provision. *See* APA at § 12.6.

2.      Under Pennsylvania law, plaintiffs seeking to proceed with a breach of contract action must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. 1999) (citing *Gen. State Auth. v. Coleman Cable & Wire Co.*, 365 A.2d 1347, 1349 (Pa. Commw. 1976)).

3.      The plaintiffs must prove each of these elements by a preponderance of the evidence for the court to find in their favor. *See Ragnar Benson, Inc. v. Bethel Mart Assocs.*, 454 A.2d 599, 602 (Pa. Super. 1982).

4.      Here, the parties do not dispute the existence of a valid contract. Accordingly, the court must determine whether the defendants breached a duty imposed by the APA and, if so, whether the plaintiffs suffered damages.

## 2.      Intent of the Parties

5.      In general, "[t]he fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself." *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006) (citations omitted); *see also Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 870 F.3d 244, 253 (3d Cir. 2017) ("The paramount goal of contract interpretation is to determine the intent of the parties. Pennsylvania contract law begins with the firmly settled principle that the intent of the parties to a written contract is contained in the writing itself." (internal quotation marks and citation omitted)).

6.      To discover this intent when the words of the contract are "clear and unambiguous," the court must look only to the express language of the agreement. *See Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982) ("It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and

unambiguous the intent is to be discovered only from the express language of the agreement." (citations omitted)); *see also East Crossroads Ctr., Inc. v. Mellon-Stuart Co.*, 205 A.2d 865, 866 (Pa. 1965) ("When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed.").

7.      The court determines whether an ambiguity exists as a matter of law. *See Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 389 (Pa. 1986) ("The court, as a matter of law, determines the existence of an ambiguity and interprets the contract . . . .").

8.      Contractual language is ambiguous only "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchison*, 519 A.2d at 390.

9.      A mere disagreement between the parties about a contract's interpretation does not render the contract ambiguous. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) ("[A] contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction." (quoting *Samuel Rappaport Family P'ship v. Meridian Bank*, 657 A.2d 17, 22 (Pa. Super. 1995)))

10.     Extrinsic or parol evidence is inadmissible to interpret an unambiguous contractual provision. *See Ins. Adjustment Bureau, Inc.*, 905 A.2d at 468.

11.     In the integration clause in Section 12.23, the parties agreed the APA "constitutes the entire agreement of whatsoever kind or nature existing between or among the parties respecting the within subject matter" and that "no oral statements or prior written material not specifically incorporated herein shall be of any force and effect." APA at § 12.23.

12. This section reflects the parties' intent that the APA is fully integrated, making parol evidence inadmissible to determine the meaning of the relevant sections of the APA. *See McGuire v. Schneider, Inc.*, 534 A.2d 115, 117–18 (Pa. Super. 1987) ("The effect of an integration clause is to make the parol evidence rule particularly applicable. Thus the written contract, if unambiguous, must be held to express all of the negotiations, conversations, and agreements made prior to its execution, and neither oral testimony, nor prior written agreements, are admissible to explain or vary the terms of the contract." (internal citations and footnote omitted)).

13. Both parties agree the relevant provisions in the APA are unambiguous. *See* Pls.' Mot. for Partial Summ. J. at p. 5 ("[T]he contractual language in the APA is unambiguous . . . ."), Doc. No. 106; *see also* Defs.' Br. in Supp. of Their Mot. for Summ. J. at p. 33 ("The provisions at issue are clear and unambiguous."), Doc. No. 108-1. The court agrees and finds that, although the parties interpret provisions of the APA differently, the relevant provisions are unambiguous because they are only subject to one reasonable interpretation. As such, the court will not consider extrinsic evidence in resolving the disputes in this case.

### 3. Principles of Contract Interpretation

14. Five principles of contract interpretation guide the court's analysis. *See City of Philadelphia v. Philadelphia Transp. Co.,* 26 A.2d 909, 912 (Pa. 1942).

15. First, "the entire contract should be read as a whole and every part interpreted with reference to the whole, so as to give effect to its true purpose." *Id.* (citations omitted).

16. Second,

"the contract itself must be read in the light of the circumstances under which it was made" and . . . it is necessary to "consider the situation of the parties at that time, the necessities for which they naturally provided, the advantages each probably sought to secure and the relation of the properties and rights in regard to which they negotiated."

*Id.* (quoting *Baseman v. Shell Union Oil Corp.*, 10 A.2d 881, 883 (Pa. Super. 1939)).

17.     Third, "where a public interest is affected, an interpretation is preferred which favors the public." *Id.* (citations omitted).

18.     Fourth, "specific provisions ordinarily will be regarded as qualifying the meaning of broad general words in relation to a particular subject." *Id.* (citations omitted).

19.     Finally, "unless contrary to the plain meaning of the contract, an interpretation given by the parties themselves will be favored." *Id.* (citations omitted).

### B.     The Plaintiffs Purchased Pottstown Hospital "AS IS"

20.     Section 3.22 of the APA specifically states that Pottstown Hospital was being sold in "AS IS" condition. APA at § 3.22. It expressly excludes all representations and warranties related to the physical condition of Pottstown Hospital. *See id.*

21.     Under Pennsylvania contract law, "when something is accepted 'as is' the buyer is put on notice that there may be liabilities attendant to the purchase. The warranties which may otherwise be implied by law do not attach when the buyer agrees to accept the [property] in the condition in which [it is] found." *PBS Coals, Inc. v. Burnham Coal Co.*, 558 A.2d 562, 564 (Pa. Super. 1989).

22.     Interpreting the introductory sentence in Section 3.22 to refer to all the representations and warranties in Section 3, as the plaintiffs argue is proper, would fail to give meaning to each provision in the APA. If Section 3.22 were read as a representation that Pottstown Hospital is being sold "as is," other than with respect to Pottstown HC's compliance with all statutes, rules, regulations, and requirements for healthcare facilities, Section 3.22 would fail to have meaning. A hospital cannot be sold "as is" while simultaneously representing compliance with the rules, regulations, or requirements that govern the hospital's physical condition.

23.     When the plaintiffs agreed to purchase Pottstown Hospital, they purchased a Type II (000) building. Day Two Tr. at pp. 20:22–21:14, 28:14–29:3. Pottstown Hospital's building type is a physical condition of Pottstown Hospital; because the plaintiffs purchased a Type II (000) building, the defendants' sale of a Type II (000) building does not constitute a breach of the APA.

24.     Consequently, the plaintiffs' claims based on Sections 3.6, 3.7, 3.8, 5.2, 5.3, and 5.4 of the APA (Counts I-III) are all rendered moot. For the sake of thoroughness, however, the court will address each count in turn.

### C.     Counts I–III: Noncompliance

25.     The plaintiffs' allegations in counts I-III are all based upon the assertion that Pottstown Hospital's physical condition was not in compliance with regulatory requirements at the time of execution and closing. CMS requires hospitals to comply with the LSC as a COP to receive Medicare payments; PA DOH likewise requires hospitals to comply with the LSC as a condition of its hospital license. The meaning of the term "in compliance" is essential to understanding whether the defendants met these requirements and, in turn, met their obligations under the APA.

26.     The APA did not define the term "compliance," so the parties will be held to the definition of compliance in the "specialized commercial and trade areas in which they deal." *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1013 (3d Cir. 1980). As a term of art in the healthcare industry, the court should interpret compliance "in accord with [its] specialized or accepted usage unless such an interpretation would produce irrational results or the contract documents are internally inconsistent." *Id.* (footnote omitted).

27.     Compliance refers to an AHJ's determination that a facility has complied with governmental statutes, licenses, and other requirements. *See* 42 C.F.R. § 488.26 (setting forth rules relating to determining compliance). Within the healthcare industry, the method for determining

whether a healthcare facility is in compliance is established by the Code of Federal Regulations, Pennsylvania statutes, and related guidance. *See* 35 P.S. § 448.903 ("It is the intent of this act to meet minimal Federal requirements for compliance with Federal law and regulations under Title XV of the Public Health Service Act requiring State certificate of need legislation as interpreted by the General Assembly." (internal footnotes omitted)). Surveys are the "means to assess compliance with Federal health, safety and quality standards." *Evelyn V. v. Kings Cnty. Hosp. Ctr.*, 956 F. Supp. 288, 291 (E.D.N.Y. 1997) (quoting 42 C.F.R. § 488.26(c)(1)); *see also* 42 C.F.R. § 488.26 (describing survey process); 35 P.S. § 448.802a (stating that a survey "determine[es] a health care facility's compliance with licensure requirements").

### 1.    Count I: Representations and Warranties

28.    The plaintiffs allege the defendants breached their representations and warranties in the APA relating to Pottstown Hospital, including Section 3.6 (licenses), Section 3.7 (Medicare participation / accreditation), and Section 3.8 (regulatory compliance). In each of these sections, the defendants represented they were "in compliance in all material respects" with various requirements for healthcare facilities.

### a.    Section 3.6: Licenses

29.    In Section 3.6 of the APA, the defendants represented and warranted they were in compliance in all material respects with their PA DOH license, which is an approval PA DOH grants healthcare facilities. *See* APA at § 3.6.

30.    An entity licensed in Pennsylvania is considered in compliance with its license. 28 Pa. Code § 101.51. PA DOH will not revoke or modify a hospital's license without providing written notice. 28 Pa. Code § 101.103.

31.     Here, the defendants did not receive written notice that Pottstown Hospital's license had been revoked or modified. Further, there were no statement of deficiencies, outstanding survey reports, inspection reports, or other notices of non-compliance prior to closing. Day One Tr. at p. 195:10–24; Day Two Tr. at p. 178:19–23.

32.     As such, the defendants met their obligations under Section 3.6 because they were in compliance in all material respects with the requirements of their PA DOH hospital license at execution and closing.

b.     Section 3.7: Medicare Participation / Accreditation

33.     In Section 3.7 of the APA, the defendants represented and warranted they were in compliance in all material respects with the Medicare, Medicaid, and CHAMPUS/TRICARE COP. APA at § 3.7.

34.     To participate in the Medicare program, a hospital must be certified as "in compliance" with CMS's COP, set forth by federal regulations. One of the conditions of participation is compliance with the LSC. 42 C.F.R. § 482.41(b)(1)(i); Day One Tr. at p. 77:10–14; Day Six Tr. at p. 37:22–24; Day Sixteen Tr. at p. 265:19–25.

35.     From May 12–15, 2015, TJC conducted an unannounced accreditation survey of Pottstown HC at Pottstown Hospital and granted the hospital an accreditation decision of "Accredited" with an effective date of May 16, 2015, and an expiration date of May 16, 2018. *See* Pl. Ex. 59, TJC Letter to PMMC re: Accreditation; Day Nine Tr. at pp. 41:9–42:7; Day Fourteen Tr. at pp. 55:24–25, 56:2–9; Day Eighteen Tr. at p. 23:14–19.

36.     TJC accreditation results in "deemed status," meaning the hospital can rely on a TJC survey to satisfy CMS's COP. Day One Tr. at pp. 81:21–82:15; Day Six Tr. at pp. 89:7–90:13; Day Nine Tr. at pp. 86:13–87:2.

51

37.     Pottstown HC was fully certified by CMS as of the execution and closing. Day Sixteen Tr. at pp. 257:13–260:16.

38.     As such, the defendants met their obligations under Section 3.7 because they were in compliance in all material respects with the CMS COP through closing, including 42 C.F.R. § 482.41(b)(1)(i).

c.     <u>Section 3.8: Regulatory Compliance</u>

39.     In Section 3.8 of the APA, the defendants represented and warranted that they were in compliance in all material respects with "all applicable statutes, rules, regulations, and requirements of the Government entities having jurisdiction over the Facilities and the operations of the Facilities." APA at § 3.8.

40.     At the closing of the transaction on October 1, 2017, Pottstown HC was licensed by PA DOH, had deemed status from TJC, and was certified by CMS. Day Seven Tr. at p. 115:9–13; Day One Tr. at p. 82:12–13; Day Nine Tr. at pp. 86:23–87:1, 88:1–10.

41.     Consequently, the defendants met their obligations under Section 3.8 because they were in compliance, as the healthcare industry uses that phrase, in all material respects with applicable requirements for healthcare facilities.

**2.     Count II: Breach of Covenants**

42.     The plaintiffs allege the defendants breached their covenants under the APA relating to Pottstown Hospital, including Section 5.2 (operations), Section 5.3 (negative covenants), and Section 5.4 (government approvals).

a.     <u>Section 5.2: Operations</u>

43.     In Section 5.2, the defendants agreed to use commercially reasonable efforts to maintain their relationships with third party payors, like CMS. *See* APA at § 5.2.

52

44.     Complying with the Medicare COP is a condition for hospitals to receive Medicare reimbursement, as well as to receive payment from third party insurance companies. Day One Tr. at pp. 74:11–20, 76:16–77:22; Pls.' Ex. 173, June 25, 2018 CMS Email with Survey and Important Notice; 42 C.F.R. § 482.41.

45.     Pottstown HC was fully accredited, fully licensed, and fully certified by CMS as of the execution and closing. Day Sixteen Tr. at pp. 257:13–260:16.

46.     At all relevant times, Pottstown HC and Pottstown Hospital were able to seek reimbursement for patient care from Medicare and Medicaid; accordingly, the defendants did not violate the covenants set forth in Section 5.2.

### b.     Section 5.3: Negative Covenants

47.     In Section 5.3, the defendants agreed they would refrain from taking any action that would result in any breach of the representations made in the APA. *See* APA at § 5.3.

48.     As previously noted in the analysis of count I, the defendants did not breach the representations of the APA and, therefore, did not violate the covenants set forth in Section 5.3.

### c.     Section 5.4: Governmental Approvals

49.     In Section 5.4, the defendants agreed to use reasonable efforts to obtain all governmental approvals or exemptions therefrom. The action (or inaction) that would give rise to this breach is the same as under Sections 3.7, 3.8, and 5.2. As such, the court reaches the same conclusion and finds in favor of the defendants.

50.     The defendants used all reasonable efforts to obtain governmental approvals and were not in violation of Section 5.4.

**3.      Count III: Breach of APA for Pottstown HC's Alleged Noncompliant Condition**

51.      The plaintiffs allege the defendants breached the APA by selling Pottstown Hospital "in a noncompliant condition on the Pertinent Dates that violated certain law and codes." Am. Compl. at p. 12.

52.      As already established, the plaintiffs have failed to demonstrate that the defendants were out of compliance with the applicable requirements for a healthcare facility like Pottstown Hospital. As the court has already concluded that Pottstown HC and Pottstown Hospital were in compliance as of the execution and closing, the court again concludes that the defendants did not breach the APA because they did not sell Pottstown Hospital in a noncompliant condition.

**D.      Count IV: Guarantee**

53.      The plaintiffs allege under count IV of the amended complaint that CHS is liable for any of Pottstown HC and Pennsylvania Hospital Company, LLC's breaches of the APA. *Id.*

54.      Because the guaranty language in Section 12.26 is only applicable to CHS if there is an underlying breach of the APA, and the court has concluded that the APA was not breached, this cause of action is moot.

**E.      Section 3.4 Violations**

55.      The plaintiffs claim the Pottstown Hospital financial statements disclosed to Tower Health before the October 1, 2017 closing did not comply with GAAP because they failed to disclose certain contingent liabilities, in breach of the APA.

56.      More specifically, the plaintiffs argue the income and balance statements violated the APA's GAAP requirements because the defendants did not disclose information related to Pottstown Hospital's building type, the "K-tag Issue," and CHSI's transition from ASC 605 to ASC 606, the "ASC 605/606 Issue."

57.     The defendants did not breach Section 3.4 of the APA because (1) at the time of execution and closing on the APA, Pottstown Hospital's financial statements were in conformance with GAAP and (2) the defendants did not have any contingent liabilities to disclose related to Pottstown Hospital.

58.     The defendants had no knowledge of any compliance issue at Pottstown Hospital prior to closing that would have required remediation. To the extent the building type deficiency PA DOH identified in its 2018 validation survey constituted a contingent liability, it would be improper under GAAP to impute the knowledge of PA DOH's findings in 2018 to the defendants at the time Pottstown Hospital's financial statements were issued. Similarly, there was no information related to a change in estimate for Pottstown Hospital's accounts receivable prior to the closing and, therefore, no contingent liability existed. Because no contingent liability existed at the time of closing, the financial statements were prepared in accordance with GAAP and the defendants did not breach Section 3.4 of the APA.

59.     Contingent liabilities are disclosed in the footnotes to financial statements. Day Fifteen Tr. at p. 99:15–18.

60.     Schedule 3.4 of the APA excluded footnotes from the information the defendants were obligated to provide with their financial statements. *See* APA at § 3.4.

61.     Because Section 3.4, via Schedule 3.4, excludes footnotes, the defendants were not obligated to identify contingent liabilities. Day Seventeen Tr. at pp. 96:11–97:25.

62.     Accordingly, even if Pottstown HC had the type of information that would typically be required to be disclosed under GAAP, such a disclosure would have been in the footnotes, which the parties expressly agreed to exclude.

63.    As such, the financial information provided by Pottstown HC under the APA was appropriate and the defendants did not breach Section 3.4.

### F.    The Defendants' Counterclaim

64.    Section 12.5 of the APA provides that the "prevailing party will be entitled to recover such legal expenses, including, without limitation, reasonable attorneys' fees, costs, and necessary disbursements at all court levels . . . ." APA at § 12.5.

65.    The court finds that the defendants are the prevailing party and are entitled to their reasonable attorneys' fees and costs based upon Section 12.5.

66.    The court awards defendants their reasonable attorneys' fees, expert and/or witness fees, and court costs in an amount the defendants shall prove by further submissions within 30 days of the entry of this judgment.

## IV.    CONCLUSION

The plaintiffs claim the defendants breached the APA by selling Pottstown Hospital in a noncompliant condition. For the reasons set forth above, Pottstown Hospital was in compliance at all material and relevant times. The defendants did not breach the APA and, as such, the court enters judgment in favor of the defendants. As the prevailing party, the defendants are entitled to their reasonable attorneys' fees and costs.

The court will enter a separate order and judgment.

BY THE COURT:

/s/ *Edward G. Smith*
EDWARD G. SMITH, J.